# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| CAREER COLLEGES & SCHOOLS OF TEXAS,<br><br>               Plaintiff,<br><br>    v..<br><br>U.S. DEPARTMENT OF EDUCATION, *et al.*,<br><br>               Defendants. | Case No. 4:23-cv-206-P |

## APPENDIX TO DEFENDANTS'
## MOTION TO DISMISS OR TRANSFER

| Document | Bates Number |
|---|---|
| Comment Submission of Career Education Colleges and Universities (Aug. 12, 2022) | 001 |

Dated: March 17, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Cody T. Knapp*
CHRISTINE L. COOGLE
CODY T. KNAPP (NY #5715438)
R. CHARLIE MERRITT
Trial Attorneys
U.S. Department of Justice
Civil Division
Federal Programs Branch

1100 L St. NW
Washington, D.C. 20005
Telephone: (202) 532-5663
Facsimile: (202) 616-8470
E-mail: cody.t.knapp@usdoj.gov

*Counsel for Defendants*



August 12, 2022

The Honorable Miguel A. Cardona
Secretary of Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

**Re:** **Comments of Career Education Colleges and Universities, and 14 Local and Regional Associations, in Response to the Proposed Student Loans and Affordability Regulations (Docket ID ED–2021–OPE–0077): Borrower Defense to Repayment, Arbitration, and Closed School Discharges**

Dear Secretary Cardona:

On behalf of Career Education Colleges and Universities ("CECU") and the undersigned associations, we submit the following comments in response to the U.S. Department of Education ("Department")'s Notice of Proposed Rulemaking ("NPRM" or "Proposed Rule") published in the July 13, 2022 Federal Register (87 Fed. Reg. 41,878). The following comments detail numerous concerns, and recommendations, regarding the Department's proposals for borrower defense to repayment, pre-dispute arbitration agreements, and closed school loan discharges.

CECU is a national trade organization with a membership of more than 750 accredited, postsecondary educational institutions throughout the United States, most of which participate in the Federal student financial assistance programs. CECU has long supported efforts to ensure that students are well served by the institutions they attend. However, we are deeply concerned that the Proposed Rule conflicts with the governing statute, threatens to impose liability without due process safeguards, and otherwise risks disproportionate financial and reputational harm to

schools, educational harm to students, and budgetary harm to the public fisc, all without sufficient meaningful analysis to date of the costs and impact of the contemplated rule.

The primary concern of CECU, its member institutions, and the undersigned associations (collectively, the "Submitters") is the well-being of our Nation's students and their preparation for productive careers. CECU shares the Department's goals of preventing fraud and deception against students who incur debt to pursue postsecondary education, and of holding accountable the institutions responsible for such misconduct. However, the Proposed Rule does not advance those policy goals. Indeed, the Department's current proposal fails to protect the rights of schools, notwithstanding their status or whether they are bad or good actors. The proposals thus present a very real risk that good schools, those that have not engaged in bad faith conduct, will be unable to defend against, and thus be subject to liability for, stale and unsubstantiated claims.

We are also concerned that the proposed revisions to the closed school discharge rule are inconsistent with the Higher Education Act and will expose schools to unwarranted liability, and create a perverse incentive structure. Furthermore, by disseminating inaccurate, incomplete, and unreliable information to the public, the Proposed Rule fails to adopt a basic standard of information or data quality in violation of the Department's Information Quality Guidelines. Collectively, the proposed reforms purport to serve the interest of students, when really they are intended to ensure the greatest number of loan discharges and harm disfavored schools.

Accordingly, we strongly believe that the Department must withdraw the NPRM, seek to correct its weaknesses and uncertainties and resubmit it to the many affected constituencies for consideration. A failure to do so—and a decision to implement the Proposed Rule as written— will put in place a system that will be impractical for the Department to administer, be nearly

The Honorable Miguel A. Cardona
Secretary of Education
Page 3 of 137

impossible for institutions to navigate, cause unwarranted harm to many worthy institutions, and

in the end, fail to serve the best interests of the very students it is meant to protect.

We appreciate the opportunity to comment on these proposed regulations and for your

careful consideration of the issues raised in the attached comment.

Should you require any additional information or further clarification, please contact

Nicholas Kent, Chief Policy Officer, at Nicholas.Kent@career.org or 571-800-6524.

Sincerely,

Jason Altmire, DBA
President and CEO


On behalf of:

Arizona Private School Association
California Association of Private Postsecondary Schools
Career Colleges & Schools of Texas
Colorado Association of Career Colleges and Schools
Florida Association of Postsecondary Schools and Colleges
Georgia Alliance for Career Education
Louisiana Association of Private Colleges and Schools
Mid-Atlantic Association of Career Schools
Nevada Association of Career Colleges
Northwest Career Colleges Federation
Northwest Career Colleges Idaho
Ohio-Michigan Association of Career Colleges and Schools
Private College and School Association of New Jersey
The Coalition of New York State Career Schools



**TABLE OF CONTENTS**

CECU COMMENT SUBMISSION IN RESPONSE TO THE JULY 2022 NPRM ...................................... 6

I.    The Department Lacks Statutory Authority to Fashion the Novel Adjudication System for
      Loan Forgiveness and Liability Shifting Proposed in the BDR Rule ..................................... 7

II.   The Department's Effective Dates of the Federal Standards Violate the Rule against
      Retroactive Rulemaking ..................................................................................................... 17

III.  The Department's Elimination of a Statute of Limitations is Unlawful and Deprives Schools
      of Critical Rights ................................................................................................................. 24

IV.   The Multiple BDR Grounds that the Department Proposes Are Unlawful ....................................... 28

      1.   The Department's proposed "substantial misrepresentation" standard would deprive
           schools of due process, is without legal precedent, and would form the basis for the bulk
           of borrower claims ........................................................................................................ 32

      2.   The proposal to recognize a freestanding "omission of fact" BDR claim is arbitrary and
           capricious, and creates amorphous duties for institutions and creates existential liability
           risks that cannot be fully anticipated .......................................................................... 43

      3.   The Department's inclusion of breach of contract as a basis for a BDR claim is
           constitutionally infirm and does not satisfy the Department's obligation to define "acts
           and omissions" under the statute. ................................................................................ 46

      4.   The "aggressive recruitment" provision does not satisfy the statute and its inclusion is
           arbitrary and capricious. ............................................................................................... 56

      5.   The Department's proposal to include any "contested judgment against an institution
           based on any State or Federal Law" as a basis for a BDR claim amounts to an
           unauthorized expansion of the borrower defense framework. ................................... 60

      6.   The proposed regulation violates the statute, the Constitution, and the Administrative
           Procedure Act in attempting to include Department final actions as a basis for a
           borrower defense claim ................................................................................................ 65

V.    The Group Process Proposal Violates the Statute, is Arbitrary and Capricious, and
      Violates the Due Process Rights of Schools ...................................................................... 67

      1.   The group process proposal violates the HEA. ............................................................ 67

      2.   The group process proposal is arbitrary and capricious. ............................................. 71

      3.   The group process proposal violates due process. ...................................................... 76

VI.   The Department's Reconsideration Proposal Is Unlawful ................................................. 77

VII.  The Department's Proposal for Assessing Discharge Amounts Violates the HEA
      and is Arbitrary and Capricious ......................................................................................... 80

1.  The discharge proposal violates the statute. ............................................................. 80

2.  The discharge proposal is arbitrary and capricious. .................................................. 84

VIII.  The Proposed Recoupment Procedures Violate the Statute, the Constitutional
Rights of Institutions, and the APA ....................................................................... 92

1.  The proposed recoupment procedures violate the statute. ..................................... 92

2.  The proposed recoupment procedures violate the Constitution. .............................. 99

3.  The proposed recoupment procedures violate the APA. ......................................... 105

IX.  The Department has Unlawfully Expanded the Definition and Scope of a Closed School
Discharge and Lacks the Authority to Impose Closed School BDR Liability upon
Affiliated Persons ................................................................................................ 107

1.  The Department's expansion of the definition of a "closed school" is contrary to
the statute. ....................................................................................................... 107

2.  The Department has unlawfully expanded the categories of borrowers who may be
entitled to closed school discharge, and relieved many borrowers of the requirement
to complete an application seeking relief. ........................................................... 109

3.  The proposed closed school discharge rule violates schools' due process rights. .................. 113

4.  The Department lacks statutory authority to impose closed school BDR liability
against affiliated persons .................................................................................... 113

X.  The Department's Proposed Application of the BDR Rule to FFEL and Perkins Loans
Violates the Statute ............................................................................................ 118

XI.  The Department's Prohibition on Pre-Dispute Arbitration Agreements and Class Action
Waivers Contravenes the Federal Arbitration Act, Restricts the Freedom of Contract,
and Fails to Consider the Benefits of Arbitration ................................................. 122

XII.  The Department's Cost/Benefit Analysis is Incomplete and Flawed ........................... 130

CONCLUSION .............................................................................................................. 134

**CECU** | Career Education
Colleges and Universities

## CECU COMMENT SUBMISSION IN RESPONSE TO THE JULY 2022 NPRM

CECU and the undersigned associations submit these comments to highlight for the Department numerous deficiencies in the NPRM that warrant withdrawing the Proposed Rule. The most reasonable course would be for the Department to withdraw the Proposed Rule in its entirety, undertake a comprehensive evaluation, and then resubmit it for consideration. At a minimum, the NPRM must be substantially revised to be consistent with the Higher Education Act of 1965, as amended ("HEA"), and the Constitution. The Department has a responsibility to ensure that schools are afforded due process while the Department works to protect and serve the interests of students, and the current proposal does not align with the Department's obligations or congressional intent.

The many flaws in the Proposed Rule are not surprising, given that the NPRM is the product of a flawed negotiated rulemaking process. For example, negotiated rulemaking sessions were held virtually (despite Federal return-to-work policies), proprietary institutions were marginalized during the process (the industry was afforded only a single representative while the Committee included numerous stakeholders from organizations that historically have taken positions that are adverse to proprietary schools), and multiple disparate topics were addressed in a compressed timeframe without a meaningful opportunity for evaluation and discussion. Thus, most topics did not result in consensus, and now the Proposed Rule includes numerous problematic points.

Moreover, the Department's accelerated 30-day comment period provides insufficient time for affected parties to submit comprehensive comments on the sweeping changes

The Honorable Miguel A. Cardona
Secretary of Education
Page 7 of 137

proposed, and therefore prejudices CECU's members, other postsecondary institutions, and other members of the public that may wish to participate in the comment process. Nevertheless, CECU presents the following points for the Department's consideration.

I.   **The Department Lacks Statutory Authority to Fashion the Novel Adjudication System for Loan Forgiveness and Liability Shifting Proposed in the BDR Rule**

Section 455(h) of the HEA provides that "the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan," except that the borrower may not recover "in any action arising from or relating to a loan made under this part" more than the amount already repaid.[1] From that single sentence, which was largely dormant for the first two decades of its existence, springs the sprawling proposed Borrower Defense to Repayment ("BDR") Rule.[2] The BDR Rule creates novel, slanted adjudicatory schemes and evidentiary presumptions to accomplish both massive loan forgiveness for borrowers and the shifting of correspondingly massive financial liability and risk to the Nation's institutions of higher education.

Beyond simply identifying defenses, the BDR Rule (among other things) converts defenses into affirmative claims that are not subject to limitation periods; weaves from whole cloth both individual and group adjudicatory processes for the resolution of those claims according to precise and arbitrary timelines; inappropriately designates State officials as representatives of borrower groups; crafts rules of evidence and pro-borrower evidentiary presumptions of reliance, adverse effect, and full discharge; imposes conflicting recordkeeping requirements on

---

[1] 20 U.S.C. § 1087e(h).
[2] 87 Fed. Reg. 41,976-41,979, 41,992-41,996, 42,002-42,010; *see also id.* at 41,883-41,891 (preamble).

The Honorable Miguel A. Cardona
Secretary of Education
Page 8 of 137

institutions; expands the loans subject to a BDR beyond congressional authorization; develops

processes for shifting liability to institutions, without due process or any colorable opportunity

to develop a defense; declares limitations periods for institutional liabilities; assigns BDR liability

to non-signatories of Program Participation Agreements ("PPAs"); and bans pre-dispute

arbitration agreements and class action waivers. The Department's own (woefully low) estimate

is that as much as $29 billion in the next 10 years in borrower defense claims will be granted

under the relaxed standards and procedures proposed[3], much of which the Department would

attempt to recover from schools. Section 455(h) is one mighty sentence, in the Department's

conception.

The Department never explains how the single sentence of Section 455(h) serves as an

open-ended grant of power to the Department to reshape radically the financial landscape of

postsecondary education and affix potentially billions of dollars of liability to schools and

taxpayers annually. Notably, Section 455(h) is a minor provision of the HEA and was rarely

invoked in its first two decades of existence. When the Department first promulgated a BDR Rule

in late 1994 ("the 1994 Rule"), that Rule (with some exceptions) at least attempted to hew to the

plain language: it recognized a State law defense that could be asserted in existing formal

collection proceedings. The 1994 Rule provided that "[i]n *any proceeding to collect on a Direct*

*Loan,* the borrower may assert as a defense against repayment, any act or omission of the school

attended by the student that would give rise to a cause of action against the school under

applicable State law."[4]  The Department commented that "the regulations identify *formal*

---

[3] 87 FR 41878, 41961 (Table 8).
[4] 34 C.F.R. § 206(c) (1995) (emphasis added).

The Honorable Miguel A. Cardona
Secretary of Education
Page 9 of 137

*proceedings* in which borrowers may raise the acts or omissions of the school as a defense against collection of the loan,"[5] which would include "(i) Tax refund offset proceedings under 34 CFR 30.33"; "(ii) Wage garnishment proceedings under Section 488A of the Act"; "(iii) Salary offset proceedings for Federal employees under 34 CFR Part 31"; and "(iv) Credit bureau reporting proceedings under 31 U.S.C. § 3711(f)."[6] The Department did not erect any novel scheme to adjudicate borrower defenses on the authority of the rule for the first 20 years of its implementation of Section 455(h).

Confronted with the closure of the Corinthian Colleges, Inc., schools in 2015, the Department in 2016 for the first time shifted to an interpretation of Section 455(h) that allowed it to adjudicate BDR claims administratively by group process.[7] The Department, partially retrenched with a change in administration, eliminated the group process provision in the 2019 Rule.[8] But now the Department seeks not only to resurrect a group process but to design it to make loan discharge virtually assured even if the borrower was unaffected by the claimed institutional act or omission. In this regard, it is ironic that the Department repeatedly touts this rulemaking as directed to "developing a regulation that would provide for fair treatment of borrowers who had been harmed by an institution's act(s) or omission(s),"[9] and justifies its relaxed substantive standards (such as eliminating any requirement that an actionable misrepresentation be intentional) by asserting that "the actions by the institution have resulted in harm to the borrower and the Department's obligation is to provide relief to ameliorate that

---

[5] 59 Fed. Reg. 61,671 (emphasis added).
[6] 34 C.F.R. § 206(c) (1995).
[7] 81 Fed. Reg. 75,926, 75,965.
[8] 84 Fed. Reg. 49,798.
[9] 87 Fed. Reg. 41,885.

harm when the evidence warrants."[10] But the purpose of the BDR Rule should be to determine *whether* a borrower was harmed and should thereby be relieved of her contractual obligation of repayment. The Department strips away the traditional guardrails with the objective of making it easier for borrowers to establish claims. By eliminating any requirement that a borrower show adverse effect (much less financial harm) from an institutional act or omission, the Department has refashioned the borrower defense rule into one that achieves mass loan forgiveness, a policy priority of the Biden administration.[11]

The Department is grossly misusing its limited BDR authority to accomplish indirectly a political goal that it cannot accomplish directly through the legislative process. The President has expressed a desire to cancel up to $10,000 of student loan debt, but acknowledges that he cannot do so by executive fiat.[12] Congress has such authority, but debt cancellation faces strong political crosswinds. Some Democrats want universal cancellation of all student debt,[13] while many Republicans oppose debt cancellation.[14] With congressional relief unavailable, "[t]he Biden administration's approach to student loan relief began with improving, extending or expanding

---

[10] 87 Fed. Reg. 41,889.

[11] U.S. Senate Committee on Health, Education, Labor and Pensions, "Members: It is clear that your agency does not care about the limits of its executive authority or the perilous economic impact of its actions," https://www.help.senate.gov/ranking/newsroom/press/burr-foxx-demand-clarity-on-bidens-statutory-authority-on-student-loan-repayment-freeze-forgiveness (last visited August 9, 2022).

[12] Cory Turner, *Biden pledged to forgive $10,000 student loan debt. Here's what's he's done so far,* National Public Radio, https://www.npr.org/2021/12/07/1062070001/student-loan-forgiveness-debt-president-biden-campaign-promise ("NPR Article").

[13] Zach Friedman, *Senator: Cancel All Student Debt,* Forbes Magazine (April 7, 2022) https://www.forbes.com/sites/zackfriedman/2022/04/07/bernie-sanders-cancel-student-loans-all-of-it/?sh=7250b6903a93.

[14] Aris Folley and Emily Brooks, *GOP steps up attacks on canceling student debt,* The Hill (May 3, 2022), https://thehill.com/policy/finance/3474583-gop-steps-up-attacks-on-canceling-student-debt/.

a handful of programs that were already on the books," including the BDR Rule.[15] "'We're working really hard to get students the relief that they're entitled to' through these preexisting programs," Under Secretary of Education James Kvaal has repeatedly told the press.[16] The potential contentiousness of this important issue "makes the oblique form of the claimed delegation all the more suspect."[17]

The Department never explains how a precise *rulemaking* grant made for the limited purpose of identifying acts or omissions of schools that borrowers can "assert" as defenses to repayment "in any *action* arising from or relating to a loan made under this part"[18] arrogates to the Department a vast and unconventional adjudicatory and loss-recovery authority. Where Congress grants rulemaking powers "to be exercised in specific ways," those limitations must be observed.[19] As the D.C. Circuit has opined, "[w]here Congress prescribes the form in which an

---

[15] NPR Article, *supra.*

[16] NPR Article, *supra. See also* Hugh T. Ferguson, *Kvaal Highlights 'Complex' Nature of Efforts to Implement Student Debt Cancellation*, National Association of Student Financial Aid Administrators ( https://www.nasfaa.org/news-item/27656/Kvaal_Highlights_Complex_ Nature_of_Efforts_to_Implement_Student_Debt_Cancellation (last visited August 9, 2022); Lili Stenn, *U.S. Education Under Secretary Kvaal Outlines Efforts to Expand Student Loan Relief*, Roguerocket (Jul. 20, 2022), https://roguerocket.com/2022/07/20/under-secretary-kvaal-expand-student-loan-relief/ (last visited August 9, 2022); James Kvaal (@UnderSecKvaal), Twitter (April 20, 2022) ("Already the Biden Administration has canceled 725,000 entire debts for borrowers in public service, who became disabled, or who were cheated by their colleges – while investing more in Pell grants and college oversight to prevent future abuses.").

[17] *West Virginia*, 142 S.Ct. at 2614 (quoting *Gonzales*, 546 U.S. at 267-68).

[18] 20 U.S.C. § 1087e(h) (emphasis added). "An action refers to a judicial proceeding." Legal Information Institute, Wex, "action," https://www.law.cornell.edu/wex/action; Merriam-Webster Online Dictionary ("action": "the initiating of a proceeding in a court of justice by which one demands or enforces one's right; also: the proceeding itself"). *Cf.* Fed. R. Civ. P. 2 ("There is one form of action: the civil action.").

[19] *Gonzales v. Oregon*, 546 U.S. 243, 259 (2006).

agency may exercise its authority, [one] … cannot elevate the goals of an agency's action, however reasonable, over that prescribed form."[20]

Although determinations of public rights can be committed to agency adjudication, that decision belongs exclusively to Congress.[21] "Agencies have only those powers given to them by Congress,"[22] and Congress must *expressly* grant the power of adjudication to agencies.[23]

The courts have repeatedly rejected the attempts of agencies to exercise adjudicatory powers that were not affirmatively granted by Congress.[24] Section 455(h) gives the Department rulemaking power to define borrower defenses based on institutional acts and omissions; it

---

[20] *Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1364 (D.C. Cir. 1990); *Motion Picture Ass'n of America v. FCC*, 309 F.3d 796 (D.C. Cir. 2002) (power to issue closed captioning regulations did not support video description regulations).

[21] *See Atlas Roofing Co. v. Occupational Safety and Health Review Comm'n*, 430 U.S. 442, 452, 460–61 (1977) (for public rights determinations, "'Congress may reserve to itself the power to decide, may delegate that power to executive officers, or may commit it to judicial tribunals.'") (quoting *Crowell v. Benson*, 285 U.S. 22, 50 (1932)).

[22] *West Virginia*, 142 S.Ct. at 2609.

[23] *National Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563, 1569 (D.C. Cir. 1987) ("the delegation of adjudicative authority to an agency that is empowered to hear disputes, receive settlement proposals, and enter binding orders *is explicit*—it closely resembles a direct congressional authorization to implement the provisions of a statute through regulations.") (emphasis added).

[24] *See*, *e.g.*, *Bank One Chicago, N.A. v. Midwest Bank & Trust Co.*, 516 U.S. 264, 273, 275 (1996) (finding that the Federal Reserve Board, despite having rulemaking authority, lacked the authority to adjudicate interbank disputes because the statutory text did not authorize "the Federal Reserve Board to function as both regulator and adjudicator in interbank controversies," and did "not explicitly confer adjudicatory authority on the Board, nor 'set forth the relevant procedures' for resolution of private disputes"); *Coit Independence Joint Venture v. Federal Sav. and Loan Ins. Corp.*, 489 U.S. 561, 572-74 (1989) (holding that statute did not grant the Federal Savings and Loan Insurance Corporation to adjudicate creditor's claims, given lack of explicit conferral of such authority or definition of procedures); *Equitable Equipment Co. v. Director, Office of Worker's Compensation Programs,* 191 F.3d 630, 632-33 (5th Cir. 1999) (holding that Longshore and Harbor Workers' Compensation Act did not authorize adjudication of contract disputes between employers and insurers); *White v. United States*, 989 F.2d 643, 647 (3d Cir. 1993) (holding that Interstate Commerce Act did not authorize the Interstate Commerce Commission to adjudicate undercharge claims).

grants no power of adjudication, much less any power to prescribe evidentiary presumptions and rules governing such adjudications and the assignment of liability to schools.

Invoking the fundamental distinction between quasi-legislative rulemaking and quasi-judicial adjudications, the Ninth Circuit has held that a grant of rulemaking authority does not grant the agency power to adjudicate cases applying that rule. Specifically, the Court held that the statutory grant of the power to the Commissioner of Internal Revenue to promulgate regulations on depletion allowances "does not subsume within it the power to decide individual cases," and instead "merely gives the Commissioner the authority to prescribe regulations setting forth standards by which courts will determine the reasonableness of depletion allowances."[25] Section 455(h)'s grant of rulemaking power does not authorize adjudication of borrower defenses to repayment, nor an institution's liability to the Government for that amount.

The Department devotes little analysis to its authority to adjudicate borrower defenses. Repeating almost verbatim an unanalyzed sentence from the 2016 rule, when the Department first developed an administrative adjudicatory scheme for borrower defenses, the Department declared:

> Congress authorized the Department to determine subordinate questions of procedure for borrower defense cases, including but not limited to the scope and nature of alleged acts or omissions that satisfy borrower defense requirements, how to process borrower claims, and whether claims should be heard successively or as a group. See 81 FR at 75965 (generally citing *FCC v. Pottsville Broad. Co.*, 309 U.S. 134, 138 (1940)). The Department thus has general authority to adjudicate claims as a group.[26]

---

[25] *RLC Indus. Co. v. CIR*, 58 F.3d 413, 417-18 (9th Cir. 1995).
[26] 87 Fed. Reg. 41,899.

The Honorable Miguel A. Cardona
Secretary of Education
Page 14 of 137

The Department's rationale offends the settled principles of law recounted above. Agencies do not have unbridled authority to develop adjudicatory systems and procedures in the absence of an express statutory grant of adjudicatory power; rather, "the formulation of procedures was basically to be left within the discretion of the agencies *to which Congress had confided the responsibility for substantive judgments.*"[27]

Not only is there no textual hook for the Department's novel adjudicatory and liability-shifting scheme, but one would not expect Congress to grant such far-reaching authority on such a slender statutory basis. As the U.S. Supreme Court has recently admonished in *West Virginia v. Environmental Protection Agency*,[28] the fundamental inquiry into agency authority is "whether Congress in fact meant to confer the power the agency has asserted."[29] The "words of a statute must be read in their context and with a view to their place in the overall statutory scheme."[30] Under the major questions doctrine, it is presumed that "Congress intends to make major policy decisions itself, not leave those decisions to agencies."[31] When the agency arrogates far-reaching powers to itself, the "'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority."[32] Even where (unlike here) a regulation has a colorable textual basis, both courts and agencies must be aware that

---

[27] *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 524 (1978) (emphasis added); *Atlantic Richfield Co. v. U.S. Dept. of Energy*, 769 F.2d 771, 784 (D.C. Cir. 1984) ("the Secretary's power to adjudicate" requires "a substantive grant of authority").

[28] 142 S.Ct. 2587, 2609 (2022).

[29] *West Virginia*, 142 S. Ct. at 2608.

[30] *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

[31] *Id.* at 2609 (internal quotation marks omitted).

[32] *Id.* at 2608 (quoting *Brown & Williamson*, 529 U.S. at 159-60).

The Honorable Miguel A. Cardona
Secretary of Education
Page 15 of 137

"[e]xtraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices."[33] Nor "does Congress typically use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme."[34] An agency cannot "seek to hide 'elephants in mouseholes.'"[35] Rather, there must be a "clear congressional authorization" of the rule that the agency propounds.[36]

The BDR Rulemaking has strong parallels to the EPA rulemaking that the Supreme Court struck down in *West Virginia*. Because Congress had declined to enact climate change legislation, the EPA seized upon a statutory provision that required adoption of the "best system of emission reduction" for certain existing pollution sources.[37] This "ancillary" statute "had been rarely used in the preceding decades," and had been interpreted to require technology-based solutions.[38] The EPA nonetheless promulgated a new rule interpreting "system of emission reduction" to include an emissions cap plan that would force utilities to shift electrical generation from coal plants to plants using cleaner fuels. The Supreme Court struck down the rule, finding no "clear congressional authorization" to the EPA to decree emissions caps incentivizing utilities to shift away from coal-based generation plants, and certainly none "in the previously little-used backwater" of the statutory section invoked.[39]

There is no textual basis for the BDR Rule adjudicatory scheme that the Department propounds. But even if the Department's interpretation were a definitional possibility, it would

---

[33] *Id.* at 2609 (internal quotation marks and brackets omitted).
[34] *Id.* (internal quotation marks and brackets omitted).
[35] *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001).
[36] *West Virginia*, 142 S.Ct. at 2614 (internal quotation marks omitted).
[37] 42 U.S.C. § 7411(a)(1), (d).
[38] *West Virginia*, 142 S.Ct. at 2602, 2610-11.
[39] *Id.* at 2613-14.

have to be rejected because there is no "'clear congressional authorization' to regulate in that manner."[40] As in *West Virginia*, Section 455(h) is a minor provision that was for the first two decades interpreted to refer to defenses in collection proceedings. The Department's rule refashions that modest statutory authority as the wellspring of power to address a matter of great political significance involving a significant portion of the American economy, on which the country's major political parties are deeply divided.[41] The Proposed Rule projects billions of dollars of burden on the public fisc, through both foregone loan cancellation and reimbursement for past payment, especially by applying new Federal standards retroactively to borrower claims arising from past acts wherein the liability cannot be shifted to schools. Prospectively, the Proposed Rule threatens educational institutions with potentially existential liability even for inadvertent acts. In disavowing the general power of mass debt cancellation, the Department has recognized that "Congress does not impliedly delegate a policy decision of massive economic and political magnitude – as blanket or mass cancellation, compromise, discharge, or forgiveness of student loan principal balances, or the material modification of the repayment terms or amounts thereof, surely would be – to an administrative agency."[42] The broad debt cancellation powers embedded in the BDR Rule are likewise not the kind of matter that Congress would delegate to the Department in obscure fashion. The Department may not attempt to squeeze the debt cancellation elephant into the Section 455(h) mousehole.

---

[40] *Id.*

[41] *See id.* at 2616, 2620-21 (Gorsuch, J., concurring) (identifying factors for identifying major questions where congressional delegation must be clear).

[42] U.S. Department of Education, Office of the General Counsel, Memorandum to the Secretary Re: Student Loan Principal Balance Cancellation, Compromise, Discharge, and Forgiveness Authority, at 2 (Jan. 12, 2021).

The Honorable Miguel A. Cardona
Secretary of Education
Page 17 of 137

For all these reasons, the BDR Rule as a whole is *ultra vires* and must be abandoned. And,

as detailed below, the major components of that rule likewise are unlawful.

## II.   The Department's Effective Dates of the Federal Standards Violate the Rule against Retroactive Rulemaking

It is a bedrock principle that an agency cannot engage in retroactive rulemaking without

congressional authorization.[43] A rule is retroactive if, among other things, it operates to "create

a new obligation, impose a new duty, or attach a new disability, in respect to transactions or

considerations already past."[44] A rule is thus retroactive if "the new provision attaches new legal

consequences to events completed before its enactment."[45] As the Supreme Court has stated:

> Elementary considerations of fairness dictate that individuals should have an
> opportunity to know what the law is and to conform their conduct accordingly;
> settled expectations should not be lightly disrupted. For that reason, the principle
> that the legal effect of conduct should ordinarily be assessed *under the law that
> existed when the conduct took place* has timeless and universal appeal.[46]

**1.** The Department appears to have recognized this principle in part. Backing away from

the position it took in the negotiated rulemaking, the Department declares, "[t]he Department

does not think it would be appropriate to hold an institution financially liable when the standard

in place at the time the loan was disbursed would not have resulted in an approved claim, since

the institution would not have had a way of knowing that *certain types of conduct* could later

---

[43] *See Bowen v. Georgetown University Hosp.*, 488 U.S. 204, 208 (1988) ("a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms") (citing *Brimstone R. Co. v. United States*, 276 U.S. 104, 122 (1928) ("The power to require readjustments for the past is drastic. It ... ought not to be extended so as to permit unreasonably harsh action without very plain words")).

[44] *Vartelas v. Holder*, 566 U.S. 257, 266 (2012) (brackets and internal quotation marks).

[45] *Landgraf v. USI Film Products*, 511 U.S. 244, 270 (1994).

[46] *Id.* at 265 (emphasis added); *National Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 158 (D.C. Cir. 2010).

The Honorable Miguel A. Cardona
Secretary of Education
Page 18 of 137

lead to financial consequences."[47] Later, the Department states that "[i]nstitutions would only face recoupment *for conduct* that would have been approved under the regulation that governed the conduct at the time it occurred in the amount that would have been granted under that regulation."[48] And the Department states that "institutions would not face recoupment for conduct approved solely under the new Federal standard *if the conduct* occurred prior to July 1, 2023."[49]

But although it recognizes that it cannot retroactively attach legal consequences to earlier *conduct*, the Department's proposed remedy is inadequate. It purports to attach recoupment liability based on the legal standard that is in effect at the time of a loan's disbursement date:

> [I]nstitutions would not be subject to recoupment actions for applications that are granted based upon this regulation that would not have been approved under the standard applicable *based upon the loan's disbursement date*, which could be the 1994, 2016, or 2019 regulations. Institutions would also not be subject to recoupment for amounts greater than what would have been approved under the applicable regulation at the time the loans were disbursed.[50]

This is incorrect. If new legal consequences are attached to conduct occurring before the promulgation of a new rule, the rule is impermissibly retroactive. The disbursement of a loan is not the institutional conduct being penalized by the new BDR standard; it is the act or the

---

[47] 87 Fed. Reg. 41,888 (emphasis added).
[48] 87 Fed. Reg. 41,912 (emphasis added).
[49] 87 Fed. Reg. 41,885 (emphasis added).
[50] 87 Fed. Reg. 41,887 (emphasis added); *see also id.* at 41902 ("an institution would only be subject to a recoupment action if the claim would have been approved under the borrower defense regulation in place at the time the loans that are being approved were disbursed. That means an institution would not be subject to a recoupment action for loans disbursed prior to July 1, 2023, under this Section unless those claims also would have been approved under the 1994, 2016, or 2019 regulations, as applicable."); *id.* at 41909 ("[T]he Department would ensure that institutions are not subject to a recoupment effort from a claim that would not have been approved under the regulation that would otherwise have been applied to the claim based upon the loan's disbursement date"); *id.* at 41912, 41940 (same).

omission of the school. A school is entitled to notice of the legal standard so that it can conform its conduct to that standard, and thus "the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place."[51] At a minimum, the legal standards set by the 1994, 2016, 2019, and 2023 rules cannot apply to any act or omission of an institution occurring before the effective date of those regulations, even if the disbursement date occurs after the promulgation of the applicable standard. Furthermore, the Department should clarify that it will not exercise its authority under 20 U.S.C. § 1094(c) to suspend or terminate an institution's eligibility to participate in the Federal loans program or to impose civil penalties or participation restrictions for conduct that violates a Departmental regulation unless the conduct antedated the effective date of that regulation.

This change is particularly important if the Department maintains its consolidation rule. The Department treats as the applicable disbursement date the date on which the consolidated loan is disbursed, rather than the disbursement date of the original Direct Loan, Federal Family Education Loan ("FFEL"), or Perkins loan.[52] The FFEL and Perkins programs were discontinued in 2010 and 2017 respectively[53]; any act or omission that might conceivably give rise to a borrower defense in relation to those loans necessarily happened before those times. But those acts or omissions cannot be governed by the new harsher legal standard simply because the consolidation loan (which may now be executed *after* the borrower defense is approved) is deemed disbursed after 2023. The applicability of the various legal standards in the 1994, 2016,

---

[51] *Landgraf*, 511 U.S. at 265.
[52] 87 Fed. Reg. 41,887 ("the Department treats the date of the consolidation loan as the one used to determine what regulation their claim should be adjudicated under").
[53] *Id.* 41,938.

The Honorable Miguel A. Cardona
Secretary of Education
Page 20 of 137

2019, and 2023 rules should at a minimum turn on whether the effective date of the regulation occurs before the act or omission, and should not turn on the loan disbursement date.

**2.** Nevertheless, even with that fix, the rule would still violate the rule against retroactive rulemaking because it declares illegal conduct that predates the new rule, with severe consequences. The Department's attempt—unique to this borrower defense rulemaking—to avoid triggering the rule against retroactive rulemaking by asserting that it is decoupling the approval of a borrower defense claim from the adjudication of recoupment against an institution does not save it from the rule against retroactive rulemaking. By declaring illegal certain conduct that predates the new rule, the Department's proposal has three significant consequences that trigger the prohibition on retroactive rulemaking.

First, the approval of a borrower defense claim—to be done under new standards—is a condition precedent to a recoupment proceeding. The Department in the past stated that recoupment follows upon an approved borrower defense claim, *see*, *e.g.*, 34 C.F.R. § 685.22(e)(7), and nowhere states that under this proposal it will recoup moneys from institutions without an approved borrower defense claim. Indeed, quite the contrary, it confirms, in discussing automatic relief for claims the Department fails to process, that "[a]n institution would not face a recoupment action for the cost of a loan being deemed unenforceable under this requirement because it would not be viewed as having received an approved borrower defense claim."[54] The lowering of the standard for approving a borrower defense claim, which the Department readily admits it is pursuing,[55] thus makes it easier to successfully recoup against

---

[54] 87 Fed. Reg. at 41,904.
[55] *See* 87 Fed. Reg. at 41,888.

The Honorable Miguel A. Cardona
Secretary of Education
Page 21 of 137

an institution. After an approved borrower defense claim, the institution is one step closer to the ledge of recoupment. That amounts to retroactive rulemaking and that fact is not changed even if the recoupment standard is not retroactive.

In addition to this straightforward logic, several additional considerations demonstrate that the lowering of the standard for approving a borrower defense claim has significant legal consequences with respect to recoupment. Most notably, the Department itself in 2019 recognized that it "must provide the school with notice of a borrower defense to repayment claim and a meaningful opportunity to respond to such a claim," and decided to combine the application and recoupment phases as a result.[56] Attempting to separate out the application and recoupment phases merely papers over the inextricable connection between them that the Department previously recognized.

More fundamentally, the Department appears to believe that its recoupment authority is most analogous to indemnification. *See infra* Section VIII (discussing recoupment authority). Indemnitors, the institutions in this analogy, often have the right to control litigation over primary liability—the borrower defense application—because they ultimately are on the hook for potential liability. The Department's attempt to decouple the application and recoupment phases is entirely inconsistent with this fundamental legal practice and thus is unlawful.

Second, the approval of a borrower defense claim may have collateral consequences outside of recoupment. The Department highly regulates institutions and repeatedly has suggested repeatedly that approved borrower defense claims will cause adverse consequences,

---

[56] 84 Fed. Reg. at 49,805; *see* 87 Fed. Reg. at 41,901 ("The Department believes it is vital to give institutions an opportunity to respond to allegations in a borrower defense claim.").

The Honorable Miguel A. Cardona
Secretary of Education
Page 22 of 137

including the requirement of posting of financial protection and loss of certification.[57] The Department nowhere foreswears that the approval of borrower defense claims will not affect institutions in this highly regulated space.

In addition, other Federal and State agencies, and accreditors, could attempt to use the approval of borrower defense claims to bring licensing proceedings, consumer protection actions, show-cause and probation orders, or investigations into institutions' practices. Private plaintiffs could attempt to use approval of a borrower defense claim to bring claims for education malpractice, fraud, misrepresentation, or other State law claims. Finally, and at a minimum, the approval of a borrower defense claim spurs more claims to which institutions must respond: One need look no further than the result of the proposed settlement in *Sweet v. Cardona*, where the mere suggestion that borrower defense claims may be approved or loans discharged prompted the filing of over 60,000 claims in a week, nearly the entire amount received in all of 2021.[58]

Third, there can be no doubt that the approval of borrower defense claims causes reputational harm to the institution. Again, one need look no further than the affidavits and briefs in the *Sweet v. Cardona* litigation. Those papers chronicle how schools that the Department

---

[57] *See, e.g.*, Office of Postsecondary Education, Department of Education, Issue Paper 4: Financial Responsibility, Session 1: January 18-21, 2022, https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/4finanresponsibility.pdf (proposing to add to conditions for when an institution must post financial protection "a new trigger related to adjudicated borrower defense to repayment claims where the approved loan discharges total more than 5 percent of title IV volume at an institution"); Office of Postsecondary Education, Department of Education, Issue Paper 6: Certification Procedures, Session 1: January 18-21, 2022, https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/6certprocedures.pdf.

[58] *See* Michael Stratford, Inside the Deal That Could Revamp Loan Forgiveness For Defrauded Borrowers, Politico (July 5, 2022), https://www.politico.com/newsletters/weekly-education/2022/07/05/inside-the-deal-that-could-revamp-loan-forgiveness-for-defrauded-borrowers-00043893.

The Honorable Miguel A. Cardona
Secretary of Education
Page 23 of 137

merely (and unjustly) speculated were engaged in "misconduct" were pilloried in the press and inundated with queries from stakeholders and additional borrower defense claims.[59] That type of reputational harm would intensify after an approved borrower defense claim, which would involve not the Department's unjust speculation as in *Sweet v. Cardona*, but an actual finding of "misconduct," albeit without any due process protections for schools.

The Department implausibly professes that it is "unaware of any evidence demonstrating reputational harm to institutions that are still operating from approved borrower defense claims" and that consequently such reputational harms are "outweighed" by borrower benefits.[60] It is hard to credit this statement in light of its too-clever-by-half limit to schools "that are still operating" and in light of the evidence generated in the short period of time between the announcement of the settlement in *Sweet v. Cardona* and the affidavits and briefs filed in that case. The Department has failed to appropriately account for this important aspect of borrower defense. Indeed, in *Sweet v. Cardona*, the pending litigation before U.S. District Court for the Northern District of California, Judge William Alsup acknowledged, "I do see that [reputational harm] as a possible legitimate concern."[61]

Moreover, these consequences cannot be undone by recoupment proceeding years later, especially when the Department need not (and in cases of delayed adjudication in violation of its times, promises not to) pursue recoupment.

---

[59] *See, e.g., Sweet v. Cardona*, No. 19-cv-03674, Dkt. Nos. 254, 261 (July 13, 2022) (and accompanying affidavits).
[60] 87 Fed. Reg. at 41,888.
[61] *Sweet v. Cardona*, No. 19-cv-03674, Dkt. 311 (Transcript from August 4, 2022 hearing).

The Honorable Miguel A. Cardona
Secretary of Education
Page 24 of 137

**3.** Regardless of these consequences, the rule would still violate the rule against retroactive rulemaking because it declares illegal conduct that predates the new rule.[62]

### III.     The Department's Elimination of a Statute of Limitations is Unlawful and Deprives Schools of Critical Rights

The Department should not implement its proposal to eliminate a statute of limitations for BDR claims, including refunding amounts that borrowers previously paid on loans that are still outstanding.[63] "Statutes of limitations are 'designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.'"[64] The Department's proposal to allow any borrower with an active loan dating from 1994 onward to file a BDR claim—including for amounts paid years before—violates this well-established principle. Therefore, it is fundamentally unfair and arbitrary and capricious.

Eliminating a statute of limitations is incompatible with – indeed, likely renders unworkable – the Department's proposed BDR claim adjudication process. The Department states elsewhere in the preamble that it recognizes "the importance of considering evidence from all available sources,"[65] and that it believes "it is **vital** to give institutions an opportunity to

---

[62] Cf. *AT&T Corp. v. Hulteen*, 556 U.S. 701, 712 (2009).

[63] 87 Fed. Reg. 41,897.

[64] *Cunningham v. M & T Bank Corp*., 814 F.3d 156, 164 (3d Cir. 2016), as amended (Feb. 24, 2016) (quoting *Order of R.R. Telegraphers v. Ry. Express Agency*, 321 U.S. 342, 348–49, 64 S.Ct. 582, 88 L.Ed. 788 (1944)). The types of claims that comprise the BDR Rule causes of action – e.g., claims sounding in fraud, tort, and contract – are routinely subject to statutes of limitations in other contexts, as they should be here.

[65] 87 Fed. Reg. 41,887.

The Honorable Miguel A. Cardona
Secretary of Education
Page 25 of 137

respond to allegations in a borrower defense claim" because "an institutional response would give the Department a more complete record on which to evaluate the borrower's application."[66]

Yet, the Department fails to acknowledge that schools, now faced with responding to cases that may be decades old, will be substantially hampered in their ability to proffer evidence and present a defense. The lack of a statute of limitations will prevent schools from participating in the "vital" BDR response process and contributing to the "complete record" the Department purportedly desires, as documentary and testimonial evidence frequently will be unavailable. Where evidence is unavailable due to the passage of time, it may be impossible for schools to disprove borrower claims that they were misled, that a school breached an education contract, or that a school engaged in "aggressive recruitment," along with other theories included in the Department's expansive rule.[67]

The elimination of a statute of limitations is inconsistent with the Department's rationale for affirming a three-year record retention requirement. In discussing schools' record retention obligations, and whether the three-year period is compatible with the BDR Rule's lack of a statute of limitations, the Department surmised that the financial aid records that must be retained under the rule "are unlikely to be the most relevant records to a defense to repayment claim."[68] Rather, according to the Department, "the records supporting these types of [BDR] claims would likely be based on administrative training manuals, marketing materials, call logs between admissions representative and borrowers, internal secret shopping programs, and other

---

[66] 87 Fed. Reg. 41,901 (emphasis added).

[67] The Department also states that it "may seek additional information from an institution later if it deems it necessary," assuming that such information would exist, which, for aged claims, is unlikely. 87 Fed. Reg. 41,901.

[68] 87 Fed. Reg. 41,902.

The Honorable Miguel A. Cardona
Secretary of Education
Page 26 of 137

centralized documentation rather than the financial aid records of individual borrowers."[69] Yet, the Department provides no explanation as to why it is reasonable to expect that schools would have maintained these manuals, call logs, and "other centralized documentation" indefinitely (particularly when these records were not within the scope of Title IV records retention requirements), or why it is reasonable to expect them to do so in the future.

Further, notwithstanding the Department's speculation that "the financial aid records of individual borrowers" are unlikely to be germane to defending a BDR claim, schools facing the possibility of BDR claims well into the future will confront two problematic options: (a) retaining such records long-term out of an abundance of caution in the event that they are relevant to a BDR defense, and (b) disposing of such records as a matter of student privacy and data security best practices.[70]

The Department attempts to explain away concerns about its open-ended claim adjudication process, contending that "[o]ther elements of the proposed regulations would protect institutions from concerns about a lack of relevant records to respond to a borrower's claim."[71] In response to concerns "about the lack of a limitations period for borrowers to file claims," the Department opines that it "believes that the proposed notice of claims and [six-year]

---

[69] *Id.*

[70] In 2016, Dr. Linda Wilbanks, the Federal Student Aid office's Chief Information Security Officer, presented a detailed overview of the Department's expectations regarding data security, minimizing the risk of breaches of student information and the importance of timely record destruction. Dr. Linda R. Wilbanks, Chief Information Security Officer, Federal Student Aid, U.S. Dep't of Educ., Cyber Security Requirements for Institutions of Higher Education, Annual Conference of the National Association of Student Financial Aid Administrators (NASFAA) (Washington, D.C. July 10-13, 2013),
https://fsaconferences.ed.gov/conferences/library/2016/NASFAA/2016NASFAACybersecurityRequirementsforIHEs.pdf.

[71] 87 Fed. Reg. 41,902.

The Honorable Miguel A. Cardona
Secretary of Education
Page 27 of 137

limitations period on recoupment provides adequate protection for institutions."[72] However, even if a six-year statute of limitation applies to recoupment proceedings,[73] schools must face the costs of defending against stale claims during the initial adjudication process without sufficient evidence, and the reputational harm that will ensue if these stale claims are routinely granted, including *en masse* through the group process. Further, the taxpayers will bear the massive burden of funding BDR claims that are granted because schools are unable to put forth defensive evidence at the claims adjudication state, and which are so aged that they fall outside of the six-year recoupment statute of limitations period.

The Department goes so far as to contend that, because, through the institutional response process, it intends to notify schools of the claims against them, the schools will therefore have "sufficient notice to retain pertinent records."[74] But this is an oversimplification that fails to address claims that may be many years old and the likely impossibility of "retaining" long-lost records pertinent to those stale allegations.

The Department's rationale for disposing of a statute of limitations for borrower defense claims is heavily tied to administrative and operational shortcomings of the Department. The Department states in the preamble that "properly enforcing … a statute of limitations is administratively burdensome,"[75] and "would create significant operational challenges for the Department."[76] The Department also maintains that applying a statute of limitations "would not

---

[72] 87 Fed. Reg. 41,913.
[73] The proposed six-year statute of limitations for recoupment proceedings has several exceptions (§ 685.409(c)(2), (3)) that substantially undermine these purported "protections."
[74] 87 Fed. Reg. 41,902.
[75] 87 Fed. Reg. 41,897.
[76] *Id.*

align with the Department's proposal to allow group claims,"[77] which fails to recognize that class action claims (a form of group claim) are subject to statutes of limitation.[78] The Department, however, cannot lawfully shirk its responsibility to adjudicate BDR claims fairly – and therefore increase exponentially the number of claims schools must defend – because it is unwilling to engage in routine factual and legal analysis.

We, therefore, recommend that the Department establish a single statute of limitations period that requires a borrower to assert a defense to repayment within three years from the date the student is no longer enrolled at the school. This three-year period will provide ample time for borrowers to submit claims, as well as establish reasonable record retention expectations for schools.

### IV.     The Multiple BDR Grounds that the Department Proposes Are Unlawful

Although Section 455(h) does authorize the Department to specify acts or omissions that a borrower may assert as a defense to repayment, the Department's proposed defenses violate the statute or the Constitution (or both), and are arbitrary and capricious.

Section 455(h) provides that "the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part, except that in no event may a borrower recover from the Secretary, in any action arising from or relating to a loan made under this part, an amount in

---

[77] *Id.*

[78] *See, e.g.*, *Lewis v. Becerra*, No. CV 18-2929 (RBW), 2022 WL 1262122, at *8, 12 (D.D.C. Apr. 28, 2022) (concluding that "the number of putative class members in this case should be reduced to account for those individuals who … did not file their claims within the applicable statute of limitations window"). Further, that a statute of limitations may interfere with the Department's policy goals is not a basis to ignore this fundamental procedural protection.

The Honorable Miguel A. Cardona
Secretary of Education
Page 29 of 137

excess of the amount such borrower has repaid on such loan."[79] The plain meaning of this provision is that if the Secretary or other authorized person brings "an action" for repayment, the borrower "may assert as a defense" an institutional act or omission specified in Department regulations. As noted above, the Department understood this plain meaning in the 1994 Rule, when it recognized that "[i]n any proceeding to collect on a Direct Loan, the borrower may assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law," and then identified specific "formal proceedings" in which the defense would be raised.[80]

The Department has departed from the statute in devising a system for borrower assertion of *claims*, not *defenses*. It first did so in 2016, when it first divined the oxymoron that is a 'borrower defense claim'. And the Department has now taken that error to an extreme, fashioning "borrower defense claims" without any statute of limitations.[81]

Even if, *arguendo*, the Department may convert a borrower defense into a borrower claim, the proposed BDR Rule must still substantively have the character of a "defense to repayment." A loan is a contract between the borrower and the United States. Contract law recognizes equitable conduct-based defenses.[82] In the unique circumstances of Direct Loans, the

---

[79] 20 U.S.C. § 1087e(h).

[80] 34 C.F.R. § 206(c) (1995); 59 Fed. Reg. 61671 (Dec. 1, 1994).

[81] 87 Fed. Reg. 41,880, 41,884 (discussing "borrower claim adjudication process"), 41,899 (claiming authorization from Congress "to process borrower claims," and "determine whether claims should be heard successively or as a group").

[82] *See, e.g.*, Corbin on Contracts §§ 28.2-7 (duress and coercion that overcomes the free will of the party); 28.9-11 (undue influence), 28.13-23 (defenses of avoidance and restitution on grounds of misrepresentation and fraud that arose as an equitable remedy); 53.5 (discussing prevention or hindrance of performance as breach of implied covenant of good faith and fair dealing), 68.7 (prevention by promissee as defense). *See also* Restatement (Second) of Contracts

The Honorable Miguel A. Cardona
Secretary of Education
Page 30 of 137

United States is the counterparty, but the institution of higher learning (as a Direct Loan Program

participant) is dealing with the student and affecting lending decisions, as well as enrollment

decisions that will be funded by the Direct Loan. Thus, Congress directed the Secretary to "specify

in regulations which acts or omissions of an institution of higher education a borrower may assert

as a defense to repayment of a loan made under this part ...."[83] And indeed contract law has

granted defenses based on third-party misrepresentations.[84]

The core, irreducible meaning of institutional "acts or omissions" giving rise to a

borrower's "defense to repayment" is that the act or omission must make it inequitable for the

borrower to be held to performance of her contractual repayment obligation. Conduct-based

contractual defenses to performance have always required an actual adverse effect on the

contracting party—whether financial (pecuniary) injury to the affected party (including the denial

of the benefit of the bargain),[85] the overbearing of the party's free will,[86] or actual inducement

to enter into obligations in justifiable reliance on misrepresentation of fact[87] — that makes

performance inequitable. Thus, even if a borrower may assert "claims" rather than "defenses,"

Section 455(h) requires at a minimum that the institutional acts in question must have an adverse

---

§§ 159-164 (fraud, concealment, non-disclosure), 173 (abuse of fiduciary relation), 174-177 (duress and undue influence).

[83] 20 U.S.C. § 1087e(h).

[84] *See* Restatement (Second) of Contracts §§ 164(2) ("If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by one who is not a party to the transaction upon which the recipient is justified in relying, the contract is voidable by the recipient, unless the other party to the transaction in good faith and without reason to know of the misrepresentation either gives value or relies materially on the transaction.")

[85] Corbin on Contracts § 28.16.

[86] Restatement (Second) of Contracts §§ 174-77.

[87] Restatement (Second) of Contracts §§ 163, 164.

effect on the borrower that makes it inequitable to require performance of her contractual repayment obligation.

The 2019 rule was a more reasonable framework, which adopted the clear and easily administrable rule that the institutional act or omission must have caused financial harm to the borrower.[88] Regardless, the Department cannot simply disregard the plain meaning of a borrower defense to repayment that requires (at a minimum) that the institutional act or omission have an adverse effect on the borrower that renders repayment of all or part of the loan obligation inequitable. The Department has done just that by eliminating the adverse-effect requirement and broadly defining a borrower defense to repayment as: "an act or omission of the school attended by the student that relates to the making of a Direct Loan for enrollment at the school or the provision of educational services for which the loan was provided ….".[89] The Department's proposed qualifier "Relates to" has an "expansive sweep,"[90] and provides no limiting principle whatsoever. If that indeed had been a proper interpretation of Section 455(h), the statute would be void as an unconstitutional delegation of legislative power that fails to provide an intelligible principle to guide the Secretary's exercise of rulemaking discretion.[91] The Department should abandon the proposed BDR Rule and conform its borrower defenses to the plain statutory meaning.

Even apart from this general error in statutory interpretation, each of the borrower defenses that the Department has identified is flawed.

---

[88] 34 C.F.R. § 685.206(e).
[89] 87 Fed. Reg. 42005 (§ 685.401(a)).
[90] *United States v. Morales*, 504 U.S. 374, 384 (1992) (internal quotation marks omitted).
[91] *Gundy v. United States*, 139 S.Ct. 2116, 2123 (2019).

The Honorable Miguel A. Cardona
Secretary of Education
Page 32 of 137

1. The Department's proposed "substantial misrepresentation" standard would deprive
schools of due process, is without legal precedent, and would form the basis for the bulk
of borrower claims.

The Department acknowledges that "substantial misrepresentations constitute most of

the claims that the Department has approved to date and have consistently served as a basis for

borrower defense discharges across the several sets of regulations."[92] The Department's

proposed changes to the substantial misrepresentation standard – which go far beyond what

existed in 2016 – would have a profound impact on how the Department adjudicates the majority

of borrower claims it receives. Earlier misrepresentation BDR claims have required that a

claimant assert that a misrepresentation was made, that it was a material misrepresentation on

which a borrower relied, that the institution intended to make the misrepresentation, and that

it caused some injury to the claimant. The Department proposes eliminating most of the

elements that have comprised a misrepresentation claim, including eliminating any specific

showing that a borrower actually relied on the alleged misrepresentation, that the alleged

misrepresentation was made with intent, or that the alleged misrepresentation caused the

borrower injury. The Department proposes a misrepresentation standard where the borrower

only has "to articulate to the Department the misrepresentation made by the institution," and

then attempt to show reliance by simply "relaying with some detail the story of the [borrower's]

recruitment experience or some other interaction with the school."[93]

Here, the Department justifies creation of this unprecedented legal standard by asserting

that the majority of the BDR claims that are submitted lack sufficient evidence to meet the

---

[92] 87 Fed. Reg. 41,889
[93] 87 Fed. Reg. 41,890

The Honorable Miguel A. Cardona
Secretary of Education
Page 33 of 137

existing substantial misrepresentation standard. But this assertion, even if true (notwithstanding the fact that the Department elsewhere admits it has adjudicated no claims under the 2019 standard), does not rationally lead to a conclusion that the standard for showing a substantial misrepresentation should be changed or the burden lowered. Rather, the lack of evidence should lead to the logical confirmation that ***not all BDR claims merit loan discharge***. Nevertheless, the Department's proposed substantial misrepresentation standard essentially collapses all doctrinal elements of misrepresentation into one element and incorrectly cites Federal Trade Commission ("FTC") case law as a basis for doing so.

> A. <u>The Proposed BDR Rule's presumption of reliance on misrepresentations and omissions for both individual and group claims is arbitrary and capricious.</u>

Contrary to the Department's assertions, the proposed amendments to the provisions related to "misrepresentation" are not merely a return to the 2016 standard. The amendments create an even looser set of standards, including a presumption of reliance and the abandonment of any requirement that a borrower demonstrate injury or harm to receive a loan discharge. Further, in arguing for the group processing of claims, the Department, by its own reasoning, admits that the lowered standard will open the flood gates to any and all BDR claims by borrowers who attended the same institutions—and invite tag-a-long claims, notwithstanding their lack of merit. That alone is telling as to the danger that the proposed changes would invite.

At the outset, the Department purports to retain reliance as an element of a misrepresentation BDR claim. It proclaims that "[r]eliance is the final component of the substantial misrepresentation standard. This requires a borrower to show that they were not only subject to the misrepresentation but that they relied upon it in their decision to take out a

Direct Loan."[94] Thus, while not requiring financial harm, the Department will "require that the borrower demonstrate that the misrepresentation caused the borrower to take out a loan to their detriment."[95] But immediately upon stating that element of proof, the Department negates it. The Department recounts that sometimes "the narrative provided by the borrower" suggests that a misrepresentation "was a key factor in their decision to take out a loan but because the borrower did not directly specify they relied upon it their claim is denied."[96] Thus, the Department proposes that, when reliance is not demonstrated, it will employ a presumption of reliance for both individual and group claimants: "[T]he Department would find reasonable reliance if a prudent person would believe and act upon the misrepresentation if told it by another person."[97] The Department's reasoning misses the mark.

The occasional failure of a borrower to plead his claim correctly might justify a rule permitting liberal amendment of submissions to cure deficiencies in allegations or proof, or even affirmative inquiry by the Department requesting that the borrower submit a sworn statement declaring reliance and explaining the basis therefor.[98] But it cannot justify an evidentiary presumption. Moreover, the Department's prudent-person standard is simply a materiality requirement[99] that is already baked into the Department's substantial misrepresentation standard, which requires that the misrepresentation or omission "on which the person to whom

---

[94] 87 Fed. Reg. 41,889.

[95] *Id.*

[96] *Id.*

[97] *Id.*

[98] *See, e.g.,* Fed. R. Civ. P. 15.

[99] "A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so." Restatement (Second) of Contracts § 162 (1981).

The Honorable Miguel A. Cardona
Secretary of Education
Page 35 of 137

it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment."[100] So the Department's position is that if a substantial misrepresentation is proven, whether or not the borrower even received it, reliance is presumed, both for an individual and an entire group. But there cannot be reliance on a communication that is never received by the borrower, and the Department does not require any proof of receipt or awareness of the communication by the borrower. The Department's reliance presumption is a non-sequitur.

It is also unlawful. As an initial matter, the Department's limited rulemaking authority under Section 455(h) extends only to specifying institutional acts or omissions that can serve as borrower defenses to loan repayment, not defining rules as to how defenses may be proven. Regardless, the presumption is legally invalid.

Provided that they are consistent with the statute, agencies may generally establish rebuttable presumptions,[101] but "their validity depends as a general rule upon a rational nexus between the proven facts and the presumed facts."[102] "Where such a nexus is lacking, the presumption is invalid."[103]

The requirement that a presumption be founded upon "a sound and rational connection between the proved and inferred facts" relates to the facts to be adjudicated: if a party proves fact A, the agency may presume fact B if the existence of fact A makes it highly probable that fact

---

[100] 87 Fed. Reg. 41,977 (proposed § 668.71(c)).

[101] *Southern Co. Servs. Inc. v. FCC*, 313 F.3d 574, 581 (D.C. Cir. 2002).

[102] *United Scenic Artists v. NLRB*, 762 F.2d 1027, 1034 (D.C. Cir. 1985); *Chemical Mfrs Ass'n v. Dep't of Transp.*, 105 F.3d 702, 703 (D.C. Cir. 1997) ("unlike a legislative body, which is free to adopt presumptions for policy reasons, an agency may only establish a presumption if there is a sound and rational connection between the proved and inferred facts") (citation omitted) *NLRB v. Baptist Hosp., Inc.*, 442 U.S. 773, 787 (1979) (holding that "a presumption adopted and applied by the Board must rest on a sound factual connection between the proved and inferred facts").

[103] *United Scenic Artists*, 762 F.2d at 1034.

B is also true, absent proof to the contrary. Thus, "[a] presumption is normally appropriate when "proof of one fact renders the existence of another fact 'so probable that it is sensible and timesaving to assume the truth of [the inferred] fact ... until the adversary disproves it.'"[104] Accordingly, in *Chemical Manufacturers*, the D.C. Circuit upheld a Department of Transportation rule that established a rebuttable presumption "that loose closures on railroad tank cars transporting hazardous materials result from the shipper's failure to conduct a proper inspection."[105] This Court found a rational nexus because the Department had required that closures be designed not to come loose during ordinary transportation, and thus alternative causes of loosening would be extraordinary.[106] This Court noted that the presumption "only arises once the Department has proven a fact strongly suggestive of a violation: the existence of a loose closure."[107] The empirical fact A proven in the adjudication (loose closure) was so closely correlated with inferred fact B (failure to inspect closure) that proof of the former reasonably served as a proxy for the latter, subject to rebuttal by actual evidence regarding fact B.

Similarly, the D.C. Circuit upheld the Federal Communications Commission's presumption that, if it is proven that a vertically integrated cable operator withholds terrestrial regional sports network programming from a rival, then that same cable operator had the purpose and effect of hindering or preventing the competitor from providing programming to its customers, given the programming's value and lack of replicability.[108]

---

[104] *Chemical Mfrs Ass'n*, 105 F.3d at 705 (quoting *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 788–89 (1990) (internal quotation marks omitted).

[105] *Id.* at 703.

[106] *Id.* at 706.

[107] *Id.* at 707.

[108] *Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 716-17 (D.C. Cir. 2011); *see also National Association of Telecommunications Officers and Advisors v. FCC*, 862 F.3d 18, 28-29 (D.C. Cir.

The Honorable Miguel A. Cardona
Secretary of Education
Page 37 of 137

Here, the Department entirely ignored the requirement that a presumption may be established only when there is a nexus between proven and presumed facts. Mere proof that a misrepresentation or communication was made and is of the kind upon which a person is reasonably expected to rely does not render "so probable" actual receipt of and reliance upon a misrepresentation by an individual borrower "that it is sensible and timesaving to assume the truth of [the inferred] fact ... until the adversary disproves it."[109] For example, many students may not read brochures, peruse school information on websites, or investigate school rankings. A person attending a trade school to become a medical technician may not rely on overall employment numbers that happened to be inaccurate, and rely instead on accurate employment numbers for that trade. A student who chose to attend a particular university to study with a world-famous classical pianist may not have relied on the general employability numbers to her detriment. Indeed, reliance is necessarily a matter of individualized proof in the framework of the Department's proposed adjudicatory scheme, and especially when the Department also proposes eliminating the elements of intent and injury or harm.

The Department's argument that FTC jurisprudence justifies the establishment of a presumption of reliance for borrower defense claims based on an alleged misrepresentation is unavailing. The Department's reasoning suffers from internal contradictions and relies on a fundamental misreading of the legal authorities on which it relies. For example, the Department cites *FTC v. BlueHippo Funding*, 762 F.3d 238 (2d Cir. 2014) and other inapposite deception

---

2017) (applying nexus standard, and upholding agency presumption that effective competition existed in a franchise area only because direct broadcast satellite providers served almost every area and competitor market share nationally was 34%).
[109] *Cablevision Sys. Corp.* 649 F.3d at 716-17.

The Honorable Miguel A. Cardona
Secretary of Education
Page 38 of 137

doctrine cases to support its "proposal to allow the Secretary to establish a presumption of reliance, whereby it can establish a rebuttable presumption."[110] But that case, for example, fails to support the Department's reasoning. In *BlueHippo*, the court was seeking to enforce an existing consent order allegedly violated; in nearly all such contempt cases, relevant facts averred in an already-entered consent order are often presumed to be admitted in those instances when the FTC has to bring a court action to enforce the consent order.[111] Moreover, the *BlueHippo* Court explained that the reason for the presumption of consumer reliance is that "[t]o require proof of each individual consumer's reliance on a defendant's misrepresentations would be an onerous task with the potential to frustrate the purpose of the FTC's statutory mandate."[112] The Department has no analogous statutory mandate, as noted above.

The Department's proposal to incorporate a presumption of reliance into the standard "to reflect natural consumer behavior that the reasonable and prudent consumer would usually rely on" also ignores critical distinctions between the FTC enforcement processes and those established under the borrower defense framework.[113] To this end, the Department incorrectly argues that the FTC follows "a similar approach to the Department's proposal" to establish a presumption of reliance. First, the FTC is not granted the presumption of reliance *unless* "widespread violations of the FTC Act have been proven" – including that that the "defendant made *material* misrepresentations" and that they were "widely disseminated." Indeed, to establish a violation of Section 5 of the Federal Trade Commission Act of 1914 ("FTC Act"), the

---

[110] 87 Fed. Reg. 41, 890.
[111] *See* 762 F.3d at 244.
[112] *Id*.
[113] 87 Fed. Reg. 41, 889

The Honorable Miguel A. Cardona
Secretary of Education
Page 39 of 137

Commission "must show that the representation, omission, or practice is (1) likely to mislead consumers acting reasonably under the circumstances (2) in a way that is material."[114] Here, the Department's proposed standard includes a significantly more lenient burden of proof, as there is no requirement to show that the alleged misrepresentation was either material or widely disseminated. Further, as discussed below, the proposed revisions to § 668.72 make it possible for even an inadvertent misstatement to qualify as a "misrepresentation."

In addition, as part of its misplaced rationale, the Department falsely equates the FTC Act's enforcement process to the borrower defense claim adjudication process. A company or other entity subject to the FTC's enforcement process has statutorily established protections (i.e., specific notice requirements) and rights, including to respond or challenge the enforcement action – both within the administrative forum and in court. No such protections or rights exist under the borrower defense framework or claim adjudication process. This distinction is significant, particularly when the Department proposes to substantially reduce the burden of proof.

The Supreme Court's treatment of reliance presumptions also reveals the error of the Department's approach. The Court has recognized that reliance should ordinarily be a matter of individualized proof, but has permitted an exception for "fraud on the market" theories in securities actions "by recognizing a rebuttable presumption of classwide reliance on public, material misrepresentations when shares are traded in an efficient market."[115] But that is a narrow presumption that only applies if the predicates of materiality and publicity of the

---

[114] *FTC v. Figgie International, Inc.*, 994 F.2d 595, 605-606 (9th Cir. 1993); *see also FTC v. Cyberspace.Com, LLC*, 453 F.3d 1196, 1199 (9th Cir. 2006).
[115] *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 462-63 (2013).

representation, and efficiency of the market that determines the price on which the buyer relies—all of which "can be proved on a classwide basis"—are first proven.[116] By contrast, a student's attendance and borrowing decisions are not market transactions; they are highly individualized, multifactorial transactions that require individual proof. The Department has established no predicates that justifies a presumption of reliance dispensing with traditional individualized proof.

Further, the presumption of reliance ill fits with the Department's specification of misrepresentations, many of which will induce reliance only of certain students. Take for example, the misrepresentation specified in proposed § 668.72(p) regarding "[a]ssistance that will be provided in securing required externships or the existence of contracts with specific externship sites." A misrepresentation regarding contracts with certain externship sites will conceivably be relied upon only by a student (1) who is aware of it and (2) for whom the specific type of externship is a deciding factor in attendance or borrowing. That will not be every student in the school or in any group composed by the Department, and a presumption of reliance is arbitrary and capricious. Reliance is quintessentially a fact known by each borrower, who can easily supply the necessary information in a sworn statement.

Moreover, the Department suggests that this and other presumptions are rebuttable, but that is a mirage. All the facts concern matters, such as reliance or adverse effects that are known to the borrower, but the borrower is not going to rebut the presumption. The very notion of a borrower "defense" implies that the borrower should bear the burden of proof, but the Department has removed any requirement of proof of the full defense. BDR adjudication is not

---

[116] *Id.* at 473.

an adversarial adjudication where an opposing party can discover facts from the adversary and introduce them at trial. The institution is limited to providing a response to the borrower's claim in § 685.405, but the institution will not generally have possession of evidence relevant to rebutting the presumption. The Department is not adversarial to the borrower, and nothing in the rule calls for the Department to discover or investigate evidence relevant to rebutting the presumption. The presumptions are rebuttable in name, but not rebuttable in practice. These are not mere evidentiary presumptions, but impermissible policy presumptions to maximize loan forgiveness for borrowers.

Accordingly, the Department should remove the presumption of reliance from the rule.

### B. Elimination of the intent requirement is also arbitrary and capricious, particularly when there is no requirement of injury to the borrower.

The Department inaccurately notes that it "does not believe the intent of the institution is relevant when determining whether to provide the borrower with relief due to misrepresentation. Intentional or not, the actions by the institution have resulted in harm to the borrower and the Department's obligation is to provide relief to ameliorate that harm when the evidence warrants."[117] Indeed, the Department also acknowledges that there is a chance that a school might make an inadvertent misrepresentation, but that nevertheless "[a]s between the school and the borrower, the school is better equipped to prevent, and where appropriate to bear the cost of a misrepresentation that turns out to be inadvertent."[118] The Department's deliberate decision to assign potentially massive and even existential liability to institutions for "inadvertent" mistakes is arbitrary and capricious.

---

[117] 87 Fed. Reg. 41, 889.

[118] *Id.*

The Honorable Miguel A. Cardona
Secretary of Education
Page 42 of 137

Such a decision overlooks the fact that reasonable, good faith errors in calculating employment rates, for example, could potentially mean that entire student cohorts would have their loans discharged and assigned to the school, so long as the fact finder finds by a mere preponderance of evidence that the representation or omission is erroneous, even if inadvertent. The elimination of the element of intent effectively imposes a strict liability regime on schools, especially when (as discussed below), borrowers also do not have to show any injury attributable to the alleged misrepresentation. Many schools may not survive such liabilities and would be forced out of business, to the detriment of their students and communities over the long run.

The Department's elimination of this element also overlooks the practical realities that intent is often proven through circumstantial evidence, that an institution's response to a claim could provide relevant evidence, and that a finder of fact can make inferences from the totality of evidence presented. In other words, eliminating the intent element in order to presumably eliminate any burden a borrower faces in putting forward a potentially valid misrepresentation borrower defense claim is not justified. The fact that schools have greater financial ability to weather an adverse decision on improper grounds than a student would is not a legitimate justification for lowering the standard and increasing the risk of improper loan discharges. The Department's rationale is arbitrary because there is no rational connection to the rules.

Furthermore, the Department says that it "does not believe the intent of the institution is relevant," but this is irrational because the borrower is also not required to prove harm under the proposed regulations.[119] Indeed, the impact of this decision to eliminate the element of intent is further compounded because the Department also has proposed eliminating any

---

[119] 87 Fed. Reg. 41, 889.

element of individual harm. A borrower need not prove that the misrepresentation actually harmed them, only that "the misrepresentation caused the borrower to take out a loan to their detriment."[120] Here, too, the Department shifts the burden elsewhere, explaining that the concern that a borrower may be unable to show financial harm stemming from the substantial misrepresentation is a "concern that outweighs the taxpayers' risk that a borrower could receive relief even without significant financial harm."[121] The Department reasons that in all instances – even ones where a misrepresentation is inadvertent or the borrower is not actually injured by the alleged misrepresentation—the school or the taxpayers or both ought to bear the burden that a borrower's claim may not have adequate evidentiary support. The Department may have a statutory obligation to provide access to borrower defenses, but it does not have the authority to tip the scales against schools (and taxpayers) to ensure approval of BDR claims.

2.  *The proposal to recognize a freestanding "omission of fact" BDR claim is arbitrary and capricious, and creates amorphous duties for institutions and creates existential liability risks that cannot be fully anticipated.*

The Department's proposed freestanding "omission of fact" BDR suffers from many of the same flaws as its proposed substantial misrepresentation standard. An omission of fact is a misrepresentation under § 668.71 if a reasonable person would have considered the omitted information in making a decision to enroll or continue attendance at the institution.[122] Under the law of misrepresentation, an omission of fact is actionable only if it renders the actual representation misleading, and the Department acknowledges that all State statutes that it consulted in crafting its freestanding omission standard include an element of intent (or

---

[120] 87 Fed. Reg. 41, 890.
[121] *Id.*
[122] 87 Fed. Reg. 41, 892.

knowledge).[123] For example, the Department's omission standard specifically uses the State of Delaware's verbatim definition of unfairness; Delaware's unfairness standard mentions an omission that includes "the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission."[124]

The Department also has departed from the limited standard for nondisclosure defenses in contract law, and without any rational explanation for having done so. Nondisclosure is typically a defense to contract performance only in four circumstances. Three of those circumstances require knowledge that the other party will be misled: (1) knowledge that nondisclosure will make a prior representation fraudulent or material; (2) knowledge of the other person's mistake as to some fact, where nondisclosure is contrary to principles of good faith and fair dealing; and (3) knowledge of the other person's mistake as to some fact as to the content or effect of the instrument. The fourth requires nondisclosure where there is a relationship of trust and confidence.[125] The Department's creation of a novel, open-ended contractual defense based on inadvertent or good-faith nondisclosures is breathtaking. There is no basis to grant a borrower a defense to loan repayment for nondisclosures that are both innocent and harmless.

Here, too, the Department proposes a legal standard that is arbitrary and capricious, and divorced from any legal precedent, notwithstanding the Department's claims to the contrary. For example, the Department looks to state unfairness law to establish the concept that there can be a freestanding omission of fact BDR claim, but the Department simultaneously declines to include the other elements of those States' unfairness standards, including those articulated

---

[123] *See id.*
[124] Del. Title 6 §2513(a).
[125] Restatement (Second) of Con

under Delaware law. Rather, the Department purports to rely on the FTC's deception doctrine (albeit incorrectly) for the proposition that a presumption of reliance and an absence of intent are acceptable components of the freestanding omission standard. But there is no legal basis for that assertion, as the FTC's deception doctrine does not include a free standing omission of fact standard of the type the Department proposes here, which is why the Department cites State law in the first instance to establish that concept. Further, the FTC's deception doctrine and the various States' unfairness standards are adjudicated in very different procedural contexts.

The result is a standard that transforms the "absence" of some information into a misrepresentation, even if it does not render an actual misrepresentation misleading and even if the omission is not knowing or intentional. This proposed standard imposes unreasonable duties upon institutions at pain of potentially existential liability. An inadvertent failure to disclose potentially triggers liability to the entire "affected" cohort and for the full amount of their loans. Liability could be in the millions of dollars (even hundreds of millions for larger institutions) for an inconsequential and inadvertent omission.

The Department's rationale lacks a reasoned basis. It says that "[b]orrowers who relied on such misrepresentations, even if they were made unintentionally, may still have experienced the harm of attending a particular institution or borrowing Federal student loans on the basis of untruths or omissions."[126] But the Department does not require proof of harm to the borrowers, and thus this rationale is not availing. On one hand, the Department acknowledges that it is essential that an omission "must be serious enough" to have influenced a borrower's decision. Curiously, however, the Department proceeds to create the presumption that (by default) an

---

[126] 87 Fed. Reg. 41,893.

The Honorable Miguel A. Cardona
Secretary of Education
Page 46 of 137

omission is deemed serious enough to have influenced a borrower's decision. What good is

acknowledging the need to create a principled requirement, only to then render it toothless? The

Department should proceed by defining required disclosures in advance and punishing

noncompliance, and making an omission of fact the basis for a BDR *only if* it renders actual

representations upon which the borrower relied misleading, or if the school knowingly permits

the borrower to rely on mistaken assumptions of fact. Here, placing potentially existential liability

on the absence of certain disclosure that is determined to be required only in after-the-fact

adjudication is unfair to schools and does not serve the public interest.

3. *The Department's inclusion of breach of contract as a basis for a BDR claim is constitutionally infirm and does not satisfy the Department's obligation to define "acts and omissions" under the statute.*

The Proposed Rule provides that a borrower may assert a BDR claim where:

> The institution failed to perform its obligations under the terms of a contract with the student and such failure was in connection with the borrower's decision to attend, or to continue attending, the institution or the borrower's decision to take out a Direct Loan or other Federal student loan that is consolidated into a Federal Direct Consolidation Loan.[127]

The Department should not include breach of contract as a ground supporting a BDR claim. The

Department is not authorized to resolve private contract disputes, and doing so would violate

principles of Federalism. Nor is the Department equipped to evaluate such claims. Further, the

Department has failed to define the elements of a breach of contract claim, including what types

of breach are cognizable, and thus has abdicated its duty to define the types of acts or omissions

that formulate a BDR claim.

---

[127] § 685.401(b)(3).

A. <u>The Department is not authorized to litigate and enforce private contracts governed by State law.</u>

Fundamentally, the Department's decision to make itself the arbiter of breach of contract claims in the BDR context runs afoul of the Supreme Court's decision in *Am. Airlines, Inc. v. Wolens*. In that matter, the Court held that a Federal agency had neither the authority nor the apparatus required to superintend a contract dispute resolution regime," and therefore declined to "foist on the [agency] work Congress has neither instructed nor funded the Department to do."[128] Indeed, as a general matter, the Supreme Court has "not been quick to infer agency authority to adjudicate private claims," especially when the authorization is not explicit and Congress has not prescribed adjudicatory procedures.[129]

Indeed, even if *arguendo* Congress authorized the adjudication of BDR claims generally (which it did not), Article III of the Constitution prohibits the Department from adjudicating breach-of-contract claims. Under the public rights doctrine and separation of powers, executive departments and agencies may only adjudicate a claim that "derives from a Federal regulatory scheme, or in which resolution of the claim by an expert Government agency is deemed essential to a limited regulatory objective within the agency's authority. In other words, it is still the case that what makes a right 'public' rather than private is that the right is integrally related to particular Federal Government action."[130] Similarly, because breach-of-contract claims are not

---

[128] *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 232, 234, 115 S. Ct. 817, 825, 826, 130 L. Ed. 2d 715 (1995); *see also JI Case Co. v. NLRB*, 321 U.S. 332, 340 (1944) (The NLRB "of course, has no power to adjudicate the validity or effect of such contracts except as to their effect on matters within its jurisdiction.").

[129] *Bank One Chicago, N.A. v. Midwest Bank & Trust Co.,* 516 U.S. 264, 274 (1996).

[130] *Stern v. Marshall*, 564 U.S. 462, 490-491 (2011) (finding that that a State law counterclaim was not a public right).

The Honorable Miguel A. Cardona
Secretary of Education
Page 48 of 137

public rights and litigants have a right to a jury trial of such claims in Federal court, the

Department's rule also violates the Seventh Amendment.[131] Thus, the Department's authority

does not extend to adjudicating a standalone State law breach of contract claim between private

actors – one that is not ancillary to a Federal claim, or a counterclaim arising out of the same

transaction as a Federal claim.[132]

> ### B. Congress did not authorize the Department to impair private contract rights.

Contracts are property and impairment of contract raises constitutional concerns.[133]

The Contract Clause, applicable to the States, "prohibits special-interest redistributive laws, even

if the legislation might have a conceivable or incidental public purpose."[134] Moreover, although

the U.S. Congress may have the power to impair private contracts if it has a rational basis to do

so, it should not be inferred that such powers have been granted to a Federal administrative

agency such as the Department.[135]

State law defines contractual rights of defendants in terms of defenses, limitations on

who can enforce contracts (e.g., assignees or third-party beneficiaries), and limitations on

---

[131] *See, e.g., Granfinanciera, S.A., v. Nordberg*, 492 U.S. 33, 51-52 (1989) ("[Congress] lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury.").

[132] *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 852 (1986) (permitting adjudication of a State law *counterclaim*, "subject to judicial review, when that claim was ancillary to a Federal law dispute").

[133] *See United States Trust Co. v. New Jersey*, 431 U.S. 1, 19 n.16 (1977) ("Contract rights are a form of property and as such may be taken … provided that just compensation is paid"), *Lynch v. United States*, 292 U.S. 571, 579 (1934) ("Valid contracts are property, whether the obligor be a private individual, a municipality, a State, or the United States.")

[134] *Ass'n of Equip. Mfrs. v. Burgum*, 932 F.3d 727, 732 (8th Cir. 2019).

[135] *See Schor, supra*; *see also Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) ("the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere").

The Honorable Miguel A. Cardona
Secretary of Education
Page 49 of 137

remedies (including monetary remedies) for breach. States also have defined statutes of limitations that apply to breach of contract actions, which may vary from State to State.

By establishing its own peculiar BDR right of action for contract breach, the Department is impermissibly abrogating State law rights. For example, as a general matter, State contract law typically allows only damages based on expectation interest as measured by loss of value of performance or by incidental or consequential losses *caused by the breach* (less the cost savings of the plaintiffs not having to perform), with exclusions for damages that are unforeseeable, avoidable, or uncertain.[136] The Department's proposal, as discussed below, does not include the requirement that a borrower prove, or even allege, damages caused by the breach in order to recover. The Department is simply creating its own law of borrower recovery from contract breaches, even though the latter is governed by specific State law. This effectively allows the Department to pre-empt State contract laws by awarding a form of consequential discharges to borrowers who have not shown any cognizable damages that are causally connected to a breach, or established their efforts to mitigate or avoid such damages. Under our system of Federalism, Congress is not deemed to intrude upon areas of traditional State power absent a clear statement of intent to do so.[137] Section 455(h) is no such clear statement authorizing the Department's extraordinary encroachment upon State contract law.

Further, the Department has abrogated an important State law right of institutions derived from statutes of limitations, which can vary depending on the State and the type of contract. Under the Proposed Rule, borrowers face no statute of limitations to bring a BDR claim

---

[136] Restatement (Second) of Contracts §§ 347-352 (1981).
[137] *Gregory*, 501 U.S. at 460-64.

The Honorable Miguel A. Cardona
Secretary of Education
Page 50 of 137

for breach of contract. BDR claims will now be brought for contract breaches even when State law causes of action for breach are extinguished. It would be extraordinary if Congress were to abrogate State statutes of limitation for enforcement of contract rights; it certainly did not authorize the Department to do so here, much less with the clarity the Constitution demands.

Finally, contracts may generally be enforced only by parties or, in carefully delineated circumstances, third-party beneficiaries,[138] and are typically enforced in court before judges and juries. (There is no warrant for the Department's flawed proposal that allows State attorneys general to intrude in private contract disputes and pursue group claims on behalf of a class of students.) And judicial actions are single adversarial proceedings with plaintiffs and defendants in opposition in which all claims, defenses, and remedies are resolved after discovery of relevant facts. The Department has no grounds to subject contract disputes to impermissible bifurcated proceedings involving no discovery, a series of presumptions that are not grounded in State law, and procedures designed to prejudice the rights of institutions.

The Department resolves contract rights in a BDR proceeding, and then shifts the discharge liability to the schools in a program-review type recoupment proceeding, which is not a proper adjudication proceeding. Here, schools will have no opportunity to assert the defenses and/or counterclaims that may be available to a contract counterparty under State law. This structure never contemplated by Congress – which deprives schools of the finality from proceedings that allow a full and fair opportunity to litigate – also risks a multiplicity of actions on the same contract. Section 455(h) cannot be stretched to the adjudication of contract rights.

---

[138] *See* Restatement (Second) of Contracts § 302.

The Honorable Miguel A. Cardona
Secretary of Education
Page 51 of 137

> C. Section 455(h) Does Not Permit the Recognition of an Indefinite Class of Institutional Acts and Omissions As Borrower Defenses to Repayment.

The Department's bald recognition of potentially every institutional act or omission governed by contract as a borrower defense to repayment does not comport with Section 455(h). As discussed above, Congress required the Secretary to "*specify* in regulations *which acts or omissions* of an institution of higher education a borrower may assert as a defense to repayment of a loan."[139] Simply designating all acts or omissions, of whatever kind, that breach a contract as borrower defense does not satisfy the statute's specification requirements because the Department has not undertaken the fundamental analysis of whether such an act or omission is so harmful to the borrower that the borrower should be relieved of his contractual duty to the United States of repayment of a Direct Loan. For example, a contract may require that the institution perform a certain duty within a period of X days, but (where time is not of the essence) a breach of that duty cannot possibly justify a defense to repayment. It is no answer that perhaps, under the (standard-less) provisions of the rule that govern discharge amounts, a given Departmental Official could deny any discharge of loan obligations. The question of whether a particular act or omission may be asserted "as defense to repayment of a loan" is antecedent to the question of what amount of discharge may be given. The Department cannot categorically designate all contractual breaches as "defense[s] to repayment" because not all such breaches meet the standard of having an adverse effect on the borrower that would make performance of her contractual repayment obligation inequitable.[140]

---

[139] 20 U.S.C. § 1087e(h) (emphasis added).
[140] *See supra* Section IV.

The Honorable Miguel A. Cardona
Secretary of Education
Page 52 of 137

D. The Department is not equipped to make breach of contract determinations under State law.

In the preamble, the Department recognizes that adjudicating cases under a State law standard would create chaos, stating: "Requiring the adjudication of State laws at the outset would be confusing, burdensome, and can lead to inconsistent treatment across the States." This is not the first time the Department has acknowledged this problem. In 2016,[141] the Department conceded that, when State laws are applied in the BDR context, "potential disparities may exist as students in one State may receive different relief than students in another State, despite having common facts and claims."[142] And certainly the unidentified officials that may conduct the BDR proceedings – who are apparently not required to be administrative law judges, or even trained in the law—are unlikely to be able to raise the myriad complex issues that arise in contract disputes.

Nevertheless, the Department has proposed a breach of contract as a basis for a BDR claim. Notably, in support of its position that it is appropriate to include breach of contract in the BDR Rule, the Department refers to State court decisions involving breaches in the postsecondary education context.[143] As the *Supplee v. Miller-Motte Bus. Coll., Inc.,* decision (cited by the Department) illustrates, evaluating breach of contract claims in the educational context involves

---

[141] 81 Fed. Reg. 75,943 ("The comments suggest some confusion about the Department's standard for evaluating breach of contract claims. For loans first disbursed prior to July 1, 2017, the Department will continue to recognize any applicable State-law causes of action, in accordance with the State of the law prior to these regulations.")

[142] In 2016, the Department anticipated "[d]eveloping a Federal standard in the particularized area of student-institution contracts," which it hoped would "ultimately lead to better consistency and greater predictability in this area." 81 Fed. Reg. 75,943. The Proposed Rule makes no reference to such Federal standard having been developed such that it could be applied at this time.

[143] 87 Fed. Reg. 41,893.

The Honorable Miguel A. Cardona
Secretary of Education
Page 53 of 137

nuanced analyses under relevant State laws. For example, in *Supplee*, the court assessed whether, under North Carolina precedent, a contractual relationship between the student and the institution existed, whether the borrower had pointed to a specific contractual promise that the school had failed to honor (specifically, one that did not "involve an 'inquiry into the nuances of educational processes and theories'"),[144] and whether the breach was material.[145] It is unclear how the Department intends to reconcile State laws that conflict with each other, or State laws that conflict with the BDR Rule (e.g., North Carolina's application of a materiality standard, which, as discussed below, the BDR Rule does not appear to contemplate), but it would be improper for the Department to simply ignore relevant State laws in favor of an ill-defined and oversimplified "Federal standard."

Further, the Department – which is keenly concerned with operational burden elsewhere in its proposal – ignores its 2016 concessions regarding "the administrative burden to the Department and difficulties Department has experienced in determining which States' laws apply to any borrower defense claim and the inherent uncertainties, in interpreting another authorities' laws. 81 FR 39339."[146] Indeed, the Department's intent, as stated elsewhere in the preamble, is to promote a "uniform Federal standard" and to relegate State law standards to the

---

[144] *Id.*, 768 S.E.2d 582, 592 (2015) (quoting *Ryan v. Univ. of N.C. Hospitals*, 494 S.E.2d 789 (1998)).

[145] *See Supplee* 768 S.E.2d 582 at 593 ("It is well established that "[i]n order for a breach of contract to be actionable it must be a material breach, one that substantially defeats the purpose of the agreement or goes to the very heart of the agreement, or can be characterized as a substantial failure to perform." *Long v. Long*, 160 N.C.App. 664, 668, 588 S.E.2d 1, 4 (2003) (citation omitted).")

[146] 81 Fed. Reg. 75,938, citing 81 Fed. Reg. 39,339 ("the reliance upon State law presents a significant burden for borrowers who are making a threshold determination as to whether they may have a claim and for Department officials who must determine the applicability and interpretation of laws that may vary from one State to another").

The Honorable Miguel A. Cardona
Secretary of Education
Page 54 of 137

reconsideration of group claims, noting that "a violation of State law could form the basis for a borrower defense claim, but only if the borrower, or a State requestor in the case of a group claim brought by a State requestor, requests reconsideration of the Secretary's denial of a claim."[147] But the Department's inclusion of a breach of contract claim – which necessarily implicates State laws – effectively writes a State law standard back into the BDR framework for the initial adjudication of a borrower defense claim.

> E.  <u>The Department has not defined what constitutes a contract or identified the elements of a breach.</u>

Distilled to its most basic elements – without the nuances presented by individual State laws – the elements required to prove a breach of contract claim are:

1. A valid contract between the parties;
2. A breach of the contract; and
3. Damages caused by the breach.[148]

The Proposed Rule is flawed because it does not explain what constitutes a valid contract in the BDR context, it does not state what "acts or omissions" constitute breaches of contract (a required element of a breach of contract claim), and it does not require borrowers to demonstrate that they suffered damages from the breach. In addition, the Rule does not require

---

[147] 87 Fed. Reg. 41,896.

[148] *See, e.g., Camarda v. Certified Fin. Planner Bd. of Standards, Inc.*, 672 F. App'x 28, 29 (D.C. Cir. 2016) (interpreting District of Columbia law); *Woytas v. Greenwood Tree Experts, Inc.*, 237 N.J. 501, 512, 206 A.3d 386, 392 (2019); *JP Morgan Chase v. J.H. Elec. of New York, Inc.*, 69 A.D.3d 802, 803, 893 N.Y.S.2d 237, 239 (2010); *Abdelhamid v. Fire Ins. Exch.*, 182 Cal. App. 4th 990, 999, 106 Cal. Rptr. 3d 26, 32 (2010); *El-Khalil v. Oakwood Healthcare, Inc.*, 504 Mich. 152, 164, 934 N.W.2d 665, 672 (2019). Some states – including North Carolina, in the *Supplee* decision that the Department cites in the preamble – require that the breach be material. *See also Friedman v. New York Life Ins. Co.,* 985 So. 2d 56, 58 (Fla. Dist. Ct. App. 2008) ("An adequately pled breach of contract action requires three elements: (1) a valid contract; (2) a material breach; and (3) damages.").

The Honorable Miguel A. Cardona
Secretary of Education
Page 55 of 137

borrowers to demonstrate that they relied on the conduct that allegedly constitutes the breach, and does not require borrowers to establish that an alleged breach was material.

The Department, in 2019, in explaining its decision to exclude breach of contract as a basis for a BDR claim, acknowledged that the 2016 rule "did not identify the elements of a breach of contract and did not define what may constitute a contract between the school and the borrower." The Department contends that the Proposed Rule, which restores a breach of contract claim, has addressed the Department's 2019 concerns by "clarifying" that, under the new rule, an act supporting a BDR claim "must be related to the making of a Direct Loan or the provision of educational services."[149] This "clarification" does not cure the Proposed Rule's fatal flaws.

First, the Department still has not provided any clarity regarding how it will define a contract when evaluating BDR claims. In 2016, when assessing adjudication of breach of contract claim, the Department admitted that "it is unable to draw a bright line on what materials would be included as part of a contract because that determination is necessarily a fact-intensive determination best made on a case-by-case determination." In making this determination, the Department—under the 2016 formulation, and apparently going forward under the Proposed Rule—would "be guided but not controlled by State law."[150] This, of course, presents the problems discussed above.

Second, the Department's definition of a breach of contract does not require a borrower to demonstrate whether or how they have been damaged by the alleged breach.

---

[149] 87 Fed. Reg. 41,893.
[150] 81 Fed. Reg. 75,944.

The Honorable Miguel A. Cardona
Secretary of Education
Page 56 of 137

In addition, although the Department's clarification in the preamble to the Proposed Rule states that the breach must have been "in connection with the borrower's decision to attend, or to continue attending" a school, or to take out a loan, this does not meaningfully narrow the acts or omissions that might constitute a breach in the school environment. Borrowers could allege that almost every conceivable breach arose "in connection" with school attendance or borrowing. It would be more appropriate for the Department to clarify that breaches must be material to entitle a borrower to relief, and that the borrower relied on the specific promise that allegedly was breached. A BDR claim should not succeed simply because the borrower alleged the violation of a non-material contractual provision, which they did not rely upon and which did not cause financial harm.

We, therefore, recommend that the Department decline to include breach of contract as a basis for a BDR claim.

4. *The "aggressive recruitment" provision does not satisfy the statute and its inclusion is arbitrary and capricious.*

The Proposed Rule includes a new standalone basis for potential BDR relief: aggressive and deceptive recruitment.[151] According to the Proposed Rule, any form of aggressive and deceptive recruitment practice (of which the Department gives amorphous examples but does not adequately define) by a school, its representatives, or contractors now constitutes a defense of repayment. No proof of reliance upon, or injury to, the borrower is required. The borrower

---

[151] 87 Fed. Reg. 41,893. The 2016 Rule referenced aggressive recruitment as a factor in determining whether "a misrepresentation was substantial enough to merit approval," but it was not conduct that alone could justify a discharge. *Id.*

The Honorable Miguel A. Cardona
Secretary of Education
Page 57 of 137

need not even prove that the alleged aggressive recruitment practice was antecedent to the

relevant lending or attendance decision.

The Proposed Rule states that a borrower may assert a BDR claim where:

> The institution engaged in aggressive and deceptive recruitment
> conduct or tactics as defined in 34 CFR part 668, subpart R, in
> connection with the borrower's decision to attend, or to continue
> attending, the institution or the borrower's decision to take out a
> Direct Loan or other Federal student loan that is consolidated into
> a Federal Direct Consolidation Loan.

The Department notes that it considered including an aggressive recruitment provision in the

2016 rule, but it opted against inclusion because it was "concerned about the potential difficulty

of developing clear, consistent standards for aggressive conduct."[152] Although the Department

now is "confident that an appropriate standard can be articulated and enforced,"[153] the

Department's confidence in the clarity and enforceability of its standard is misplaced. The

Department's use of a non-exhaustive list of examples in § 668.501 without an overarching

definition constitutes an abdication of the Department's statutory duty to specify the acts or

omissions giving rise to a BDR. The Department is also inconsistent. It criticized its former

misrepresentation regulation because its reliance on non-exhaustive examples created

"unnecessary ambiguity for borrowers and institutions," for it is "unclear whether that would

mean anything else … might also still qualify as a misrepresentation, providing other

requirements are met."[154] Yet the Department adopts the same flawed approach in the

---

[152] 87 Fed. Reg. 41,895 (citing 81 Fed. Reg. 39,343).
[153] *Id.*
[154] 87 Fed. Reg. 41,890.

aggressive recruitment regulation, leaving—all of which engage in some form of student recruitment—vulnerable to liability based on amorphous and highly subjective standards.

For example, the non-exhaustive list of aggressive and deceptive tactics or conduct[155] includes:

- "Demand[ing] or pressur[ing]" a student to "make enrollment or loan-related decisions immediately" – but the rule does not explain how the Department intends to assess what might constitute improper "pressure" or how to assess the reasonableness or credibility of a student's subjective assertion that they felt pressured.

- Placing an "unreasonable emphasis" on the unfavorable consequences of delayed enrollment – but the rule does not explain how the Department intends to assess what constitutes reasonable emphasis, rather than unreasonable emphasis.

- "Tak[ing] advantage of a student's or prospective student's lack of knowledge" about postsecondary programs or financial aid – but the rule does not explain how the Department will assess whether a school or recruiter had actual knowledge about a student's knowledge about the postsecondary or financial aid processes.

---

[155] § 668.501(a).

The Honorable Miguel A. Cardona
Secretary of Education
Page 59 of 137

The Department has provided no assurance that it will be able to evaluate and enforce these types of claims – particularly in the group claim context – in such a way to ensure that schools are not wrongly held liable for good faith recruitment efforts.

Moreover, the Department acknowledges that an aggressive recruitment claim could exist even if statements made by the school were "accurate and without omissions."[156] Although the Department believes that its construction of aggressive recruitment "demonstrates that isolated instances of well-intentioned recruiter behavior will not result in an approved claim,"[157] it is impossible to reconcile the Department's belief with its incomplete list of highly subjective actions that could potentially constitute an aggressive recruitment claim, and its acknowledgement that truth is no defense.

Further, the Department's Proposed Rule allows borrowers to receive relief under an aggressive recruitment theory without requiring the borrower to demonstrate causation or injury. A student should be required to show that they would not have enrolled in a particular school or program, or borrowed funds that the student would not otherwise have borrowed, absent the alleged aggressive recruitment tactics. Otherwise, absurd results are likely to occur. For example, a school's failure to respond to a student's information request – one of the aggressive or deceptive recruitment tactics on the Department's non-exhaustive list[158]—would not have injured the student unless the information requested, but not received, would have altered their attendance or borrowing decision.

---

[156] 87 Fed. Reg. 41,894.
[157] 87 Fed. Reg. 41,894.
[158] § 668.501(a)(5).

The Honorable Miguel A. Cardona
Secretary of Education
Page 60 of 137

The vagaries of the aggressive recruitment provision are multiplied by the group claim

process proposal and the Department's rebuttable presumption "that everyone in the group was

affected" by any BDR,[159] including aggressive recruiting. Given that the grounds for asserting an

aggressive recruitment claim are numerous, highly subjective, and dependent on individualized

facts (e.g., what the prospective student knew about postsecondary education processes, and

what the recruiter knew about the prospective student's knowledge), the Department cannot

simply bypass fact-finding in favor of a presumption that all members of a group are entitled to

a discharge. Rather, the Department must determine an aggressive recruitment claim based on

individual proof and on an individual basis.

Accordingly, the Department must abandon aggressive recruitment as a standalone

ground for a BDR claim. At the very least, the Department must better define what constitutes

aggressive recruitment, require borrowers to show justifiable reliance and injury, and eliminate

the presumption of adverse effect and discharge.

5. *The Department's proposal to include any "contested judgment against an institution based on any State or Federal Law" as a basis for a BDR claim amounts to an unauthorized expansion of the borrower defense framework.*

CECU objects to the Department's proposed provision in § 685.401(b) that would

improperly recognize the following as an additional basis for a borrower defense claim:

> The borrower, whether as an individual or as a member of a class, or a
> governmental agency has obtained against the institution a favorable judgment
> based on State or Federal law in a court or administrative tribunal of competent
> jurisdiction in connection with the borrower's decision to attend, or to continue
> attending, the institution or the borrower's decision to take out a Direct Loan or

---

[159] 87 Fed. Reg. 41,904.

other Federal student loan that is consolidated into a Federal Direct Consolidation Loan.[160]

Critically, under the proposed amendment, the proposed standard would apply regardless of whether the judgment was obtained by the borrower as an individual or member of a class, or was obtained by a State's Attorney General or other governmental agency. And, although the proposed regulation does not contain this language, the Department indicates that this defense would apply to a "nondefault, contested judgment obtained against an institution based on any State or Federal law, whether obtained in a court or in an administrative tribunal of competent jurisdiction."[161]

This provision of the BDR Rule violates the statute. Section 455(h) provides that "the Secretary shall *specify* in regulations *which acts or omissions* of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part."[162] A judgment against an institution is not an "act or omission" of an institution. Furthermore, judgments can be based on an indeterminate number of acts or omissions of institutions that happen to violate Federal law, State statutory or regulatory law, State common law, municipal law, or even foreign law. The Department has thus abdicated its duty to "specify … which acts or omissions of the institution" should give rise to a borrower defense. And by failing to undertake such specification, the Department has not analyzed why such acts justify relieving the borrower of her contractual duty of repayment, which is the expert decision that Congress delegated to the Secretary to make.

---

[160] 87 Fed. Reg. 42,005 (§ 685.401(b) (*Borrower defense to repayment,* subpart 5(i)); *see also id.* at 41,889, 41,921.
[161] *Id.* at 41895.
[162] 20 U.S.C. § 1087e(h) (emphasis added).

The Honorable Miguel A. Cardona
Secretary of Education
Page 62 of 137

The Department has not complied with the statute by purporting to limit applicable judgments to those "in connection with the borrower's decision to attend, or to continue attending, the institution or the borrower's decision to take out a Direct Loan or other Federal student loan that is consolidated into a Federal Direct Consolidation Loan."[163] First, the fact that a judgment has such a connection is not the specification of particular institutional acts or omissions that give rise to a borrower defense.

Second, even if the Department's intent is to identify judgments where the institution's act or omission has "connection with" attendance or lending decisions that would not cure the statutory violation. "In connection with" is a phrase of "broad reach."[164] The Supreme Court has recognized that the broad phrase "'in connection with' is essentially indeterminate because connections, like relations, stop nowhere."[165] This provision falls well short of "specify[ing]" the acts or omissions that warrant borrower relief from repayment. Almost all acts or omission of the institution relating to a student are connected to attendance, continuation of attendance, or borrowing decisions. Under the proposed amendment, any and all Federal, State, municipal, and foreign law violations could be grounds for a borrower defense claim and, therefore, an award of loan discharge – despite the fact that the act or omission giving rise to the claim has not independently been deemed by the Department as a worthy basis for a borrower defense claim.

---

[163] 87 Fed. Reg. 42,005 (§ 685.401(b) (*Borrower defense to repayment,* subpart 5(i)).

[164] *United States v. Sturtevant*, 62 F.3d 33, 34 (1st Cir.1995) (per curiam); *Huntsman v. CIR*, 905 F.2d 1182, 1184-85 (8th Cir. 1990).

[165] *Maracich v. Spears*, 570 U.S. 48, 59 (2013) (quotation altered).

The Honorable Miguel A. Cardona
Secretary of Education
Page 63 of 137

Third, an act or omission should not qualify as a BDR merely because it happens to be embodied in a judgment. This proposal will invite disparate treatment even when not factually justified, which does not comport with Section 455(h) and is arbitrary and capricious.

To permit any judgment based on any Federal or State law to serve as the basis for a borrower defense claim would defeat the purpose of the borrower defense provisions, which require the Secretary to evaluate and specify which acts or omission of the institution justify loan discharge. And, for the same reasons discussed with regard to breach of contract, the Department does not have authority to supplement State law or other Federal laws it does not administer by creating additional liability or relief and overriding legal restrictions on relief, nor may it effectively extend any applicable statute of limitations. This is yet another example of a proposed amendment designed to ensure increased loan discharges and administrative recoupment, regardless of whether the grounds for the underlying claim are attenuated or meritless.

The Department's rule also offends longstanding principles of claim preclusion. A prior judgment "'prevents litigation of *all grounds for*, or defenses to, *recovery* that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding.'"[166] A claim that is precluded is defined not by the legal theory asserted, but by whether it arises from the same transaction or common nucleus of operative fact.[167] "If the

---

[166] *Lucky Brand Dungarees, Inc. v. Marcel Fashions Group, Inc.*, 140 S. Ct. 1589, 1594-95 (2020) (emphasis added) (quoting *Brown v. Felsen*, 442 U.S. 127, 131 (1979). Applying State law of claim preclusion to state court judgments is commanded by the Full Faith and Credit Clause of the U.S. Constitution. *See Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985).
[167] *Id.* at 1595.

The Honorable Miguel A. Cardona
Secretary of Education
Page 64 of 137

plaintiff wins, the entire claim is merged in the judgment; the plaintiff *cannot bring a second independent action for additional relief*,"[168] even under a different legal theory,[169] and even if the plaintiff could not have recovered the same relief in the first tribunal.[170] "[C]laim preclusion … has at its fundamental base the vindication of private litigants' interest in repose."[171] So if a borrower has won a judgment against a school, any right the borrower has to further relief from those acts or omissions of the school is extinguished. And the Department cannot simply disregard claim preclusion by the ruse of bifurcating proceedings so that the BDR claim is brought only against the Secretary, with the Secretary then recouping liability from the school. In substance, the BDR operates prospectively to impose liability on the institution for any discharge granted to the borrower. It is at a minimum arbitrary and capricious to trample on the institution's rights of repose in a judgment. And there is no reason for the Department to grant additional relief when the court that issued the judgment and evaluated the facts and the nature of the legal violation presumably granted the plaintiff the full relief to which they were entitled.

Finally, not only is this provision contrary to Section 455(h), but the Department's rationale is unavailing. The Department has justified including any judgment against an institution as part of the Federal standard, and resurrecting an aspect of the 2016 rule that was abandoned in 2019, on the grounds that it would "allow for recognition of State law and other Federal law causes of action, but would also reduce the burden on the Department and

---

[168] *Id.* (emphasis added).
[169] *Gonzales v. Cal. Dep't of Corrections*, 739 F.3d 1226, 1232 (9th Cir. 2014) (California law).
[170] *Restatement (Second) of Judgments* § 24, cmt. g.
[171] *Clements v. Airport Auth. Of Washoe Cty.*, 69 F.3d 321, 330 (9th Cir. 1995); *EDP Med. Comput. Sys., Inc. v. United States*, 480 F.3d 621, 624 (2d Cir. 2007) ("Res judicata is a rule of fundamental repose important for both the litigants and for society.") (internal quotation marks omitted).

borrowers of having to make determinations on the applicability and interpretation of those laws."[172]

Reducing the burden on the Department is not a rationale for abdicating its specification duties under Section 455(h). That said, to the extent the Department has adjudicatory authority, it may accord judgments the normal preclusive effects that the rendering court jurisdiction affords,[173] and claim or issue preclusion may reduce the Department's administrative burden. But preclusion works both ways. If the borrower has already received a judgment for a particular violation of law, that should be *res judicata* end of the matter, regardless of whether the borrower might reap more benefits for the same act or omission. A judgment may also preclude re-litigation of issues, but issue preclusion should be applied neutrally whether it benefits the borrower or the institution.

Accordingly, the Department should remove the proposed prior-judgment BDR.

6. *The proposed regulation violates the statute, the Constitution, and the Administrative Procedure Act in attempting to include Department final actions as a basis for a borrower defense claim.*

The Department's proposal to include prior "Departmental final actions" as a basis for a borrower defense claim is unlawful for several reasons.[174]

First, the proposed regulation violates the statute. The HEA requires the Department to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan."[175] The proposal abdicates that duty because it

---

[172] *Id.* at 41,896.
[173] *Matsushita Elec. Indus. Co., Ltd. v. Epstein,* 516 U.S. 367, 375 (1996).
[174] *See* 87 Fed. Reg. at 41,896; proposed § 685.401(b)(5)(ii).
[175] 20 U.S.C. § 1087e(h).

makes "any adverse action" that "could give rise to a borrower defense claim" under other provisions into a borrower defense. That does not "specify" any "acts or omissions."

In addition, as discussed above, the HEA requires individual borrowers to prove that they have suffered some injury as a prerequisite for any borrower defense to repayment claim. *See supra* Section IV. But the Department's proposal does not require any such injury. Indeed, and departing even further from the statute, the proposal does not require that the Department's action satisfy the standards for a borrower defense claim; only that the "reasons" underlying the adverse Department decision "*could* give rise" to a borrower defense claim under one of the BDR provisions.

Second, the proposed regulation violates fundamental principles of collateral estoppel, which are grounded in due process.[176] As the Supreme Court has explained, collateral estoppel applies to agency action only "[w]hen an administrative agency is acting in a judicial capacity and resolved disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate."[177]

The Department's proposal runs afoul of that requirement. The Department's "final action" may have resulted from a non-adjudicative process, such as an audit or program review. In addition, the proposal does not ensure the institution a full and fair opportunity to litigate the borrower defense aspect of the "Department final action." The proposal does not guarantee notice to the institution that the Department action may subsequently be used to determine a borrower defense claim. Indeed, to the contrary, the proposal indicates by its own terms that the

---

[176] *Blonder-Tongue Lab'ys, Inc. v. Univ. of Illinois Found*., 402 U.S. 313, 329 (1971) (due process prohibits applying collateral estoppel in certain circumstances).
[177] *United States v. Utah Const. & Min. Co*., 384 U.S. 394, 422 (1966).

The Honorable Miguel A. Cardona
Secretary of Education
Page 67 of 137

Department action need only involve "reasons that could give rise to a borrower defense claim."[178] The proposal also does not guarantee the institution an opportunity to be heard regarding the borrower defense aspect of the other proceeding because that other proceeding may be non-adjudicative, such as an audit or a program review. The proposal thus violates the principles of collateral estoppel that are fundamental to agency practice and due process.

Third, the Department's proposal is arbitrary and capricious, for the reasons stated above and for at least one additional reason. The only rationale that the Department offers is that it "wants to consider all information available to it."[179] Desiring to consider information that is available in other proceedings does not, however, justify blindly adopting the conclusions of those proceedings. That is arbitrary and leaves the proposed regulation without a reasoned basis.

### V.   The Group Process Proposal Violates the Statute, Is Arbitrary and Capricious, and Violates the Due Process Rights of Schools

The Department's proposed regulations attempt to resurrect and then enlarge the flawed group adjudication process in the 2016 regulations.[180] The proposal exceeds the Department's statutory authority, is arbitrary and capricious in violation of the Administrative Procedure Act ("AP""), and violates the due process rights of schools.

> 1.   *The group process proposal violates the HEA.*

The group process proposal conflicts with the HEA in at least two ways. First, the statute requires a determination that an individual borrower has a defense to repayment, and that

---

[178] 87 Fed. Reg. at 42,005.
[179] 87 Fed. Reg. at 41,896.
[180] *See* 87 Fed. Reg. 41,898-41,900.

The Honorable Miguel A. Cardona
Secretary of Education
Page 68 of 137

necessarily requires a showing of injury and the repayment amount to be discharged. Second, the Department lacks the authority to authorize group or class action procedures.

First, the Department's proposal conflicts with the statutory requirement that the Secretary make a determination that a borrower has a defense to repayment. As discussed above, and as the Department previously recognized, a borrower has a defense to repayment under the statute only when they were injured to a specific extent by the school's conduct.[181] The Department's proposal for class action or group procedures to adjudicate claims is inconsistent with that requirement in that it provides no mechanism for the determination of whether an individual borrower was in fact injured and to what extent the borrower was injured for purposes of the amount of discharge.

Second, the Department lacks the authority to promulgate group or class action procedures. "Agencies have only those powers given to them by Congress."[182] In addition, under the major questions doctrine, it is presumed that "Congress intends to make major policy decisions itself, not leave those decisions to agencies."[183]

Here, Congress has not authorized the Department to promulgate group or class action procedures. Quite the contrary, Congress authorized the Department merely to specify which "acts or omissions" "a borrower" may assert as a "defense." As discussed above, the statute does not provide authority for an affirmative adjudication scheme, but rather the specification of standards a particular borrower must meet to raise a defense to a collection proceeding. To the

---

[181] *See* 84 Fed. Reg. 89,400 ("[T]the Department has an obligation to taxpayers to independently assess the strength of each borrower defense claim.").
[182] *West Virginia v. Environmental Protection Agency*, 142 S. Ct. 2587, 2609 (2022).
[183] *Id.* (internal quotation marks omitted).

The Honorable Miguel A. Cardona
Secretary of Education
Page 69 of 137

extent the statute authorizes an affirmative adjudication scheme at all, it would stretch the

statutory text beyond recognition to take the singular phrase "a borrower," the authorization to

specify *standards*, and the statutory term "defense" and transform the statute into authorization

for the Department to promulgate for plural "borrowers" a set of group or class action *procedures*

that are not for a "defense" but for an offense, and in which a Department official acts as an

advocate. The clear statutory text forbids the Department's proposal.

Lest the text leave any doubt, Congress' explicit provision of class action or group

procedures for other agencies removes it. When Congress knows how to provide an agency with

particular authority, its failure to do so for another agency is telling.[184] Congress knows how to

provide an agency the authority to promulgate group or class action procedures. For example,

Congress authorized, within two years of its enactment of the borrower defense statute, the

Commodity Futures Trading Commission the power to hear cases brought on behalf of "other

persons similarly situated, if the [CFTC] permits such actions pursuant to a final rule issued by the

[CFTC]."[185] It also authorized the Consumer Product Safety Commission to hold hearings in which

"a class of participants who share an identity of interest" participate "through a single

representative."[186] That authorization is notably missing from the HEA.

That omission is particularly important because the promulgation of group or class action

procedures is the very type of "major question" that courts expect Congress to address explicitly.

Resolving claims through group or class action procedures is a significant policy decision in

---

[184] *See, e.g.*, *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177
(1994); *BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1539 (2021).
[185] 7 U.S.C. § 18(a)(2)(A).
[186] 15 U.S.C. § 2064(f)(1).

multiple ways. First, as the Department recognized in the course of rescinding group procedures in the 2019 regulations, "a group discharge process could place an extraordinary burden on both the Department and the taxpayer."[187] Indeed, other agencies have rejected group and class action procedures on precisely the ground that it would burden the agency and claimants.[188] Second, the Department itself admits it would disproportionately burden the public fisc, by acknowledging that most of the cost of the proposed borrower defense regulations will arise from the granting of group claims.[189]

The Department has appealed to a World War II-era Supreme Court case, *FCC v. Pottsville Broad. Co*., involving the FCC's decision to decide in one proceeding which of three applicants for the same broadcast facility should receive the requisite FCC license.[190] That case does not justify interpreting the borrower defense provision to authorize the proposed class action or group procedures. As an initial matter, *Pottsville*'s aggrandizement of agency authority is a historical anomaly of a pre-APA era at odds with modern Supreme Court precedent such as *West Virginia v. EPA*. In addition, *Pottsville* involved the consolidation of multiple proceedings into one proceeding, not the creation of class action and group procedures that eliminate individualized fact-finding.

Finally, unlike in *Pottsville*, the Department proposes to bind absent class members—it admits it cannot even identify, let alone contact, all class members.[191] Federal courts rely on their

---

[187] 83 Fed. Reg. 37,244 (2018).
[188] *E.g.,* Rules Relating to Reparation Proceedings, 59 Fed. Reg. 9,631 (Mar. 1, 1994) (CFTC rejecting such a rule).
[189] *See* 87 Fed. Reg. 41,957-61.
[190] *See* 87 Fed. Reg. 41,899 (citing *FCC v. Pottsville Broad. Co*., 309 U.S. 134, 138 (1940)).
[191] *See* 87 Fed. Reg. 41,898 & n.18.

The Honorable Miguel A. Cardona
Secretary of Education
Page 71 of 137

equitable authority to exert that authority, but agencies do not have inherent authority of any kind absent congressional authorization, let alone equitable authority.[192]

The Department's proposal is especially problematic because it does not address the collateral consequences of group discharge that it previously acknowledged, which include, but are not limited to, the fact that, "[b]ecause an institution can refuse to provide an official transcript for a borrower whose loan has been forgiven, group discharges could render some borrowers unable to verify their credentials or work in the field for which they trained and have enjoyed employment."[193]

    2. *The group process proposal is arbitrary and capricious.*

The Department's group process proposal violates the APA because it is arbitrary and capricious. The proposal depends on a series of unjustified presumptions that favor loan forgiveness and does not accomplish the HEA's obligation regarding borrower defense clams.

As an initial matter, there is no reasoned basis for a group process. The Department's only stated rationale is that a group or class action procedure would be "more efficient."[194] But it provides no supporting documentation or evidence for that assertion. That omission is especially damning because issues that are common to multiple borrower defense claims could be adjudicated in individual proceedings and, if the institution is given a full and fair opportunity to litigate those issues, given issue preclusion in subsequent proceedings. The Department's appeal

---

[192] *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 808 (1985) ("[T]he class action was an invention of equity to enable it to proceed to a decree in suits where the number of those interested in the litigation was too great to permit joinder. The absent parties would be bound by the decree[.]").

[193] *See* § 685.206(e)(8)(vi).

[194] 87 Fed. Reg. 41,899.

The Honorable Miguel A. Cardona
Secretary of Education
Page 72 of 137

to efficiency is thus a red herring and leaves the group process proposal without any adequate rationale, notwithstanding its well-documented defects that the Department has previously recognized.

The Department implies that it will be able to grant a higher rate of borrower defense claims through a group process.[195] That is a wholly improper rationale for adopting a group procedure: procedural changes are not supposed to alter substantive outcomes.[196] That divergence in predicted approval rate also indicates that the adoption of the group procedure is in fact an alteration of the substantive standard for the approval of a borrower defense claim. (Indeed, the presumption of reliance is in fact different for group claims, *see infra* Section V). That the group process rests on an altered standard further undermines the Department's assertion that it has authority to promulgate a class action or group procedure under an authority to regulate its own procedures.

The Department's group process proposal also fails to specify adequate criteria for when a group process is appropriate. The proposal would permit the Department to institute a group process, "upon consideration of factors including, but not limited to, common facts and claims by borrowers, and the promotion of compliance by an institution or other title IV, HEA program participant" (*see* proposed § 685.402). Both of these criteria are arbitrary and capricious.

The first criteria—common facts and claims—is merely a threshold question, not a definitive basis for proceeding with a group determination.[197] The mere presence of some

---

[195] *See* 87 Fed. Reg. at 41,959 (estimating higher rate of approval for group claims).
[196] *See, e.g.*, 28 U.S.C. § 2072 (Federal Rules Enabling Act providing that procedural rules, including class action rules, "shall not abridge, enlarge or modify any substantive right").
[197] *See* Fed. R. Civ. P. 23(a) ("questions of law or fact common" to group is "prerequisite").

The Honorable Miguel A. Cardona
Secretary of Education
Page 73 of 137

common facts and claims does not justify proceeding on a class basis, because the presence of other individualized facts and claims may render group determination inappropriate.[198] This criteria is over-inclusive.

The second criteria—promoting compliance—fares no better. That is a results-oriented consideration that has no bearing on whether a group or individualized adjudication is appropriate. Rather, it resembles the type of "in terrorem" concerns that have motivated the Supreme Court to restrict the use of class actions in Federal courts.[199] It is arbitrary to determine whether to proceed on a group basis in a present proceeding based on whether doing so will affect in the future a regulated party's behavior. That is especially true because the Department elsewhere estimates that the effect of its regulations on behavior is minimal in the short-term.[200]

The Department also proposes to form groups of its own accord in the presence of "actions by …. State attorneys general, other State agencies or officials, or other law enforcement activity" or "Lawsuits related to educational programs filed against the institutions." 87 Fed. Reg. 42,006. These circumstances are inconsistent with the Department's reasoning elsewhere. The first circumstance is inconsistent with the Department's proposed empowerment of states in the group requestor process because it would enable the formation of a group even when the State, which the Department terms a key partner whose views should be respected, does not request a group process. The second circumstance is even more troubling: it makes the Department's (welcome) decision not to empower non-profit organizations and other advocacy organizations

---

[198] *See* Fed. R. Civ. P. 23(b).
[199] *See AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 350 (2011) (class actions can entail a "risk of 'in terrorem' settlements").
[200] *See* 87 Fed. Reg. 41,960.

The Honorable Miguel A. Cardona
Secretary of Education
Page 74 of 137

in the group request process illusory, because those organizations can merely file a lawsuit to trigger the Department to form a group.

The Department's group process proposal fails to limit class-like procedures to common issues and ensure separate determination of matters that require individualized proof. To the extent that the Department enjoys authority to promulgate class-like procedures, it is arbitrary and capricious not to limit those procedures to common issues, as opposed to matters that require individualized proof. The Department's proposal, however, does not follow this course. It instead rests on its determination that certain individualized inquiries, including reliance, effect or injury, and the amount of harm for calculation of discharge amount, are simply not required by the statute and can be presumed. Once those unfounded presumptions are rejected, as they should be, the Department's group process proposal collapses into incoherence because it provides no way to conduct the individualized fact-finding required for these inquiries.

One need look no further than the Department's own discussion of the timeline for adjudication of a group claim to see that the Department plans to gloss over individualized issues in the group process. In justifying its proposal to provide for automatic discharge of group claims after two years but automatic discharge of individual claims after three years, the Department states that "[i]ndividual claims would be subject to a longer adjudication timeframe because they may include case-specific research on the merits." 87 Fed. Reg. 41,904. The obvious implication is that the Department intends to rush through group adjudication to grant bulk loan forgiveness without conducting too much "research on the merits."

But the group process proposal suffers an even greater flaw. The Department proposes to establish a "rebuttable presumption" that "each member of the group relied on the act or

The Honorable Miguel A. Cardona
Secretary of Education
Page 75 of 137

omission giving rise to the borrower defense."[201] As discussed above, *see supra* Section IV.1.A

(discussing *Chemical Manufacturers*), agencies cannot establish presumptions that have no basis

in fact, and such presumptions render meaningless the Department's commitment to the

"preponderance" standard. Here, the Department provides no explanation as to why this

presumption is reasonable. The Department gestures that "the idea behind a group claim is that

all the borrowers in the group may have been affected by the same misrepresentation,"[202] but

that is entirely circular in light of the Department's proposal not to in fact determine, when

deciding to proceed with a group claim, whether the group was so affected. What is worse, the

Department establishes a "rebuttable presumption" for reliance without any indication as to how

and by who that presumption can be rebutted. The arbitrariness of this presumption alone

dooms the Department's group process proposal.

Finally, the special role the Department envisions for State requestors in the group

process is arbitrary and capricious. The Department recognizes that non-profit organizations

should not be able to request group treatment, but provides that right to State requestors

because they have provided evidence to the Department in the past.[203] This is a non-sequitur:

that State agencies may provide evidence has no rational relationship to whether they should

have the right to request group treatment. The Department's aim becomes clear when it

recommends that nonprofit organizations work with State agencies[204]: the Department envisions

laundering the plaintiffs' attorney advocacy of many unscrupulous actors in this space, which the

---

[201] *See* § 685.406(b)(2) (proposed).
[202] 87 Fed. Reg. at 41,890.
[203] 87 Fed. Reg. at 41,899.
[204] *See id.*

The Honorable Miguel A. Cardona
Secretary of Education
Page 76 of 137

Department acknowledged in 2019, through State requestors in order to increase the number of

group process requests. The Department envisions that a single active (perhaps overly active)

State requestor can essentially set a nationwide course that obligates the Department to expend

administrative resources (even if it does not ultimately grant group status). This is arbitrary and

lacks a reasoned basis.

3. *The group process proposal violates due process.*

It is a fundamental principle that agency rules must comport with due process. The

Department's group process proposal contravenes due process norms.

Due process requires that a party be able to present a defense to allegations of

wrongdoing.[205] That includes presenting individualized evidence on matters of individualized

proof.[206] That is one reason, among others, that the Federal Rules of Civil Procedure provide

protections for defendants before authorizing class actions, including the potential use of sub-

classes.[207] It also is one reason, among others, that the Department's mass denial of claims in the

*Sweet v. Cardona* litigation was criticized.[208] Here, as discussed above, numerous issues critical

to a borrower defense claim, including reliance, injury, and damages, involve individualized issues

of proof and yet the Department has jettisoned any of the protections of Rule 23 of the Federal

---

[205] *Degen v. United States*, 517 U.S. 820, 828 (1996); *Hovey v. Elliott*, 167 U.S. 409, 433 (1897).
[206] *See, e.g.*, *Western Elec. Co, v. Stern*, 544 F.2d 1196, 1199 (3d Cir. 1976) ("defendants must be allowed to present any relevant rebuttal evidence they choose, including evidence that there was no discrimination against one or more members of the class"; "to deny [a defendant] the right to present a full defense on the issues would violate due process").
[207] *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 465 (2000) ("[t]he Federal Rules of Civil Procedure are designed to further the due process of law that the Constitution guarantees").
[208] *See, e.g., Sweet v. Cardona*, No. 19-cv-03674, Dkt. Nos. 254, 261 (July 13, 2022) (chronicling 2020 mass denial of borrower defense claims and Judge Alsup criticism thereof and Department proposal to grant all borrower defense claims).

Rules of Civil Procedure. In addition, it is not clear how the "rebuttable presumption" of reliance could in fact be rebutted. Finally, the very formation of a group is not subject to any oversight or challenge by an institution (or any entity). That is a complete denial of the opportunity to be heard at the equivalent of the class-certification stage.

The Department states that an institution would "have a separate opportunity to respond to a claim during any recoupment proceeding," but the program review proceeding it proposes as a mechanism for recoupment does not provide an effective opportunity to contest reliance, effect on borrowers, or amount of discharge. *See infra* Section VIII (discussing illegality of recoupment proposal). In addition, the Department explicitly forswears a recoupment proceeding if it does meet its arbitrary two-year deadline, after which a group claim is automatically discharged. 87 Fed. Reg. 41,904.

At the end of the day, the Department's group process proposal is another thinly-veiled attempt to institute mass loan forgiveness with minimal procedural safeguards (and automatically and at taxpayer expense if the Department is slow to act). Congress did not contemplate, in enacting a one-line borrower defense provision, that the Department would attempt to turn itself into a class action advocate riding roughshod over the rights of schools, the public fisc, and even students. Nor is it reasoned decision-making to promulgate class action and group procedures based on unfounded assumptions. The group process proposal is unlawful and must be abandoned.

## VI.    **The Department's Reconsideration Proposal Is Unlawful**

In addition to suffering from the flaw of exceeding the Department's statutory authority, *see supra* Section I (discussing lack of authority to impose adjudicatory scheme), the

The Honorable Miguel A. Cardona
Secretary of Education
Page 78 of 137

Department's proposal regarding reconsideration also is arbitrary and capricious and violates the Constitution. The Department proposes a one-sided process by which only borrowers and State requestors may seek reconsideration and in which State law matters may be adjudicated.[209] The former is discriminatory and arbitrary in violation of the APA and the latter violates due process and the Seventh Amendment.

The one-sided nature of the Department's reconsideration proposal is discriminatory and arbitrary. Administrative agencies "must accredit themselves by acting in accordance with the cherished judicial tradition embodying the basic concepts of fair play."[210] Accordingly, due process instructs administrative agencies to provide both sides of a dispute with an opportunity to be heard.[211]

Here, only one side of a dispute—the borrower or the State requestor—has the opportunity to be heard by requesting reconsideration. That is fundamentally unfair.[212] The Department posits that borrowers or State requestors may want to seek reconsideration due to administrative or technical errors and new evidence, but provides no reason to think that schools will not want to seek reconsideration on the same grounds. And it provides no reason to distinguish between schools and borrowers or State requestors in this regard, nor why duplicating judicial review for borrowers but not institutions is appropriate. Drawing such a distinction without a rationale is discriminatory, and thus arbitrary. It also is particularly harmful

---

[209] *See* 87 Fed. Reg. 41,906-08 (preamble), 42,008-09 (proposed § 685.407).
[210] *Morgan v. United States*, 304 U.S. 1 (1938).
[211] *See id.*
[212] *Cf. Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1286-1287 (9th Cir. 2006) (finding of substantive unconscionability where contract gave one party "access to a judicial forum . . . while it provided [the other party] with only the arbitral forum to resolve her claims").

The Honorable Miguel A. Cardona
Secretary of Education
Page 79 of 137

because schools are provided limited procedural rights in both discharge and recoupment proceedings.

The Department's proposal to consider State law claims for the first time on reconsideration is equally unlawful. The Department admits that it will have a difficult time administering the State law standard,[213] but then proceeds to propose establishing a system for adjudicating State law matters with fewer procedural specifications for schools than in the initial discharge proceeding. The Department provides no explanation for why it is abandoning its position since 2016 that the Department should not adjudicate State law matters.[214]

Nor is it acceptable to credit a State requestor as the "persuasive authority on that State's standard."[215] It violates due process and is inconsistent with the public interest to defer to the party seeking government action—the State requestor—in making a determination that affects both the public fisc and the borrower's institution.

The Department's decision to offer itself as an open forum for any State law cause of action the borrower may have against the institution is unlawful for the same reasons that its proposed breach-of-contact "defense" is illegal. Congress is not presumed to grant adjudicatory authority of private disputes to Federal agencies, especially when there is no express statutory authorization or definition of procedures. Because private State law actions are not public rights, Article III and (for some actions) the Seventh Amendment forbid the vesting of adjudication of

---

[213] *See* 87 Fed. Reg. 41, 907 ("The Department believes such an upfront analysis would be unduly burdensome and delay the ability to provide relief to borrowers.").

[214] *See* 81 Fed. Reg. 75,939 ("As discussed, the current State law-based standard necessarily involves complicated questions relating to which State's laws apply to a specific case and to the proper and accurate interpretation of those laws.").

[215] 87 Fed. Reg. 41,907.

such disputes in administrative agencies. Nor did Congress grant the Department the authority, by permitting claims for monetary relief without any limitations period, effectively to abrogate State law restrictions on enforcement and damages, and limitations periods, for those causes of action. Furthermore, granting a borrower defense willy-nilly if the act violates State law abdicates the Department's statutory duty under Section 455(h) to specify acts or omissions that so adversely affect the borrower as to make performance of contractual repayment obligations inequitable. Finally, the Department simply lacks institutional capacity to adjudicate myriad State law claims.[216]

Borrowers have the remedies for State law violations that State law provides. There is no warrant (or authority) for the Department to intercede in such matters or redefine remedies for State causes of action. It should confine itself to defining Federal standards for borrower defenses.

### VII.   The Department's Proposal for Assessing Discharge Amounts Violates the HEA and is Arbitrary and Capricious

*1.   The discharge proposal violates the statute.*

The limited rulemaking grant of Section 455(h) only authorizes the Secretary to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan …."[217] It does not have the authority to prescribe rules for assessing discharge amounts, which are left to the appropriate tribunal. But, to the extent the Department is deemed to have both broad rulemaking authority over discharge amounts *and* adjudicatory authority over borrower defenses, the Department must make individualized

---

[216] *See supra* Section IV.
[217] 20 U.S.C. § 1087e(h).

determinations of the amount of discharge based on the harm or injury to the borrower caused by the conduct that prompted the loan obligation.[218] The Proposed Rules do not satisfy that requirement. The Proposed Rules do not satisfy that requirement.

The clear text of the statute indicates that the amount of the discharge must be based on the harm or injury to the individual borrower. A "defense to repayment" is a circumstance that excuses the repayment of a loan that was caused by, and antecedent to, the "act or omission" giving rise to the defense. In other words, a borrower has a "defense to repayment" when the borrower cannot equitably be held responsible for repayment of all or part of the loan obligation. That, of course, depends on the borrower's actual, individualized harm or injury, that is, a determination that the borrower, as result of the institution's act or omission, would not have incurred the loan, suffered harm from attending the institution or enrolling in a particular program, or did not receive the value of the promised education that the loan funded.[219]

That straightforward textual analysis is consistent with basic principles of law and logic and the Department's longstanding position. As discussed above, *see supra* Section IV.1.A. (discussing adverse effect flaws), courts do not allow statutes to be interpreted to provide a "financial windfall."[220] Yet disconnecting the amount of discharge from the amount of harm or injury to the borrower does just that. In addition, disconnecting the amount of discharge from the amount of harm or injury to the borrower eliminates any intelligible principle for the amount

---

[218] *See* 20 U.S.C. § 1087e(h).
[219] *See* 20 U.S.C. § 1087e(h) (requiring individual assessment of what borrower has repaid so far).
[220] *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 701 (D.C. Cir. 2014).

of discharge (certainly, the Department has not proposed an alternative). Courts are loathe to interpret statutes to have delegated unbridled discretion to agencies.[221]

Finally, the Department long has held that the amount of discharge must turn on the comparison between the value of the education received and the loan obligation. In 2016, for example, the Department emphasized that the amount of relief turns on the "value of the education" that the borrower received notwithstanding a school's misconduct.[222] In 2019, similarly, the Department again made the amount of discharge turn on "educational value," concluding that because "the degree of financial harm suffered is critical to the determination of defense to repayment relief for the reasons explained above, the Department must take this into consideration when awarding relief."[223] Although an agency is permitted to change its mind, an agency must explain its reasons for doing so: "an agency may not, for example, depart from a prior policy *sub silentio*."[224]

The Proposed Rules, however, appear to deviate from the Department's long-held position that the amount of discharge is tied to educational value, without awareness or explanation. Under the Proposed Rules, the Department presumes a full, automatic discharge is appropriate absent rebuttal and "remov[es] the requirement for individualized harm determinations," even though it "recognize[s] that there may be circumstances in which the financial harm by a borrower is less than the amount of a full loan discharge."[225] Indeed, under the Department's discharge proposal, it appears that there would be a full discharge for a loan

---

[221] *E.g.*, *Mistretta v United States*, 488 U.S. 361, 374 n. 7 (1989).
[222] 81 Fed. Reg. 75,974.
[223] 84 Fed. Reg. 49,834.
[224] *FCC v. Fox Television Stations, Inc*., 556 U.S. 502 (2009).
[225] 87 Fed. Reg. 41,908-41,909.

The Honorable Miguel A. Cardona
Secretary of Education
Page 83 of 137

taken in 2009 based on a borrower defense claim of misconduct in 2010. This proposal thus is contrary to the plain text of the statute. Even worse, the Department proposes to issue a full, automatic discharge even when it does not even adjudicate the borrower defense application at all under certain timelines, such that there is no connection at all between discharge and value.[226]

To the extent the statute is ambiguous, the Department's apparent view is unreasonable and not justified by the Department's two advanced justifications. The Department first states that the previous "requirement for a borrower to demonstrate individual harm and the standards associated with that proposal could have the unintended consequence of providing lesser amounts of relief for a borrower who succeeded despite their program."[227] This rationale belies the Department's true aim—discharge loans at any cost—because the Department offers no rationale for why it is better for the Department to accept a proposed windfall to the borrower of full discharge *without harm* at the expense of potential liability for the school, the Department, and ultimately the taxpayer when no one was harmed. It also is disingenuous in that the Department elsewhere admits that it has not adjudicated any claims under the standard it criticizes.[228] The Department next expresses concerns that assessing harm is a "subjective" or difficult enterprise.[229] In addition to being flatly inconsistent with the Department's 25 year-old position,[230] the Department offers no explanation as to why it—the primary Federal regulator of

---

[226] 87 Fed. Reg. 41,904.

[227] 87 Fed. Reg. 41,908.

[228] *See* 87 Fed. Reg. 41,884 ("the Department has yet to adjudicate any claims under the 2019 regulations").

[229] *Id.* at 41,909.

[230] *See, e.g.*, 84 Fed. Reg. 49,834 ("We disagree that such an approach would be subjective").

educational institutions—cannot assess the "value of education," especially when tribunals across the country routinely assess individualized harm in tort cases outside of their expertise.

It is possible that the Department does not in fact propose to abandon its long-held statutory interpretation that the amount of discharge must be related to the amount of individualized harm regarding the value of education received. The Department toward the end of its proposal states that there should not be a full discharge when school misconduct "did not affect the value of the education that was delivered or the outcomes that students experienced" and discharge should be based on the "level of harm."[231] To the extent that the Department nonetheless does in fact propose to, in its own words, "remov[e] the requirement for individualized harm determinations," which would be consistent with its disavowal of considering harm in other parts of the proposal, *see supra* IV.1.A. (discussing adverse effect flaws), these latter inconsistent statements confirms the proposal's violation of the statute (and its violation of the APA).

2. *The discharge proposal is arbitrary and capricious.*

The Department's proposal also violates the APA to the extent it establishes an improper presumption and, regardless of the presumption, lacks a rational basis. The proposal is not designed to pursue truth or fair determinations, but rather to make it easy to award full or 50% discharges and shift the financial burden to institutions or taxpayers.

To the extent that the Department does not in fact propose to abandon its long-held statutory interpretation that the amount of discharge must be related to the amount of individualized harm regarding the value of education received, then it has established an

---

[231] 87 Fed. Reg. 41,909-41,910.

improper presumption of full discharge. The proof of a borrower defense claim on the merits, on whatever basis, does not render a full discharge so probable that individual fact-finding can be bypassed.[232] That renders the Department's proposal unlawful.

The Department's only purported rationale for this presumption is "as of May 2022, all approved borrower discharges have been for full discharges." This statement is disingenuous, for two reasons. First, the Department elsewhere admits that it has not adjudicated any claims under the 2019 regulations, which apply to years' worth of borrower defense claims.[233] Second, in June 2022, the Department entered into a settlement where it in fact promised (with representations to a court) to adjudicate whether partial relief was appropriate.[234] Nor do the Department's other rationales, regarding borrowers who succeed "despite" their school's conduct and "subjective" determinations, explain why a presumption rather than individual fact-finding is appropriate: those rationales would support a different standard for assessing the amount of discharge, not a presumption, and in fact confirm that individualized fact-finding is required because borrowers are differently situated.

The Department's proposal also is riddled with provisions that are arbitrary and capricious in that they lack a reasoned basis or are inconsistent with other aspects of the proposal.

First, the proposal's limitation for only three criteria for partial discharges is arbitrary and internally inconsistent. As an initial matter, the limitation ignores whether a borrower was

---

[232] *Chemical Mfrs Ass'n*, 105 F.3d at 705.

[233] *See* 87 Fed. Reg. 41,884 ("the Department has yet to adjudicate any claims under the 2019 regulations").

[234] Settlement Agreement at 11, *Sweet v. Cardona*, Dkt. 246, No. 3:19-cv-03674 (June 22, 2022) (providing that post-class applicants will be adjudicated under 2016 regulations and, unlike class members, not providing that approval of a borrower defense claim will result in "full" relief).

The Honorable Miguel A. Cardona
Secretary of Education
Page 86 of 137

harmed by misconduct by taking out a loan and receiving reduced value, or rather instead
whether the borrower would have incurred the loan obligation anyway and/or received full
value.

In addition, the Department premises the second criteria for when a full discharge is not
appropriate—when "the borrower defense claim is based *entirely* on actions that did not involve
promises by the institution about educational outcomes or the quality of educational services
delivered"—on the ground that the alleged misconduct "did not affect the value of the education
that was delivered or the outcomes that students experienced."[235] But the circumstances of the
second criteria are not the only likely fact pattern where the act or omission underlying the
borrower defense claim does not affect the value of the education or the outcome for the
borrower. In other words, there is no rational basis to conclude that only misrepresentations that
do not relate *at all* to "value" or "outcomes" of education require an amount of discharge that
must be "tied to the full amount of the harm to the buyer," but *every* value or outcome-related
misrepresentation is not assessed for harm and results in full discharge.

Indeed, the Department's lack of a rational basis on this point is evidenced when the
Department ties itself into inconsistent knots over examples. The Department draws a contrast
between "when an institution misrepresents the profile of its incoming class" and when an
institution makes false statements about "rates of completion" or the educational credentials of
the faculty.[236] The former, the Department contends, may arise even when the "classroom
instruction [*i.e.*, educational value] and the outcomes of that instruction match what was

---

[235] 87 Fed. Reg. at 41,909 (emphasis added).
[236] *See* 87 Fed. Reg. at 41,909; *see also* 87 Fed. Reg. at 41,910 (no presumptive full discharge for
misrepresentations about GRE scores that inflate published rankings).

otherwise anticipate and marketed," and so thus merit only a partial discharge, while the latter do not, and thus merit a full discharge. Yet it is completely arbitrary to think that a representation about a school's ranking is not related to the "value" or "outcome" of the education but that a representation about the quality of the faculty or graduation rates is so related. This distinction seems primarily designed to foreclose full discharges for borrower defense claims made against highly-ranked nonprofit schools that fudge their rankings submissions.

The second example is even more dizzying. The Department attempts to distract from the absurd result that its discharge proposal would have with respect to a representation regarding taking classes with an "award-winning professor."[237] The Department gestures that borrowers in these circumstances would not "result in an approved borrower defense claim" because it "do[es] not believe it is reasonable to assume that the borrower . . . relied on the particular misrepresentation." But it is no answer to an arbitrary discharge proposal to say that another aspect of the proposal may prevent this issue, particularly when the Department largely has eliminated the very requirement—the reliance requirement—that would do so. Regardless, it is wholly arbitrary for the Department to distinguish between representations regarding the quality of faculty with respect to credentials and representations regarding the quality of the faculty with respect to awards. This distinction, too, seems primarily designed to shield favored elite institutions.

Protecting elite institutions through the examples and proposed provisions in the Department's description is particularly arbitrary and capricious because of the numerous examples of wrongdoing that have come to light regarding these institutions. Just a month ago,

---

[237] *See* 87 Fed. Reg. at 41,910 (discussing award-winning professor example).

The Honorable Miguel A. Cardona
Secretary of Education
Page 88 of 137

U.S. News & World Report sent the University of Southern California ("USC") a letter regarding its inaccuracies in reporting an important input to rankings—research expenditures.[238] That letter follows on faculty concerns that the university also was inflating its GRE scores—a practice the Department notably largely protects from full liability in the proposed regulations.[239]

There have been similar problems at Temple University and Columbia University—one Columbia professor even posted an analysis criticizing his own university's data submissions[240] and a dean of Temple University was, in fact, convicted of fraud for submitting fake data.[241]

But it does not stop there in recent years. A whistleblower accused Rutgers University's Business School with inflating its rankings by creating fake jobs for its graduates.[242] The University of California San Diego admitted it provided erroneous data regarding the success of its MBA

---

[238] *See* Jonathan Park, U.*S. News & World Report Issues Letter to USC Following Ranking Misreports*, Daily Trojan (June 7, 2022), https://dailytrojan.com/2022/06/07/u-s-news-world-report-issues-letter-to-usc-following-ranking-misreports/?utm_source=Iterable&utm_medium=email&utm_campaign=campaign_4445879_nl_Daily-Briefing_date_20220610&cid=db&source=&sourceid=.

[239] *See* Melissa Korn, *University of Southern California Pulls Out of Education-School Rankings*, Citing Data Errors, Wall St. J. (Mar. 23, 2022), https://www.wsj.com/articles/university-of-southern-california-pulls-out-of-education-school-rankings-citing-data-errors-11648055454?mod=hp_lead_pos6.

[240] *See id.*

[241] Alyssa Lukpat, *Former Temple U. Dean Found Guilty of Faking Data for National Rankings*, N.Y. Times (Nov. 29, 2021), https://www.nytimes.com/2021/11/29/us/temple-university-moshe-porat-fraud.html; see Scott Jaschik, Ex-Dean at Temple Convicted, Inside Higher Ed (Dec. 6, 2021), https://www.insidehighered.com/print/admissions/article/2021/11/30/former-dean-temple-convicted-rankings-scandal.

[242] Oyin Adedoyin, *Rutgers B-School Faked Jobs for Graduates to Inflate Its Rankings, Lawsuit Says*, The Chronicle of Higher Education (Apr. 8, 2022), https://www.chronicle.com/article/rutgers-b-school-faked-jobs-for-graduates-to-inflate-its-rankings-lawsuit-says?utm_source=Iterable&utm_medium=email&utm_campaign=campaign_4045502_nl_Academe-Today_date_20220411&cid=at&source=&sourceid=&cid2=gen_login_ref.

programs to the Financial Times.[243] The University of Oklahoma, according to reports, "knowingly exaggerated the share of alumni who donate," which accounts for a significant percent of the rankings methodology, so much that U.S. News & World Report stripped the University of Oklahoma of its ranking.[244] It was not the only college stripped of its rankings that year: that list included at least Boston University, Bowling Green State University, Eastern Virginia Medical School, University of Akron, University of California, Riverside, University of Texas at San Antonio, and Widener University.[245] Columbia University, considered one of the most elite universities in the world, is currently unranked by U.S. News as a result of this wrongdoing.[246]

This issue among so-called elite institutions is all too common. Schools routinely notify U.S. News & World Report that they misreported data. Indeed, it is so common that U.S. News has established a webpage to attempt to track the errors, although that has to be updated frequently and is difficult for the public to track.[247] In light of the widespread wrongdoing

---

[243] *See* Gary Robbins, *UC San Diego Accidentally Overstated Success of Its MBA Program in Financial Times Rankings*, The San Diego Union Tribune (Mar. 9, 2020), https://www.sandiegouniontribune.com/news/education/story/2020-03-09/uc-san-diego-admits-to-mistaking-success-in-placing-mba-students.

[244] Scott Jaschik, *Oklahoma Gave False Data for Years to 'U.S. News,' Loses Ranking*, Inside Higher Ed (May 28, 2019), https://www.insidehighered.com/admissions/article/2019/05/28/university-oklahoma-stripped-us-news-ranking-supplying-false.

[245] *Id.*

[246] *See* Robert Morse, *U.S. News Rankings Updates*, U.S. News (July 7, 2022), https://www.usnews.com/education/articles/us-news-rankings-updates.

[247] Robert Morse, *U.S. News Rankings Updates*, U.S. News (July 7, 2022), https://www.usnews.com/education/articles/us-news-rankings-updates; Robert Morse, Matt Mason, and Eric Brooks, *Updates to 8 Schools' 2018 Best Colleges Rankings Data*, U.S. News (Aug. 22, 2018), https://www.usnews.com/education/blogs/college-rankings-blog/articles/2018-08-22/updates-to-8-schools-2018-best-colleges-rankings-data (Austin Peay State University, Dakota Wesleyan University, Drury University, Hampton University, Oklahoma City University, Randolph College, Saint Martin's University and St. Louis University); Robert Morse, Matt Mason, and Eric Brooks, *Updates to 5 Schools' 2019 Best Colleges Rankings Data*, U.S. News (July 25, 2019), https://www.usnews.com/education/blogs/college-rankings-blog/articles/2019-07-25/updates-

The Honorable Miguel A. Cardona
Secretary of Education
Page 90 of 137

regarding these institutions—extending to the Ivy League (Columbia University), prestigious public institutions (Berkeley), and numerous highly-ranked universities, it is arbitrary for the Department to render them potentially less liable.

Second, there is no rational basis for the Department's Proposed Rule of thumb that any partial discharge must be 50% if the amount is not easily quantifiable.[248] Tribunals, including juries of laypersons, award damages all the time when sums are not easily quantifiable. In addition, in many cases, although it may not be easy to quantify the exact amount of relevant discharge, it will clearly be lower than 50%. The Department must determine what part of the repayment obligation is relieved by the defense, especially when the facts are likely to be highly variable and unpredictable. The Department also does not explain what "easily quantifiable" means.

Third, there is no rational basis for the rule "awarding the same percentage or dollar amount of relief to all similarly situated borrowers."[249] The Department reasons that "borrowers were subject to the same substantial misrepresentations, substantial omissions, breaches of contract, aggressive recruitment, or judgments or Department actions the Department," but that is unreasonable. That borrowers experienced a common act or omission does not mean that the suffered the same injuries. In other words, even if borrowers are similarly situated with respect to liability, they are not necessarily similarly situated for damages. That is why Federal courts

---

to-5-schools-2019-best-colleges-rankings-data (University of California—Berkeley, Scripps College, Mars Hill University, the University of North Carolina—Pembroke and Johnson & Wales University).

[248] *See* 87 Fed. Reg. at 41,910.

[249] *See* 87 Fed. Reg. at 41,909.

routinely bifurcate liability and damages in class actions: borrowers may not be similarly situated in all respects.

Fourth, there is no administrative economy justifying any of these presumptions or rules of thumb. The Department concedes that it must, in conformity with the statute, make individualized determinations of the ultimate discharge by reducing the initial determination "by the amount of any refund, reimbursement, indemnification, restitution, compensatory damages, settlement, debt forgiveness, discharge, cancellation, compromise, or any other financial benefit received by, or on behalf of, the borrower that was related to the borrower defense."[250] Because the Department must already engage in an actual individualized inquiry, its claims of efficiency ring hollow: it provides no explanation why the initial determination of the actual discharge amount should not be part of this individualized inquiry, as the 2019 rule does.

The flaws of the Department's proposal are exacerbated by the schools' general inability to participate in the discharge calculation process. *See supra* Sections IV.1 and V.3. (discussing violation of schools' due process rights for lack of procedural protections). The proposal does not provide for a role for schools in the discharge process, other than that the Department may consider evidence gathered in the liability phase, which was not geared to the fact of discharge, did not require the borrower to provide any facts regarding discharge amount, and did not provide the school with any discovery or other rights to pursue facts in the borrower's possession.[251] In addition, the student may appeal the denial of a full discharge, but the school may not, further adding to the one-sided nature of the inquiry.[252]

---

[250] *See* proposed § 685.408(j).
[251] *See* proposed § 685.406(f).
[252] *See* proposed § 685.406(g); *supra* Section VI (discussing reconsideration provision).

The Honorable Miguel A. Cardona
Secretary of Education
Page 92 of 137

The traditional rule is that the plaintiff has the burden "to prove, with certainty, both the existence of damages and the causal connection between the wrong and the injury. No damages could be recovered for uncertain, conjectural, or speculative losses."[253] The borrower should likewise have the burden to prove the amount of the discharge with reasonable certainty, and that fact must be determined individually based on the harm to the borrower. That is true even if the Department resorts to a group process for determining whether the relevant act or omission occurred. The Department's proposal ignores this requirement and establishes improper presumptions that conflict with the statute and are arbitrary and capricious.

**VIII.** **The Proposed Recoupment Procedures Violate the Statute, the Constitutional Rights of Institutions, and the APA**

To justify massive loan forgiveness, the Department attempts to make it easier to recoup its losses from institutions, thereby shifting the risks of nonpayment of student loans from borrowers and itself to institutions. Its proposal far exceeds its statutory authority, violates the Constitution, and contravenes the APA. The flaws in the recoupment processes are more important than ever before because of the massive amount of liability the Department contemplates shifting onto institutions.

1. *The proposed recoupment procedures violate the statute.*

The Department's recoupment procedures exceed its statutory authority: the Department has no authority to recover discharged loans at all and certainly does not have the authority to establish internal procedures that make it a judge in its own cause.

---

[253] *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 533 n.26 (1983).

The Honorable Miguel A. Cardona
Secretary of Education
Page 93 of 137

The Department has no statutory authority to recoup from institutions the value of loans

that it discharges. Agencies may exercise only those authorities that Congress provides by

statute.[254] "[T]he words of a statute must be read in their context and with a view to their place

in the overall statutory scheme."[255] In particular, where "Congress includes particular language

in one section of a statute but omits it in another section of the same Act, it is generally presumed

that Congress acts intentionally and purposely in the disparate inclusion or exclusion."[256]

Here, Section 455 of the HEA does not provide the Department with the authority to

recover the amount of loans discharged by way of borrower defense.[257] That stands in stark

contrast to other parts of the HEA, which do provide such authority.[258] Indeed, the Department

appears to have admitted as much.[259]

The Department has pointed to three sources of authority for recoupment, but none of

them provide the requisite authority. The Department currently points to Section 454(a)(3) of

the HEA,[260] as authority for its recoupment procedures.[261] But that provision states merely that

---

[254] *West Virginia*, 142 S. Ct. at 2608.

[255] *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

[256] *Aishat v. U.S. Dep't of Homeland Sec*, 288 F. Supp. 3d 261, 267 (D.C. Cir. 2018).

[257] *See* 20 U.S.C. § 1087e(h).

[258] *See, e.g.*, 20 U.S.C. § 1087(c)(1) (in cases of closed schools, false certification, and lender refunds, "the Secretary shall discharge the borrower's liability on the loan (including interest and collection fees) by repaying the amount owed on the loan and shall subsequently pursue any claim available to such borrower against the institution and its affiliates and principals or settle the loan obligation pursuant to the financial responsibility authority under subpart 3 of part H").

[259] 81 Fed. Reg. at 75,929 ("Similarly, by recognizing that acts or omissions of the school in participating in the title IV, HEA programs would *give rise to a claim by the Department against the school that arises not by virtue of any statutory requirement*, but under common law as discussed elsewhere and by requiring the Department to provide a hearing for a school that disputes that common law claim for damages, Congress necessarily committed adjudication of that common law claim to the Department." (emphasis added)).

[260] 20 U.S.C. § 1087d(a)(3),

[261] *See* 87 Fed. Reg. at 41,911.

a Program Participation Agreement must "provide that the institution accepts responsibility and financial liability stemming from its failure to perform its functions pursuant to the agreement." The provision notably does not by itself connect an institution's "responsibility and financial liability" to the Department's discharge of loans related to borrower defense and it would be odd to infer it did so in light of specific statutory grant of such authority elsewhere in the HEA. The Department's citation of this statutory provision also does not provide the public with an opportunity to comment on the Department's asserted statutory authority.

It is possible that the Department is attempting to refer to its recently promulgated regulations, at 34 C.F.R. § 685.300(k)(12), that purport to authorize the Secretary to collect from institutions loans that the Secretary discharged.[262] That regulation, however, is contrary to the clear text of the statute: the *Secretary*'s discharge of a loan is not the *institution*'s "failure to perform its functions." And it does not appear to be authorized by any general authority to impose contractual conditions in PPAs.

In addition, that regulation violates the Spending Clause. There can be no doubt that the withholding of Title IV funding is "economic dragooning" that provides schools with "no real option but to acquiesce," especially given its imposition only after schools have relied on that funding—which makes the regulation effectively a retroactive restriction. *Nat'l Fed'n. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581-82 (2012). There is no "unambiguous" congressional intent to impose liability on the schools for the Department's discharges through a condition in a PPA.[263]

---

[262] *Id.* (stating that in a PPA, an institution must "[a]ccept responsibility and financial liability stemming from losses incurred by the Secretary for repayment of amounts discharged by the Secretary pursuant to §§ 685.206, 685.214, 685.215, 685.216, and 685.222").

[263] *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

The Honorable Miguel A. Cardona
Secretary of Education
Page 95 of 137

And this indemnification-like provision, which is aimed at recovering the Secretary's losses, is unrelated to the purpose of the Direct Loan Program, which is to provide loans to students for education.[264] In any event, the Department's condition is certainly unrelated to the mass loan forgiveness regime that the proposed regulations entail.

In the past, the Department also has asserted a general reliance on its authority to administer the loan programs, relying on the method of analysis in *Chauffeur's Training School v. Spellings.*[265] But that case is not authority that the Department can conduct recoupment adjudications without statutory authorization, much less without a hearing. The question in *Chauffeur's* was whether the Department could pursue damages for losses from falsely certified loans that were determined in a program review proceeding, even though such damages not among the statutorily specified remedies. The Second Circuit held that "Congress expressly required the Department to conduct hearings to review program review determinations, but did not describe what a program review determination is."[266] The Second Circuit framed the issue as a question of what remedies were available in an authorized proceeding, and held that "it would be unreasonable to view the specification of remedies set forth in § 1094(c) as exclusive."[267] And the Court found the Department's interpretation was reasonable. "Congress's express empowerment of the Department to assess liability in administrative proceedings in those circumstances strongly supports the view that Congress would find nothing unreasonable in the

---

[264] *S. Dakota v. Dole*, 483 U.S. 203, 207 (1987); *see City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 955 (N.D. Cal. 2018), *aff'd in part, vacated in part (other grounds) sub nom*. *City & Cnty. of San Francisco v. Barr*, 965 F.3d 753 (9th Cir. 2020) (holding that program directed criminal enforcement was unrelated to condition regarding immigration enforcement).
[265] 478 F.3d 117 (2d Cir. 2007). *See* 81 Fed. Reg. 75,930.
[266] 478 F.3d at 126.
[267] *Id.* at 127.

The Honorable Miguel A. Cardona
Secretary of Education
Page 96 of 137

Department's institution by regulation of administrative proceedings to assess liability to recover its guarantee payments in cases of guarantees extended pursuant to improper documentation."[268]

Although its analysis is questionable, *Chauffeur's* does not support the Department's wholesale creation of a novel adjudication scheme untethered to any authorized statutory hearing; indeed, the Department has abolished hearings for recoupment that former existed under § 668.87. The Department cannot read *Chauffeur*'s broadly, for three reasons.

First, such a reading is not consistent with current precedents on administrative law and statutory interpretation. As discussed in Part I, Congress must expressly authorize an agency to adjudicate public rights. Further, the Supreme Court has instructed in *West Virginia v. EPA*, and other cases, that agencies only enjoy those powers provided them by Congress and, when major questions are involved, a "clear congressional authorization" is required.[269] The Department cannot rely on *Chauffeur's* to place the burden on the private party to disprove the agency's authority, rather than on the agency to justify its authority. In addition, Congress' provision of specific authority indicates that it did not intend to provide other authority. The Department's broad reading of *Chauffeur's* is especially inappropriate because here the Department arrogates to itself the power to adjudicate liability for at least $29 billion in discharged loans, potentially shifting that liability from students or the Department to institutions. Courts now require a clear statement for such a major policy issue.

---

[268] *Id.* at 129.
[269] *West Virginia*, 142 S.Ct. at 2614 (internal quotation marks omitted).

Second, *Chauffeur's* reached a holistic conclusion regarding Congress' intent with respect to the Department's authority to pursue supplemental remedies for false certification in an authorized hearing, resting on numerous indicia, including some relevant only to the FFEL program.[270] Its analysis is thus limited to the context in which it arises and must be re-done for a different regulatory framework. The Department has not attempted that analysis. In 2016, the Department concluded that *Chauffeur's* nonetheless provides authority to the Department because "[t]he HEA directs that, generally, Direct Loans are made under the same 'terms, conditions, and benefits' as FFEL Loans."[271] That is a non sequitur: what is relevant is whether Congress provided for authority regarding recoupment *procedures* for Direct Loans, not whether the loans *themselves* are made on the same terms, conditions, and benefits. *See infra* Section X (discussing whether Department has authority to apply its rules to the FFEL program).

Finally, *Chauffeur's* does not support the distinction between a statute that authorizes administrative remedies for statutory and regulatory violations and one that authorizes administrative remedies for breach of contract or indemnification actions. The latter are typically handled by courts and are, as the Department admitted in 2016, most analogous to borrower defense recoupment.[272] To put it another way, the court misconceived the question as to whether the agency could pursue a supplemental legal remedy in an authorized proceeding, when it fact the agency arrogated itself the power to pursue a new legal remedy for a different type of claim. But the Department here does more than attempt to graft additional remedies

---

[270] *See, e.g.*, 478 F.3d at 117 (citing Section 1082, which relates to only the FFEL program).
[271] 81 Fed. Reg. 75,930 (citing 20 U.S.C. § 1087a(b)(2).
[272] 81 Fed. Reg. 75,931 (referring to common law actions such as breach of contract and indemnification).

The Honorable Miguel A. Cardona
Secretary of Education
Page 98 of 137

unto an authorized adjudicatory proceeding; it attempts to claim a power to assess massive

recoupment liability when Congress has authorized neither relief nor a statutory proceeding.

In the same vein, the Department also may claim that its general authority to administer

the loan programs grounds the recently promulgated 34 C.F.R. § 685.308(a)(3), which purports

to authorize the Secretary separate and apart from PPAs to "require the repayment of funds and

the purchase of loans by the school if the Secretary determines that the school is liable as a result

of . . . [t]he school's actions that gave rise to a successful claim for which the Secretary discharged

a loan, in whole or in part, pursuant to § 685.206, § 685.214, § 685.216, or § 685.222, or 34 CFR

part 685, Subpart D." But that provision is ultra vires for the same reasons discussed above (and

inconsistent with the Department's prior denial of statutory authority[273]).

In any event, to the extent the Department relies on either of these recently-promulgated

regulations, it cannot recoup the amount of discharged loans that arose prior to the regulations'

effective date without running afoul of imposing retroactive liability.

The Department also in the past has appealed to "common law" rights,[274] but that appeal

depends on any contractual and fiduciary duty rights accruing to the Secretary from the

relationship between the institutions and the Secretary, including the PPA. That relationship has

been established by Congress and in other instances recoupment has been prescribed by

Congress: generalized (and mystical) invocations of the common law and fiduciary duty cannot

trump congressional intent. In sum, the Department is not authorized by statute to recover the

amount of loans that it discharges. In addition, even if the Department may recover that money,

---

[273] *See* 81 Fed. Reg. 75,929.
[274] 81 Fed. Reg. 75,931.

The Honorable Miguel A. Cardona
Secretary of Education
Page 99 of 137

it cannot do so through its own adjudication. The statute does not authorize such adjudicative

power under its terms.

2. *The proposed recoupment procedures violate the Constitution.*

In addition to exceeding the Department's statutory authority, the Department's

proposed regulations violate a host of constitutional protections (as discussed above, an attempt

to recoup losses based on conditions in PPAs violates the Spending Clause).

First, the proposed recoupment procedures do not ensure adjudication by a neutral

decision-maker, in violation of due process. It is a fundamental principle of due process (and also

consequently the APA) that the adjudicator of a claim must be unbiased.[275] Here, the Department

stands to gain financially from deciding to recoup discharged loan amounts from schools, because

it is able to shift its risk of the nonpayment of student loans from itself to institutions. To put it

differently, recoupment cannot be fairly determined by the Department because the Department

is attempting to recover its own "losses." It is particularly problematic that the Department has

arrogated to itself the power to adjudicate its own liability for such a large amount of money,

billions of dollars, without clear congressional authorization.

Second, the proposed procedures violate Article III and the Seventh Amendment. The

Seventh Amendment protects the right to trial by jury for actions that arise "at common law."[276]

Under both Article III and the Seventh Amendment, Congress may assign an action to

---

[275] *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) ("Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness.'").
[276] U.S. Const. amend. VII; *Tull v. United States*, 481 U.S. 412, 417 (1987).

administrative adjudication only when it involves "public rights."[277] Here, a recoupment action arises "at common law" and does not involve "public rights."

The right that the Department seeks to vindicate in a recoupment action arises at common law. The Department admitted as much in 2016, conceding that recoupment was a "common law claim."[278] The closest analogues, in the Department's mind, are contract, indemnification, and fiduciary duty common law claims.[279] In addition, any administrative recoupment proceeding that is based on a borrower defense that turns on a violation of State law or breach of contract involves the common law under any plausible reading of Supreme Court precedent.

This right is not a public right that can be committed to administrative adjudication. A right may be committed to administrative adjudication when it is a "new action" and jury trials would "dismantle the statutory scheme" and "impede swift resolution" of the agency's prosecutions.[280] That is not the case here. Contract, indemnification, and fiduciary duty claims have been heard by common law courts, not agencies, for centuries, even when brought by the government.[281] Nor would pursuit of these claims in court dismantle the statutory scheme or impede swift resolution of claims—the Department explicitly aims, in fact, in these proposed regulations to decouple the award of a discharge to a borrower from the recoupment of that

---

[277] *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 450 (1977).
[278] 81 Fed. Reg. 75,929.
[279] *See id.*; *id.* at 75,931.
[280] *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989); *see Jarkesy v. Sec. & Exch. Comm'n*, 34 F.4th 446, 455 (5th Cir. 2022).
[281] *See Jarkesy*, 34 F.4th at 455.

The Honorable Miguel A. Cardona
Secretary of Education
Page 101 of 137

money from the institution in order to allow for delay in the latter, and proposes a lengthy statute of limitations in which to recover from institutions.

In the past, the Department has relied on *Commodity Futures Trading Comm'n v. Schor*[282] to argue that resolution of recoupment in an administrative adjudication is acceptable because the school consented to it in a PPA.[283] But *Schor* involved counterclaims to Federal claims that Congress authorized the agency to adjudicate. Further, *Schor* involved a statutory interpretation question and an Article III challenge, not a Seventh Amendment challenge. To the extent that the Department is arguing that it has coerced schools to waive their jury trial rights in order to participate in the Direct Loan Program, such a requirement would violate the Spending Clause because it is not unambiguously expressed by Congress nor related to the purposes of the Direct Loan Program.

Third, the Department's proposed procedures do not satisfy procedural due process protections. The Constitution guarantees due process in administrative adjudications that will deprive an entity of a property interest.[284] There can be no doubt that a recoupment proceeding can deprive an institution of property. Consequently, due process requires procedures that are adequate to balance the party's interest, the risk of error, the value of additional safeguards, and the government's interest.[285]

---

[282] 478 U.S. 833 (1986).
[283] 81 Fed. Reg. at 75,929.
[284] *See, e.g.*, *Mathews v. Eldridge*, 424 U.S. 319 (1976).
[285] *Id.* at 335.

The Honorable Miguel A. Cardona
Secretary of Education
Page 102 of 137

In balancing those interests, courts routinely require agencies to provide a meaningful opportunity for a party to develop and present evidence.[286]

The proposed recoupment proceedings do not satisfy these constitutional standards. The institution's interest in the recoupment proceeding cannot be underestimated: the Department proposes to attempt to shift literally billions of dollars from students and the Department onto institutions.

At the same time, the procedures the Department has established are woefully inadequate and prone to error, while additional safeguards—indeed, safeguards that are taken for granted in American law—would be incredibly valuable. Institutions have no meaningful opportunity either in the borrower defense proceeding itself or in the recoupment proceeding to develop evidence on (and thus meaningfully contest) numerous important issues, including such as reliance, injury, and amount of discharge. That is because institutions are governed by recordkeeping and privacy obligations that limit their ability to maintain exculpatory evidence and because they have no discovery rights during the proceedings. It also is because the Department has rendered some of these issues irrelevant to the borrower defense proceeding but still relevant to the recoupment proceeding, thereby imposing the costs of inconsistent standards solely on the institutions.

To be sure, the Department has imposed a duty of borrower cooperation, but the borrower has no duty to cooperate with the institution and the Department has not promised to use its own authority to help institutions. Indeed, that duty of cooperation is largely illusory

---

[286] *See, e.g.*, *McClelland v. Andrus*, 606 F.2d 1278, 1286 (D.C. Cir. 1979) (right to discovery); *N. Am. Coal Co. v. Miller*, 870 F.2d 948, 951 (3d Cir. 1989) (cross-examination).

because the Department has refused to provide examples of how borrowers may run afoul of the cooperation requirement (and proposes to rescind current examples), notwithstanding the Department's decision to provide extensive (and confusing) examples of how institutions may run afoul of various standards.[287] The result is that institutions have no regulatory text to point to in requesting even the most basic borrower cooperation. The Department's inequitable treatment of providing examples that harm schools in defending themselves as opposed to providing examples that could help schools in defending themselves is telling. The Department rests this decision not to provide examples on the mistaken premise that borrower cooperation is relevant only to the Department, not the institution. But even if adjudication of recoupment can be decoupled from adjudication of a borrower defense claim, as the Department posits (incorrectly), borrower cooperation is surely relevant to recoupment proceedings and the Department leaves institutions with an inability to gather evidence from the most likely source, the borrower who filed a claim.

The Department's proposal to harness the program review process does not rectify that deficiency. Program review proceedings are not evidentiary adjudications. They do not entail discovery or cross-examination. Institutions have very limited rights to submit evidence to the hearing officer: it does not appear that institutions could submit anything that is not in their own records or the records of the Department, that is, they could not submit any evidence that arises from the borrower.[288] The burden of persuasion falls on the institution, not the Department. The default is that there is no oral hearing.[289] And oral hearings do not appear to involve witness

---

[287] *See* 87 Fed. Reg. at 41,906.
[288] 34 C.F.R. § 668.116(e)(1).
[289] 34 C.F.R. § 668.116(b).

testimony, unlike existing protections.[290] These procedures do not provide for a meaningful defense of potentially billions of dollars in liability.

The government's interest in not providing these procedural safeguards is low. To date, the Department has not offered any reason why it cannot provide these safeguards. That forecloses the public with a meaningful opportunity to comment on those reasons. And there are no legitimate reasons to forbid these procedural safeguards. They could cause delay, but the Department has acknowledged that delay is one of the goals of its own proposal. *See, e.g.*, 87 Fed. Reg. at 41,912.

Fourth, the exceptions to the statute of limitations in the recoupment proposal are infirm, in that they do not provide sufficient notice of a borrower defense claim (they also are arbitrary in violation of the APA for the same reason). Indeed, these exceptions are so broad that they render the statute of limitation meaningless. The second exception is when an institution "receives" a class action complaint asserting relief "for a class that may include the borrower" for "underlying facts that may form the basis of the claim." This is insufficient notice: it would require institutions to be omniscient as to what facts the Department may believe in the future will "form the basis" of a claim. Indeed, the proposal even would allow for an exception to the statute of limitation when an institution is mailed (not even served) a complaint that "may" be amended to eventually include the borrower in its class and to list potentially relevant actions. The third exception fares no better, for it purports to put a school on notice when any government agency inquires as to any time period, program or practice that "may" have affected the borrower, again

---

[290] *See, e.g.*, 34 C.F.R. § 668.87 (incorporating 34 C.F.R. § 668.89).

regarding facts that "may" form the basis of a claim. These exceptions swallow the statute of limitations on recoupment.

3. *The proposed recoupment procedures violate the APA.*

The Department's recoupment proposal also violates the APA because it lacks a reasoned basis. The Department first argues that it wants to separate borrower defense application reviews from recoupment proceedings.[291] But those two proceedings were separate under the 2019 regulations (if not the 2016 regulations) and the Department does not explain why that 2019 separation is insufficient.[292] The Department's first rationale appears to misunderstand the current regulation and thus violates the APA.

The Department's second rationale fares no better. The Department claims that institutions would prefer the program review process in part H because it is more "familiar."[293] This, too, is hogwash, for the Department's 2019 recoupment procedures are based on part G, which is equally familiar to institutions. The difference between part G, which the 2019 recoupment process relied on, and part H, which the Department now proposes, is that part H provides fewer procedural protections (part G hearings, while not perfect, do allow institutions to put on witnesses, submit expert testimony, and engage in motions practice). Schools are equally familiar with both longstanding parts of their governing regulations.

---

[291] 87 Fed. Reg. at 41,912.

[292] *Compare* 34 C.F.R. § 685.206(e)(1)-(15) (discussing how borrower defense claim is adjudicated), *with* 34 C.F.R. § 685.206(e)(16) (setting forth how Department may recover after "borrower's successful borrower defense to repayment" through 34 C.F.R. § 668.87, that is subpart G of part 668).

[293] 87 Fed. Reg. at 41,912.

The Department also appears to assert the decoupling application review and recoupment proceedings helps to eliminate any concerns that it is engaging in retroactive rulemaking with its proposed amendments to the borrower defense standards.[294] That effort is in vain. Granting a borrower defense application under any standard puts an institution one step closer to recoupment, even if recoupment is based on the borrower defense standard that is chronologically appropriate.

In other words, making changes to the borrower defense standard retroactive but keeping the recoupment standard chronologically appropriate does not change the fact that there are two steps to recoupment—application review and recoupment itself—and the Department has made the first step more likely to occur. And that is not even considering the significant reputational harms that institutions face from approved borrower defense claims, even if they do not face recoupment proceedings.

The *Sweet v. Cardona* proceedings regarding intervention are filled with affidavits attesting to these reputational harms arising even before final adjudication of borrower defense claims and the Department fails to properly credit these concerns. Similarly, the proposed regulation's concept of separating application review and recoupment (even if it were a new concept) does nothing to change the fact that it is not until after a successful application that an institution can face a recoupment proceeding.

---

[294] 87 Fed. Reg. at 41,912; *see supra* Section II (discussing retroactivity).

The Honorable Miguel A. Cardona
Secretary of Education
Page 107 of 137

IX.      **The Department has Unlawfully Expanded the Definition and Scope of a Closed School Discharge and Lacks the Authority to Impose Closed School BDR Liability upon Affiliated Persons**

  1.  *The Department's expansion of the definition of a "closed school" is contrary to the statute.*

In the preamble, the Department refers to closed school discharge as something borrowers are "legally entitled to in the HEA,"[295] and declares that the Proposed Rule changes are intended to "clarify and streamline" loan discharges for students whose schools closed while the students were attending an institution or shortly after the students left the institution. But the Proposed Rule goes well beyond the HEA, including in its highly expanded, and discretionary, definition of what constitutes a "closed school."

The Proposed Rule changes would afford the Secretary discretion to determine that a school's closure date is the earlier of the date that the school ceased to provide instruction in "most" programs, "as determined by the Secretary," or "a date chosen by the Secretary that reflects when the school had ceased to provide educational instruction for most of its students."[296] The HEA, however, does not suggest that a school closure is – or should be – defined as a scenario where "most" programs have ceased or "most" students have ceased to receive educational instruction. Rather, the HEA describes the discharge as applying where:

> [A] borrower who received, on or after January 1, 1986, a loan made, insured, or guaranteed under this part and the student borrower, or the student on whose behalf a parent borrowed, is

---

[295] 87 Fed. Reg. 41,881.

[296] The Department has stated that it will provide additional guidance as to what constitutes a closed school in Volume 2 of the Federal Student Aid Handbook, *see* 87 Fed. Reg. 41,923, 41,924; this will be made available on the Department's website at https://fsapartners.ed.gov/knowledge-center/fsa-handbook. To the extent this forthcoming guidance includes triggering events that are inconsistent with the statute, it is objectionable and unlawful.

> unable to complete the program in which such student is enrolled
> ***due to the <u>closure</u> of the institution.***[297]

"Closed" is an unambiguous term, the plain meaning of which, according to multiple sources, is "not open." *See, e.g.,* Merriam-Webster Dictionary ("not open");[298] Cambridge Dictionary ("not open").[299] The Department's attempt to rewrite the term "closed," and to give the Secretary ***additional*** discretion to interpret the Department's rewritten definition, contradicts the U.S. Supreme Court's instruction that: "An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms. Agencies exercise discretion only in the interstices created by statutory silence or ambiguity; they must always give effect to the unambiguously expressed intent of Congress."[300]

Further, utilizing a new definition of "closed" to provide discharges for "mostly closures" that may have occurred in the indefinite past (because there is no statute of limitations, which itself is unfair and prejudicial, *see supra* Section III), is improperly retroactive. The Department's

---

[297] 20 USC § 1087(c)(1) (emphasis added).

[298] https://www.merriam-webster.com/dictionary/closed.

[299] https://dictionary.cambridge.org/us/dictionary/english/closed.

[300] *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 325–26 (2014) (internal quotation and citation omitted)). *See also Henson v. Santander Consumer USA Inc*., 137 S. Ct. 1718, 1725, 198 L. Ed. 2d 177 (2017) ("it is never our job to rewrite a constitutionally valid statutory text under the banner of speculation about what Congress might have done. …we will not presume … that any result consistent with [a party's] account of the statute's overarching goal must be the law but will presume more modestly instead 'that [the] legislature says ... what it means and means ... what it says.'") (quoting *Dodd v. United States*, 545 U.S. 353, 357, 125 S.Ct. 2478, 162 L.Ed.2d 343 (2005)). Similarly, the Department's proposal to redefine "program" pushes the meaning of the term beyond reason. The Department admits that it is "expanding the definition of 'program'" to encompass multiple fact patterns that will allow the Department additional "discretion to determine whether an institution has placed a student in a different program or awarded the student a different degree to make the student ineligible for a closed school discharge." 87 Fed. Reg. 41,923; *see* § 674.33(g)(1)(ii)(D), § 682.402(d)(1)(ii)(D), § 685.214(a)(2)(iii). But, as the aforementioned decisions instruct, the Department must not promote its goals through advancing a tortured definition that has no basis in the text of the statute.

proposed closed school discharge rule cannot apply to any act or omission of an institution occurring before the effective date of those regulations.

The Department's definition also affects the practical operation of schools in an ever-changing economic environment. Institutions evaluate the labor market and make decisions to add or discontinue program offerings in response to market demand and student needs. The Department's vague definition of what constitutes a closure risks penalizing schools that adjust their programming to reflect market shifts, and could be particularly damaging to small institutions that wish to make changes to their portfolio of programs.[301] Instead of starting new programs and discontinuing old programs, some colleges may keep old programs afloat simply to avoid school loan liability.

Accordingly, the Department must abandon its proposal to modify the definition of a "closed school" and maintain the current formulation. This will help to reduce the likelihood that schools will be subject to meritless closed school discharges when they are, in fact, open and serving students.

2. *The Department has unlawfully expanded the categories of borrowers who may be entitled to closed school discharge, and relieved many borrowers of the requirement to complete an application seeking relief.*

In addition, the Proposed Rule would uniformly allow borrowers who withdrew from the school not more than 180 days before closure to seek a discharge. On its face, the rule is at odds

---

[301] Although the Department maintains that "[t]his provision would not automatically apply if, for example, a small institution remains open but ends a program or two but would capture a circumstance where an institution continues only one small program while otherwise ceasing all other enrollment," 87 Fed. Reg. 41,923, given the Secretary's discretion to interpret what constitutes the termination of "most" programming, the risk to small institutions remains substantial.

with the statute, which states that closed school discharges are available only to those students who are "unable to complete the program in which such student is enrolled."[302] Further, the rule makes no distinction between borrowers who may have left their schools due to circumstances unrelated to the educational programming, e.g., illness, locational preference, change in family situation, job change. Thus, the Proposed Rule will allow discharges even where there is no causal connection between a student's decision to withdraw from school and a school's closure. Compounding this problem, the Proposed Rule would include a more expansive "but nonexhaustive" list of "exceptional circumstances" that provide the Secretary with discretion to expand the 180-day timeline. These circumstances include (but are not limited to) events such as revocation of accreditation or licensing, termination by the Department of participation in the Title IV program, an agency finding or court judgment that a school violated State or Federal laws "related to education or services to students, and "discontinuance of "a significant share" of the school's academic programs. The Department concedes that affording the Secretary the discretion to extend the 180-day timeline "would increase eligibility for closed school discharges, ***potentially by several years***."[303] Given all of this, the Department should allow only those students who were unable to complete their programs because their schools closed to seek closed school discharges; alternatively, the Department should limit the timeline to 120 days before closure and hem in the Secretary's discretion to extend that timeline.

In addition, the Secretary or a guaranty agency (for FFEL loans) "may discharge a loan without an application for an eligible borrower" where the Secretary has "information in the

---

[302] 20 U.S.C. § 1087(c)(1).
[303] 87 Fed. Reg. 41,955 (emphasis added).

The Honorable Miguel A. Cardona
Secretary of Education
Page 111 of 137

Secretary's possession" that the borrower did not complete an institutional teach-out plan or teach-out agreement at another approved school.[304] The Department previously recognized that including automatic closed school loan discharges was unnecessary because it "is not overly burdensome for borrowers to apply for a closed school loan discharge, and that they should retain the choice of whether to apply."[305] This statement continues to be true, given that the Secretary will mail the borrower a discharge application,[306] which is currently (and presumably will be in the future) a form document that asks several questions – primarily in multiple choice format, with checkboxes to indicate the borrower's answer – regarding the borrower, the program attended, and circumstances surrounding the closure.[307] Given that the Department proposes to further "streamline" the discharge qualifications, the Department's about-face on its requirement for borrowers to complete the discharge application to obtain relief is arbitrary and capricious. Accordingly, the Department must not include an automatic discharge provision.

In the event that the Department maintains the automatic discharge provision, it should not reduce the time for a borrower to qualify for the discharge from three years to one year after the borrower's last date of attendance in a teach-out program that the borrower did not complete. Although the Department has proposed this change with the goal of providing relief

---

[304] The Department has stated that, "the Department did not collect and does not have reliable data on students' programs prior to 2014; therefore, the borrower could not qualify for an automatic discharge prior to 2014." 87 Fed. Reg. 41,922. *See also* Department of Education, Issue Paper #2: Closed School Discharge: Session 1: October 4-8, 2021, at 2 (https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/2closedschooldisc.pdf) ("[b]efore 2014 the Department does not have data on the program a borrower attended.")
[305] 84 Fed. Reg. 49,848.
[306] *See* § 685.214(g)(2).
[307] *See* Loan Discharge Application: School Closure (OMB No. 1845-0058), https://studentaid.gov/sites/default/files/closed-school-loan-discharge-form.pdf.

more quickly to avoid borrower loan defaults, it has done so notwithstanding "the possibility that some students may opt to re-enroll and transfer their credits after one year," resulting in a windfall.

The Department also should reconsider its proposal to remove the current requirement that a borrower may only receive a closed school discharge without an application if the borrower does not enroll in another Title IV school within three years of the prior school's closure date. In proposing this deletion, the Department ignores the reality that numerous borrowers will be incentivized to receive discharges and then subsequently transfer their credits and enroll in new schools. Here, the Department is also departing from well-established higher education norms that have historically encouraged structures that incentivize students faced with school closure to transfer timely and complete regardless of whether there is a formal teach-out agreement between institutions. The Department acts arbitrarily and capriciously by failing to adequately explain this about-face change in which the anticipated benefits clearly do not outweigh the costs when factoring in students' lost credits and potentially forgone labor market income.

Further, the Proposed Rule – by allowing borrowers to seek discharges even when they are offered a teach-out program, and even when they begin a teach-out program – undermines the Department's acknowledgement that "participating in a teach-out program may be the most expeditious way for a borrower to complete their original program."[308] Thus, the Department should encourage students to complete accredited teach-out programs and not encourage those who are offered, and who participate in, these beneficial arrangements to abandon them in favor of a loan discharge.

---

[308] 87 Fed. Reg. 41,924.

The Honorable Miguel A. Cardona
Secretary of Education
Page 113 of 137

3.  *The proposed closed school discharge rule violates schools' due process rights.*

The Department has stated that "especially" for "closed school discharges, the Department will seek to recover funds from the institutions involved."[309] Yet, the Proposed Rule fails to provide any procedural protections for institutions (or their affiliates or principals)[310] to allow them to present evidence to defend against an application or recoupment. This is unfair and a violation of the due process rights, particularly where the Secretary is empowered to pursue "closed" school discharges against schools that remain open. And for schools that are closed, the taxpayers likely will bear much of the burden of funding the discharge amounts.[311]

4.  *The Department lacks statutory authority to impose closed school BDR liability against affiliated persons.*

The Proposed Rule would, "in the case of a closed school," allow the Department to pursue BDR recovery for loans disbursed on or after July 1, 2023, from "a person affiliated with the school."[312] The term "affiliated person" is described elsewhere in Department regulations, and generally hinges on the level of ownership or control a person or entity exercises over the institution (which includes directors and executive officers).

Congress has authorized limited recourse against principals and affiliates of a closed school. In Section 437 of Part B, governing FFEL, Congress has provided,

> If a borrower who received, on or after January 1, 1986, a loan made, insured, or guaranteed under this part and the student borrower, or the student on whose behalf a parent borrowed, is unable to complete the program in which such student is enrolled due to the closure of the institution or if such student's eligibility to borrow under this part was falsely certified by the eligible institution or was falsely certified as a result of a crime of identity theft, or if the institution

---

[309] 87 Fed. Reg. 41,881.

[310] 20 U.S.C. § 1087(c)(1).

[311] *Id.*

[312] § 685.409(a).

The Honorable Miguel A. Cardona
Secretary of Education
Page 114 of 137

> failed to make a refund of loan proceeds which the institution owed to such student's lender, then the Secretary shall discharge the borrower's liability on the loan (including interest and collection fees) by repaying the amount owed on the loan and shall subsequently pursue any claim available to such borrower against the institution and its affiliates and principals or settle the loan obligation pursuant to the financial responsibility authority under subpart 3 of part H. In the case of a discharge based upon a failure to refund, the amount of the discharge shall not exceed that portion of the loan which should have been refunded. The Secretary shall report to the authorizing committees annually as to the dollar amount of loan discharges attributable to failures to make refunds.[313]

If the borrower's loan is discharged pursuant to Section 437(c)(1), the borrower "shall be deemed to have assigned to the United States the right to a loan refund up to the amount discharged against the institution and its affiliates and principals."[314]

There is no comparable authority under Part D, the William D. Ford Federal Direct Loan Program. Nonetheless, the Department claims the authority to recover approved BDR discharges from, "in the case of a closed school, a person affiliated with the school as described in § 668.174(b) of this chapter."[315] Section 668.174(b) describes affiliated persons as those who individually or with family members exercise substantial control or ownership of the institution, or have liability for violation of a Title IV, HEA requirement, including directors, executive officers, and general partners.[316]

The Department simply cannot create BDR liability for controlling or affiliated persons without statutory authority. No such authority can be derived, directly or indirectly, from Section 437(c)(1). Section 437(c)(1) is limited by its terms and does not permit attribution of BDR liability for Direct Loans to controlling persons. It only applies to FFEL loans made under Part B, not Direct

---

[313] 20 U.S.C. § 1087(c)(1).
[314] *Id.* § 1087(c)(2).
[315] 87 Fed. Reg. 42,009 (§ 685.409(a)).
[316] 34 C.F.R. § 668.174(b).

The Honorable Miguel A. Cardona
Secretary of Education
Page 115 of 137

Loans under Part D. It authorizes discharges (and recovery against an institution and its affiliates and principals) only in one of three circumstances: (1) inability to complete the program; (2) false certification by the eligible institution, or (3) false certification because of identity theft.[317] And it allows the Secretary to recover any discharge amount by one of two mechanisms. The Secretary "shall subsequently pursue any claim available to such borrower against the institution and its affiliates and principals," which means that the *borrower* must have a claim of legal liability that can be asserted against those persons (and which Section 437(c)(2) has assigned to the Secretary by operation of law).[318] Or the Secretary may "settle the loan obligation pursuant to the financial responsibility authority under subpart 3 of part H,"[319] under which the Secretary may require for specific institutions sufficient cash reserves, third-party guarantees, financial guarantees from controlling persons, or the assumption of personal liability by controlling persons.[320]

The Department's only discussion of its extension of closed-school discharge provisions to Direct Loans is the summary statement that "[t]he closed school discharge provisions also apply to Direct Loans, under the parallel terms, conditions, and benefits provision in Section 455(a) of the HEA."[321] But the Secretary's rights to recover BDR losses against institutions and affiliated persons are not the "terms, conditions, and benefits" of FFEL "loans made to borrowers."[322]

---

[317] 20 U.S.C. § 1087(c)(1) *Id.* § 1087(c)(1)
[318] *Id.* § 1087(c)(1), (2).
[319] *Id.* § 1087(c)(1).
[320] *id.* § 1099c(c), (e).
[321] 87 Fed. Reg. 41,920; 20 U.S.C. § 1087e(a)(1) ("Unless otherwise specified in this part, loans made to borrowers under this part shall have the same terms, conditions, and benefits, and be available in the same amounts, as loans made to borrowers, and first disbursed on June 30, 2010, under Sections 1078, 1078–2, 1078–3, and 1078–8 of this title.").
[322] *See id.*

The Honorable Miguel A. Cardona
Secretary of Education
Page 116 of 137

Even if, *arguendo*, Section 437(c) could be extended to Direct Loans, it would not support the imposition of BDR liability on affiliated persons. As noted above, BDR is not among the three types of discharges covered by Section 437(c)(1); each of the statutory grounds is distinct from the acts or omissions that BDR predicates. And recovery under BDR (which is a defense against a Secretary's claim to enforce repayment obligations of a Direct Loan) does not involve a legal "claim *available to such borrower against* the institution and its affiliates and principals."[323] A borrower cannot bring a BDR "claim" against an institution or its affiliates and principals. And the alternative enforcement mechanism authorized by Section 437(c)(1) under the financial responsibility regulations would apply to affiliates and principals only of specific schools where such persons have made financial guarantees or assumptions of institutional liabilities pursuant to 20 U.S.C. § 1099c(c), (e). There is no basis for the Department's universal claim that it can seek to recoup institutional BDR liability from any affiliated person who meets the definition of 34 C.F.R. § 668.174(b), (c).

Not only is § 685.409(a) invalid as applied to affiliated persons, but the Department has no authority to redefine "*school* or *institution*" as "includ[ing] persons affiliated with the institution as described in § 668.174(b) of this chapter."[324] The HEA clearly defines "institutions of higher education" as limited to the institutions themselves,[325] and differentiates controlling and affiliated persons.[326] The Department's purpose in expanding the definition of "school" or "institution" is unclear. To the extent that the Department is attempting to impute the acts of

---

[323] 20 U.S.C. § 1087(c)(1) (emphasis added).
[324] 87 Fed. Reg. 42,005 (§ 685.401(a)).
[325] 20 U.S.C. §§ 1001, 1002.
[326] *See, e.g., id.* §§ 1087(c)(1), 1099(c), (e).

affiliated persons to institutions, those matters should be covered by traditional principles of agency. To the extent that the Department is attempting to impute institutional liability to controlling persons (including officers, directors, and partners), it lacks statutory authority to do so, and certainly not in ways that depart from established legal principles of derivative liability.

The Department in the preamble declared that its "recoupment efforts … complement other executive and regulatory actions contemplated by the Department to increase institutional accountability," including its initiative to increase the frequency with which entities that own institutions are required to sign Program Participation Agreements and thus potentially face financial consequences if there are liabilities against the institution."[327] CECU notes that the PPA initiative requiring additional signatories to assume financial liability is a legislative rule because it is "[a]n agency action that purports to impose legally binding obligations or prohibitions on regulated parties."[328] The Department cannot impose such obligations without going through notice-and-comment rulemaking.[329] But, in fact, § 685.409(a) is inconsistent with the Department's PPA initiative, not complementary. In its PPA Guidance, the Department notes that individual signatories are "typically the institution's chief executive officer, president, chancellor, or other designated official," but that financial liability will be borne only by institutional co-signatories: "By co-signing the PPA, the entities (but not the individuals who sign as authorized representatives of the entities) agree to assume liability for financial losses to the Federal government related to the institution's administration of the Title IV programs."[330] This directly

---

[327] 87 Fed. Reg. 41,884.

[328] *National Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014).

[329] 5 U.S.C. § 553.

[330] Department of Education (GENERAL-22-16) *Updated Program Participation Agreement Signature Requirements for Entities Exercising Substantial Control Over Non-Public Institutions*

The Honorable Miguel A. Cardona
Secretary of Education
Page 118 of 137

contradicts the operation of § 685.409(a), which subjects all affiliated persons to liability, including individual officers and directors. Such unexplained inconsistencies with earlier agency policies are a sign that the rule is arbitrary and capricious.[331]

The Department should amend § 685.409 to eliminate affiliated-person liability for approved BDR discharges, and amend its definition of "school or institution" as including affiliated persons under § 685.401(a). At a minimum, it should limit affiliated person liability to institutional affiliates.

### X.    The Department's Proposed Application of the BDR Rule to FFEL and Perkins Loans Violates the Statute

Section 455(h) authorizes borrower defenses to repayment under the Direct Loan Program only to a loan "made under this part," namely, Part D (the William D. Ford Federal Direct Loan Program).[332] The Department acknowledges this limitation but proposes to apply the BDR Rule to both FFEL and Perkins Loans that have been *or will be* consolidated with Direct Loans. Indeed, the Department proposes that the BDR application will itself serve as the application for consolidation, and that consolidation can occur *after* a borrower defense is granted.[333] This rule cannot be squared with Section 455(h).

---

*of Higher Education* (March 23, 2022), https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2022-03-23/updated-program-participation-agreement-signature-requirements-entities-exercising-substantial-control-over-non-public-institutions-higher-education.

[331] *Exxon Mobil Corp. v. F.E.R.C.*, 571 F.3d 1208, 1217 (D.C. Cir. 2009) ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.") (internal quotation marks omitted).

[332] 20 U.S.C. § 1087e(h).

[333] 87 Fed. Reg. 41,886.

Congress chose to authorize a BDR only for Direct Loans because the government is the lender, and thus Congress has only authorized the Department to specify borrower defenses to repayment of the government's own lending contracts. FFEL and Perkins loans—which have not been issued since 2010 and 2017 respectively[334]—stand on a different footing. FFEL loans are agreements that the borrower executes with private lenders, for which the United States guaranteed repayment.[335] Perkins loans involve a lending contract with the school, which the United States subsidizes.[336] Congress granted the Department no authority to specify borrower defenses to repayment of loans to private or institutional lenders under the FFEL or Perkins programs.

CECU does not dispute that a Federal Direct Consolidation Loan ("FDCL") is a loan under Part D (the William D. Ford Federal Direct Loan Program), and thus the Department may specify as borrower defenses to repayment under Section 455(h) acts or omissions taken against a borrower who at the time holds or is applying for a FDCL.[337] But the Department may not recognize a borrower defense based on acts or omissions against a student who at the time funded her education with FFEL or Perkins loans, not Direct Loans. That is beyond the authority delegated by Congress.

---

[334] 87 Fed. Reg. 41,879 n.2.

[335] Federal Student Aid, Department of Education, *Federal Family Education Loan (FFEL) Program*, https://studentaid.gov/help-center/answers/article/ffel-program.

[336] Financial Aid Programs, https://www.benefits.gov/benefit/418; Federal Student Aid, Department of Education, *Participating in the Perkins Loan Program*, https://fsapartners.ed.gov/knowledge-center/fsa-handbook/2021-2022/vol6/ch3-participating-perkins-loan-program.

[337] *See* 20 U.S.C. § 1087e(a)(2)(D).

The Honorable Miguel A. Cardona
Secretary of Education
Page 120 of 137

Indeed, the Department's position would lead to unfair and arbitrary treatment of similarly situated individuals. Take the example of two students from the same school who each took out $10,000 in FFEL loans in 2008 in reliance on the same fraudulent misrepresentation of graduation rates. Student A repaid the FFEL loan in full without consolidation; Student B has not made any repayments of the FFEL loan. Student A would not be entitled to any recovery because she has no further repayment obligations to discharge, and Section 455(h) only authorizes recovery of payments of loans made under Part D (not under FFEL).[338] Student B, under the Department's Proposed Rule, could convert the whole FFEL amount into a consolidated Direct Loan and would have the full $10,000 discharged. There is no rationale for treating similarly situated borrowers so radically differently, and indeed treating borrowers who have dutifully met their repayment obligations worse. This arbitrariness would be avoided if Section 455(h) is properly interpreted to apply the defense only to borrowers who funded their education with Direct Loans.

The Department justifies its consolidation rule because Congress has provided that Direct Loans should be made under the same "terms, conditions, and benefits" as FFEL Program loans.[339] But BDR is not a term, condition, or benefit of a FFEL Program loan; it is a statutory provision specific to Direct Loans, and cannot be extended to FFEL and Perkins loans through consolidation. The Department must comply with the statute as written, not as it wishes it was written.

---

[338] The Department's rule tracks the statute in this respect. It only permits reimbursement if an FFEL or Perkins loan is "repaid by the Direct Consolidation Loan." 87 Fed. Reg. 42,005 (§ 685.402(a) "*Borrower defense to repayment*, subpart (ii)).
[339] *Id.* (citing 20 U.S.C. §§ 1087a(b)(2), 1087e(a)(1), 81 Fed. Reg. 75,930).

The Honorable Miguel A. Cardona
Secretary of Education
Page 121 of 137

Furthermore, the statute contemplates only "a defense to a *repayment* of loan *made* under this part."[340] One cannot assert a defense unless the Direct Loan has already been "made," past tense; further, there is no such thing as "repayment" of a Direct Loan that has not yet been made. But under the Department's proposed consolidation rule, the Department first adjudicates a borrower defense even when no Direct Loan has been made, and then consolidates other loans into a Direct Loan "only … if the borrower's claim is approved, giving the borrower a streamlined process for receiving discharge of their loans."[341] The statute does not permit the granting of borrower defenses to putative "repayment" of future Direct Loans that have not yet been "made." The Department's proposal violates this provision of the statute.

Finally, the Department's proposed consolidation rule is at odds with its regulatory definition of a "borrower defense." The definition provides that "*Borrower defense to repayment* means an act or omission of the school attended by the student that relates to *the making of a Direct Loan* for enrollment at the school or the provision of educational services for which *the loan* [*i.e.*, the Direct Loan] was provided …."[342] That would exclude acts or omissions that relate to the making of an FFEL or Perkins loans, which are not Direct Loans. The Department did not cure the problem by declaring that BDR includes "repayment of amounts owed to the Secretary on a Direct Loan including a Direct Consolidation Loan that was used to repay" FFEL and Direct Loans.[343] Under the proposed regulation, there is still no defense if the act or omission did not

---

[340] 20 U.S.C. § 1087e(h) (emphasis added).
[341] 87 Fed. Reg. 41,886.
[342] 87 Fed. Reg. 42,005 (§ 685.402(a) "Borrower defense to repayment").
[343] 87 Fed. Reg. 42,005 (§ 685.402(a) "Borrower defense to repayment," subpart i).

The Honorable Miguel A. Cardona
Secretary of Education
Page 122 of 137

relate to the making of a Direct Loan, or if no Direct Loan was provided to pay for educational services. The Department's regulations are an exercise in contradiction.

### XI. The Department's Prohibition on Pre-Dispute Arbitration Agreements and Class Action Waivers Contravenes the Federal Arbitration Act, Restricts the Freedom of Contract, and Fails to Consider the Benefits of Arbitration

According to the Department's 2019 estimate, approximately one-half of participating proprietary institutions agree with students, upon enrollment, to arbitrate potential future disputes and/or resolve them on an individual, case-by-case basis, rather than through class action processes.[344] Student borrowers have reason to prefer such agreements because they "permit relatively inexpensive and expeditious resolution of customer grievances."[345] Consequently, the Department's guiding philosophy has been "to incentivize informed customers to make rational decisions that they think are best for them …. not to substitute [the Department's] own subjective and paternalistic judgment in place of the student's own wishes about their legal rights and remedies."[346] To that end, the current regulations do not restrict the freedom of contract but instead seek to "provide students with information that they need to empower themselves to understand [their] legal rights and available remedies."[347]

For example, institutions "must make available to enrolled students, prospective students, and the public, a written (electronic) plain language disclosure of those conditions of enrollment."[348] The required disclosure must make known, *inter alia*, that the borrower may file

---

[344] *See* 84 Fed. Reg. 49,904 ("Of the 1,888 proprietary institutions participating in the title IV, HEA programs, we estimate that 50 percent or 944 will use a pre-dispute arbitration agreement and/or class action waiver and will provide the required information electronically.").
[345] *Id.* at 49,843.
[346] *Id.*
[347] *Id.*
[348] 34 C.F.R. § 668.41(h)(1)(i).

The Honorable Miguel A. Cardona
Secretary of Education
Page 123 of 137

a BDR application with the Department prior to any arbitration or internal dispute resolution process and that the school cannot require borrowers to relinquish their rights to pursue a BDR claim.[349] "All statements in the plain language disclosure must be in 12-point font" on the institution's public admissions webpage and catalogue.[350]

The present regulatory scheme ensures that borrowers understand their rights prior to enrollment while still preserving "the strong Federal policy favoring arbitration,"[351] which is reflected in the Federal Arbitration Act (the "FAA") and nearly a century of Supreme Court jurisprudence applying it. "[I]n Congress's judgment," arbitration offers "the promise of quicker, more informal, and often cheaper resolutions for everyone involved."[352] Hence, Section 2 of the FAA categorically provides that when parties agree to arbitrate, their agreement "shall be valid, irrevocable, and enforceable."[353] The Supreme Court has called this Section a "congressional declaration of a liberal Federal policy favoring arbitration agreements, notwithstanding any substantive or procedural policies to the contrary."[354] Put simply, Federal courts have "emphatic directions" from Congress "to respect and enforce agreements to arbitrate."[355]

In the absence of a congressional mandate, Federal agencies are no more free than courts to disparage arbitration agreements in pursuit of other policy goals. Nevertheless, relying solely

---

[349] *Id.*

[350] *Id.* § 668.41(h)(1)(ii).

[351] 83 Fed. Reg. 37,265.

[352] *Epic Sys. Corp. v. Lewis*, 138 S.Ct. 1612 (2018).

[353] 9 U.S.C. § 2.

[354] *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *see also CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006) ("To overcome judicial resistance to arbitration, Congress enacted the [FAA]. Section 2 embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts.").

[355] *Epic Sys.* 138 S.Ct. at 1621.

The Honorable Miguel A. Cardona
Secretary of Education
Page 124 of 137

on the HEA § 454's vague permission to condition funding on "such other provisions as the Secretary determines are necessary,"[356] the Department's BDR Rule would simply ban advance agreements between schools and students to arbitrate.[357] By forbidding reliance on arbitration agreements, the Proposed Rule renders them invalid and unenforceable—an out-and-out nullification of the FAA. The Supreme Court has foreclosed this result time and time again. For example, in *Italian Colors*, it was argued that enforcing an arbitration agreement "would contravene the policies of the antitrust laws" by denying plaintiffs "an affordable procedural path."[358] But finding no "contrary congressional command" to exempt antitrust cases from the FAA, the Court declined to take the "remarkable" step of "erasing [the] expectation" to arbitrate.[359] Similarly, the Court was asked to decide that the National Labor Relations Act (the "NLRA") "overrides" the FAA because the NLRA guarantees "the right to self-organization …. to bargain collectively … and to engage in other concerted activities for the purpose of collective bargaining."[360] Because this Section of the NLRA did not express a view on arbitration—let alone do so "clearly and manifestly, as [the Court's] precedents demand"—it could not "displace the Arbitration Act."[361] So too here: there is zero indication in the HEA that the Department's policy prerogatives can trump "dispute resolution procedures . . . usually left to other statutes and rules—not least the Federal Rules of Civil Procedure [and] the Arbitration Act."[362] Congress did

---

[356] 20 U.S.C. § 1087d(a)(6).
[357] 87 Fed. Reg. 41,913–41,918.
[358] *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013).
[359] *Id.* at 233–34.
[360] *Epic Sys.*, 138 S.Ct. at 1623–24.
[361] *Id.* at 1624.
[362] *Id.* at 1627.

not "tuck[] into the mousehole of [Section 454(a)(6)'s] catchall term an elephant that tramples the work done by [the FAA]."[363]

The Department insists that its proposed arbitration ban would neither "displace or diminish the effect of the FAA" nor "invalidate any arbitration agreement," but instead "would simply condition the institution's future participation in the Direct Loan Program on the institution not enforcing of certain [arbitration or class action] provisions in those contracts going forward."[364] In the Department's view, the rule does not render any arbitration agreement unenforceable; it only threatens to withhold funding critical to the existence of any school that enforces an arbitration agreement. Even accepting the Department's euphemism—that the rule is a "simple condition" and not a ban—the FAA preempts *any* discrimination against arbitration not authorized by Congress.[365] Under prevailing Supreme Court precedent, there is no difference between an outright prohibition on arbitrating a certain type of claim and a "rule that covertly accomplishes the same objective." *Id.* However described, the Department's Proposed Rule is unlawful because it "fails to put arbitration agreements on an equal plane with other contracts."[366]

The Department's Proposed Rulemaking ignores the Supreme Court's FAA jurisprudence and relies instead on one district court opinion that was vacated before the merits could be

---

[363] *Id.* at 1627; *see also id.* (collecting cases wherein the Court "rejected efforts to conjure conflicts between the Arbitration Act and other Federal statutes"); *Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360, 367, 385 (5th Cir. 2018); *Associated Builders & Contractors of Se. Tex. v. Rung*, No. 1:16-CV-425, 2016 WL 8188655, at *1–2, 14 (E.D. Tex. Oct. 24, 2016); *Am. Health Care Ass'n v. Burwell*, 217 F. Supp. 3d 921, 931, 946 (N.D. Miss. 2016).
[364] 87 Fed. Reg. 41,915, 41,917.
[365] *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017).
[366] Id. at 1426–27.

The Honorable Miguel A. Cardona
Secretary of Education
Page 126 of 137

reviewed on appeal.[367] *CAPPS* was wrongly decided. After admitting that the FAA would prevent a Federal agency from taxing regulated entities $1 million per arbitration—a concession that severely undermines its conclusion—the district court resorted to vague policy considerations, noting that the Department has a "substantial interest" in the contracts between students and schools, that the arbitration ban "bears a reasonable nexus to the Department's statutory responsibilities," and that the rule was based on "real-world experience in dealing with the aftermath of the collapse of the Corinthian Colleges."[368] But just as the purposes of antitrust law or labor law could not be invoked to disfavor arbitration in *Italian Colors* and *Epic Systems*, whatever good reasons the Department may have to ban arbitration of BDR claims cannot override the FAA—even if those reasons relate to legitimate, statutory goals of the agency. Tellingly, the district court cited no example of another Federal agency purporting to have the power to extinguish arbitration of certain claims—much less a judicial opinion sustaining the exercise of such a power.

In addition, the Department's reliance on its vague power to place conditions for Federal funding as authority for this proposed regulation violates the Spending Clause because in the absence of unambiguous congressional intent, it wrongly coerces schools to agree to a condition not related to the purpose of Federal funding. A threat to withdraw Title IV funding, which is incredibly significant for schools and students, is a "gun to the head" and an "economic dragooning" that goes well beyond "the point at which pressure turns into compulsion" and provides schools with "no real option but to acquiesce," especially given its retroactive character

---

[367] *California Ass'n of Private Postsecondary Sch. v. DeVos* ("*CAPPS*"), 436 F. Supp. 3d 333, 344 (D.D.C. 2020), *vacated as moot,* No. 20-5080, (D.C. Cir. Oct. 14, 2020).
[368] *Id.* at 346–47.

now that schools have relied on funding.[369] Congress has not unambiguously expressed its intent to impose this condition on schools: there is no reference to it in the HEA and indeed it is inconsistent with the FAA.[370] And a provision regarding arbitration agreements and class action waivers is not related to the "main purposes" for which educational loan funds are expended—the provision of education.[371]

The Department protests that the "purposes" of the Direct Loan Program are served by this proposed regulation because the proposed regulation would prevent evasion of accountability, curtail borrowers' rights, and hurt the public fisc,[372] but that would justify a ban on arbitration agreements and class-action waivers in just about any contract related to federal funding. This vague and general rationale has nothing to do with the provision of education specifically. Moreover, the Department's assertion of relatedness is also fundamentally inconsistent with the borrower defense statute, which provides for borrower "defenses" in collection proceedings, not the massive scheme the Department has proposed for mass loan forgiveness. In any event, the Department has not explained why a provision that restricts student choice in education is related to a program whose purpose is increasing student choice in education.

Apart from the plain contravention of the FAA and the Spending Clause, the Proposed Rule is arbitrary and capricious for failing to weigh the benefits of arbitration in any meaningful

---

[369] *Nat'l Fed'n. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581-82 (2012); *cf. South Dakota v. Dole*, 483 U.S. 203, 211 (1987) (emphasizing that the condition at issue applied to "a relatively small percentage of certain highway funds").
[370] *See Pennhurst State Sch.*, 451 U.S. at 17.
[371] *See Nat'l Fed'n. of Indep. Bus.,* 567 U.S. at 581-82.
[372] 87 Fed. Reg. 41,916.

The Honorable Miguel A. Cardona
Secretary of Education
Page 128 of 137

way. In 2019, the Department's "extensive review" suggested that arbitration of BDR-related claims made sense for borrowers in light of "the burdens attending litigation."[373] In comparison to the courts, "arbitration adjudicates claims relatively quickly, cheaply, and, concurrently, gives the 'customers' what they want."[374] More specifically, arbitration is "more accessible to borrowers since it does not require legal counsel and can be carried out more quickly than a legal process that may drag on for years."[375] A speedier adjudication benefits not only the individual borrower but also many future students because (a) it enables "an institution to more quickly identify and stop bad practices to ensure that other students are not harmed" and (b) "it may reduce the expense of litigation that a university would otherwise pass on to students in the form of higher tuition and fees."[376]

The Proposed Rulemaking failed to consider these benefits, which directly address the Department's stated concern that arbitration agreements "stymie a borrower's ability to fully reap the rights and benefits of the Direct Loan Program."[377] Unfortunately, it is all too often the case that the overburdened Federal court system stymies effective resolution. Likewise, class actions in the Federal court system can be lucrative for plaintiffs' lawyers, yet provide slow and paltry relief for class members. In contrast, the American Arbitration Association's Consumer Rules, utilized by hundreds if not thousands of educational institutions, are designed first and foremost to "achieve a fair, efficient, and economical resolution."[378]

---

[373] 84 Fed. Reg. 49,843.

[374] *Id.*

[375] 83 Fed. Reg. 37,265.

[376] 83 Fed. Reg. 37,265.

[377] 87 Fed. Reg. 41,914.

[378] *See, e.g.*, AAA Consumer Arbitration Rules (effective Jan. 1, 2016) R-22, R-23, R-51.

The Department never engages in a real comparison between arbitration and litigation on these points. Without citing evidence or even acknowledging the benefits of arbitration, the Department's Proposed Rule elliptically asserts that arbitration agreements "impede borrowers' ability to file borrower defense claims and receive appropriate relief."[379] Rather than review any literature on the efficacy and fairness of arbitration, the Department throws up its hands, suggesting that "no study . . . has addressed arbitration in the context of higher education and student loans."[380] Thus, the Department frees itself to rely solely upon "the Department's experience with Corinthian Colleges."[381] Even if this sort of tunnel vision were a permissible mode of agency decision-making, the agency's reasoning ultimately relies on a counterfactual—*not its experience*—that Corinthian would have possibly faced "significant deterrent threat" if not for its arbitration provisions.[382] The agency cannot, of course, prove its counterfactual history, which also glosses over a host of reasons for the failure of Corinthian Colleges that have nothing to do with pre-dispute arbitration clauses.

In sum, the proposed arbitration and class action ban relies on broad and conclusory statements backed by just one anecdotal example that predates the 2019 Rule. Without more—concrete evidence or at least some justification for why the Department's view has changed since 2019—the rejection of the Department's previous legal position is not only cursory but arbitrary and capricious as well.

---

[379] 87 Fed. Reg. 41,915. *Cf. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("Normally, an agency rule would be arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem."); *Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955, 962 (D.C. Cir. 2003).

[380] *Id.*

[381] *Id.*

[382] *Id.*

The Honorable Miguel A. Cardona
Secretary of Education
Page 130 of 137

XII.     **The Department's Cost/Benefit Analysis is Incomplete and Flawed**

The Department's cost/benefit analysis is flawed and rests on implausible assumptions, is incomplete and incapable of proper evaluation, and demonstrates the arbitrariness and capriciousness of the Department's proposals.

As an initial matter, even the Department's (unduly low) estimates of costs are staggering. The Department estimates (as its "primary" estimate) that the borrower defense changes alone in its proposal will cost $17 billion retroactively and $2.7 billion over the next 10 years.[383] That is a tremendous number and reinforces the argument that courts will require clear congressional authorization for such a major policy decision.

More fundamentally, the Department's estimates are flawed and rest on several implausible assumptions that understate the potential costs of the Department's proposal. First, the Department provides no explanation for estimating that only 12% of individual claims will be approved, while 75% of group claims will be approved, when the standards are largely the same.[384] This is especially troubling when the overall estimate for approval of claims in the 2016 regulations was 65%.[385] Raising the estimate for individual claims would increase the costs of the Department's proposal.

Second, the Department is underestimating the amount of loan volume subject to BDR. It predicts that the loan volume of proprietary schools subject to BDR claims will actually decrease as time passes, notwithstanding the loosening of the standard and the corresponding

---

[383] 87 Fed. Reg. at 41,961.
[384] 87 Fed. Reg. at 41,959 (Table 5).
[385] *See* 87 Fed. Reg. at 41,833.

strengthened incentives to file a borrower defense claim with loosened standards, and the lack of a similar prediction for non-profit institutions.[386]

Third, the Department underestimates its recovery percentages, thereby underestimating the harm of the proposal to institutions. The Department estimates that it will recover only 15% of discharged loans from proprietary institutions and 12% from non-profit institutions, but the recoupment procedures do not allow the institution much opportunity at all to try and defend itself.[387] This assumption is particularly incongruous with the Department's estimate of recovering 20% from proprietary and private institutions and 75% from public institutions under the 2019 regulations and 37% from proprietary and private institutions and 75% from public institutions under the 2016 regulations.[388] The Department utterly fails to explain why these estimates differ so greatly. Indeed, the Department's tabular assumptions as a whole lack adequate explanation: the Department does not explain how it makes these estimates, other than a fleeting reference to the President's Budget.

In addition, the Department's cost/benefit analysis is incomplete and incapable of proper evaluation as required by the APA. The Department admits that it proposed a settlement agreement in *Sweet v. Cardona* but that "any effects of that agreement are not contemplated in this regulation."[389] But that proposed agreement would grant discharges to hundreds of thousands of borrower defense claims. It is impossible to properly evaluate the Department's proposal from a cost/benefit perspective without knowing whether that agreement will be

---

[386] *See* 87 Fed. Reg. at 41,958 (Table 5, predicting drop from 14% to 10% to 8% of loan volume for proprietary institutions).
[387] 87 Fed. Reg. at 41,959 (Table 5).
[388] *See* 87 Fed. Reg. at 41,960 (Table 6).
[389] 87 Fed. Reg. at 41,946.

approved. If the agreement is approved, then all of the proposed assumptions for approval of claims are incorrect. Even if the agreement is not approved, the proposed assumptions are inaccurate, because the announcement of the settlement spurred the filing of over 60,000 borrower defense claims in a week, more than in all of 2021, which was one of the years the Department based its assumptions on.

Further, the Department's cost/benefit analysis demonstrates the arbitrariness and capriciousness of its proposal. The Department states that for the 2019 regulations, it estimates 7.5% of claims were approved and for the 2016 regulations, 65% of claims were approved, and then from those bare statistics claims that the 2019 regulations led to "denials for too many claims."[390] It is entirely arbitrary to conclude that a 7.5% approval rate is too low absent an analysis of the error rate for the Department. That is especially true because the 7.5% statistic is simply an estimate, for the Department, by its own admission, did not adjudicate any claims under the 2019 regulations. The Department's analysis demonstrates that its proposal is not designed to approve legitimate borrower defense claims, but rather to increase the approval of borrower defense claims regardless of their legitimacy to some pre-conceived and arbitrary rate. That is not reasoned decision-making.

Moreover, the Department's proposal is not in compliance with the Information Quality Act (also known as the Data Quality Act).[391] Any studies the Department conducts and the resulting data it relies upon most comply with the Act and its implementing guidelines, which

---

[390] 87 Fed. Reg. at 41,883.
[391] Consolidated Appropriations Act, Pub. L. No. 106-554, § 515(a), 114 Stat. 2763 (2001) (text of Information Quality Act) (reproduced at 44 U.S.C. § 3516 note).

The Honorable Miguel A. Cardona
Secretary of Education
Page 133 of 137

require that the Department rely on information that is "accurate and reliable."[392] In particular, such information must be objective, where "objectivity refers to the accuracy, reliability, and unbiased nature of information."[393] To meet that standard, the Department must rely only on high-quality information including "peer-reviewed, scientific evidence-based research that is appropriately documented."[394]

The Department's proposal falls short of this requirement in several ways. As discussed immediately above, the Department's cost-benefit analysis lacks supporting data and documentation. In addition, this comment letter repeatedly points out that the Department has failed to explain adequately its proposals with reasoning and quality data. For example, the Department utterly fails to justify its numerous proposed presumptions with adequate data, notwithstanding legal requirements to do so. Similarly, the Department fails to justify empirically with quality data its proposal regarding arbitration agreements and class action waivers, its proposal concluding borrowers are similar enough to merit group process, and its proposal regarding discharges in light of how students are perceived, in the Department's mind, to behave. Finally, the Department repeatedly purports to rely on its experience in adjudicating borrower defense claims, but both fails to produce any data regarding that experience and also admits it has not adjudicated any claims under the 2019 rule.

---

[392] See 67 Fed. Reg. 8,452 (Feb. 22, 2002) (OMB implementing guidelines); U.S. Department of Education Interim Information Quality Guidelines (2019), available at https://www2.ed.gov/policy/gen/guid/iq/infoqualguide.pdf (current guidelines); see also Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (2020).
[393] *Id.*
[394] *Id.*

The Honorable Miguel A. Cardona
Secretary of Education
Page 134 of 137

**CONCLUSION**

CECU has long advocated for thoughtful borrower defense policies that serve the best interests of students and the schools that educate them, and further supports efforts to carry out the Department's responsibilities under the HEA. However, the Proposed Rule, as drafted, is at odds with the HEA and the Constitution. Further, the proposed BDR Rule would not further the goal of protecting students; indeed, it would have the opposite effect. The Proposed Rule, if implemented, will enable meritless BDR claims and result in erroneous loan discharges, which would be unfairly funded by schools, taxpayers, and ultimately current and future students.

The proposed BDR claims are each unlawful and would violate the procedural rights of schools. For example, the proposed "substantial misrepresentation" BDR claim (which, by the Department's own admission, would form the bulk of BDR claims) relies on an unprecedented legal standard that functionally presumes a school's liability by eliminating nearly all legal requirements for proving the elements of a misrepresentation. Moreover, nearly every aspect of the proposed BDR Rule contravenes long-standing due process principles. The BDR Rule would violate general prohibitions against the retroactive application of the law, promote a group claims process that fails to take into account the actual merits or commonality of individual BDR claims, eliminate the statute of limitations provision or any temporal limit on when BDR claims may be brought, and establish an adjudicatory process bereft of procedural safeguards mandated by the Constitution. The Department offers no rational explanation for its proposal. The proposed BDR Rule is arbitrary and capricious and, if promulgated, would violate the APA.

CECU, therefore, recommends that the NPRM be withdrawn, further studied, corrected, and then resubmitted. At a minimum, the Department must correct the errors CECU has

The Honorable Miguel A. Cardona
Secretary of Education
Page 135 of 137

identified in this comment submission. As discussed above, the necessary corrections include (but are not limited to):

- Abandoning Departmental adjudication of BDR claims, and limiting the BDR Rule to the specification of institutional acts and omissions that a borrower can assert as a defense to repayment of a Direct Loan;

- Ensuring that no adverse consequences attach to conduct that predates the rule, including the declaration of such conduct to be illegal;

- Establishing a single statute of limitations period that requires a borrower to assert a defense to repayment within three years from the date the student is no longer enrolled at the school;

- Recognizing acts or omissions of institutions as a predicate for borrower defenses only if those acts or omissions adversely affect borrowers such that requiring borrower performance of contract obligations would be inequitable;

- Eliminating presumptions except where the proven facts render the presumed fact so probable that adjudicative efficiency is served by the presumption, and only if the Department establishes processes whereby evidence can be discovered and adduced to rebut the presumptions;

- Requiring borrowers to demonstrate that they reasonably relied on a substantial misrepresentation or omission;

- Allowing an omission of fact to serve as a basis for a BDR claim only if it renders misleading actual misrepresentations upon which the borrower relied;

- Removing breach of contract as a basis for a BDR claim;

The Honorable Miguel A. Cardona
Secretary of Education
Page 136 of 137

- Removing aggressive recruitment as a basis for a BDR claim or, at a minimum, better defining aggressive recruitment and requiring borrowers to demonstrate reliance and injury;

- Removing prior judgments and Departmental final actions as bases for a BDR claim;

- Abandoning the group claim process;

- Allowing schools to meaningfully participate in BDR proceedings, as well as at the recoupment stage;

- Allowing schools to seek reconsideration of adverse determinations;

- Removing the right of borrowers to raise new State law claims on reconsideration;

- Requiring the Department to determine the amount of discharge based on actual financial harm to individual borrowers;

- Declining to expand the definition of a closed school and the categories of borrowers who may seek a closed school discharge, abandoning the automatic closed school discharge process, and allowing schools and affiliates to defend against closed school discharge claims; and

- Declining to impose BDR liability against persons affiliated with closed schools;

- Excluding from the BDR Rules loans that are not Direct Loans at the time of the act or omission;

- Abandoning the proposed ban on arbitration and class action waiver provisions.

CECU appreciates the Department's consideration of our and many others' concerns, and recommendations, regarding the July 2022 NPRM and the Department's proposals. We look forward to engaging with the Department to develop a new proposal that would serve students in a manner that is consistent with the HEA and the Constitution.

* * * * *