**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| CAREER COLLEGES<br>& SCHOOLS OF TEXAS,<br><br>                    Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>EDUCATION; MIGUEL CARDONA,<br>in his official capacity as the Secretary<br>of Education,<br><br>                    Defendants. | CASE NO.:   4:23-cv-00206-P |

**APPENDIX IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

| Description | Appendix Page Number |
|---|---|
| Expert Declaration of Diane Auer Jones | App-1 |
| CV of Expert Diane Auer Jones | App-15 |
| Declaration of Nikki England | App-22 |
| Declaration of Scott Shaw | App-30 |
| Declaration of Jeff Arthur | App-37 |
| Department's Response to Court's Inquiry Concerning Number of Post-Class Applicants in *Sweet v. Cardona*. | App-47 |

Dated: April 5, 2023    Respectfully submitted,

       /s Allyson B. Baker
       Allyson B. Baker (*pro hac vice*)
       Meredith L. Boylan  (*pro hac vice*)
       Stephen B. Kinnaird  (*pro hac vice*)
       Michael Murray  (*pro hac vice*)
       Sameer P. Sheikh  (*pro hac vice*)
       PAUL HASTINGS LLP
       2050 M Street NW
       Washington, DC 20037
       allysonbaker@paulhastings.com
       (202)-551-1830


       Philip Vickers
       Texas Bar No. 24051699
       pvickers@canteyhanger.com
       Katherine Hancock
       Texas Bar No. 24106048
       khancock@canteyhanger.com
       CANTEY HANGER LLP
       600 West 6th Street, Suite 300
       Fort Worth, TX 76102
       (817) 877-2800

       *Attorneys for Plaintiff*
       *Career Colleges & Schools of Texas*


## CERTIFICATE OF SERVICE

   I certify that on April 5, 2023, a true and correct copy of this Appendix was served upon all counsel of record in this action via the Court's CM/ECF system.


       /s/ Philip Vickers
       Philip Vickers

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

CAREER COLLEGES
& SCHOOLS OF TEXAS,

                    Plaintiff,

v.

UNITED STATES DEPARTMENT OF
EDUCATION; MIGUEL CARDONA,
in his official capacity as the Secretary
of Education,

                    Defendants.

CASE NO.:   4:23-cv-00206-P

**EXPERT DECLARATION OF DIANE AUER JONES**
**IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## I.    INTRODUCTION

1.    My name is Diane Auer Jones.

2.    I was retained by counsel for Plaintiff Career Education Colleges & Schools of Texas ("CCST") to offer my expert opinion based on my 30-year career in higher education and public policy, including as Assistant Secretary for Postsecondary Education during the George W. Bush Administration, and Principal Deputy Under Secretary (delegated the Duties of Under Secretary) of Education during the Donald J. Trump Administration.

3.    In this Declaration, I offer my expert opinion in connection with CCST's motion for a preliminary injunction to enjoin the United States Department of Education ("Department") from implementing its November 1, 2022 final rule regarding the Department's administration of student loans under the William D. Ford Federal Direct Loan ("Direct Loan"), the Federal Perkins Loan ("Perkins"), and the Federal Family Education Loan ("FFEL") programs. *See* 87 Fed. Reg. 65,904 (Nov. 1, 2022) (the "New Rule").

4.    As detailed below, it is my opinion that the Department's New Rule imposes a standard and process that prejudices schools and was designed to ensure that borrower defense claims, regardless of their legitimacy, will be approved. The New Rule, which takes effect on July 1, 2023, threatens substantial financial and reputational harm to not only proprietary schools, including those that make up CCST's membership, but also the countless students they prepare for direct entry into jobs or professions that meet the needs of the local economy and for which there is a critical need throughout the country.  Conversely, given that the regulations already in place afford both schools and students necessary protections that do not exist under the New Rule, there will be no harm to the Department by delaying implementation of the New Rule. By the same token, delaying implementation of the New Rule would prevent unnecessary and significant harm to schools and students that cannot be reversed. For example, once the

Department forgives a student loan under the New Rule's standard and process, that decision that cannot be reversed. There is no way to undo the harm that would have already been inflicted upon schools and taxpayers.

5.      The opinion presented reflects my personal knowledge and familiarity with the New Rule and related regulations, as well as extensive experience working on borrower defense issues. I am being compensated at a rate of $600/hour by CCST's counsel for time spent in connection with preparing this report. My compensation is not contingent upon my opinions or conclusions, the testimony I may give, or the outcome of this litigation.

## II.    PROFESSIONAL BACKGROUND AND QUALIFICATIONS

6.      I have served in multiple capacities at the U.S. Department of Education, including as the Senate-confirmed Assistant Secretary for Postsecondary Education during the George W. Bush Administration and as the Principal Deputy Under Secretary, delegated the duties of Under Secretary of Education, during the Donald J. Trump Administration.  During my tenure at the Department, I oversaw the development and implementation of programs and regulations authorized by the Higher Education Act, as amended, including Federal Student Aid programs, postsecondary grants programs and accrediting agency recognition.  During both the Bush and Trump Administrations, I served as the Senior Department Official for Accrediting Agency Recognition.

7.      I have an extensive understanding of and experience working on issues related to the borrower defense to repayment regulations. During the Trump Administration, I oversaw the development of the 2019 borrower defense regulations ("2019 Rule"), which were designed to correct deficiencies in the 2016 regulations ("2016 Rule").

8.      It was during my work at a proprietary institution that I came to understand just how difficult and costly it is for schools to respond to a significant change in regulations. That burden is all the greater in the case of the New Rule, which imposes impossible expectations on schools, as I discuss below.

9.      Through my work at the Department, I gained a keen insight into and appreciation of the issues that impact proprietary schools, including those that comprise CCST's membership.

10.     During my 30-year career in higher education, I also held teaching and administrative positions at numerous institutions, including a community college, a four-year public institution, an Ivy League university (Princeton University), a proprietary education provider that operated schools in the State of Texas, and a Washington-based consortium of the nation's top business schools, including the Mays Business School at Texas A & M University and McCombs School of Business at the University of Texas at Austin.

11.     I have also held senior staff positions serving the U.S. House of Representatives Committee on Science and Technology, the White House Office of Science and Technology Policy, the U.S. Department of Labor, the U.S. Department of Education, and the National Science Foundation.

12.     I hold a Bachelor of Science in biology with a minor in chemistry from Salisbury University, and a Master of Science in applied molecular biology from University of Maryland Baltimore County. I additionally completed the coursework required for a PhD in molecular and cellular biology.

13.     My complete CV appended to my report.

### III.   EVIDENCE CONSIDERED

14.     Prior to preparing this report, I closely reviewed and considered the New Rule, as it was published in the Federal Register.  87 Fed. Reg. 65,904.   In reaching my opinion, I relied upon my professional judgement and expertise directly working on issues pertinent to borrower defense regulations, including but not limited to the 2016 Rule and 2019 Rule.

15.     My opinions are based on the information available to me as of the date of this declaration. I may modify or supplement my opinions, if necessary and allowed, based on review and analysis of information provided to me after the filing of this declaration.

### IV.   FAMILIARITY WITH CCST SCHOOLS SUBJECT TO THE NEW RULE AND THE STUDENTS THEY EDUCATE

16.     I am well familiar with the types of schools that comprise CCST's membership and are subject to the New Rule.

17.     CCST member schools are private, proprietary institutions and career education schools that participate in the Direct Loan program and enroll students in certificate and degree programs that lead to specific career or vocational opportunities.

18.     Graduates of career education schools go on to serve their local communities and the State economy as skilled trade professionals, including as welders, plumbers, truck drivers, electricians, mechanics, and as necessary service providers at medical clinics, salons, and restaurants. Career education schools have helped to address persistent shortages in essential workers, such as allied health workers, who are responsible for keeping doctor's offices, long-term care facilities, and hospitals staffed and operating at full capacity.   The occupations for which students at proprietary institutions prepare are in great demand throughout our country.

19.     In addition to serving as a necessary pathway to highly demanded professions, these schools serve a population of students that is otherwise underserved by larger colleges, including

2-year community colleges with limited vocational education opportunities and often much more expensive four-year non-profit public and private institutions that provide even fewer vocational education options. Unlike most large institutions, career education schools are small, are more accessible to students, provide a more personalized learning experience, offer opportunities for adults to learn away from distractions, and cater to the unique needs of non-traditional students. These schools often construct specialized facilities, and acquire expensive, state of the art equipment to provide practical career-focused education to students to prepare them to work immediately after graduation.

## V. DEFICIENCIES IN THE NEW RULE AND THE HARM TO SCHOOLS AND STUDENTS, BOTH BEFORE AND AFTER THE JULY 1, 2023 EFFECTIVE DATE

20.     The Department's New Rule eliminates procedural protections for schools that previously existed under the 2019 Rule. By denying schools a fair process and applying a standard that tips the scale heavily in favor of claim approval, even when there is no compelling evidence of a misrepresentation, the New Rule will result in massive financial liabilities for schools and taxpayers, who will be responsible for what cannot be recovered from schools.

### Separate Claim Adjudication and Recoupment Processes Deny Schools the Ability to Defend Against Liability

21.     Under the process and standard that existed prior to the promulgation of the New Rule, for loans disbursed on or after July 1, 2020, the regulations required evidence from claimants that they actually suffered harm as a result of the alleged conduct or omissions, provided schools and students the ability to review all of the evidence on which the adjudication process would rely, and afforded each party an opportunity to rebut any of the evidence provided by the other party. The New Rule strips away these due process rights and protections exclusively from schools. .

22.     The New Rule creates two separate processes each with limitations that tie the hands of schools and thus prejudges their fate. During the New Rule's recoupment proceedings, for example, schools bear the burden of defending against the imposition of a loan discharge and liability for the corresponding amount. The New Rule does not, however, provide any mechanism by which the school can access evidence to establish that that the borrower was not injured.

23.     The Department states in the New Rule that it is "an insurmountable administrative burden" to have to determine borrower relief and school liability at the same time. 87 Fed. Reg. 65909. But that is neither true, nor an excuse for denying schools their right to defend against recoupment actions for claims based on highly questionable "evidence" or, on some issues, no evidence at all.

### Overly Broad Borrower Defenses Lack Definitions, Ensure Claim Approval and Will Cause Untold Liability for Schools

24.     Whereas the 2019 Rule relied on a standard that distinguished between inadvertent misrepresentations and knowing and reckless misrepresentations of material facts, limiting loan discharges to approved claims based on the latter, the New Rule imposes overly broad and catch-all definitions. This, in my opinion, was intentional. An overly broad definition improperly gives the Department the ability to find schools liable and grant complete loan discharges to large numbers of borrowers on the basis of even minor errors or a single, accidental misstatement. And the New Rule's vague requirement that the Department will determine that the borrower suffered detriment warranting the relief of a full discharge is not a substitute for limiting the borrower's recovery to *actual* harm.

25.     By doing away with the elements that commonsensically make up a misrepresentation claim, including the requirement of intent, the New Rule has fashioned an all or

nothing standard of liability against schools that did not exist under the 2019 Rule and is not contemplated in any way under the Higher Education Act.

26.     Further, the New Rule's definitions for substantial misrepresentation or omission leave schools in an impossible situation. On the one hand, they are liable for an inadvertent and innocent misstatement, and on the other they can be liable for an inadvertent and innocent omission. It begs the question as to how a school can practicably comply with such a standard, without altogether prohibiting staff and faculty from engaging in open dialogue with students and answering the types of questions students routinely ask about program details and the nature of various careers. These are the types of conversations that can be easily, and unfairly, misconstrued by borrowers for purposes of pursuing a claim and loan discharge.

**Group Claim Process is a Vehicle for Mass Discharge of Loans**

27.     Prior to promulgating the 2019 Rule, the Department carefully considered but ultimately decided not to include a group claim process on account of significant risk of erroneous discharges and approval of claims without merit. When formulating the 2019 Rule, the Department understood that claims are best adjudicated on an individual basis because the highly individualized facts and considerations that are integral to fairly and equitably determining whether a claim has merit and that the borrower suffered harm as a result of the alleged misstatement or omission.

28.     The 2019 Rule permitted the Department to review and use the same evidence to adjudicate claims for more than one borrower, if each was subject to the same misrepresentation. But it required each student to attest that he or she had been the victim of a substantial misrepresentation and had been harmed by that misrepresentation.  The requirement to provide at least some proof was necessary to protect against the approval of improper and meritless claims.

29.     The New Rule's group claim process imposes no such requirements of proof from borrowers, and thus exposes schools and taxpayers to untold liability on account of a process that appears designed to grant loan discharges en masse. Under the group claim process, it is presumed that the statement or omission giving rise to the common claim harmed each member of the group, that it impacted each borrowers' decision to attend the school and, further, that each borrower's reliance was reasonable. This essentially amounts to an all or nothing approach, whereby schools are presumed liable and cannot easily prove otherwise. After all, it's hard to prove a negative. This problem is further exacerbated by the fact that the New Rule also permits third party legal organizations to initiate a group process, where previously under the 2019 Rule, only the Department or a state attorney general could do so.

### Closed School Criteria Will Increase Discharges and Discourage Schools From Investing in Better Campuses, and Improved Education and Facilities

30.     A similar defect exists with respect to the New Rule's closed school discharge provisions, which also grant a presumption in favor of borrowers and against schools, thus again establishing an all-or-nothing standard of liability for schools.

31.     In addition, the closed school provision defines "closed school" in such a manner as to include schools that are actually open and merely relocated to a new, geographically proximate, campus.  Take, for example, a situation in which a school moves to a new and larger campus in the same community in order to offer students the benefit of more modern facilities. Even though there is no burden to students, but rather a benefit to them, this would still be considered a "closed school" under the New Rule's criteria. In situations such as this, loan discharges would be approved and schools would suffer tremendous undeserved financial liability, simply for having tried to do the right thing, and serve the best interests of students.

32.     For example, both proprietary and non-profit schools frequently open temporary satellite campuses when enrollments surge or a new employer brings sudden but temporary opportunities with training requirements to a local community. Based on a plan that must be approved by both the state authorizing agency and the school's accrediting agency, schools will open the satellite campuses with the intent of closing them when demand subsides, and cease operations of the older campus as students are transitioned to the new campus. Under the broad criteria for "closed schools" in the New Rule, the school is potentially liable for complete loan discharges for students who attended the "closed" school.

33.     As a result of the closed school discharge provision, proprietary schools will be rightfully reluctant and potentially unable to relocate to better facilities, phase out educational programs that no longer meet workforce needs, add new programs that serve a critical, but potentially short-term need or improve co-curricular opportunities and student services by moving to a larger, more accessible campus or one that offers students more amenities. In fact, as the effective date approaches, many schools will be required to cancel planned investments in new facilities that would otherwise serve the best interests of students. The closed school discharge rule thus significantly harms both schools and students.

34.     Proprietary schools are relatively small, especially as compared to larger non-profit institutions. They do not have the financial means or other resources to withstand the massive liability to which they are undoubtedly exposed, even when no substantial misrepresentation has occurred, by virtue of the New Rule's expansive federal standard and borrower defense claim adjudication process. In my estimation, if the New Rule is permitted to take effect on July 1, 2023, we will see numerous schools forced to close, unable to defend themselves or their reputations in the face of mass borrower defense claims and an all-or-nothing approach to loan forgiveness.

**The Ban on Arbitration Agreements and Class Action Waivers Contradicts Fact and Experience that Arbitration is More Efficient and Less Costly for Students**

35.     The 2019 Rule protected the right of schools and students to enter into agreements with arbitration provisions and class action waivers. However, it required institutions to provide in clear and conspicuous writing information for students and borrowers on how to access the arbitration process and initiate a demand against the school.  Schools had to demonstrate that they had made it clear to the student that enrollment at the institution requires the student to agree to arbitration in the event of a dispute, and a student who did not want to accept binding arbitration could enroll elsewhere.  The Department previously protected the right of arbitration on account of ample evidence that arbitration is the most efficient and, for students/borrowers, least costly method to resolve a dispute.  The New Rule's prohibition against arbitration agreements and class action waivers disregards all of what the Department knows about the benefits of arbitration, including that through arbitration, a student with valid concerns or complaints against a school can receive a full refund of all tuition and fees paid, and not merely the forgiveness of the federal student loan.

36.     As evidenced by the Department's lacking or dismissive justifications and reasoning in the Federal Register announcing the New Rule, the Department either improperly downplayed or completely disregarded patent deficiencies in the New Rule's borrower defense regulations, which deny schools essential due process protections and otherwise ensure that baseless borrower defense claims will be approved.

**Reputational Harm to Schools, Students, and Graduates**

37.     The Department's complete disregard for the extensive studies and well-accepted findings during prior administrations, including the Trump Administration, strongly suggests that the New Rule is part of the Biden Administration's multi-pronged effort to impose wide scale debt

relief. In addition to financial liability, the power negative effect is massive reputational harm to proprietary institutions through a process that empowers the Department to serve as prosecutor, judge and jury without due process safeguards. By inflicting reputational harm against these schools, the Department is by extension harming their students and graduates of those institutions. Graduates of schools subject to borrower defense claims, regardless of their lack of merit, will likely have greater difficulty finding employment, despite their ample job position qualifications and desire to contribute to society.

38.     When the Department solicits or otherwise discusses borrower defense claims in connection with a particular institution, it feeds the misperception that the claims are supported by evidence. Even worse, the Department has a history of employing inflammatory words like *bad actor* and *fraud* to describe the schools that have faced mere allegations of misrepresentations, and without regard for the lack of evidence, whether it was the misstatement was minor or unintentional, and whether students benefited from a rigorous educational program that prepared them for employment in their chosen field.

39.     In my experience, even if the Department was to cease the practice of using inflammatory language to describe the schools, there would nonetheless be significant reputational harm to schools that are the subject of these claims. Prospective students and potential employers often incorrectly view the fact of borrower defense claims as an indication of substandard education.

40.     When potential employers improperly view schools through a negative lens based on a misperception of the quality of training a school provides, they are reluctant to hire from those institutions. The risk of such misperception increases substantially when the borrower defense standard and adjudication process is designed to ensure claim approval, particularly as against

proprietary institutions, which do not have the resources or established reputational history of large non-profit institutions.

41.     For the reasons explained in this Declaration, I believe that significant harm will assuredly result from the New Rule.  The long-term damage to past, present and future students, as well as taxpayers, strongly outweighs any good it could possibly do given the protections that the 2019 Rule already affords borrowers who have been victims of misrepresentation.  As a result, there would be no harm to the Department or students by delaying implementation of the New Rule.

(Signature on following page)

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 4th day of April, 2023.

DIANE AUER JONES

# Diane Auer Jones

## Contact Information

*22 Old Granary Court*
*Catonsville, MD 21228*
410-218-0433
dauerjones@me.com

## Education

*Ph.D. – Cellular and Molecular Biology (coursework completed, degree not completed),*
*        University of Maryland, Baltimore County. 1998-2000*
*M.S.   – Applied Molecular Biology, University of Maryland, Baltimore County. 1986-1988*
*B.S.  –  Biology,* Summa Cum Laude, *Salisbury University,  1982 – 1986*

## Experience

***U.S. Department of Education:  Principal Deputy Under Secretary Delegated the Duties of Under Secretary: June, 2018 – January, 2021;  Also served as Senior Policy Advisor to the Assistant Secretary for Postsecondary Education (February, 2018 – June, 2018) and Acting Assistant Secretary for Postsecondary Education (June, 2018 – August, 2019)***
Serve as senior higher education policy official, overseeing the Office of the Under Secretary; the Office of Postsecondary Education; the Office of Career, Technical and Adult Education; Federal Student Aid (FSA) and the White House Initiative on Historically Black Colleges and Universities.  Lead the development and implementation of the Secretary's higher education agenda, including reforming higher education accreditation, reducing regulatory burden, enabling innovation in distance learning, engaging employers in creating new postsecondary education and workforce development opportunities, and modernizing the Federal Student Aid program to integrate the use of new technologies, improve customer support and expand borrower education. Led one of the largest postsecondary education negotiated rulemaking efforts in the Department's history and achieved consensus on final rules designed to reform accreditation, protect the rights of faith-based institutions, improve the administration of TEACH grants, and promote innovation in distance education.  Oversaw the development of regulatory waivers and new funding programs in response to the COVID-19 pandemic.

***Senior Policy Advisor to the Secretary, U.S. Department of Labor: November 2017 – February 2017***
Led the Task Force on Expanding Apprenticeship, which was established in response to President Trump's Executive Order, *Expanding Apprenticeships in America,* and included leaders from business, industry, labor, higher education and workforce development that made recommendations for expanding apprenticeship in America.  Also oversaw the activities and staff of the Office of Apprenticeship within the Employment and Training Administration.

***Senior Fellow, Urban Institute: October 2015 to November 2017***
Served as senior fellow in the Center on Labor, Human Services and Population where I conducted research on higher education quality and workforce development.  As part of this work, I manage a $3.2 million technical assistance contract awarded by the U.S. Department of Labor to assist and advise them in developing and implementing competency-based occupational standards for registered apprenticeship programs.

***President and CEO, AJsquared Consulting, LLC: March 2015 to November 2017***
Established and served as president of a higher education consulting firm dedicated to advancing innovation in higher education, developing new methods for quality evaluation and assurance, evaluating learning effectiveness, designing institutional research plans, promoting evidence-based public policies and reviewing institutional compliance with all federal and state regulatory requirements.  Also engage in public speaking, including keynote addresses, plenary sessions and expert panel discussions related to higher education quality, accessibility and accountability.

## Diane Auer Jones

***Career Education Corporation: October 2010 – March 2015, SVP & Chief External Affairs Officer (2013 - 2015); President, Career Education Scholarship Fund (2012 - 2015); SVP External and Regulatory Affairs (2012 - 2013); VP External and Regulatory Affairs (2010 - 2012)***
Served as a member of the executive leadership team (ELT) and led the company's regulatory operations, government relations, public affairs, corporate communications and centralized academic support services divisions.  As the only experienced academic on the ELT, also served as the principal advisor on educational innovation (including online and adaptive learning), student success and academic programming for the organization.  Served as president of the Career Education Scholarship Fund, an independent non-profit organization that raised funds to award both need-based and merit-based academic scholarships.  Represented both the company and the larger higher education community in advocacy, public speaking and editorial activity.  Participated in strategic planning and development, profit and loss management, risk assessment and mitigation, reputation building, creating a positive and ethical corporate culture, change management and improving employee morale and collaboration.  Also served as a leader in academic program development, student learning and outcomes assessment and the development and implementation of innovative learning technologies, including adaptive learning technology.

***President & CEO, The Washington Campus, Washington, DC:  June 2007 – October 2010***
Led non-profit educational organization founded by Bill Seidman, which served as the Washington, DC campus of a consortium of the nation's top graduate schools of business.  Developed and delivered educational programs to undergraduate and graduate students, non-profit leaders and corporate executives about the intersection between business and public policy, the federal regulatory environment and methods for effectively and ethically interacting with public policy leaders in order to preserve and advance free markets.  Recruited new board members, developed a new marketing strategy including a new branding and advertisement campaign, and dramatically improved organizational efficiency while reducing administrative costs.  Expanded client base and program offerings to include international organizations and instruction on the structure and function of the European Commission.

***Assistant Secretary for Postsecondary Education, US Department of Education:  August 2007 – May 2008 (Deputy Assistant Secretary from May 2007 – August 2007)***
Nominated by President George W. Bush and confirmed by the U.S. Senate to lead the U.S. Department of Education's Office of Postsecondary Education with responsibility for developing and overseeing the agency's postsecondary grant programs, its higher education accreditation program, its teacher education and foreign language programs and its higher education policy division, which developed and interpreted regulations for all Federal Student Aid programs.  Served as senior administrative leader of the White House Initiative on Tribal Colleges and of the Historically Black Colleges and Universities Initiative.  Provided leadership for the development of the Administration's higher education priorities and budget requests to Congress and participated in the development of several major pieces of legislation, including the College Cost Reduction and Access Act of 2007 and the Higher Education Opportunity Act of 2008.  Served as the senior department official for negotiated rule making and participated in numerous public speaking opportunities and media events.

***Deputy to the Associate Director for Science, White House Office of Science and Technology Policy:  November 2005 – May 2007***
Supported the President's Science Advisor and the Associate Director for Science in developing the Administration's programs, policies and budget requests to Congress for all initiatives related to scientific research, science policy and STEM education policy.  Served as one of the lead authors of President Bush's American Competitiveness Initiative (ACI), which was introduced during the 2006 State of the Union Address and worked with federal agencies and Congress in the development and implementation of the America COMPETES Act. Coordinated multiple federal interagency working groups that included the US Trade Representative,

App-16

## Diane Auer Jones

Department of State, Department of Health and Human Services, Department of Education, National Science Foundation, NASA, Environmental Protection Agency, US Geological Service, National Oceanographic and Atmospheric Administration, Department of Commerce and the Department of Homeland Security.  Served as the US representative and delegation leader to the US-EC Task Force on Biotechnology Research and was elected by the Organization for Economic Cooperation and Development (OECD) Working Party on Biotechnology to serve as its chair.  Participated in the creation, organization and work of the National Mathematics Advisory Panel.

***Director, Office of Government Affairs, Princeton University: December 2002 – November 2005***
Served as Princeton University's principal representative in Washington, DC on matters related to higher education, labor, tax, intellectual property and scientific research and development policy.  Chaired the Intellectual Property Working Group of the Council of Federal Relations for the Association of American Universities, led the Science 101 Initiative of The Science Coalition, and represented Princeton's interests to the American Council on Education, the Coalition for National Science Funding, the Coalition for National Scientific Research, the Council on Government Relations, the Council of Graduate Schools and the Energy Sciences Coalition.  Supported Princeton Alumni Relations and Development Offices in their work with Washington-based alumnus.  Served as guest lecturer in the Woodrow Wilson Policy School on federal science and higher education policy.

***Professional Staff Member and Acting Staff Director, Research Subcommittee of the US House of Representatives Committee on Science (Majority Staff to Chairman Sherwood Boehlert, R-NY) – February 2001- November 2002***
Provided staff leadership for policy, budgetary, programmatic and legislative development and oversight for the National Science Foundation, the Federal Emergency Management Agency and the US Fire Administration.  Participated in the development and passage of authorizing legislation including:  HR 4464 The National Science Foundation Authorization of 2002 (*PL 107-368*); HR3394 The Cyber Security Research and Development Act (*PL 107-305*); and HR 4687 The National Construction Safety Team Act (*PL 107-231*).  Also participated in the development of the National Nanotechnology Research and Development Act (*PL 108-153*). Provided technical expertise to the Committee on: K-graduate science, technology, engineering and mathematics (STEM) education; teacher preparation; intellectual property rights; US Patent and Trademark Office standards and procedures; technology transfer; earthquake and natural hazards mitigation and management; major research equipment and national research facilities; immigration and the high technology workforce; and the Federal Research and Development funding portfolio.  Co-led the Congressional engineering investigation of the collapse of the World Trade Center following the 9/11 terrorist attacks.  Developed, organized and recruited witnesses for Congressional hearings held by the Committee.

***Program Director, National Science Foundation, Division of Undergraduate Education.  Temporary Assignment through the Intergovernmental Personnel Act.  June 2000 – February 2001***
Served as the lead program director for the Computer Science, Engineering and Mathematics Scholarships program providing management and oversight for all aspects of the program, including awarding grants to institutions of higher education.  Also served as a program director for the Advanced Technological Education program and the Course, Curriculum and Laboratory Improvement programs.  Reviewed proposals, organized and managed peer review sessions and made award decisions in the areas of biotechnology, molecular biology, environmental biology, plant biology and biochemistry.  Provided guidance and oversight for funded projects and worked with the external academic community to encourage innovation in instruction and the preparation of more effective pre-K through graduate teachers and instructors.  Managed a portfolio of approximately $70 million.

# Diane Auer Jones

*Associate Professor of Biology (2000-2001), Assistant Professor of Biology (1998-2000), Full-Time Instructor (1995-1998), Adjunct Faculty Member (1988-1993), Community College of Baltimore County*

Served as lecturer and laboratory instructor for several core courses including anatomy and physiology, biology, genetics and biotechnology and served as the course coordinator for human anatomy and physiology II, biotechnology and genetics. Established and directed the NSF-funded Biotechnology Institute. Founded and directed the Consortium for Statewide Biotechnology Education in Maryland and served as an elected member of the Faculty Senate and a chair of the Student and Community Affairs Senate Subcommittee. Participated in the College Speaker's Bureau, served as a faculty mentor for various student clubs and activities, and served as a faculty advisor for the Minority Student Mentoring program. Secured grant funding to support several STEM education summer programs for middle school students and for middle and high school teachers.

## Entrepreneurial Activities

*Founder and President, AJsquared Consulting, Washington, DC – 2015 – 2017 and 2021 - present*

Consulting firm dedicated to improving access to and quality of higher education, to ensuring regulatory compliance by institutions and to providing thought leadership regarding contemporary challenges in the higher education marketplace.

*Founding Partner, Athena Environmental Sciences, Inc., Baltimore, Maryland - 1995 - 2001*

Subchapter S corporation that conducted research, development and small-scale manufacturing of microbial products for use in environmental bioremediation, molecular biology research, enzymatic industrial processes and protein biosynthesis.

*Consultant, Applied Biotech Consortium, Baltimore Maryland - 1991-2000*

Consulting firm provided environmental and biotechnology laboratory consulting including technical support, methods development, trouble-shooting, employee training, document preparation, safety instruction and inspection, laboratory hazard evaluation and mitigation and EPA certification instruction and support to new and expanding laboratories. Served as curriculum development consultant for Baltimore County Public Schools.

*Owner, Good & Good For You Natural Market, Catonsville, Maryland - 1992-1999*

Founded and managed gourmet and natural foods store, gift shop and tearoom.

**Owner, Holistic Wellness Center, Catonsville, Maryland - 1991-1999**

Founded and managed alternative health care facility staffed by 15 alternative health care practitioners.

## Legislative and Regulatory Activities

### U.S. Department of Education

Oversaw negotiated rule making and the promulgation of regulations for new higher education grant programs, new Federal Student Loan repayment and loan forgiveness programs and other elements of Higher Education Act Title IV programs following changes in legislation.

Served as the Administration's representative in negotiating and advancing priorities for the following legislation:

- The Higher Education Opportunity Act of 2008 *(PL 110-315)*
- The College Cost Reduction and Access Act 0f 2007 (*PL 110-84*)
- Ensuring Continued Access to Student Loans of 2008 (*PL 110-227*)

App-18

## Diane Auer Jones

### White House Office of Science and Technology
- Annual President's Budget Request to Congress (budgets and policy priorities for science and STEM education)
- President's American Competitiveness Initiative
- America COMPETES Act (*PL 100-69*)

### U.S. House of Representatives Committee on Science
- HR 3130 - The Technology Talent Act
- HR 4664 - The Investing in America's Future Act (National Science Foundation Reauthorization Bill) (*PL 107-368*)
- HR 4687 - The National Construction Safety Team Act of 2002 (*PL 107-231*)
- HR 3394 - The National Cyber Security Research and Development Act (*PL 107-305*)
- HR 3400 - The Networking and Information Technology Research Advancement Act
- HR 2051 - The Regional Plant Genome and Gene Expression Research and Development Centers Act
- HR 1858 - The National Mathematics and Science Partnerships Act
- The 21st Century Nanotechnology and Research Development Act (*PL 108-153*)

### Testimony
- Testified before the Florida State Senate Committee on Education Appropriations about Institutional Cohort Default Rates, February 2015.

### Congressional Hearings (Organized and Staffed)
- Conducting Research during the War on Terrorism:  Balancing Openness and Security (October 10, 2002)
- The Investigation of the World Trade Center Collapses:  Findings, Recommendations and Next Steps (May 1, 2002)
- A View from the Blackboard:  The 2001 Presidential Awardees for Excellence in Science and Mathematics Teaching (March 20, 2002)
- Meeting the Demands of the Knowledge Based Economy:  Strengthening Undergraduate Science, Mathematics, Engineering and Technology Education (March 7, 2002)
- Learning from 9/11:  Understanding the Collapse of the World Trade Center (March 6, 2002)
- Strengthening National Science Foundation Sponsored Agricultural Biotechnology Research:  HR 2051 and HR 2912 (September 25, 2001)
- National Science Foundation's Major Research Facilities:  Planning and Management Issues (September 6, 2001)
- Innovation in Information Technology:  Beyond Faster Computers and Higher Bandwidth (July 31, 2001)
- National Science Foundation FY02 Budget Request:  Research and Related Activities (June 6, 2001)
- Classrooms as Laboratories:  The Science of Learning Meets the Practice of Teaching (May 10, 2001)
- Improving Math and Science Education so that No Child is Left Behind (May 2, 2001)

### Sample Publications and Presentations
- ***New Skills Marketplace Podcast: The Role of Apprenticeship in Filling Workforce Gaps.*** *Hosted by Andy Smarick and John Bailey, American Enterprise Institute, September 25, 2017.*
- ***Measuring the Impact of Interventions in Tertiary Education: Is there Room to Develop and Use More Effective Performance Indicators?*** The World Bank, Washington, DC.  2017.
- ***Risk Adjusted Metrics: Using Statistical Methods to More Accurately Assess Student Outcomes.***  Keynote address at the invitation of the International Network for Quality Assurance in Higher Education for their Annual Conference in Bahrain.  2016.
- ***Using Sound Science to Determine Student Outcomes and Evaluate Institutional Value.***  Presented to the Council of Higher Education Accreditors, the Council for Regional Accreditors, the Distance Education Accreditation Consortium, the University of Maryland Provosts Meeting and the University of Arkansas Provosts Meeting.  2015.

5

## Diane Auer Jones

- An Education Agenda for 2016:  Conservative Solutions for Expanding Opportunity. Chester E. Finn Jr., Michael Q. McShane, John Bailey, Frederick M. Hess, Katharine B. Stevens, Diane Auer Jones, Kevin J. James, Andrew P. Kelly, American Enterprise Institute. June, 2015.
- ***How Much Government Regulation is Too Much?*** (panelist) Annual Meeting of the Higher Learning Commission, Program for Presidents and Trustees, Chicago, Illinois.  April 2014.
- ***Apprenticeships as a Alternative Route to Skills and Credentials*** *(Commissioned chapter), Getting to Graduation:  The Completion Agenda in Higher Education;* edited by Andrew P. Kelley and Mark Schneider, The Johns Hopkins University Press, 2012, pages 126-153.
- Assessment Changes Online Teaching from Art to Science *(Commissioned paper), The Chronicle of Higher Education,* Special Report on Online Learning, October 2012.
- ***Financial Pain Should Focus Universities*** *(Commissioned Paper), Nature* 465:  32-33, 2010.
- ***Apprenticeships:  Back to the Future, Issues in Science and Technology,*** Summer 2011.  National Academy of Science and National Academy of Engineers press.
- ***Analytics and Data Drive Decision Making*** (panelist), EDUCAUSE Annual Conference, October 2014.
- ***How Gainful Employment Fits into the Toolbox for Measuring Institutional Effectiveness*** (panelist), ACICS Policy Forum. New Orleans, LA, 2014.
- *Distance Education Workshop* (presenter), Accrediting Commission of Independent Colleges and Schools, 2011 ACICS Leadership and Annual Conference, Grapevine, TX, 2011.
- ***No Good Deed: Disclosure of Performance Indicators In Advertising and Marketing***  (panelist), ACICS Annual Conference, Nov 7, 2013.
- *Women Leading in Proprietary Education* (panelist), APSCU Convention and Exposition.  Orlando, Florida. June 7, 2013.
- ***Career Colleges go to Washington:  How We Got Here.***  (Keynote Address) FAPSC Annual Administrator Conference. Florida  August 3, 2011.
- ***The Texas Saga:  Needed Reform or Impending Disaster?***  (Panelist)  Squeezing the Tower: Are We Getting All We Can from Higher Education?  Cato Institute.  Washington, DC.  November 18, 2011.
- ***Rebooting Higher Education:  change.edu and the Future of Postsecondary Education in the United States*** (panelist), American Enterprise Institute.  Washington, DC, November 16, 2011.
- ***Opening Pandora's Box…..Again!***  Keynote address to the Higher Earning Commission of the North Central Association, Annual Conference, April 2009.
- Commencement Speaker at Ball State University, May 2007.
- Wrote weekly editorials and blogs for the *Chronicle of Higher Education, 2008 – 2010.*

## Board Activities

- *TranzEd Apprenticeship Board of Directors, The Children's Guild – 2016 – 2017*
- *American Academy for Liberal Education, President (2015 – 2017), Executive Committee (2008 – 2017)*
- *Brooks Institute, Board of Trustees – 2012 to 2015*
- *Colorado Technical University, Board of Trustees - 2010 - 2015*
- *American InterContinental University, Board of Trustees - 2010 - 2015*
- *UMBC Research Park, Inc. - Board Member 1994-2007  (Secretary and Executive Board Member 1994 –2001)*
- *UMBC President Freeman Hrabowski's Community Advisory Board - 1994 – 2000*
- *Greater Catonsville Chamber of Commerce – 1994 - 1996  (Secretary and Executive Board Member)*
- *Catonsville 2000, Inc.  (Secretary 1994, Vice President 1995-1996)*
- *Advisory Board, Western School of Environmental Science and Technology -  1993 - 1996*

## Awards and Honors

- *Outstanding Alumna Award, UMBC, 2006*
- *The Community College of Baltimore County, Faculty Service Award, 2000*
- *American Society for Microbiology Faculty Travel Award, 1997*
- *Catonsville Community College Outstanding Adjunct Faculty Award, 1993*
- *University of Maryland Graduate Fellowship Award, 1987*
- *Alex Brown & Sons Scholarship Award, 1987*

6

## Diane Auer Jones

### <u>Grants and Contracts Awarded</u>

*Technical Assistance to the U.S. Department of Labor Office of Apprenticeship for Developing Competency-Based Registered Apprenticeships (2016).* **$**3.5 million over 5 years to develop standardized processes for performing occupational analyses and developing occupational standards, competency-based instruction and competency assessments for use in the Registered Apprenticeship program.

*Council for Innovative Student Learning, The Community College of Baltimore County, 1999.* $15,000 to purchase a 5-headed Nikon teaching microscope for The Biotechnology Institute.

*National Science Foundation, Advanced Technology Education Program, 1998-2001.* $499,000 to establish the Consortium for Statewide Biotechnology Education and  the Biotechnology Institute, which provides biotechnology technician training at the Community College of Baltimore County.

*National Science Foundation, Instrumentation Laboratory Improvement Program, 1998-2000.* $62,000 to purchase new instruments for biology classes at Catonsville Community College.

*Maryland Department of Education, Collaborative Training Grant, 1994.* Environmental Sciences Summer Camp at Catonsville Community College

*Baltimore County Department of Environmental Protection and Resource Management, 1988-1991.* $1,000,000 to establish the Upper Chesapeake Bay Water Quality Assessment Center at Essex Community College.

*National Science Foundation, 1990-1992.* $56,000 to establish the Young Scholars Environmental Science and Technology Program at Essex Community College.

*Chesapeake Bay Trust, 1989.* $17,690 for Establishing an Upper Chesapeake Bay Volunteer Monitoring Program at Essex Community College.

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

CAREER COLLEGES
& SCHOOLS OF TEXAS,

              Plaintiff,

v.

UNITED STATES DEPARTMENT OF
EDUCATION; MIGUEL CARDONA,
in his official capacity as the Secretary
of Education,

              Defendants.

CASE NO.: 4:23-cv-206-P

**DECLARATION OF
NIKKI ENGLAND**

I, Nikki England, do hereby declare and state as follows:

## BACKGROUND

1.      I make this declaration in support of Career Colleges & Schools of Texas's ("CCST") Motion for Preliminary Injunction. This declaration is based on my personal knowledge, and I could and would competently testify to its contents if called to do so.

2.      I am a product of career education and proud graduate of a proprietary school.

3.      I serve as Chair of CCST's Board of Directors, and have served in this capacity since October 26, 2022. Prior to that, I served as a member of the Board of Directors for more than four years.

4.      As Chair, I am responsible for, among other things, convening and overseeing meetings of the board of directors for CCST, engaging with CCST members on issues facing the

1

career education industry and proprietary sector, and engaging with skilled trade employers who have provided, and will provide, employment opportunities to career education graduates in Texas.

5.      In addition to serving as Chair of the CCST Board of Directors, I have extensive experience in the career education industry, having spent the last 16 years working on issues that impact career education, proprietary schools, and the American educational system, generally.

6.      CCST's headquarters is in Austin, Texas, but its members—of which there are more than 70 postsecondary schools, institutes, colleges, and universities—are located in Fort Worth, Grand Prairie, Arlington, elsewhere in the Northern District of Texas, and across the State of Texas.

7.      Career education schools are essential to preparing individuals to enter the skilled trade workforce, in Texas and around the country. Graduates of career education schools continue on to serve their communities and our country as nurses and medical assistants, plumbers and HVAC repair technicians, mechanics and truck repair specialists, and information technology and cybersecurity experts, among other skilled trade professions. Today, the need for skilled trade workers in our country has never been greater.

8.      CCST's mission is to represent and protect the interests of its career education school members, the students they train, as well as of career education, more generally, in the State of Texas.

## THE FINAL RULE

9.      In my capacity as Chairwoman of CCST, I am familiar with the Department of Education's (the "Department") November 1, 2022 final rule regarding the Department's administration of student loans under the William D. Ford Federal Direct Loan ("Direct Loan"),

2

the Federal Perkins Loan, and the Federal Family Education Loan programs. *See* 87 Fed. Reg. 65,904 (Nov. 1, 2022) (the "Final Rule").

10.     I am both personally familiar as well as knowledgeable based on my discussions with CCST member schools about the significant harm that the Final Rule continues to have and will have on career education schools both before and after the rule takes effect on July 1, 2023.

11.     I understand that the Final Rule applies to Direct Loan program participants, and greatly broadens the substantive grounds for relief to student loan borrowers. For instance, I know that the Final Rule amends regulations, and establishes a new standard and process for adjudicating borrower defenses to repayment claims.

12.     The new borrower defense regulations hold schools strictly liable for even minute and inadvertent misstatements and omissions, and have established processes that all but ensure borrower defense claims will be approved – regardless of whether the borrower can demonstrate harm. Lax standards for approval and the promise of debt cancellation will undoubtedly open the floodgates to such claims. Further, once the borrower defense claims are approved, the Department will have the ability to seek recoupment of monies from the schools, or otherwise force the taxpayer to bear the burden.

13.     Further, under the Final Rule, group consideration of borrower defense claims are permitted, the possibility of anything less than a 100% loan discharge is removed, there is no statute of limitations for borrowers, and schools cannot seek reconsideration of or appeal an adverse decision by the Department in a borrower defense claim proceeding.

14.     Additionally, the Final Rule prohibits the inclusion of mandatory arbitration provisions and class action waivers in contracts between institutions and students.

3

App-24

15.     Most CCST member schools currently have mandatory arbitration provisions and class action waivers in contracts between the school and its students.

16.     The implications of the Final Rule on CCST and its member schools are extensive, and both CCST and its member schools have already expended and continue to expend significant resources in anticipation of the Final Rule's effective date.

17.     If enacted, the Final Rule would continue to drain the resources of CCST and its member schools; would result in reputational harm; and is extremely likely to result in excessive liability and even closure of member schools, irreparably harming schools and frustrating CCST's mission to support and grow career education schools in Texas.

18.     Reputational harm to schools will, by extension, harm students and graduates, especially those seeking employment. Regulations that disproportionately punish career education and vocational schools will taint the entire career education industry, discourage future applicants, and, ultimately, harm communities and industries that critically rely on skilled trade workers.

### HARM TO CCST MEMBER SCHOOLS AND THEIR STUDENTS

19.     The majority or 54 of CCST's member schools participate in the Direct Loan program, including participating schools in Tarrant County, and throughout the State of Texas.

20.     As such, these schools are subject to and directly impacted by the Final Rule's provisions, including the BDR regulations.

21.     Each of these member schools will be required to conform to the substantive provisions of the Final Rule specifying acts or omissions that give rise to borrower defenses. This will require schools to expend money and resources on measures necessary to confirm with the requirements imposed under the Final Rule. For example, the removal of any time limitation on when a borrower defense claim, and the burden placed on schools to disprove claims, necessarily

4

means that schools are now required to maintain extensive and long-term recordkeeping practices for past, current, and future students in anticipation of potential claims. Correspondingly, schools will bear the burden associated with   and compliance efforts in order to avoid reputational and financial liability.

22.     Additionally, each member school is subject to significantly increased liability due to the Final Rule's relaxation of BDR standards and elimination of the possibility of less than complete loan forgiveness.

23.     Violations of the Final Rule's provisions would subject member schools to potential liability for discharged loans, revocation or denial of eligibility to participate in the federal student loan programs, or restrictions upon participation.

24.     Further, the closed school discharge provisions of the Final Rule have had the effect of forcing institutions to abandon plans of opening new schools, building larger campuses to expand programmatic offerings and provide improved facilities, or relocating campuses to this District to meet increased demand for career education. The closed school discharge provisions will limit educational opportunities for future students and result in reduced quality of education for existing students.

25.     Above all, regulations like those in the Final Rule that disproportionately harm career education schools, ultimately punish students, communities, and state and local economies. A decline in career education schools and vocational training will mean fewer welders, surgical technicians, truck drivers and repair personnel, and other skilled trade professionals that are the backbone of our country's infrastructure, security, and technology industries.

26.     The Final Rule is already harming schools and students and the threat of substantial harm come July 1, 2023 is undoubtedly great.

5

## HARM TO CCST

27.    A significant amount of CCST's resources have already been and continue to be diverted in order to identify and counteract the harms of the Final Rule. Indeed, CCST has already expended approximately three hundred staff hours working on issues integral to the Final Rule, including compliance measures that need to be undertaken in anticipation of the effective date.

28.    Critically, CCST has lost out on potential additional members, and existing members have abandoned plans to build new schools, campuses, and facilities, on account of the new closed school discharge provisions in the Final Rule. The lost potential members has directly resulted in lost revenues to CCST, which relies on member dues that are calculated based on, among other things, the size of the schools' presence in Texas.

29.    CCST, along with over a dozen other organizations representing career and private schools around the country, submitted 137 pages of comments before publication of the Final Rule in response to the Department's July 13, 2022 Notice of Proposed Rulemaking ("NPRM"). In its comments, CCST highlighted that the implementation of the Final Rule would threaten disproportionate financial and reputational harm to schools and would result in burdensome operational challenges.

30.    CCST has additionally been working with its members and affiliate organizations to prepare for the future regulatory landscape, both before and after the publication of the Final Rule. This has included working with schools to manage heightened cost and resource demands related to a borrower defense process that permits borrowers to bring claims several years later.

31.    CCST's resources will continue to be diverted should the Final Rule go into effect on July 1, 2023. In order to comply with the sweeping changes in the Final Rule, CCST will incur increased regulatory burdens and compliance costs. The effect of that is anticipated reduced

revenues and resources needed to support existing and future members. This will frustrate CCST's mission by diverting essential resources towards compliance with new regulations.

32.     Additionally, CCST would experience drastically increased costs in order to support its members. Such costs include, but are not limited to, engagement of third-party training provider organizations to assist schools in conforming to expensive and burdensome compliance requirements under the Final Rule.

33.     Liability against proprietary schools also substantially threatens the financial survival of CCST's member schools, which threatens CCST's operations and undermines its mission.

34.     Moreover, the closed school discharge provision of the Final Rule has had the effect of forcing institutions to abandon plans of opening new schools, building larger campuses, or relocating campuses to this District, on account of the closed school discharge provision's overly broad criteria for what constitutes a "closed school" for purposes of granting complete loan discharges. This too has had the effect of eroding the growth of CCST's membership and will inevitably lead to a decrease in the membership of Texas schools.

35.     A reduction in the number of CCST members would correspondingly result in reduced membership dues and other fees, on which CCST relies entirely to cover operations costs.

36.     Putting aside the loss of future or potential members, the substantial threat of school closures and a drastic reduction in the number of CCST members, with particular effect on schools outside large populous cities, correspondingly threatens the survival of CCST itself.

37.     Finally, as a prominent representative of the interests of Texas career education schools, CCST would incur irreparable reputational harm by the Final Rule, which disproportionately threatens career education schools and the proprietary sector.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this ⎵5th⎵ day of April, 2023. .

_____
NIKKI ENGLAND

App-29

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| CAREER COLLEGES<br>& SCHOOLS OF TEXAS,<br><br>     Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>EDUCATION; MIGUEL CARDONA,<br>in his official capacity as the Secretary<br>of Education,<br><br>     Defendants. | CASE NO.: 4:23-cv-206-P<br><br>**DECLARATION OF<br>SCOTT SHAW** |

I, Scott Shaw, do hereby declare and state as follows:

**<u>BACKGROUND</u>**

1. I make this declaration in support of Career Colleges & Schools of Texas's ("CCST") Motion for Preliminary Injunction. This declaration is based on my personal knowledge, and I could and would competently testify to its contents if called to do so.

2. I am the President and Chief Executive Officer of Lincoln Educational Services Corporation ("Lincoln Tech"), which is headquartered in Parsippany, New Jersey. I have held this position since July 2015. I originally joined Lincoln Tech in 2001 as the Chief Financial Officer.

3. As President and Chief Executive Officer, I am responsible for, among other things, overseeing our schools' operational activities. In addition, I am familiar with the extensive efforts undertaken by Lincoln Tech to ensure compliance with applicable regulations.

App-30

4.      Founded in 1946, Lincoln Tech is now one of the country's largest providers of career education and training, operating 22 campuses in 14 states under four brands: Lincoln College of Technology, Lincoln Technical Institute, Lincoln Culinary Institute, and Euphoria Institute of Beauty Arts and Sciences. Our schools offer programs in health sciences, automotive technology, skilled trades, hospitality services, and business and information technology. Since our Lincoln Tech's founding in 1946, our schools have graduated more than 250,000 students.

5.      Lincoln Tech has long supported carefully crafted rules, regulations, and legislation that protect both students and borrowers alike. However, the newly issued borrower defense regulations stack the decks against schools. They threaten substantial harm to not only Lincoln Tech schools but career education institutions across the country.

## LINCOLN TECH GRAND PRAIRIE

6.      One of Lincoln Tech's premier schools is the Lincoln Technical Institute in Grand Prairie, Texas ("Lincoln Tech Grand Prairie"). Lincoln Tech Grand Prairie was formed in 1966 as an automotive technical school. The school's program offerings have expanded over the decades and currently include automotive technology, collision repair and refinishing, diesel technology, HVAC service and repair, machining and manufacturing, and welding technology.

7.      Lincoln Tech Grand Prairie is a member of trade association Career Colleges and Schools of Texas (CCST).

8.      Lincoln Tech Grand Prairie participates in the Direct Loan Program and is thus subject to the Department of Education's (the "Department") November 1, 2022 final rule regarding the Department's administration of student loans under the William D. Ford Federal Direct Loan ("Direct Loan"), the Federal Perkins Loan, and the Federal Family Education Loan programs. *See* 87 Fed. Reg. 65,904 (Nov. 1, 2022) (the "Rule").

9.      Lincoln Tech Grande Prairie has two campuses. The main campus is located at 2915 Alouette Drive in Grand Prairie. The second campus is located at 2501 Arkansas Lane in Grand Prairie.

10.     Both campuses of Lincoln Tech Grand Prairie are located in Tarrant County, which I understand to fall within the Fort Worth Division of the Northern District of Texas.

11.     During the 2022 academic year, Lincoln Tech Grand Prairie served proximately 900 students, the vast majority of whom took out Direct Loans to finance their education and meet their obligations.

12.     Over the last 15 years, Lincoln Tech Grand Prairie has enrolled 14,854 students, approximately 31% of whom reside in one of the counties that fall within the Fort Worth Division; and approximately 41% of whom reside within the Northern District of Texas.

13.     According to the Department's Rule, any of these students and alumni who have loan balances would be eligible to file a borrower defense claim based on the Rule's new standard, which lowers the threshold for claim approval and presume liability against schools, regardless of whether the borrower has any proof of harm.

### THE DEPARTMENT'S RULE AND
### HARMS SUFFERED PRIOR TO EFFECTIVE DATE

14.     I have reviewed the Rule. I am familiar with its provisions and how they have harmed and are likely to harm Lincoln Tech schools and their staff, students, alumni, and communities both before and after the Rule takes effect.

15.     Lincoln Tech Grand Prairie participates in the Department of Education's Direct Loan Program and will be subject to the Rule's requirements when they go into effect.

16.     As President and Chief Executive Officer, I am additionally responsible for overseeing Lincoln Tech's strategic planning, including decisions about how to adjust the

3

allocation of the Lincoln Tech's resources in response to changes in student demand. These decisions include whether to open campuses in new markets, whether to close or consolidate facilities, and whether to expand or limit certain program offerings.

17.     The Rule's closed school discharge provisions will have a significant and adverse impact on Lincoln Tech's future decisions regarding growth and expansion. If the Rule should become effective, Lincoln Tech will be forced to reconsider the opening of new campuses and upgrading of existing ones, whether in Texas, or other parts of the country. This is because of the potential liability resulting from "closing a school" – as that term is broadly defined in the new regulations. Under the new Rule, the consolidation of facilities, closing of one campus to open a newer and better one, or the reallocation of funding from one program to invest in others that have greater demand from students, could each constitute a "closed school" under the Rule, which gives the Department wide discretion to determine. In such a case, Lincoln Tech would be held liable for all outstanding loan balances for current and recent students of the "closed school" – even though there was no adverse impact (and more likely a positive impact) on the students' education.

18.     The Rule's closed school provisions create a significant disincentive for schools to explore new program offerings, build new or upgrade existing campuses, or otherwise improve the facilities and services for students.

19.     I am also responsible for, among other things, overseeing Lincoln Tech's financial performance, including its staffing and compliance costs.

20.     As a result of the Rule, Lincoln Tech Grand Prairie and other schools are effectively being forced to expend time and resources that could otherwise be spent on educational programming to instead prepare to comply with new regulations. Such preparatory activities include, but are not limited to: counseling Lincoln Tech's schools and staff on the Rule's

requirements; reviewing every marketing and advertising material and training recruitment and admissions staff on account of the regulations' imposition of strict liability against schools; dedicating or allocating staff and resources to handle the anticipated flood of meritless borrower defense claims that will be submitted following the effective date and as a result of the lowered threshold for claim approval; and developing and upgrading recordkeeping systems to maintain student records for perpetuity, on account of the fact that there is no statutory of limitations to borrower defense claims.

21.     I expect that compliance-related costs and burdens to Lincoln Tech schools will increase substantially if the Rule is allowed to go into effect.

## SUBSTANTIAL THREAT OF IMPENDING HARM THAT CANNOT BE UNDONE

22.     I understand that under the Rule's new borrower defense standard, even inadvertent misstatements or omissions by school representatives or contractors could result in an approved borrower defense claim and the school's being liable for the complete loan discharge.

23.     By eliminating the requirement of proof of harm and permitting claims based on unintentional and innocent erroneous statements or omissions to be the basis for an approved borrower defense claim, the Rule has the effect of holding schools like Lincoln Tech Grand Prairie strictly liable for meritless claims based on harmless conduct.

24.     Further, under the Rule's new group claim process, there is the significant risk of tag-a-long claims. As a result, schools like Lincoln Tech could be liable for loan discharge amounts for entire groups of borrowers, regardless of whether each student was actually ever harmed by the school's alleged conduct.

25.     Group claims and the resulting financial harm to schools would be so great as to threaten their closure, or at the very least divert resources away from educational offerings, thus

5

denying current and future generations of career education students the opportunity to better themselves and their communities.

26.     Even if Lincoln Tech Grand Prairie were not forced to close as a result of liability, the reputational harm to the school of a borrower discharge would be substantial. Such a discharge by the Department may create a false impression that the school provides poor service, which would hurt the school's ability to recruit new students.

27.     Such reputational harm to the school is also likely to harm the school's students and alumni in finding employment, as potential employers will wrongly conclude on the basis of the approval of a borrower defense claim and granting of a loan discharge that the students and graduates have received a subpar education – when the opposite is true.

28.     Given the significantly lower burden that a borrower would need to meet for a claim to be approved, and the promise of a financial windfall as a result of a complete loan discharge, there are likely to be many students of Lincoln Tech Grand Prairie and other Lincoln Tech schools that will apply for such a discharge, especially when the Rule does not require borrowers to prove that they were ever harmed by the conduct the allege occurred.

29.     Defending against the inevitable deluge of borrower defense claims will be costly and, given the new standard that presumes liability without due process protections for schools, effectively futile.

30.     If the Rule is permitted to take effect on July 1, schools like Lincoln Tech Grand Prairie will suffer harm that cannot be undone.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 3rd day of April, 2023.

_____
SCOTT SHAW

7

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| CAREER COLLEGES<br>& SCHOOLS OF TEXAS,<br><br>              Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>EDUCATION; MIGUEL CARDONA,<br>in his official capacity as the Secretary<br>of Education,<br><br>              Defendants. | CASE NO.: 4:23-cv-206-P<br><br>**DECLARATION OF**<br>**JEFF ARTHUR** |

I, Jeff Arthur, do hereby declare and state as follows:

## BACKGROUND

1.      I make this declaration in support of Career Colleges & Schools of Texas's ("CCST") Motion for Preliminary Injunction. This declaration is based on my personal knowledge, and I could and would competently testify to its contents if called to do so.

2.      I am the Vice President of Regulatory Affairs and Chief Information Officer for ECPI University, which is headquartered in Virginia Beach, VA. I joined ECPI University in April 1993, and have worked in career education and the proprietary sector for almost 40 years.

3.      As Vice President of Regulatory Affairs and Chief Information Officer, I am responsible for, among other things, overseeing our schools' compliance with Title IV and other regulations.

1

App-37

4.      Founded in 1966, ECPI University was initially formed as an institution focused entirely on accelerated education in computer science and computer programming. ECPI University has since expanded to the bachelor's and master's degree levels with educational offerings that include nursing, advanced clinical and health sciences, electronics engineering, and business. Today, ECPI University is one of the country's most prominent providers of career education and training, with enrollment of over 12,000, operating six colleges and 20 campuses across five states, including the State of Texas.

5.      Over the last 50 years, ECPI University has graduated more than 75,000 students. Its graduates have earned degrees in computer science, electronics engineering technology, health science, nursing, business, criminal justice, and the culinary arts.

### ECPI University—Texas

6.      One of ECPI University's most exciting developments has been its expansion to Texas, beginning with the development of a state of the art campus with facilities in San Antonio, Texas ("ECPI Texas").

7.      ECPI Texas, like all ECPI University campuses, participates in the Direct Loan Program.

8.      ECPI Texas's educational offerings include nursing, computer science, and engineering technologies.

9.      Since its founding, ECPI Texas has been a member of trade association Career Colleges and Schools of Texas (CCST).

### THE FINAL RULE

10.      In my role at ECPI University, I have developed a keen understanding of the issues and implications of the Department of Education (the "Department")'s November 1, 2022 final

rule regarding the Department's administration of student loans under the William D. Ford Federal Direct Loan ("Direct Loan"), the Federal Perkins Loan, and the Federal Family Education Loan programs. *See* 87 Fed. Reg. 65,904 (Nov. 1, 2022) (the "Final Rule").

11.    I am especially familiar with the Final Rule's provisions and how they have harmed, continue to harm, and will substantially threaten further harm to ECPI University, their staff, students, alumni, and the communities they serve both before and after the Final Rule takes effect on July 1, 2023.

12.    On account of its participation in the Department of Education's Direct Loan Program, ECPI Texas is subject to the Final Rule's provisions and requirements.

13.    The majority of the students enrolled at ECPI Texas have taken out Direct Loans to support their educational goals.

14.    ECPI University fully supports carefully considered and thoughtful regulations that preserve and equally protect the rights of students and the schools that educate them; however, the Final Rule does not exhibit those qualities and, in fact, has and will substantially threaten the viability of not only ECPI University, but career education schools across the country.

## PREPARATORY EFFORTS AND ONGOING HARM

15.    As VP of Regulatory Affairs, I oversee ECPI University's regulatory compliance initiatives and resources, including those related to staffing and compliance costs. ECPI University has four staff directly responsible for monitoring regulations and ensuring its schools' compliance with state and federal regulations, and an additional 10-12 who directly monitor all Title IV documentation for compliance.

16.    In anticipation of the Final Rule's July 1, 2023 effective date, ECPI has already undertaken and continues to undertake significant efforts to comply with the Rule's requirements

and to, as best as possible, prepare for the anticipated harms that will result from the overhauled borrower defense to repayment regulations. ECPI has expended significant time and effort preparing and training staff to comply with the new regulations. These preparations include:

    a.  Training ECPI University staff on the Final Rule's requirements;

    b.  Reviewing recruitment and advertising materials and training recruiting, admissions, financial aid, and student records staffs. Preparing to train faculty and other staff in connection with the Final Rule's borrower defense regulations, which presume liability against schools;

    c.  Rewriting our enrollment agreements to remove arbitration and class action waiver provisions;

    d.  Implementing new record-keeping policies and training to account for the removal of the statute of limitations period on borrower defense claims and the possibility that recoupment proceedings could be instituted for ECPI University graduates whose enrollments ended several years ago;

    e.  Implementing and dramatically expanding systems that monitor representations made by hundreds of staff both in recruiting processes and to our tens of thousands of students, including verbal and digital communications, including engaging in extensive legal reviews of the monitored content.

    f.  Ensuring a considered and thorough legal review of proposed communications, documents, and scripts.

17.    ECPI University employs ~60 staff members who are responsible for monitoring and complying with Department of Education regulations. These staff members are being and will need to be further trained regarding Final Rule's provisions and requirements.

18.     ECPI employs 95 staff members who are responsible for assisting students in obtaining loans through the Direct Loan Program. These staff members are being and will need to be constantly trained regarding Final Rule's provisions and requirements.

19.     ECPI also employs over 100 staff members who are responsible for new student engagement, advertising of the school's educational programs, and preparing marketing materials. These staff members are being and will need to be constantly trained regarding Final Rule's provisions and requirements.

20.     I expect that the costs and burdens to ECPI Texas and ECPI University, generally, associated with the aforementioned activities will only increase further with incredible urgency if the Final Rule is permitted to go into effect.

## CLOSED SCHOOL DISCHARGE, BORROWER DEFENSE TO REPAYMENT, AND ARBITRATION AND CLASS ACTION WAIVER PROVISIONS

21.     In my role at ECPI University, I am also involved in decisions concerning growth and strategic planning, including decisions about ways in which to meet or respond to changes in employer demand for career education and new programming. These decisions include whether to open campuses in new geographic regions, close or consolidate campuses and facilities, transfer students to improved or upgraded facilities, and expand or modify certain program offerings in accordance with student needs and convenience.

22.     As a result of the Final Rule's closed school discharge provisions, ECPI University has been forced to abandon plans to build new or upgrade existing schools in not only Texas but across the country. The risk is simply too great.

23.     This is because of potential and extensive liability that will result from the Final Rule's overly broad criteria for what constitutes a "closed school" and imposition of complete loan discharges to students who attend or have attended the school.

24.     Pursuant to the Final Rule's criteria, a "closed school discharge" could be triggered by consolidating facilities or cutting back certain programs, even if a campus remains open and certainly when ECPI University remains open. Upon the Department's determination that the criteria is met, a school would be presumptively held liable for the entire amount of the resulting loan discharges. Not only is this a significant portion of revenue, but it would also include any loan funds received by the student to pay for their personal expenses, including rent, food, transportation, and computer equipment. This would be a considerable multiple of realized proceeds presenting a serious threat to ECPI University, its staff, and its students.

25.     For example, if ECPI University were to:

a. consolidate two campuses;

b. upgrade to an additional facility and later move that facility back to its parent campus;

c. move a location from one institution to another under the same control for reasons beneficial to the institution and its students (i.e. more favorable accreditation with stronger standards and protections for students); or

d. relocate due to student demand in some situations,

the Department would determine under the Final Rule's criteria that these scenarios would amount to a closed school, thus resulting in complete loan discharges for all borrowers with a subjective close date and an extensive look back period for those that had attended, regardless of the benefit they received or the purpose of the consolidation or relocation.

26.     The Final Rule's closed school provisions create a significant disincentive for schools to open new campuses or explore new program offerings or facility expansions to improve

the quality of education students receive. This harms both schools and students, not to mention career education generally.

27.     With respect to the new borrower defense to payment regulations, ECPI is deeply concerned that the potential liability that schools face has increased significantly under the Final Rule.

28.     Under the new borrower defense regulations, even inadvertent or otherwise inconsequential misstatements or omissions by school representatives or contractors can result in the school's being liable for the full balance of a borrower's loan.

29.     Further, under the new group claims process, schools could be liable for the discharge amounts for an entire group of students, regardless of whether each student proves that they were harmed by school's alleged conduct. ECPI, like schools across the country, are rightfully concerned that the low barrier to approval and promise of loan discharges will invite tag-along claims. In my estimation, group claims could be so costly for schools that they would force them to reduce educational offerings and substantially threaten the school's financial viability.

30.     Moreover, under the Final Rule's group process, institutions would be effectively prevented from defending against the primary claim before the Department makes the decision to group it with other claims, solely on the basis that the primary claim 'appears credible.' In reaching that primary determination, the Department would have reached its conclusion before the school has the ability to rebut the allegations on which the primary claim is premised.

31.     The above discussed dangers associated with the group process are compounded by the fact that, under the Final Rule, third party legal advocacy organizations may also initiate the group process.

App-43

32.    Putting aside the financial harms, there is significant reputational harm to schools as a result of borrower defense claim approval. The approval of claims will create a false impression that a school's educational offerings are substandard or that the school knowingly engaged in wrongful conduct, when all that might've happened was that a single admissions officer made an inadvertent misstatement to a student. Regardless of the merits, approved borrower defense claims would hurt the school's ability to recruit new students.

33.    Such reputational harm to the school is also likely to harm the school's students and alumni in finding employment, as potential employers will wrongly associate the approval of a borrower defense claim and granting of a loan discharge with lower-quality training.

34.    Given the significantly lower burden that a borrower would need to meet in order to receive a full loan discharge, and the amount of money at stake in providing complete loan forgiveness, there are almost certainly going to be students of ECPI Texas and other ECPI University campuses who will apply for such a discharge, given the possibility of a sure-fire payout with no risk or downside.

35.    Given this strong likelihood, I believe ECPI Texas, and the entire ECPI University, would suffer both reputational and financial harm – if the Final Rule were allowed to go into effect. The harm could not be undone even if the Rule were later vacated.

36.    Additionally, the Final Rule prohibits the inclusion of mandatory arbitration provisions and class action waivers in contracts between institutions and students.

37.    In arbitration, majority of the cost is borne by the school and the proceedings are more streamlined, bringing about quicker resolution for both students and schools. Indeed, for this very reason, ECPI University previously included pre-dispute arbitration, with an opt-out provision, in its contracts with students, as well as a class-action waiver.

App-44

38.     However, once the Final Rule goes into effect, the schools will not be able to renegotiate its agreements with students, and it will irreparably have lost the right to arbitrate disputes and avoid class-action litigation. As a result, in the event of a dispute, students and schools will be forced to engage in protracted litigation that is both costly and inefficient to both parties, and often favors attorneys over students.

39.     Putting aside our belief that prohibitions against arbitration are illegal, the Final Rule's provisions will ultimately harm students and schools, banning a less expensive (for students) and more efficient process for resolving potential disputes.

App-45

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 4th day of April, 2023.

_____
Jeff Arthur

App-46

1  BRIAN D. NETTER
   Deputy Assistant Attorney General
2  STEPHANIE HINDS
   United States Attorney
3  MARCIA BERMAN
   Assistant Branch Director
4  R. CHARLIE MERRITT
   STUART J. ROBINSON
5  Attorneys
   U.S. Department of Justice
6  Civil Division, Federal Programs Branch
   1100 L Street, N.W.
7  Washington, DC 20005
   Telephone: (415) 436-6635
8  E-mail: stuart.j.robinson@usdoj.gov

9  *Attorneys for Defendants*

10

11                    **UNITED STATES DISTRICT COURT**
                **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
12

13  THERESA SWEET, ALICIA DAVIS, TRESA
    APODACA, CHENELLE ARCHIBALD,              **Case No. 19-cv-03674-WHA**
14  DANIEL DEEGAN, SAMUEL HOOD, and
    JESSICA JACOBSON on behalf of themselves
15  and all others similarly situated,

16          *Plaintiffs*,                      **RESPONSE TO COURT'S INQUIRY
                                               CONCERNING NUMBER OF POST-
17          v.                                 CLASS APPLICANTS**

18  MIGUEL CARDONA, in his official capacity
    as Secretary of the United States Department of
19  Education, and

20  THE UNITED STATES DEPARTMENT OF
    EDUCATION,
21
            *Defendants*.
22

23

24          During the hearing on February 15, 2023, the Court inquired about the number of "post-

25  class applicants" who submitted borrower defense applications after the settlement agreement's

26  execution date but before the final approval date.  That group consists of approximately 250,000

27  applications from approximately 206,000 borrowers who attended approximately 4,000 schools.

28

Dated: February 16, 2023

Respectfully submitted,

BRIAN D. NETTER
Deputy Assistant Attorney General

STEPHANIE HINDS
United States Attorney

MARCIA BERMAN
Assistant Branch Director

*/s/ Stuart J. Robinson*
R. CHARLIE MERRITT
STUART J. ROBINSON
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20055
Telephone: (415) 436-6635
E-mail: stuart.j.robinson@usdoj.gov

*Counsel for Defendants*

Response to Court's Inquiry
19-cv-03674-WHA

2

App-48