**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| CAREER COLLEGES & SCHOOLS OF TEXAS,<br><br>                              Plaintiff,<br><br>          v.<br><br>U.S. DEPARTMENT OF EDUCATION *et al.*,<br><br>                    Defendants. | Case No. 23-cv-433-RP |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**[1]

---

[1] This brief exceeds the page limit set forth in Local Rule CV-7(d)(3).  On May 11, 2023, Defendants filed a consent motion to exceed that page limit and to file a 40-page brief in opposition to Plaintiff's motion for a preliminary injunction.  *See* ECF No. 54.  For the reasons set forth in that motion, Defendants respectfully renew their request for leave to file the attached overlength opposition brief.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................3

I.   Statutory and Regulatory Background ..........................................................................3

      A.   The Higher Education Act and Borrower Defense to Repayment.................................3

      B.   Regulatory History....................................................................................................3

      C.   The 2022 Rule ........................................................................................................6

II.  This Lawsuit ..............................................................................................................7

LEGAL STANDARD .........................................................................................................8

ARGUMENT ...................................................................................................................8

I.   The Court Lacks Jurisdiction to Grant CCST's Motion ...............................................8

      A.   CCST Lacks Standing to Bring the Claims at Issue.......................................................8

            1.   CCST has not clearly shown a likelihood of associational standing.................9

            2.   CCST has not clearly shown a likelihood of organizational standing .............11

      B.   The Claims at Issue Are Not Ripe ...........................................................................13

II.  CCST Cannot Show a Likelihood of Success on the Merits .......................................15

      A.   The Borrower-Defense Provisions Are Statutorily Authorized ...................................15

            1.   The HEA authorizes borrower defense claims adjudication...........................15

            2.   The Department's reasonable interpretation is entitled to deference ............22

            3.   The major questions doctrine does not apply ..................................................22

      B.   The Borrower-Defense Provisions Are Reasonable .....................................................24

      C.   The Borrower-Defense Provisions Are Constitutional .................................................29

      D.   The Closed-School Discharge Provisions Are Lawful...................................................31

III. CCST Has Failed to Establish Any Irreparable Harm ................................................32

IV. The Balance of the Equities and Public Interest Weigh Against Injunctive Relief.......................38

V.  CCST's Requested Relief Is Overbroad ...................................................................38

CONCLUSION....................................................................................................................................40

# TABLE OF AUTHORITIES

## Cases

*Acosta v. Hensel Phelps Construction Co.,*
909 F.3d 723 (5th Cir. 2018) ...................................................................... 18, 22

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
570 U.S. 205 (2013) ............................................................................................. 35

*Alabama Ass'n of Realtors v. HHS,*
141 S. Ct. 2485 (2021) ....................................................................................... 24

*Ass'n of Proprietary Colls. v. Duncan,*
107 F. Supp. 3d 332 (S.D.N.Y. 2015) ............................................................ 31

*Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n,*
430 U.S. 442 (1977) ............................................................................................. 29

*Cal. Ass'n of Private Postsecondary Schs. v. DeVos,* ("CAPPS"),
344 F. Supp. 3d 158 (D.D.C. 2018) ...................................................... *passim*

*Carpenters Dist. Council of New Orleans v. Dillard Dep't Stores, Inc.,*
15 F.3d 1275 (5th Cir. 1994) .......................................................................... 17

*CCST v. U.S. Dep't of Educ.,*
No. 4:23-cv-206-P, 2023 WL 2975164 (N.D. Tex. Apr. 17, 2023) ........... 8

*Chamber of Commerce v. Hugler,*
2017 WL 1062444 (N.D. Tex. Mar. 20, 2017) ........................................... 35

*Chauffeur's Training School, Inc. v. Spellings,*
478 F.3d 117 (2d Cir. 2017) ..................................................................... 21, 22

*Chevron v. NRDC,*
467 U.S. 837 (1984) ............................................................................................. 22

*Christopher v. SmithKline Beecham Corp.,*
567 U.S. 142 (2012) ............................................................................................. 26

*City of Arlington v. FCC,*
569 U.S. 290 (2013) ................................................................................ 16, 19, 32

*Commonwealth v. Biden,*
57 F.4th 545 (6th Cir. 2023) ........................................................................... 39

*Cornish v. Dudas,*
540 F. Supp. 2d 61 (D.D.C. 2008) .................................................................. 38

*DaimlerChrysler Corp. v. Cuno,*
547 U.S. 332 (2006) ................................................................................................. 8

*Daves v. Dallas Cnty.*,
22 F.4th 522 (5th Cir. 2022) (en banc) ............................................................ 39

*Def. Distributed v. U.S. Dep't of State*,
121 F. Supp. 3d 680 (W.D. Tex. 2015) ............................................................ 38

*Div. 80, LLC v. Garland*,
2022 WL 3648454 (S.D. Tex. Aug. 23, 2022) ............................................ 36, 38

*DM Arbor Cit., Ltd. v. City of Houston*,
988 F.3d 215 (5th Cir. 2021) ............................................................................ 13

*Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
762 F.2d 464 (5th Cir. 1985) ............................................................................ 32

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .......................................................................................... 25

*FCC v. Prometheus Radio Project*,
141 S. Ct. 1150 (2021) ...................................................................................... 25

*Franciscan All., Inc. v. Burwell*,
227 F. Supp. 3d 660 (N.D. Tex. 2016) .............................................................. 40

*Freedom Holdings, Inc. v. Spitzer*,
408 F.3d 112 (2d Cir. 2005) .............................................................................. 35

*FTC ex rel. Yost v. Educare Centre Servs., Inc.*,
2020 WL 4334117 (W.D. Tex. Apr. 3, 2020) .................................................... 36

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l*,
695 F.3d 330 (5th Cir. 2012) .............................................................................. 9

*Georgia v. President of the United States*,
46 F.4th 1283 (11th Cir. 2022) ......................................................................... 39

*Gill v. Whitford*,
138 S. Ct. 1916 (2018) ...................................................................................... 39

*Google, Inc. v. Hood*,
822 F.3d 212 (5th Cir. 2016) ............................................................................. 37

*Green Valley Special Util. Dist. v. City of Schertz*,
969 F.3d 460 (5th Cir. 2020) ............................................................................. 39

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ............................................................................ 11, 12, 13

*Huawei Techs USA v. FCC*,
2 F.4th 421 (5th Cir. 2021) ........................................................ 22, 24, 25, 27

*Inv. Co. Inst. v. CFTC*,

720 F.3d 370 (D.C. Cir. 2013) ................................................................................................ 25

*Jarkesy v. SEC*,
   34 F.4th 446 (5th Cir. 2022) ............................................................................................. 30

*Johnson v. Owens*,
   2013 WL 12177176 (W.D. Tex. Aug. 5, 2013) .................................................................. 32

*Jordan v. Fisher*,
   823 F.3d 805 (5th Cir. 2016) ............................................................................................. 8

*K Mart Corp. v. Cartier, Inc.*,
   486 U.S. 281 (1988) .......................................................................................................... 40

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019) ...................................................................................................... 26

*Littlepage v. Trejo*,
   2017 WL 3611773 (W.D. Tex. Aug. 21, 2017) .................................................................. 37

*Long Island Care at Home, Ltd. v. Coke*,
   551 U.S. 158 (2007) ..................................................................................................... 15, 16

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ....................................................................................................... 9, 33

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) .......................................................................................................... 14

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) .......................................................................................................... 40

*Massimo Motor Sports LLC v. Shandong Odes Indus. Co.*,
   2021 WL 6135455 (N.D. Tex. Dec. 28, 2021) .................................................................. 33

*Munaf v. Geren*,
   553 U.S. 674 (2008) .......................................................................................................... 8

*N.Y. Legal Assistance Grp. v. DeVos*,
   527 F. Supp. 3d 593 (S.D.N.Y. 2021) .............................................................................. 25

*NAACP v. City of Kyle*,
   626 F.3d 233 (5th Cir. 2010) ............................................................................................. 12

*Nat'l Council of Agr. Emp's v U.S. Dep't of Labor*,
   2023 WL 2043149 (D.D.C. Feb. 16, 2023) ...................................................................... 38

*Nat'l Fuel Gas Supply Corp. v. FERC*,
   811 F.2d 1563 (D.C. Cir. 1987) ........................................................................................ 19

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
   538 U.S. 803 (2003) ..................................................................................................... 13, 14

*NFIB v. OSHA*,
   142 S. Ct. 661 (2022) ................................................................... 24

*Nken v. Holder*,
   556 U.S. 418 (2009) ..................................................................... 38

*North Dakota ex rel. Bd. of Univ. Sch. Lands*,
   461 U.S. 273 (1983) ..................................................................... 20

*OCA-Greater Houston v. Texas*,
   867 F.3d 604 (5th Cir. 2017) ........................................................ 12

*ODonnell v. Harris Cnty.*,
   892 F.3d 147 (5th Cir. 2018) ........................................................ 39

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
   138 S. Ct. 1365 (2018) ................................................................. 30

*Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*,
   492 F. Supp. 3d 701 (E.D. Tex. 2020) ......................................... 36

*Perez v. Mortg. Bankers Ass'n*,
   135 S. Ct. 1199 (2015) ................................................................. 28

*Pruvit Ventures, Inc. v. Forevergreen Int'l LLC*,
   2015 WL 9876952 (E.D. Tex. Dec. 23, 2015) .............................. 34

*Restaurant Law Ctr. v. U.S. Dep't of Labor*,
   2023 WL 3139900 (5th Cir. Apr. 28, 2023) .................................. 37

*Roark & Hardee LP v. City of Austin*,
   522 F.3d 533 (5th Cir. 2008) ........................................................ 13

*Rozelle v. Lowe*,
   2015 WL 13236273 (W.D. Tex. June 1, 2015) ............................. 32

*Serrano v. U.S. Customs & Border Prot.*,
   975 F.3d 488 (5th Cir. 2020) ........................................................ 31

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   482 F. Supp. 3d 543 (W.D. Tex. 2020) ......................................... 33

*Somerset House, Inc. v. Turnock*,
   900 F.2d 1012 (7th Cir. 1990) ...................................................... 37

*Speech First, Inc. v. Fenves*,
   979 F.3d 319 (5th Cir. 2020) ........................................................ 9

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ..................................................................... 9

*Sweet v. Cardona*,

2022 WL 16966513 (N.D. Cal. Nov. 16, 2022) ............................................................. *passim*

*Sweet v. Cardona,*
2023 WL 2213610 (N.D. Cal. Feb. 24, 2023) ............................................................. 34

*Texas v. Biden,*
10 F.4th 538 (5th Cir. 2021) ............................................................. 35

*Texas v. EPA,*
829 F.3d 405 (5th Cir. 2016) ............................................................. 36

*Texas v. EPA,*
2023 WL 2574591 (S.D. Tex. Mar. 19, 2023) ............................................................. 37

*Texas v. United States,*
523 U.S. 296 (1998) ............................................................. 14

*Union Home Mortg. Corp. v. Cromer,*
31 F.4th 356 (6th Cir. 2022) ............................................................. 39

*United States v. City of Los Angeles,*
595 F.2d 1386 (9th Cir. 1979) ............................................................. 35

*United States v. Mead Corp.,*
533 U.S. 218 (2001) ............................................................. 22

*Utility Air Regul. Gp. v. EPA,*
573 U.S. 302 (2014) ............................................................. 24

*West Virginia v. EPA,*
142 S. Ct. 2587 (2022) ............................................................. 23, 24

*Winter v. NRDC, Inc.,*
555 U.S. 7 (2008) ............................................................. 8

*Vara v. DeVos,*
2020 WL 3489679 (D. Mass. June 25, 2020) ............................................................. 17, 18, 19

*Zimmerman v. City of Austin,*
881 F.3d 378 (5th Cir. 2018) ............................................................. 13

**Statutes**

5 U.S.C. § 705 ............................................................. 40
20 U.S.C. § 1070 ............................................................. 3
20 U.S.C. § 1082 ............................................................. 20
20 U.S.C. § 1087 ............................................................. 3, 31, 32
20 U.S.C. § 1087d ............................................................. 20, 30
20 U.S.C. § 1087e ............................................................. 3, 16, 20, 30

20 U.S.C. § 1094 ...................................................................................................... 3, 10

20 U.S.C. §§ 1071–1087-4 ............................................................................................ 3

20 U.S.C. §§ 1221e-3, 1082, 3441, 3474, 3471 ............................................................. 3

## Regulations

34 C.F.R. § 685.222 ...................................................................................................... 5

34 C.F.R. §§ 685.206(c)(2), 685.222(e) ......................................................................... 5

59 Fed. Reg. 42,646 (Aug. 18, 1994) ..................................................................... *passim*

59 Fed. Reg. 61,664 (Dec. 1, 1994) ................................................................... 4, 17, 32

60 Fed. Reg. 37,768 (July 21, 1995) ........................................................................ 4, 17

81 Fed. Reg. 75,926 (Nov. 1, 2016) ....................................................................... *passim*

82 Fed. Reg. 6253 (Jan. 19, 2017) ................................................................................ 5

84 Fed. Reg. 49,788 (Sept. 23, 2019) ................................................................... *passim*

86 Fed. Reg. 28,299 (May 26, 2021) ............................................................................ 6

87 Fed. Reg. 41,878 (July 13, 2022) ...................................................................... *passim*

87 Fed. Reg. 52,943 (Aug. 30, 2022) ......................................................................... 23

87 Fed. Reg. 65,904 (Nov. 1, 2022) ...................................................................... *passim*

## INTRODUCTION

Congress charged the Secretary of Education with administering the federal student loan programs and thereby ensuring that eligible borrowers can obtain the benefits of postsecondary education. It recognized, however, that a federal student loan recipient might be deprived of the intended educational benefits through improper acts or omissions by the borrower's school. And to ensure that, in those circumstances, borrowers do not bear the costs of school misconduct, Congress authorized the Secretary to specify in regulations the institutional acts and omissions that a borrower may claim as a defense to the general obligation to repay a federal student loan. Such borrower-defense claims, as they have become known, are between the borrower and the Department of Education. While the Department may subsequently recoup discharged loan amounts from the school whose misconduct necessitated discharge—thereby ensuring that taxpayers do not bear the cost of school misconduct—recoupment occurs in wholly separate proceedings with the school.

Beginning in 2015, an unprecedented number of borrowers invoked borrower defenses to repayment following the discovery of widespread fraud by a large chain of for-profit colleges. In response, the Department updated, and has continued to update, its regulations to specify and improve processes for resolving borrower-defense claims. Those updates have responded to changing demands in ways that protect borrowers, schools participating in the federal loan programs, and the public monies that support them. The Rule at issue in this case, set to take effect on July 1, 2023, sets out the latest updates, alongside other related (and unrelated) provisions.

Plaintiff Career Colleges and Schools of Texas (CCST)—a trade association dedicated to the interests of for-profit colleges and similar post-secondary institutions in Texas—seeks to enjoin the Rule and, in doing so, thwart much-needed regulatory improvements and undermine the decades-old foundations of the statutory borrower-defense scheme. This extraordinary request should be rejected.

To start, CCST has not made a clear showing that it has standing to obtain its requested relief.

Though it purports to challenge the Rule on behalf of its member schools, CCST has not identified any member that would have standing in its own right.  Nor has CCST shown the Rule's challenged provisions will harm it directly.  And in this pre-enforcement context, CCST's claims rest on contingencies and speculation that leave them unripe for judicial review.

CCST fares no better on the merits of its Administrative Procedure Act (APA) claims. Congress provided the Secretary with express authority to create and administer borrower-defense regulations.  CCST's arguments that the Secretary nonetheless lacked authority to promulgate the borrower-defense provisions of the Rule defy statutory text, reason, and history, and are unlikely to succeed.  Likewise, CCST's substantive objections to the Department's borrower-defense standards and procedures cannot support an injunction because the Department's choices were reasonable and reasonably explained.  And CCST's undeveloped constitutional arguments lack foundation.

Nor has CCST demonstrated any certainly impending, irreparable harm absent preliminary relief.  CCST insists that the Rule's provisions addressing relief to borrowers harmed by school misconduct will render its members' business models unviable.  Yet CCST supports its prognostication with only conjecture and inapt comparisons and impermissibly seeks to evade the irreparable-harm requirement through cursory invocations of compliance costs and underdeveloped constitutional claims.

Finally, CCST has not shown the wholesale nationwide injunction it seeks is in the public interest.  The challenged Rule represents the Department's considered judgment on the best means of realizing the congressional objective to afford relief to thousands of student borrowers harmed by schools' misconduct.  Against these compelling interests, CCST offers only its members' economic interest in continuing to profit from the federal student aid programs in which they voluntarily participate.  No injunction should issue in these circumstances, much less one that governs nationwide against the Rule in its entirety.

## BACKGROUND

### I.    Statutory and Regulatory Background

#### A.    The Higher Education Act and Borrower Defense to Repayment

Title IV of the Higher Education Act of 1965 (HEA) charges the Department of Education (Department) with the administration of federal student loan programs to "mak[e] available the benefits of postsecondary education to eligible students." 20 U.S.C. § 1070(a).  Initially, the largest such program involved Federal Family Education Loans (FFEL)—loans issued by non-federal lenders and supported by the federal government. *See id.* §§ 1071–1087-4.  In 1993, Congress created the Direct Loan Program, through which "loan capital is provided directly to student and parent borrowers by the Federal Government rather than through private lenders." 59 Fed. Reg. 42,646 (Aug. 18, 1994).  The Department's portfolio now consists of more than 43 million student loans, and Congress has granted the agency broad authority to promulgate regulations to administer these loans and carry out its duties under Title IV. *See, e.g.*, 20 U.S.C. §§ 1221e-3, 1082, 3441, 3474, 3471.  Congress has also authorized the Department to issue regulations to ensure that the schools with which it contracts to provide Title IV funds comply with program requirements. *See id.* §§ 1094(c)(1); 1099c(c).

Generally, borrowers must repay all federal student loans received, but the HEA provides authority to relieve this obligation in some circumstances, including based on misconduct by the borrower's school.  In particular, the HEA requires the Secretary to specify by regulation "which acts or omissions of an institution of higher education a [Direct Loan] borrower may assert as a defense to repayment of a loan." 20 U.S.C. § 1087e(h).  The HEA also requires the Department to "discharge [a] borrower's liability on [a] loan" where that borrower "is unable to complete the program in which such student is enrolled due to the closure of the institution." *Id.* § 1087(c).

#### B.    Regulatory History

Over the past 30 years, the Department has promulgated four sets of borrower-defense

regulations.  The first, in 1994, explained that borrowers in the newly enacted Direct Loan Program could request that the Secretary "exercise his long-standing authority to relieve the borrower of his or her obligation to repay a loan on the basis of an act or omission of the borrower's school."  59 Fed. Reg. at 42,649.  The 1994 rule permitted a borrower to assert as a defense to repayment "any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law." 59 Fed. Reg. 61,664, 61,696 (Dec. 1, 1994).  The rule also provided a non-exhaustive list of "proceedings" in which the borrower could assert a defense, *id.*, and created a "system for adjudicating claims by borrowers that have a defense against repayment of a loan based on the acts or omissions of the school," *id.* at 61,671.  The Department explained that the regulations were designed to continue in the Direct Loan Program the same liability that institutions had long faced under the FFEL program for misconduct related to recruiting and enrolling federal student loan borrowers, *see* 60 Fed. Reg. 37,768 (July 21, 1995)—namely, that such borrowers could assert "both claims and defenses to repayment, without regard as to whether such claims or defenses could only be brought in the context of debt collection proceedings." 81 Fed. Reg. 75,926, 75,956 (Nov. 1, 2016).

The 1994 rule left to the Secretary's discretion the relief to be afforded to successful borrower-defense applicants.  *See* 59 Fed. Reg. at 61,696.  And it authorized the Secretary to "initiate an appropriate proceeding to require the school whose act or omission resulted in the borrower's successful defense against repayment of a Direct Loan to pay to the Secretary the amount of the loan to which the defense applies."  *Id.*; *see also* 60 Fed. Reg. at 37,770 (explaining such recovery proceedings would be conducted "in the same manner and based on the same reasons" as they had historically been conducted in the FFEL Program).

For the next 20 years, the Department's borrower defense regulations were used relatively infrequently.  *See* 81 Fed. Reg. at 75,926.  But in 2015, in response to the high-profile collapse of one of the country's largest for-profit colleges, the Department began to receive an unprecedented "flood

of borrower defense claims." *Id.*  The Department announced that it would issue a new rule to "establish a more accessible and consistent borrower defense standard and clarify and streamline the borrower defense process." *Id.*  This second rule, published on November 1, 2016, established a uniform federal standard governing what institutional "acts or omissions" give rise to a borrower defense, *see* 34 C.F.R. § 685.222(a)-(d), and created a procedural framework to address the surge of borrower-defense claims the Department had begun to receive.  *Id.* §§ 685.206(c)(2), 685.222(e).  It also built on the Secretary's existing authority to take "remedial actions . . . to collect losses arising out of successful borrower defense claims for which an institution is liable."  81 Fed. Reg. at 75,927.  In such proceedings, institutions are "afforded a full and fair opportunity to defend themselves," 82 Fed. Reg. 6253 (Jan. 19, 2017), including notice, the opportunity to present evidence, and a hearing.  *See generally* 34 C.F.R. 668, subpart G.

In 2019, the Department published a third rule revising the borrower-defense standard and amending related claim-review procedures.  *See* 84 Fed. Reg. 49,788 (Sept. 23, 2019).  The 2019 rule reaffirmed that the Department would continue to accept "affirmative" defense-to-repayment claims outside of formal debt collection proceedings, *id.* at 49,795-97, and it expanded "institutional responsibility and financial liability" for losses resulting from approved claims. *see id.* at 49,790.

Under each of these earlier rules, the Department would adjudicate applications from federal student loan borrowers to discharge their student loan repayment obligations based on misconduct by their institutions.  In appropriate circumstances, the Department has also initiated subsequent proceedings to recoup discharged amounts from the school whose misconduct necessitated the loss to the taxpayer.  Because the various regulations set forth different substantive standards and procedural rules depending on the disbursement date of a given loan, the Department determined, based on its experience reviewing "hundreds of thousands of claims" over the past several years, 87 Fed. Reg. 41,878, 41,889 (July 13, 2022), that new regulations were necessary to, among other things,

"clarif[y] [the] process for" borrowers to submit applications and "creat[e] . . . a single upfront Federal standard to streamline the Department's consideration of applications." *Id.* at 41,880.

### C.     The 2022 Rule

The Department initiated the latest rulemaking in 2021. *See* 86 Fed. Reg. 28,299 (May 26, 2021). After engaging in a statutory negotiated rulemaking process, the Department published a notice of proposed rulemaking (NPRM) in July 2022. The NPRM proposed "several significant improvements to existing programs authorized under the [HEA] that grant discharges to borrowers who meet specific eligibility conditions." 87 Fed. Reg. at 41,879. After receiving more than 4,000 public comments, the Department issued its final rule, updating regulations governing borrower defense and closed school discharges, along with a number of other provisions affecting a broad swath of statutory programs. *See* 87 Fed. Reg. 65,904 (Nov. 1, 2022) (2022 Rule or Rule).

Like the 2016 and 2019 rules, the 2022 Rule creates a uniform federal standard defining the acts and omissions that a Direct Loan borrower can assert as a defense to repayment. The Rule states that, for all loans disbursed on or after July 1, 2023, and with respect to all applications pending as of that date, a borrower defense will be based on the Department's conclusion "by a preponderance of the evidence that the institution committed an actionable act or omission and, as a result, the borrower suffered detriment of a nature and degree [] warranting relief." 87 Fed. Reg. at 66,068. The Rule then lists five categories of acts or omissions that are actionable when connected to a borrower's decision to attend an institution or take out a covered loan: (1) substantial misrepresentations that mislead a borrower, (2) substantial omissions of fact, (3) failures to perform contract obligations, (4) uses of aggressive and deceptive recruitment methods, and (5) conduct giving rise to court or administrative tribunal judgment, or Department sanctions, favorable to the borrower. *Id.* at 66,068–69.

The Rule also sets forth revised procedures to govern a borrower's assertion of a defense to repayment and the Department's consideration thereof. These procedures require that borrowers

submit an application, "under penalty of perjury," describing the institutional act or omission giving rise to the application; that institutions receive notice of any claims against them and the opportunity to respond; and that the Secretary issue a written decision approving or denying the claim and notifying the applicant of any relief awarded. *Id.* at 66,070–72.

The 2022 Rule again "provide[s] a path for recouping the cost of approved discharges from institutions when warranted and after significant due process opportunities." *Id.* at 65,907. Recoupment remains a separate proceeding, conducted only after the Department grants relief to a borrower. The Department must provide the borrower's school written notice and an opportunity to present evidence and a hearing, and must prove that any amounts it seeks to recover were discharged on the basis of a borrower-defense claim. *See id.* at 66,041, 66,072–73. And the 2022 Rule makes clear that "the Department will not attach any new liability for institutions to actions or transactions that were permissible when the events occurred." *Id.* at 65,941.

The Department also amended its closed-school discharge regulations (which provide relief separate from a defense to repayment) to "expand borrower eligibility for automatic discharges," *id.* at 65,904, by changing the criteria for determining the "closure date for a school that has ceased overall operations," *id.* at 65,966. The Rule provides that a school closure date is, as determined by the Secretary, the earlier of the date "that the school ceased to provide educational instruction in programs in which most students at the school were enrolled" or the date "that reflects when the school ceased to provide educational instruction for all of its students." *Id.* at 66,060. This ensures that "[a] school that has remained open would not be considered a closed school," while closing existing loopholes that allowed schools to sometimes "deny[] closed school discharges to [otherwise eligible] borrowers." *Id.* at 65,966. The Rule only "establish[es] a closure date for a school that has ceased overall operations," *id.*, and does not expand the overall scope of the closed-school definition.

## II.      This Lawsuit

CCST is a trade association for Texas-based, for-profit, higher education institutions that claims "more than 70 member schools." Compl. ¶ 3, ECF No. 1.  It initially filed this case in February in the Northern District of Texas.  *Id.* at 1.  Several weeks later, on April 5, 2023, CCST moved for a preliminarily injunction.  *See* Br. in Supp. of Mot. for Prelim. Inj., ECF No. 24 ("PI Br.").  The case was then transferred to this District.  *See CCST v. U.S. Dep't of Educ.*, No. 4:23-cv-206-P, 2023 WL 2975164 (N.D. Tex. Apr. 17, 2023).  While its motion only addresses claims against the 2022 Rule's provisions concerning borrower-defense claims and closed school discharges, CCST seeks a nationwide preliminary injunction against the Rule in its entirety.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy" that should "never [be] awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted).  A plaintiff may obtain this "extraordinary remedy" only "upon a clear showing" that it is "entitled to such relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008).  The plaintiff must show (1) "a substantial threat of irreparable injury," (2) "a substantial likelihood of success on the merits," (3) "that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted," and (4) "that the grant of an injunction will not disserve the public interest." *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016) (citation omitted).  The plaintiff must "clearly carr[y] the burden of persuasion on all four requirements." *Id.* (citation omitted).

## ARGUMENT

## I.      The Court Lacks Jurisdiction to Grant CCST's Motion

### A.      CCST Lacks Standing to Bring the Claims at Issue

Standing is a jurisdictional requirement, and it must be established "for each form of relief sought," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (citation omitted).  Because CCST

seeks a preliminary injunction on behalf of both itself and its members, it must "clearly show" a likelihood that it has direct or "associational standing" to bring each of its claims on the merits. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329–30 (5th Cir. 2020). CCST cannot make either showing.

### 1. CCST has not clearly shown a likelihood of associational standing

To establish associational standing, an organization must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Speech First*, 979 F.3d at 330 (citation omitted). At the first step, the organization must "make specific allegations establishing that at least one identified member ha[s] suffered or [will] suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). "To make this showing when seeking an injunction, the organization must show an individual [member] who has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct, and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 (5th Cir. 2012) (citation omitted). CCST's allegations fail at this threshold step.

As to the Rule's borrower-defense provisions, CCST asserts that some of its members are "required to conform" to the challenged provisions, which could one day "subject [them] to *potential* liability for discharged loans, to revocation or denial of eligibility to participate in the federal student loan programs, and to restrictions upon participation," and leave them facing "reputational injury and enormous financial liability." Compl. ¶ 27 (emphasis added). These allegations involve only "conjectural or hypothetical" injuries dependent on the independent actions of third parties (student-borrowers), rather than any direct injury to a CCST member from the borrower-defense provisions that is "real and immediate." *Funeral Consumers*, 695 F.3d at 344; *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Even assuming that some student at some CCST member school will someday be

injured by that school in a manner contemplated by the Rule and then assert a related borrower-defense claim to the Department, any pecuniary or reputational injury to the school is still further steps removed.  The Department must then decide the claim in favor of the student—hardly a foregone conclusion—and then also initiate a subsequent recoupment action against the school.  *See, e.g.*, 87 Fed. Reg. at 65,909.  Even then, the school may contest its financial liability before the agency and may seek judicial review of any final recoupment decision.  *See Cal. Ass'n of Private Postsecondary Schs. v. DeVos* ("*CAPPS*"), 344 F. Supp. 3d 158, 180-81 (D.D.C. 2018) (finding that association of for-profit schools lacked standing and did not present ripe challenges to the 2016 borrower defense rule).

CCST's supporting declarations only underscore the conjectural nature of these supposed harms.  For example, one states that Lincoln Tech schools are engaging in preparatory activities such as "allocating staff and resources" and "upgrading recordkeeping systems" to deal with an "anticipated flood of meritless borrower defense claims."  Decl. of Scott Shaw (Shaw Decl.) ¶ 20, ECF No. 25 at 4-5.  But it offers no facts to support the prediction that borrowers who attend or attended Lincoln Tech schools will bring "meritless" claims.  And allocating staff to ensure compliance with the requirements of a program that a school voluntarily participates in and benefits from is not a concrete injury attributable to the Rule.  Indeed, the absence of any "real and immediate" injury is also shown by the fact that ECPI University *already* employs significant staff whose job duties include ensuring compliance with Title IV and other state and federal regulations.  *See* Decl. of Jeff Arthur (Arthur Decl.) ¶ 15, ECF No. 25 at 41.  These compliance efforts are plainly preexisting efforts required to participate in the Direct Loan Program.  *See, e.g.*, 20 U.S.C. § 1094 (placing compliance requirements on Title IV participation).

CCST's claims of injury from the closed school discharge provisions are even more vague and attenuated.  CCST asserts that member schools have "abandon[ed] plans to build, expand, or consolidate campuses or facilities" because of their perceived risk of "liability stemming from the new

regulations governing closed schools."  PI Br. at 3; *see* Arthur Decl. ¶ 22, ECF No. 25 at 43 (alleging that "ECPI University has been forced to abandon plans to build new or upgrade existing schools"); Shaw Decl. ¶ 17, ECF No. 25 at 35 (alleging vaguely that Lincoln Tech schools will "reconsider the opening of new campuses and upgrading of existing ones").  None of this demonstrates any real and immediate injury sufficient for standing.  CCST does not identify any specific plans that have been or may be delayed or abandoned, nor explain why the closed school discharge provisions would necessitate any such changes to members' unspecified plans.  And mere "uncertainty" about what the Rule actually requires "falls short of the type of actual and imminent threat needed to show" CCST's entitlement to relief, *CAPPS*, 344 F. Supp. 3d at 172, particularly in light of the Department's stated intent to provide further guidance as to what constitutes a closed school.  *See* 87 Fed. Reg. at 41,924.

As with the borrower-defense provisions, any concrete harm that CCST's members might suffer from the closed school discharge provisions remains several steps down the line.  To start, CCST does not allege that any member school has closed or plans to close.  And the imposition of closed school liability against apparently open schools based on their hypothetical future plans to "build, expand, or consolidate campuses," PI Br. at 3, is not only unlikely, but could occur only after the Department prevails in an administrative proceeding, after having granted relief to eligible student-borrowers.  *Cf.* Arthur Decl. ¶ 24, ECF No. 25 at 44 (contending that "a 'closed school discharge' *could* be triggered by consolidating facilities," for which a school potentially "*would* be presumptively held liable" in the event that the Department "determin[es] that the criteria is met" (emphases added)).  That potential outcome is too remote to provide associational standing here.

### 2.    CCST has not clearly shown a likelihood of organizational standing

To establish organizational standing, CCST must make the same showing required of an individual plaintiff: an injury in fact that is "concrete and demonstrable," fairly traceable to the challenged agency conduct, and likely to be redressed by a favorable court decision.  *Havens Realty*

11

*Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982); *see OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017).  It is not enough to show merely "a setback to the organization's abstract social interests." *Havens*, 455 U.S. at 379.  Rather, CCST must demonstrate that it "diverted significant resources to counteract the defendant's conduct," which "significantly and 'perceptibly impaired' the organization's ability to provide its 'activities—with the consequent drain on the organization's resources.'" *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010) (quoting *Havens*, 455 U.S. at 379).

CCST alleges direct injury in the form of (1) a "frustrated" mission; (2) "reputational harm" as a representative of purportedly "disfavor[ed]" institutions; and (3) the diversion of resources to "identify" the effects of the Rule, to submit comments on the proposed rulemaking, and to "prepare for the future regulatory landscape." Compl. ¶¶ 22–23.  None of these constitutes an injury in fact.

To bolster CCST's cursory allegations of a frustrated mission, CCST asserts in a declaration that its mission—"to represent and protect the interests of its career education school members [and] the students they train, as well as of career education, more generally, in the State of Texas," Decl. of Nikki England (England Decl.) ¶ 8, ECF No. 25 at 25—will be negatively affected by "regulations like those in the Final Rule," that allegedly will cause a "decline in career education schools and vocational training," *id.* ¶ 25, ECF No. 25 at 28.  This conclusory assertion is nothing more than an unspecified "setback to the organization's abstract social interests"—and "far more" is required to establish organizational standing.  *Havens*, 455 U.S. at 379.

As to reputational harm, allegations of injury to CCST are even more abstract than those concerning its member schools: each of CCST's alleged injuries depend on the already-speculative harms that its member schools allegedly have suffered or will suffer.  *See supra* pp. 9-11.  Similarly, as to the closed-school discharge provisions, CCST's allegation that its "operations" would be "hinder[ed]," "*[t]o the extent*" that liability of its member schools "will result in the closure" of some schools under the Rule, is vague and speculative.  Compl. ¶ 22 (emphasis added).  The closed school

discharge provisions do not threaten any real and immediate injury to the member schools, and CCST does not identify any concrete, direct effect on its own operations.

Finally, CCST's allegations that it has expended resources to "identify" and "prepare for" the effects of the Rule, Compl. ¶ 23, fall far short of showing a "drain" on its resources significant enough to "perceptibly impair[]" its activities in support of member schools, *Havens*, 455 U.S. at 379. CCST states that it submitted comments on the Department's proposed rule, but voluntarily submitting such comments does not give rise to an injury in fact. *Cf. Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018) ("[S]tanding cannot be conferred by a self-inflicted injury."). Nor does "working with schools to manage" unidentified demands on resources that certain aspects of the Rule may cause. England Decl. ¶ 30, ECF No. 25 at 29. Contrary to showing a drain on organizational resources and impairment of the organization's activities, actions such as advocating for and working with member schools appear to align comfortably with the organization's ordinary activities. *See* Compl. ¶¶ 10, 28.

### B.      The Claims at Issue Are Not Ripe

CCST also fails to establish that its pre-enforcement challenges to the Rule are ripe. The ripeness doctrine requires a reviewing court to ensure "that federal courts do not decide disputes that are premature or speculative," reflecting both "Article III limitations on judicial power, as well as prudential reasons for refusing to exercise jurisdiction." *DM Arbor Ct., Ltd. v. City of Houston*, 988 F.3d 215, 218 (5th Cir. 2021) (citation omitted); *see Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003). The ripeness inquiry relies on two factors: (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 545 (5th Cir. 2008). A case is ripe only "when it would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future." *DM Arbor Ct.*, 988 F.3d at 218 (citation omitted). Claims are not ripe if they "rest[] upon 'contingent future events that may not occur as anticipated, or indeed may not occur at

all.'"  *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted).

CCST's claims against the Rule's borrower-defense provisions fail both prongs of the ripeness inquiry.  First, they are not "fit" for judicial decision because they rest on "contingent future events." *Texas*, 523 U.S. at 300.  The Rule's standards and procedures for adjudicating borrower-defense claims principally concern borrowers and the taxpayers who foot the bill for relieving borrowers of their obligation to repay their loans; they could potentially threaten harm to a school only to the (at this point hypothetical) extent that the Department engages in a recoupment proceeding designed to impose financial liability on the school.  This has been true under every iteration of the borrower-defense regulations, and any assertion that the number of borrower-defense actions by students at CCST member schools (and subsequent recoupment proceedings) will increase under the Rule is wholly speculative.  If a school is ultimately subject to a recoupment proceeding, it will then have the opportunity to contest the facts underlying that proceeding—with a fully developed record, supplemented by the school—followed by an opportunity to appeal the agency decision, and it may challenge the result and procedures in federal court.  None of the steps in that process have been taken here, and it is uncertain how the relevant standards and procedures might be applied as to any CCST member.  It would thus be "premature" to adjudicate CCST's claims at this stage.  *Nat'l Park Hosp.*, 538 U.S. at 807; *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) ("[A] regulation is not ordinarily considered . . . 'ripe' for judicial review under the APA until the scope of the controversy has been reduced . . . by some concrete action applying the regulation to the claimant's situation[.]").

Nor will CCST or its members suffer hardship from withholding review of CCST's borrower-defense challenges.  Again, the relevant provisions will be applied to impose liability on any school, if at all, only after an actual recoupment proceeding, in which the school will have ample opportunity to contest liability and the ability to seek judicial review of any final recoupment decision.  Postponing review until after the conclusion of any such proceedings will impose no hardship on CCST or its

member schools.  *See CAPPS*, 344 F. Supp. 3d at 181–82 (finding challenge to 2016 borrower-defense rule unripe given "the undisputed availability of APA review of any final recoupment decision").

CCST's claims challenging the closed school discharge provisions are likewise premature.  As described above, the potential for closed-school liability is several steps removed from CCST's allegations.  Without the benefit of the relevant factual development, CCST's claims challenging these provisions are not ripe.  Indeed, the inchoate nature of CCST's concerns with the closed school discharge provisions reinforces this conclusion, as does the fact that the Department has stated that it will provide further administrative guidance on those provisions.  *See* 87 Fed. Reg. at 41,924; Compl. at 72 n.4.  Given that CCST identifies no specific effects that the closed school discharge provisions will have on member schools before any liability proceedings,  it will not suffer hardship absent a judicial decision on its claims at this stage.

## II.     CCST Cannot Show a Likelihood of Success on the Merits

### A.     The Borrower-Defense Provisions Are Statutorily Authorized

On the merits, CCST's principal argument is that, notwithstanding the HEA's clear directive that the Secretary "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a [Direct] loan," the Secretary lacks authority either to "adjudicate borrower defense claims" at all or to recoup amounts discharged on the basis of successful borrower defense claims from Title IV participating institutions.  *See* PI Br. at 9.  CCST's argument that these borrower-defense provisions are unlawful is inconsistent with the plain meaning of the HEA, common sense, and the agency's three-decade uninterrupted history of interpreting and applying the statutory provision.

#### 1.     The HEA authorizes borrower-defense claims adjudication

The HEA broadly delegates to the Department the authority to issue regulations giving shape to the statutory concept of borrower defense.  *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158,

165 (2007) (the "power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress" (citation omitted)).  Coupled with the Department's general authority to promulgate regulations to effectuate its responsibilities under the federal student loan programs, *see supra* p. 3, the HEA authorizes the longstanding provisions of the Rule to which CCST objects. *See City of Arlington v. FCC*, 569 U.S. 290, 296 (2013) (Congress "knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion").

     1.     To start, there is no statutory basis for CCST's attempted distinction between "*defenses* to repayment that a borrower may assert in collection actions" and "*affirmative* claims."  PI Br. at 9. The HEA refers broadly to a borrower's ability to "assert . . . a defense to repayment."  20 U.S.C. § 1087e(h).  And as the Rule explains, "the concept of repayment is widely understood to encompass not just borrowers in default but also those actively repaying their loans."  87 Fed. Reg. at 65,914. That makes sense: a borrower maintains an ongoing obligation to repay federal student loans, whether collection is attempted by sending the borrower monthly billing statements or via "involuntary" proceedings—such as offset or wage garnishment—once a borrower falls into default.  It is the "existing obligation to repay" the loan, *id.*, not the pendency of any formal action to collect a defaulted loan, that gives rise to the defense against repayment.[2]  Indeed, as the Rule explains, limiting borrowers to so-called "defensive" assertions of their right against repayment would be "illogical" because it would "place borrowers in an unfair situation of either intentionally defaulting in the hopes that a BD claim is successful or repaying a loan that potentially should be discharged."  *Id.*; *see also* 84 Fed. Reg. at 49,796 (noting problems associated with interpreting the HEA to "provide borrowers with an

---

[2] For this reason, among others, CCST's reductive assertion that Congress intended to limit the availability of the student loan borrower defense to individuals already in default merely because the statute uses the words "defense" and "defendants assert defenses," PI Br. at 9, is unpersuasive.

incentive to default"). The HEA—which to the contrary recognizes a broad "right to raise 'defense[s] to repayment," *Vara v. DeVos*, 2020 WL 3489679, at \*2 (D. Mass. June 25, 2020)—does not require that perverse result. *See Carpenters Dist. Council of New Orleans v. Dillard Dep't Stores, Inc.*, 15 F.3d 1275, 1285 (5th Cir. 1994) (courts should "avoid any interpretation that would lead to absurd results or unreasonable outcomes").

CCST seeks support for its interpretation in the Department's 1994 rule, which provided for borrower defenses to be asserted in enumerated "proceeding[s] to collect on a Direct Loan." PI Br. at 9–10. But that selective reference to the Department's historical practice is misleading. *See supra* pp. 4-5. Setting aside that the 1994 rule's list of proceedings was not exhaustive, *see* 59 Fed. Reg. at 61,696, it has always been the case that "borrowers who are not facing [default collection] proceedings and, indeed, not in default at all may nonetheless assert and obtain an adjudication of their borrower defense." *Vara*, 2020 WL 3489679, at \*3. The HEA's reference to "defense to repayment" codified the Secretary's "long-standing authority to relieve [a] borrower of his or her obligation to repay a loan on the basis of an act or omission of the borrower's school," 59 Fed. Reg. at 42,649, and the Department's borrower defense regulations were "intended to ensure that institutions participating in" the Direct Loan Program have "similar potential liability" as participants in the older FFEL Program, 60 Fed. Reg. at 37,769. And in *that* program, borrowers have long been permitted to "assert both claims *and* defenses to repayment, without regard as to whether such claims or defenses could only be brought in the context of debt collection proceedings." 81 Fed. Reg. at 75,956.

Across three rulemakings over the last few years, the Department has consistently reaffirmed its common-sense understanding that the HEA permits borrowers to assert institutional misconduct as a defense at any point during the repayment process. *See, e.g.*, 84 Fed. Reg. at 49,796 ("throughout the history of the [1994] borrower defense repayment regulation, the Department has approved . . . affirmative borrower defense to repayment requests"). In short, "the texts of the HEA and the [1994]

17

borrower defense regulation, as well as Education's contemporaneous interpretations, contracts, and adjudicatory practices, demonstrate that the agency must adjudicate affirmative applications for borrower defense relief." *Vara*, 2020 WL 3489679, at *6; *see also Acosta v. Hensel Phelps Constr. Co.*, 909 F.3d 723, 736 (5th Cir. 2018) (agency's "contemporaneous construction of applicable law and subsequent consistent interpretation" is entitled to "persuasive weight" (citation omitted)).

2.    Next, CCST contends that the HEA does not authorize the Department to adjudicate borrower defense claims at all.  *See* PI Br. at 10-12 (arguing that even if the HEA authorizes the creation of affirmative borrower defense claims, nothing authorizes the Department to adjudicate them).  This argument fails for many of the same reasons discussed above.  CCST in effect argues that, even though Congress explicitly provided for borrowers to broadly assert defenses to their ongoing repayment obligations based on the misconduct of their schools, Congress nonetheless made no provision for the Department to actually review those assertions or to provide relief from the referenced repayment obligations.  That is self-evidently an unreasonable interpretation of the borrower defense statutory provision, and it ignores the broad rulemaking authority that Congress has otherwise granted the Department to carry out its statutory duties and administer the programs that Congress creates.  *See supra* p. 3.

As the Department has explained, these provisions "grant the Department authority to promulgate regulations giving content to the statutory BD provision, including an adjudication framework" for determining whether a borrower's asserted institutional "acts or omissions" meet the regulatory defense-to-repayment standard.  87 Fed. Reg. at 65,913; *see also* 84 Fed. Reg. at 49,706 ("by providing that the Department may regulate borrowers' assertion of borrower defenses to repayment, [the HEA] grants the Department the authority to . . . establish the procedures for receipt and adjudication of borrower claims"); 81 Fed. Reg. at 75,965 (Congress "gave the Department the authority to determine such subordinate questions of procedure, such as . . . how . . . claims by

borrowers should be determined"). Within the context of that statutory scheme, the Department has the statutory authority to adjudicate whether asserted acts or omissions establish a borrower's defense to repayment. *See Vara*, 2020 WL 3489679, at *3 (where "Congress has delegated to an agency the task of administering federal programs, that agency undertakes a non-discretionary duty to adjudicate claims or applications that are essential to the administration of those programs" (citation omitted)); *Sweet v. Cardona*, 2022 WL 16966513, at *1 (N.D. Cal. Nov. 16, 2022) (recognizing Department's authority to adjudicate borrower-defense claims).

CCST has no real rejoinder to any of this. Rather, it relies on an unreasonably crabbed reading of the HEA and the curious assertion that any power of adjudication must be "*explicitly*" granted to federal agencies. PI Br. at 11 (emphasis in original). But the case it cites for that proposition, *National Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563 (D.C. Cir. 1987), imposed no such blanket requirement. Indeed, it recognized the general principle that "where Congress has made an explicit *or implicit* grant of power to an agency over certain matters, that grant of power . . . compels deference from the courts in reviewing how that power is exercised," *id.* at 1570 (emphasis added). Given how well settled the authority of agencies to conduct adjudications is, *see, e.g.*, *City of Arlington*, 569 U.S. at 304 n.4 ("Agencies make rules . . . and conduct adjudications . . . and have done so since the beginning of the Republic."), the question of whether a particular statute permits an agency to conduct adjudications is resolved not by asking whether Congress has provided a clear statement, but by asking, as in any other question of agency statutory interpretation, "whether the statutory text forecloses the agency's assertion of authority." *Id.* at 301. The HEA does not.

CCST also contends that it would somehow "require a waiver of sovereign immunity," PI Br. at 11, for the Department to provide borrower-defense loan discharges in administrative proceedings. But sovereign immunity is a defense to be asserted by the United States in court proceedings initiated against the federal government; it is not a limitation on an agency's ability to disburse benefits

according to a congressionally created scheme. *See, e.g., Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983). When federal student loan recipients assert defenses against their repayment obligations, they are not making "claims for financial relief against the Government," PI Br. at 11, much less bringing suits against the United States in which the sovereign immunity defense might apply. *See Sweet*, 2022 WL 16966513, at *13 ("Discharge of an obligation to repay a debt does not constitute monetary damages."). In any event, the HEA waives sovereign immunity with respect to any civil action relating to the Secretary's performance of "the functions, powers, and duties, vested in him by" the FFEL and Direct Loan Programs. 20 U.S.C. § 1082(a)(2); *see also id.* § 1087e(a)(1).

      3.      Finally, CCST asserts that the Department lacks statutory authority to "adjudicat[e] . . . recoupment actions against schools after a borrower defense claim has been granted." PI Br. at 12. As explained above, any challenge to the Department's recoupment procedures is not ripe. *See supra* Sec. I.B. Even setting that aside, CCST again challenges a feature of the Rule that has been in place, without incident and across multiple versions, for almost 30 years. *See, e.g.*, 81 Fed. Reg. at 75,931 (the Department has, "from the inception of the Direct Loan Program, considered its administrative authority under the HEA . . . to authorize the Department to hold schools liable for losses incurred through borrower defense, and to adopt administrative procedures to determine and liquidate those claims"). And, as CCST appears to recognize, PI Br. at 13, the Department's authority to hold institutions liable for losses that they generate through participation in Title IV is well established. *See* 87 Fed. Reg. at 65,948 (explaining that the HEA requires "that an institution must accept responsibility and financial liability stemming from its failure to perform the functions set forth" in its participation agreement with the Department); 20 U.S.C. § 1087d(a)(3). This is an important aspect of the Department's stewardship of the public fisc; the Department loans billions of dollars to students attending participating institutions every year to further their higher education, and being able to recoup from schools the "discharge-related liabilities" that their acts or omissions create is a "critical

tool" for protecting the taxpayer investment.  87 Fed. Reg. at 65,948; *see also* 84 Fed. Reg. at 49,838.

In light of this clear statutory authority, CCST's objection appears to be that the HEA does not explicitly address whether the schools' financial liability should be "adjudicated . . . by the courts or the Department."  PI Br. at 13.  That argument presents a false choice because any final recoupment decision by the Department is subject to judicial review under the APA.  And as explained, *infra* Sec. II.C, there is no doubt that the Department may use administrative adjudication, subject to judicial review, to determine entitlements and liabilities that exist only by virtue of federal law.[3]  Because the HEA provides for the Department to discharge loans based on institutional misconduct and requires schools to accept financial liability arising from their participation in Title IV, the Department is authorized to initiate administrative proceedings to recoup from schools amounts discharged on the basis of borrower defense.  *See Chauffeur's Training Sch., Inc. v. Spellings*, 478 F.3d 117, 125–30 (2d Cir. 2007) (upholding Department's authority to "administratively assess a liability for loan program violations" even where the HEA was "silent" with respect to the particular context at issue).

CCST notes that the Department's right to recoup amounts associated with other kinds of loan discharges is expressly stated in the HEA.  *See* PI Br. at 13.  But that is no reason to conclude that Congress intended to preclude the Department from seeking recoupment in connection with its longstanding "authority to relieve [a] borrower of his or her obligation to repay a loan on the basis of an act or omission of the borrower's school."  59 Fed. Reg. at 42,649.  The HEA broadly authorizes the Secretary to recover liabilities incurred by Title IV participating schools, and its express—and nonexclusive—provision for recoupment in certain circumstances is "not inconsistent with implied

---

[3] CCST misleadingly contends that the Department has previously recognized that its recoupment authority arises "not by virtue of any statutory requirement, but under common law."  PI Br. at 13.  That quote is taken from the 2016 rule, which in actuality states that the Secretary's authority to seek recoupment arises from "two distinct, and overlapping, lines of authority"—the HEA *and* "the government's rights under common law."  81 Fed. Reg. at 75,930.

authorization to recover funds" discharged on the basis of borrower defense.  *Chauffeur's Training Sch.*, 478 F.3d at 127; *see* 81 Fed. Reg. at 75,930 (explaining how additional provisions of the HEA support the Department's recoupment authority).

### 2.     The Department's reasoned interpretation is entitled to deference

Even if there were any doubt about whether the Department's interpretations of these statutory issues represent the best reading of the HEA, the Court should defer to those interpretations. In instances where an agency interpretation carries the force of law and Congress has not "directly spoken to the precise question at issue," *Chevron, USA, Inc. v. NRDC, Inc.*, 467 U.S. 837, 842–43 (1984), courts "defer to the agency's" interpretation so long as it is "based on a permissible construction of the statute." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 433 (5th Cir. 2021).  There can be no question that the Rule carries the force of law—Congress has "delegated authority to the agency generally to make rules carrying the force of law," and the Rule was "promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001).

For the reasons explained above, the Department's interpretation that the HEA permits it to adjudicate defense to repayment claims from borrowers and to initiate corresponding administrative recoupment proceedings is reasonable.  This is especially true because the interpretations are nearly 30 years old and unchanged across multiple rulemakings dating back to the period contemporaneous to Congress' enactment of the borrower defense statutory provision.  *See, e.g.*, *Acosta*, 909 F.3d at 735–36 (upholding as "well within the bounds of permissible interpretation" agency position that "makes practical sense" and was "consistently held . . . for decades").

### 3.     The major questions doctrine does not apply

Perhaps recognizing the weakness of its statutory arguments, CCST resorts to the major questions doctrine.  But that doctrine—which is reserved for "extraordinary cases," involving assertions of "extravagant statutory power over the national economy" or "highly consequential power

beyond what Congress could reasonably be understood to have granted," *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (citations omitted), has no application here. The provisions of the Rule that CCST challenges have been in effect for more than 30 years and were enacted pursuant to a statutory provision that codified the Department's "long-standing authority to relieve [a] borrower of" his or her loan repayment obligation based on "an act or omission of the borrower's school." 59 Fed. Reg. at 42,649.

CCST's basis for invoking the major questions doctrine is that the rule "may impose billions of dollars of burden on the public fisc and existential liability on [some] post-secondary schools." PI Br. at 14. That use of "may" is telling—as discussed, CCST comes nowhere close to establishing that the Rule will actually have such calamitous effects. Even setting that aside, "*West Virginia* made clear that determining whether a case contains a major question is not merely an exercise in checking the bottom line." *Sweet*, 2022 WL 16966513, at *6. And this is not a case where the "sheer scope" of the agency's claimed authority provides a "reason to hesitate," *West Virginia*, 142 S. Ct. at 2608. To the extent the provisions CCST challenges affects schools at all, they operate as conditions on the receipt of federal funds, applicable only to the entities that choose to contract with the Department. The Rule does not apply outside the Department's contractual relationships or the field of higher education financing, and it does require any school to take any action at all; if the schools disagree with the challenged provisions of the Rule, they are free to decline the funds.[4] This is unlike the assertions of

---

[4] CCST's reference to a January 2021 memorandum from the Department's Office of General Counsel addressing the Secretary's authority to cancel Title IV loan debt on a "blanket or mass" basis, PI Br. at 14, is a non-sequitur. The Rule defines, in accordance with specific statutory authorization, the types of institutional misconduct that a borrower can assert as a defense to repayment and articulates standards for the Department to adjudicate such assertions and provide relief where the defense is established by a preponderance of the evidence. It obviously does not involve the mass cancellation of all existing federal student loan debt. In any event, the cited memorandum has no binding effect because the Department later concluded that it was "not properly promulgated." *See* 87 Fed. Reg. 52,943, 52,945 (Aug. 30, 2022).

sweeping regulatory authority to which the Supreme Court has applied the doctrine, such as when OSHA sought to adopt "a broad public health regulation" requiring vaccination or other COVID-19 precautions in the workplace, *NFIB v. OSHA*, 142 S. Ct. 661, 666 (2022); the CDC sought to regulate "the landlord-tenant relationship" through a nationwide eviction moratorium, *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021); or the EPA contemplated regulation of power plants that would require restructuring the country's mix of electricity generation, *West Virginia*, 142 S. Ct. at 2608.

Nor does the Rule represent a novel exercise of agency authority or rely on an "ancillary," *id.* at 2602, statutory provision. *See Utility Air Regul. Gp. v. EPA*, 573 U.S. 302, 324 (2014) (invoking major questions doctrine "[w]hen an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy'" (citation omitted)). The parts of the Rule that CCST challenges—providing for the assertion and adjudication of borrower defense to repayment based on institutional misconduct—are based on a statutory provision that requires the Department to issue regulations governing the institutional misconduct that borrowers can assert as defense to repayment. They have been consistently included in four different versions of the same regulation, dating back to 1994. And they are in the heartland of the Department's statutory expertise in administering federal student loans and issuing rules to govern the award of relief from repayment obligations in statutorily-recognized circumstances. This is not a case where an agency is attempting to use vague statutory language to justify expansive regulatory action, and the major questions doctrine does not apply.

### B. The Borrower-Defense Provisions Are Reasonable

Unable to show that the Rule's borrower-defense provisions are altogether unauthorized under the HEA, CCST next assails them as substantively unreasonable. *See* PI Br. at 15–20. These arguments are properly considered under the "narrow and highly deferential" arbitrary-and-capricious standard of review, *Huawei Techs.*, 2 F.4th at 449 (citation omitted), which requires simply that the

agency "has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision," *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). "[A] court is not to substitute its judgment for that of the agency," and should uphold even a decision of "less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) (citation omitted). The Rule readily satisfies this deferential standard. *See N.Y. Legal Assistance Grp. v. DeVos*, 527 F. Supp. 3d 593, 604–09 (S.D.N.Y. 2021) (rejecting arbitrary-and-capricious challenges to the 2019 borrower-defense rule).

Before adopting the Rule's borrower-defense provisions, the Department considered its decades of experience with borrower-defense applications, and it reviewed how recent developments had undermined its previous approaches to borrower-defense claims. 87 Fed. Reg. at 41,883. Among other things, the Department explained that the precipitous collapse of Corinthian Colleges, Inc. in 2015 had led to a flood of borrower-defense claims; that this flood of claims had revealed significant inadequacies in the Department's existing regulations; and that the rate of borrower-defense claims had not meaningfully abated in the ensuing years. *See* 87 Fed. Reg. at 65,910. Based on its review, the Department was concerned that "too many borrowers who were subjected to an act or omission by their institution that should give rise to a successful defense to repayment have not received appropriate relief, at least in part because the regulatory requirements have created unnecessary or unfair burdens for borrowers." *Id.* at 65,908. In light of these concerns, the Department explained the need to adopt updated standards and procedures for resolving borrower-defense claims that would balance "transparency, clarity, and ease of administration" with "adequate protections to borrowers, institutions, the Department, and the public monies that fund Federal student loans." *Id.* This response to changed circumstances, carefully explained in response to commenters, falls well within the "zone of reasonableness," even if CCST might have "weighed the evidence differently." *Huawei Techs.*, 2 F.4th at 449, 451; *see also Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 377 (D.C. Cir. 2013).

CCST quibbles with the Rule's new standards for defining the institutional acts and omissions that may give rise to a meritorious borrower defense to repayment and potentially provide a basis for a recoupment action, but those objections lack foundation.  According to CCST, the five common-sense categories adopted by the Department, fleshed out with real-world examples, lack sufficient "specificity" to allow regulated parties to "conform their conduct," thus subjecting institutions to potential yet unpredictable liability for recoupment.  PI Br. at 15.  But the APA does not require the Department to list every conceivable act and omission.  Indeed, the definitional ambiguity to which CCST objects is "a familiar problem in administrative law," reflecting "well-known limits of expression or knowledge." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2410 (2019).  And notwithstanding CCST's apparent opposition to a "case-by-case" evaluation of institutional conduct, PI Br. at 15, "factual investigations" and "consult[ation] with affected parties" are a well-established (even lauded) method for resolving edge applications of a regulation. *Kisor*, 139 S. Ct. at 2413.  CCST's concerns should be assuaged by the robust procedural protections afforded to institutions in recoupment proceedings, 87 Fed. Reg. at 66,072–73, and the familiar principles of administrative law that safeguard against the sort of impermissible applications of the Rule that CCST seems to fear. *Cf. Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156–57 (2012) (rejecting agency interpretation that would have caused unfair surprise by imposing retroactive liability for longstanding conduct the agency had never addressed).

For similar reasons, there should be no concern that borrower-defense claims based on court judgments and Departmental sanctions lack any basis in an act or omission of the relevant institution or otherwise constitute an "end-run[] around the rules of claim preclusion . . . and issue preclusion." PI Br. at 15–16.  In those circumstances, the Rule specifies that the earlier judgment or sanction must be "based on" an act or omission by the institution that relates to a borrower-defense claim.  87 Fed. Reg. at 66,069.  And because any remedies provided in those earlier proceedings may not supplant the relief provided by a borrower defense to repayment, there is no reason to foreclose borrowers from

26

pursuing a borrower defense as well.  *Id.* at 65,932.  Moreover, nothing in the Rule purports to reverse the Department's longstanding practice of following established principles of collateral estoppel in its determination of borrower defense claims.  *Id.*  Rather, the Rule reasonably leaves an institution's defenses to liability intact, while promoting full relief for borrowers whose experiences warrant it.

CCST portrays the Rule's allowance for borrower-defense claims based on substantial misrepresentations and substantial omissions of fact as threats "to sanction a school for innocent and unintentional misstatements or omissions of fact."  PI Br. at 18.  But that caricature bears no resemblance to the Rule's actual standards, for which culpable conduct by a borrower's institution is an essential element.  *See* 87 Fed. Reg. at 65,920 ("to approve a claim, the Department must find that the institution committed 'an actionable act or omission and, as a result, the borrower suffered detriment of a nature and degree warranting the relief provided by a borrower defense to repayment'"); *id.* at 65,921 ("[H]armless and inadvertent errors are unlikely to be approved.").  Having required a causal link between a school's conduct and a borrower's injury, the Department was not required to condition approval of borrower-defense claims on a further finding that the school knew of or intended to cause harm to the borrower.  *Contra* PI Br. at 17.  And the Department reasonably concluded that requiring proof of intent would place an unreasonable burden on individual borrowers at the claims stage to prove the state of mind of an institution and its representatives, without any concomitant benefit to the Department's objective of ensuring that injured borrowers can access appropriate relief.  *See* 87 Fed. Reg. at 65,921.  The obvious distinctions between recoupment proceedings and adjudications of borrower defense claims reinforce that conclusion: in the latter, a school's interests are collateral and extensive adversarial proceedings are administratively infeasible, while in the former, a school may meaningfully contest liability.  CCST might have imposed a higher burden on borrowers at the threshold, *see* PI Br. at 17, but bare disagreement with the Department's approach is no cause to enjoin the Rule.  *See Huawei Techs.*, 2 F.4th at 451.

CCST's remaining arguments merely quibble with the Department's chosen procedures for adjudicating borrower defense applications. It is black letter law, however, that beyond the minimum procedural requirements for agency action set forth in the APA (which CCST does not dispute have been followed here), "courts lack authority to impose upon an agency its own notions of which procedures are best." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 102 (2015) (citation omitted). In any event, there is nothing unreasonable about the Rule's procedures for group adjudications. *Contra* PI Br. at 18. Much like class actions in the judicial system, a group-based process for adjudicating borrower-defense claims is appropriate given the common and recurring issues involved: often, an institution's act or omission (such as misrepresenting its graduates' employment rates in mass communications to prospective students) will have affected many borrowers. 87 Fed. Reg. at 65,937. It would be inefficient—and a waste of public resources—for the Department to perform individualized adjudications of virtually identical claims involving the same facts and circumstances.

CCST's attack on the Rule's rebuttable presumption in favor of relief where a borrower's defense concerns a closed school is similarly meritless. *See* PI Br. at 19. As an initial matter, this presumption factors into a remedial determination only once a borrower has shown all other required elements—actionable acts or omission, causation, and harm. *See* 87 Fed. Reg. at 65,920. CCST misapprehends this distinction by confusing the remedial element with the factual elements of causation and harm. *See* PI Br. at 19. CCST is equally mistaken in contending that this presumption somehow expands its liability. In fact, the element to which this presumption applies operates as a *limitation* on relief and, thus, on a school's potential liability. *See* 87 Fed. Reg. at 65,947 ("[T]he language ensuring that an approved claim must warrant this relief adds a requirement that the circumstances justify the remedy BD provides.").

In any event, the presumption is reasonable. The remedial prong of a borrower-defense claim is intended to ensure that approved claims match circumstances warranting the full array of remedies

that a defense to repayment provides.  *See id.* at 65,920.  And in the Department's experience, that remedy is often particularly appropriate when the borrower's school has closed and, prior to closure, has been responsible for injurious acts or omissions, but relief can be challenging to obtain due to the absence of evidence necessary to fully establish the nature and degree of detriment.  *Id.* at 65,947.  The Department reasonably relied on that experience to conclude that a rebuttable presumption in favor of relief was appropriate in adjudications involving closed schools.  And that conclusion is not undermined by the presumptive remedy of full discharge when it is warranted by the totality of the circumstances, *contra* PI Br. at 18, given the documented difficulties associated with measuring harm and calibrating relief in this context, and the underlying equitable purposes of the borrower-defense provisions.  *See* 87 Fed. Reg. at 65,946 (concluding that "a clear and consistent standard for applying a partial discharge is not feasible"); *see also id.* (analogizing borrower defenses to rescissionary remedies that seek to "restore the injured party to a pre-transaction status").

## C.    The Borrower-Defense Provisions Are Constitutional

Briefly, CCST raises the specter of constitutional infirmities in the Rule's borrower-defense provisions, but its concerns are unfounded.  For one thing, the challenged provisions do not "arrogate" to the Department "the power to adjudicate and enforce state law," nor abridge the Seventh Amendment's guarantee that the right of a trial by jury shall be preserved in suits at common law involving more than twenty dollars.  *Contra* PI Br. at 16.  As the Supreme Court has explained, "Congress is free to provide an administrative enforcement scheme without the intervention of a jury," *Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n*, 430 U.S. 442, 448 (1977), and the Seventh Amendment does not apply to administrative proceedings involving "public rights created by statutes within the power of Congress to enact," *id.* at 450.  Congress has accorded to borrowers a federal statutory right to assert defenses recognized by the Department against the government's otherwise-prevailing right to recover on student-loan debts.  20 U.S.C. § 1087e(h).  Congress has

likewise empowered the Department to recover losses it incurs as a result of a Title-IV-participating school's actionable acts or omissions. *See* 20 U.S.C. § 1087d(a)(3). In no sense, then, do borrower-defense adjudications pursuant to the Rule contravene the Seventh Amendment.

As noted above, the claims in some adjudications might resemble common law causes of action or incorporate similar standards because the Department has chosen to recognize such standards as good indicators of the kind of acts or omissions that can justify a federal student loan borrower's defense against repayment. But what is being adjudicated is the borrower's repayment obligations—not any rights or liabilities a school might otherwise possess outside of Title IV. In any event, borrower-defense claims concern rights "so closely integrated with a comprehensive regulatory scheme"—that governing federal student loan programs—that they are "appropriate for agency resolution." *Jarkesy v. SEC*, 34 F.4th 446, 453 (5th Cir. 2022); *cf. Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373 (2018) ("[T]he public-rights doctrine applies to matters arising between the government and others, which from their nature do not require judicial determination and yet are susceptible of it." (citation omitted)).

CCST also claims that the Rule "violates the Tenth Amendment and principles of federalism by preempting or modifying state law rights without congressional authorization," PI Br. at 16, but that argument is a red herring. The borrower-defense claims that the Rule governs do not arise under state law, do not substitute for claims under state law, and do not turn on the procedural rules that apply under state law. *See, e.g.*, 87 Fed. Reg. at 65,946 (describing how the borrower-defense "remedy differs from damages"). Indeed, whether or not a borrower prevails on a borrower-defense claim before the Department, resolution of that administrative claim does not dispose of related state-law claims or defenses that the borrower or the borrower's institution might assert in collateral litigation. And contrary to CCST's suggestion, any recoupment action by the Department does not result in a "fine," but simply the recovery of federal funds. *See* 87 Fed. Reg. at 65,949 (explaining that

recoupment is a "means of recovering federal funds" rather than a "punitive step[]").

Finally, CCST cursorily raises due process concerns with the Rule's provisions permitting group adjudications and establishing a presumption in favor of relief for borrower-defense claims concerning closed schools. *See* PI Br. at 19. Even assuming *arguendo* that institutions' protected property or liberty interests are implicated in the Rule's borrower-defense provisions—*but see, e.g.,* *Ass'n of Proprietary Colls. v. Duncan*, 107 F. Supp. 3d 332, 349–50 (S.D.N.Y. 2015) (rejecting due process claim because the HEA "does not create entitlements that receive constitutional protection")—the Rule affords adequate process. Indeed, at the claim-adjudication stage, institutions are provided notice of a borrower's claim and an opportunity to respond with contradictory evidence and responsive legal arguments. An institution may not appeal a decision at that particular stage, but that is entirely proper because loan-discharge proceedings are between the borrower and the Department. When the institution's interests are at issue in any subsequent recoupment proceedings, the Rule affords robust and familiar procedural protections for the institution—including *additional* opportunities to challenge the Department's evidence and findings, present relevant evidence of its own, and pursue an administrative appeal from any adverse determination. The Department's approach appropriately balances the various interests involved in adjudications of borrower-defense claims and the relative benefit of more stringent procedures, calibrating them at each step. Given that "due process is flexible and calls [only] for such procedural protections as the particular situation demands," *Serrano v. U.S. Customs & Border Prot.*, 975 F.3d 488, 496 (5th Cir. 2020) (citation omitted), CCST's procedural qualms are without merit.

### D.     The Closed-School Discharge Provisions Are Lawful

CCST also challenges the closed-school discharge provisions on the ground that the Secretary does not have authority to define the statutory phrase "closure of the institution." PI Br. at 20; *see* 20 U.S.C. § 1087(c)(1) ("the Secretary shall discharge" the loan of a student borrower "unable to complete

[a] program . . . due to the closure of the institution"). CCST objects that the statute's language is so precise that there exists no room for interpretation—because "clos[ed]" is an unambiguous term meaning "not open." PI Br. at 20. But it was well within the Department's authority to define the relevant statutory phrase, *see City of Arlington*, 569 U.S. at 296 (courts defer to "reasonable" agency interpretations of "[s]tatutory ambiguities"), as it has done since 1994, *see* 59 Fed. Reg. at 61,701. The Rule's grant of authority to the Secretary to determine a school's "closure date" is consistent with both the HEA and CCST's definition: as the Rule explains, "[a] school that has remained open would not be considered a closed school." 87 Fed. Reg. at 65,966. And the Rule's interpretation of the operative phrase—to be applied by the Secretary on a case-by-case basis—is reasonable: it reflects a common-sense understanding of when a student borrower's inability to complete a program would be "due to" the closure of their school, 20 U.S.C. § 1087(c)(1), while allowing for the various circumstances in which this may occur. *See, e.g.*, 87 Fed. Reg. at 65,966 (explaining that the definition's language protects "against a situation where an institution could intentionally keep a single, small program open long enough to avoid [liability], otherwise denying closed school discharges to borrowers").

## III.    CCST Has Failed to Establish Any Irreparable Harm

Clearly demonstrating irreparable injury is a "heavy burden," *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985), and "a preliminary injunction will not be issued simply to prevent the possibility of some remote future injury," *Johnson v. Owens*, 2013 WL 12177176, at *1 (W.D. Tex. Aug. 5, 2013). Rather, a movant must affirmatively demonstrate a substantial likelihood that, in the absence of the extraordinary remedy it seeks, it will suffer injury that is "both certain and great," "actual and not theoretical." *Rozelle v. Lowe*, 2015 WL 13236273, at *1 (W.D. Tex. June 1, 2015) (citation omitted). CCST has not carried this burden.

Although CCST now contends that it and its member schools "have suffered and will continue to suffer" irreparable injury "unless and until" temporary injunctive relief is granted, PI Br. at 20, its

delay of more than five months in seeking such relief "militates against the issuance of a preliminary injunction." *Massimo Motor Sports LLC v. Shandong Odes Indus. Co.*, 2021 WL 6135455, at *2 (N.D. Tex. Dec. 28, 2021) (citation omitted).  Looking past CCST's lack of urgency in moving for emergency relief, its asserted injuries are plainly insufficient to demonstrate irreparable harm.

Exposure to Borrower Defense Claims:  CCST claims to face a threat of "financial and reputational harm" resulting from its member schools having to "defend against a deluge of borrower defense claims."  PI Br. at 22.  But the Rule was promulgated more than five months ago, and CCST provides no evidence any member school is facing any concrete financial consequence as a result of its revised borrower-defense provisions.  Instead, CCST offers the prognostication of for-profit college officials that the Rule will lead to an "inevitable deluge of borrower defense claims," *see* Shaw Decl. ¶¶ 24–29, ECF No. 25 at 36–37, or "increase[] significantly" the "potential liability that schools face," Arthur Decl. ¶ 27, ECF No. 25 at 45.  This unsubstantiated conjecture cannot substitute for actual evidence of harm, and it fails to establish an injury "of such imminence that there is a clear and present need for equitable relief."  *Sierra Club v. U.S. Army Corps of Eng'rs*, 482 F. Supp. 3d 543, 559 (W.D. Tex. 2020) (citation omitted). CCST's speculation about how third-party federal student loan borrowers are likely to react to the Rule cannot establish standing, *Lujan*, 504 U.S. at 562, much less irreparable harm.

CCST's failure to demonstrate irreparable harm from the Department's revised borrower-defense standards is unsurprising.  Those standards will necessarily be applied on a case-by-case basis in proceedings between borrowers and the Department and could only result in financial liability for participating institutions many steps down the road.  Even assuming (because CCST has submitted no evidence on this point) that CCST member schools will be named in an increased number of borrower-defense applications going forward as a result of the Rule, and even assuming the Department granted some portion of those applications after providing notice to the school and an

opportunity to respond, "*the grant of a borrower-defense application has no binding effect on the school.*" *Sweet*, 2022 WL 16966513, at *9 (emphasis in original).  At that point, the Department could initiate a separate recoupment proceeding against the school on the basis of the approved claim—but even then, "the school still retains all due process rights, is not bound by the success of the student's application, and is free to litigate *ab initio* the merits of its performance." *Id.*  In other words, no CCST member school is currently at imminent risk of "los[ing] a dime," *id.*—much less facing liability that "places their viability in question," PI Br. at 21.  CCST cannot show irreparable harm based on speculation about the outcome of hypothetical future recoupment proceedings.  *See CAPPS*, 344 F. Supp. 3d at 182–83 (finding that association of for-profit schools failed to demonstrate irreparable harm from 2016 borrower defense provisions for similar reasons).[5]

CCST claims support for its theory in "recent outcomes," namely a settlement agreement that, according to CCST, "led to a torrent of borrower defense applications."  PI Br. at 21 (citing *Sweet v. Cardona*).  Again, even if that were true, a mere increase in borrower defense applications does not impose any financial consequence on the schools involved, much less create any imminent threat of irreparable harm.  Indeed, the court in *Sweet* rejected similar arguments because, regardless of whether any school exercises its ability to participate in the Department's first-step adjudication of a borrower's application, a "school cannot be held liable for any remedial measures absent proceedings initiated specifically against them."  *Sweet*, 2022 WL 16966513, at *9.

In any event, the settlement in *Sweet* constituted an exercise of the "plenary settlement

---

[5] CCST's conclusory reference to "reputational injury," *see* PI Br. at 23, also fails to establish irreparable harm, as it is "unsupported by evidence[,] is far from self-evident, . . . [and] does not demonstrate that type of 'actual and not theoretical' harm necessary to support a preliminary injunction." *CAPPS*, 344 F. Supp. 3d at 182-83 (rejecting similar theory of reputational injury); *see also Sweet v. Cardona*, 2023 WL 2213610 (N.D. Cal. Feb. 24, 2023) (rejecting claims of irreparable reputational harm from borrower defense applications); *Pruvit Ventures, Inc. v. Forevergreen Int'l LLC*, 2015 WL 9876952, at *5 (E.D. Tex. Dec. 23, 2015) (to constitute irreparable injury, "showing of reputational harm must be concrete and corroborated, not merely speculative" (citation omitted)).

authority of the Secretary and Attorney General" to resolve the massive backlog of borrower-defense claims at issue on a class basis, without undertaking the "individualized reviews" that the borrower-defense regulations would otherwise require. *Id.* at *7; *see also id.* at *10 (emphasizing that "the settlement does not constitute a successful or approved borrower-defense claim"). The response of individuals entitled to a measure of relief under the settlement says nothing about how borrowers are likely to respond to the Department's comprehensive and multifaceted new borrower-defense provisions. And indeed, CCST provides no indication that any member school is, in fact, being "inundated by thousands of borrower defense claims." PI Br. at 21.

Compliance Costs: CCST also claims harm in the form of "substantial time and financial resources" dedicated towards "complying with the impending Rule." PI Br. at 23. But CCST member schools are under no obligation to participate in the Title IV program, and if they object to the Rule, they can simply decline such funds and obviate the need to incur any costs complying with Title IV funding conditions. *See, e.g.*, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) ("[I]f a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds."). Any costs CCST member schools incur complying with the funding conditions set forth in the Rule thus cannot constitute irreparable harm. *See, e.g.*, *Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (self-inflicted harm is not irreparable); *United States v. City of Los Angeles*, 595 F.2d 1386, 1391 (9th Cir. 1979) (irreparable harm cannot be established simply because an agency action "may require recipients of congressional largesse to expend large amounts of time and [monetary] resources").

Even setting that aside, it is well established that "ordinary compliance costs are typically insufficient to constitute irreparable harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) (collecting cases); *see also Chamber of Commerce v. Hugler*, 2017 WL 1062444, at *2 (N.D. Tex. Mar. 20, 2017) ("an injury resulting from attempted compliance with government regulation ordinarily is not irreparable harm" (citation omitted)). With good reason—the general rule is that "economic

harms cannot, as a matter of law, constitute irreparable harm." *Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*, 492 F. Supp. 3d 701, 725 (E.D. Tex. 2020). There is a narrow "exception" for economic harm that is "so great as to threaten the existence of the movant's business." *FTC ex rel. Yost v. Educare Centre Servs., Inc.*, 2020 WL 4334117, at *4 n.2 (W.D. Tex. Apr. 3, 2020) (citation omitted); *see also Div. 80, LLC v. Garland*, 2022 WL 3648454, at *4 (S.D. Tex. Aug. 23, 2022). The types of economic harms that CCST attributes to complying with the Rule—such as "recordkeeping activity," "compliance efforts," "lost business opportunity," "abandon[ed] plans to build or consolidate campuses," and "divert[ed]" resources," PI Br. at 23–24—fall well short of this standard. *See CAPPS*, 344 F. Supp. 3d at 171 (finding that similar declarations from schools about the compliance-related costs of the 2016 borrower defense rule failed to present the requite "specific details regarding the extent to which [their] business will suffer" (citation omitted)).

CCST tries to avoid this straightforward conclusion by emphasizing that "complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." PI Br. at 23 (quoting *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016)). But this selective quotation from *Texas v. EPA* cannot bear the weight CCST places upon it. Most obviously, that case involved regulatory standards that the record demonstrated would require regulated entities to either install emission controls or close facilities at a cost of $2 billion and "threaten the very existence of some of Petitioner's businesses." *Texas v. EPA*, 829 F.2d at 433. CCST has not shown that federal funding conditions—which member schools are free to decline—impose the same kind of substantial injuries, *id.*, *i.e.*, "irreversible, extensive, and expensive actions," on any member school. *FTC ex rel. Yost*, 2020 WL 4334117, at *4; *see also Div. 80, LLC*, 2022 WL 3648454, at *2–5 (distinguishing *Texas v. EPA* and declining to find irreparable harm based on alleged cost of complying with agency regulation).

Moreover, the Fifth Circuit has been "less generous with private-sector plaintiffs' efforts to

show irreparable harm" based on the costs of complying with agency regulations.  *Texas v. EPA*, 2023 WL 2574591, at *10 (S.D. Tex. Mar. 19, 2023).  As in a more recent case in which a trade association similarly attempted to demonstrate irreparable harm on that basis, CCST's "conclusory and speculative allegations" about the hypothesized effect of agency action "simply do not show that [the plaintiff trade associations] or their members face irreparable harm."  *Id.* at *10–11 (emphasizing that private plaintiffs must show "more specificity" and "ascribe more urgency to the consequences of a challenged action" than a state plaintiff); *cf. Restaurant Law Ctr. v. U.S. Dep't of Labor*, 2023 WL 3139900, at *3 (5th Cir. Apr. 28, 2023) (finding that regulated entities could demonstrate irreparable harm where the plaintiffs "introduced evidence that their members would" be required by regulation to "incur exactly the kinds of continuing compliance costs predicted by the [agency] itself").

Constitutional Allegations:  CCST contends that its constitutional claims demonstrate harm that is "irreparable per se," PI Br. at 22, but does not even attempt to quantify any associated harm, and mere allegations of a constitutional deprivation do not relieve a party of its burden of actually showing irreparable harm.  Indeed, even in the context of alleged First Amendment violations—not at issue here—where courts sometimes find irreparable harm based on a regulation's alleged chilling effect, a party must "demonstrate that First Amendment interests are either threatened or in fact being impaired at the time relief is sought."  *Google, Inc. v. Hood*, 822 F.3d 212, 227–28 (5th Cir. 2016).  No authority holds that parties making claims based on the constitutional provisions CCST invokes are entitled to preliminary injunctive relief without otherwise demonstrating irreparable harm.  *See, e.g., Somerset House, Inc. v. Turnock*, 900 F.2d 1012, 1018 (7th Cir. 1990) (declining to presume irreparable harm in a due process case); *Littlepage v. Trejo*, 2017 WL 3611773, at *6 (W.D. Tex. Aug. 21, 2017).

* * *

Ultimately, it "proves too much to suggest"—as CCST does—"that 'irreparable' injury exists, as a matter of course, whenever a regulated party seeks preliminarily to enjoin the implementation of

a new regulatory burden." *CAPPS*, 344 F. Supp. 3d at 170.  Rather, "[i]t remains that in this circuit, a 'preliminary injunction is not appropriate where the potential harm to the movant is strictly financial, unless the potential economic loss is so great as to threaten the existence of the movant's business.'" *Div. 80, LLC*, 2022 WL 3648454, at * 4 (citation omitted).  Because CCST has not carried that burden here, it is not entitled to extraordinary emergency relief against revisions to an existing regulatory program the broad parameters of which have been in place for nearly 30 years.  *See Nat'l Council of Agr. Emp's v U.S. Dep't of Labor*, 2023 WL 2043149, at *10 n.10 (D.D.C. Feb. 16, 2023) ("frustration at the complexity of an already-existing regulatory program is [not] sufficient harm to warrant extraordinary injunctive relief to prevent a rule revising the program from taking effect.").

## IV.   The Balance of the Equities and Public Interest Weigh Against Injunctive Relief

When a plaintiff seeks an injunction against the federal government, the balance-of-equities and public-interest factors merge, *Nken v. Holder*, 556 U.S. 418, 435 (2009), and "require weighing of the respective interests of the parties and the public" to ensure "that the threatened injury out-weighs any damage that the injunction may cause the opposing party and that the injunction will not disserve the public interest," *Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 689 (W.D. Tex. 2015). "[T]here is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop." *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008).  And, as the Rule explains, both Congress and the Department have found it in the public interest to ensure that borrowers harmed by the misconduct of their schools can access debt relief.  The Rule represents significant steps toward reaching those goals, and these substantial public interests are not outweighed by the parochial and pecuniary interests of CCST and its member schools. The balance of the harms and the public interest thus tilt decisively in favor of Defendants.

## V.    CCST's Requested Relief Is Overbroad

Even if the Court were to reject all of Defendants' arguments above, it still should not grant

the relief CCST seeks.  In a case challenging federal regulations, a court may award preliminary injunctive relief only as to those regulatory provisions that the court finds are likely to inflict irreparable harm on the plaintiff and also are likely to be invalidated on the merits.  *See Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."); *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 478 n.39 (5th Cir. 2020) (instructing that "the scope of injunctive relief is dictated by the extent of the violation established" (citation omitted)); *cf. Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 364 (6th Cir. 2022).  Yet CCST seeks relief— "enjoining the Defendants from enforcing, applying, or implementing the Rule anywhere within the Department's jurisdiction," ECF No. 23 at 2—that would sweep far beyond its motion.  That request is decidedly overbroad, and it should not be granted.  *See ODonnell v. Harris Cnty.*, 892 F.3d 147, 163 (5th Cir. 2018) ("A district court abuses its discretion if it does not narrowly tailor an injunction to remedy the specific action which gives rise to the order." (citation omitted)), *overruled on unrelated grounds*, *Daves v. Dallas Cnty.*, 22 F.4th 522 (5th Cir. 2022) (en banc).

The mismatch between CCST's contentions and the relief it seeks is striking.  Even as it forecasts localized impacts on its Texas-based membership, *see* PI Br. at 7–8, CCST contends that Defendants should be barred from implementing or enforcing the Rule nationwide, *id.* at 25.  But CCST's members are readily identifiable, geographically bounded, and easily distinguished from other regulated entities, so there is no reason why CCST's views on the Rule should govern for the rest of the country.  *See Georgia v. President of the United States*, 46 F.4th 1283, 1306–07 (11th Cir. 2022) (noting importance that "injunctive relief operate[] on specific parties" in cases challenging federal administrative actions); *see also Commonwealth v. Biden*, 57 F.4th 545, 557 (6th Cir. 2023).

Similarly out of proportion is CCST's insistence that the Court should "enjoin[] Defendants from implementing or enforcing *any* provision of the Rule."  PI Br. at 25 (emphasis added).  Many (if not most) of the Rule's provisions are not challenged in this case, *see, e.g.*, 87 Fed. Reg. at 66,063–65

(unchallenged provision regarding the Public Service Loan Forgiveness Program), and CCST has pointedly declined to claim a likelihood of success even as to all of the provisions that it *does* challenge. *See, e.g.*, Compl. ¶¶ 283–293 (detailing claims against Rule's "arbitration and class action provisions" not addressed in CCST's preliminary-injunction motion). CCST cannot obtain relief as to claims for which it has not even attempted to demonstrate a likelihood of success on the merits. And the clear indications that the Department intended for the Rule's provisions to be severable, *see, e.g.*, 87 Fed. Reg. at 66,042**,** 66,073, make an injunction against the Rule wholesale even less proper here. *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988) (invalidating only the regulatory provision found to exceed an agency's statutory authority); *cf. Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016) (same).[6] So even if it finds *some* preliminary relief appropriate, the Court should reject CCST's overbroad request and craft a narrower remedy "no more burdensome to [Defendants] than necessary to provide complete relief." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).

## CONCLUSION

For the reasons herein, this Court should deny CCST's request for extraordinary relief.

Dated: May 15, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ R. Charlie Merritt*
CHRISTINE L. COOGLE

---

[6] Even if CCST's request for a preliminary injunction were analogized to a motion for a stay of agency action, *see* PI Br. at 8 (citing 5 U.S.C. § 705), CCST's request would remain overbroad. The APA authorizes a court to "postpone the effective date of an agency action," but that authority is limited "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. For all the reasons explained *supra*, CCST's requested relief would far exceed these limits.

CODY T. KNAPP
R. CHARLIE MERRITT
Trial Attorneys
U.S. Department of Justice
Civil Division
Federal Programs Branch
1100 L St. NW
Washington, D.C. 20005
Telephone: (202) 616-8098
Facsimile: (202) 616-8470
E-mail: robert.c.merritt@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed electronically via the Court's ECF system, which sent notification of such filing to counsel of record.


*/s/  R. Charlie Merritt*