# EXHIBIT A

JOSEPH H. HUNT
Assistant Attorney General
David L. Anderson
United States Attorney
MARCIA BERMAN
Assistant Branch Director
KATHRYN C. DAVIS
R. CHARLIE MERRITT
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
(202) 616-8298 (phone)
(202) 616-8470 (fax)
Kathryn.C.Davis@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH DEVOS, in her official capacity as Secretary of Education, and the UNITED STATES DEPARTMENT OF EDUCATION <br><br> Defendants. | No. 19-cv-03674-WHA <br><br> **DECLARATION OF DIANE AUER JONES** <br><br> Honorable William H. Alsup |

# DECLARATION OF DIANE AUER JONES

I, Diane Auer Jones, declare as follows:

1. My name is Diane Auer Jones, I am over the age of 18, and serve as Principal Deputy Under Secretary, Delegated the Duties of the Under Secretary, in the United States Department of Education ("ED"). I have personal knowledge of the matters set forth herein and if called as a witness, I could and would testify competently thereto.

2. As Principal Deputy Under Secretary, I am the senior higher education official responsible for overseeing Federal Student Aid, the Office of Postsecondary Education, and the Office of Career, Technical and Adult Education at ED. In particular, I advise the Secretary of Education on policies and issues relating to the Federal student financial aid programs, authorized and administered by the Department under Title IV of the Higher Education Act of 1965, as amended, including the Federal Direct Loan Program.

3. I was appointed Principal Deputy Under Secretary at ED on June 25, 2018 and delegated the duties of Under Secretary on June 27, 2019. I also served as Acting Assistant Secretary for Postsecondary Education. Previously, I served as the Assistant Secretary for Postsecondary Education in ED during the administration of President George W. Bush. Earlier in my career, I was a biology professor at the Community College of Baltimore County in Maryland and I later worked at Princeton University and the Career Education Corporation. I have also worked at the National Science Foundation, the U.S. House of Representatives Committee on Science, and the White House Office of Science and Technology Policy, and as a senior policy advisor to the Secretary of Labor.

4. As part of my responsibilities in the Department, I have worked extensively on issues relating to the implementation and administration of the Department's regulations regarding borrower defenses to the collection of Federal student loans.

## The Department's Federal Student Aid Priorities 2018-2019

5. In November 2016, the Department promulgated new "borrower defense" regulations addressing, among other things, standards and procedures for student borrowers to seek relief from certain federal student loan obligations based on misconduct by an educational institution ("the 2016 regulations"). Those regulations were scheduled to become effective on July 1, 2017. However, , the Department determined that the 2016 regulations did not reflect an appropriate balance of the responsibilities of the agency to protect taxpayers, and borrowers and to hold institutions accountable. Also, the 2016 regulations did not provide due process rights to institutions during the claim adjudication process. Accordingly, in June 2017, the Department initiated a process to develop new rules governing borrower defense. The Department then delayed the effective date of the 2016 regulations pending, *inter alia*, the completion of that rulemaking process.

6. When I started in my current position in 2018, the Department had just completed the statutorily required negotiated rulemaking process to develop its new borrower defense regulations, a process that required the Department to solicit the input of a broad group of stakeholders and hold public hearings over a multiple-month period. When the negotiating parties failed to reach consensus, the Department drafted new regulations and issued a Notice of Proposed Rulemaking (NPRM) with proposed borrower defense regulations on July 31, 2018.

7. In the fall of 2018, the United States District Court for the District of Columbia found the Department's delays of the 2016 regulations unlawful under the Administrative Procedure Act and vacated them. *See Bauer v. DeVos*, 325 F. Supp. 3d 74 (D.D.C.

2018); 332 F. Supp. 3d 181 (D.D.C. 2018). Shortly thereafter, the court denied a motion to preliminarily enjoin the 2016 regulations, and so they took effect. *California Association of Private Postsecondary Schools v. DeVos*, 344 F. Supp. 3d 158 (D.D.C. 2018). Copies of those decisions are Exhibits 1 and 2 to this Declaration.

8. The 2016 regulations significantly changed the rules for considering borrower defense claims. Under the Department's original regulations, the determination of whether a defense existed was based on whether the borrower defense claimant could establish a cause of action under applicable state law. The 2016 regulations adopted a new federal standard that allowed a borrower to assert a defense on the basis of a school's substantial misrepresentation (as defined by the Department), breach of contract, or the existence of a favorable, nondefault contested judgment against the school. In addition, the 2016 regulations established a new evidentiary standard for reviewing allegations made by students or others and required the Department to issue written decisions on borrower defense claims.

9. The 2016 regulations also included other provisions unrelated to borrower defense that imposed new conditions on institutions participating in the Department's Title IV student loan program. Among these were new "financial responsibility" standards that included a requirement that all institutions of higher education report to the Department all litigation filed against them; "repayment rate" provisions that created a number of new reporting requirements for institutions; provisions disallowing participating institutions' use of predispute arbitration agreements and class action waivers in their enrollment contracts with students; and new procedures governing loan discharges based on a school's closing.

10. Once the court decisions were issued and the 2016 regulations became effective, the Department had to implement them, including the development of mechanisms to collect information on years of litigation filed against institutions that participate in the Federal student financial aid programs and to identify borrowers who qualify for automatic closed school discharges and provide loan relief. The Department also had to develop processes for implementing the new financial responsibility requirements of the 2016 regulations, which included substantial reporting requirements. The Department spent considerable time and effort identifying which offices would handle different parts of the process and developing the necessary instructions.

11. The Department also needed to issue guidance to regulated parties in light of the delay of the 2016 regulations' effective date. On March 15, 2019, the Department issued an electronic announcement to inform institutions of higher education of their responsibilities under those regulations and published a Final Rule announcing the effective date of the regulations and providing further information for program participants on how the regulations would be implemented and enforced by the Department. The electronic announcement is included as Exhibit 3 and the Final Rule is included as Exhibit 4 to this Declaration.

12. At the same time, the Department was reviewing the public comments it received on the new borrower defense NPRM published on July 31, 2018, evaluating what changes, if any, were needed to those proposed regulations, and preparing a final rule responding to the comments received and explaining any changes from the NPRM. The Department received comments on the NPRM from 38,450 parties and made significant changes to those rules to respond to those comments. We also consulted

with other government agencies which provided comments during the agency review process for the final regulations.

13. The Department published its revised final regulations on borrower defenses to repayment on October 23, 2019. The final regulations are included as Exhibit 5 to this Declaration.

Development of a new methodology for determining the amount of borrower relief

14. Neither the 1995 regulations, the 2016 regulations nor the new final regulations published in 2019 set forth a methodology to determine the appropriate relief once a borrower establishes a successful borrower defense claim. Developing such a methodology has been an important priority of the Department under Secretary DeVos' leadership. Given the difficulties associated with assessing the harm suffered by the hundreds of thousands of borrowers who have filed claims for relief based on the asserted misconduct of numerous institutions, the consideration and development of relief methodologies has required significant time and resources.

15. In 2017, the Department conducted a thorough review of its existing methods for adjudicating borrower defense claims and calculating relief and concluded that it did not have an adequate process to handle the growing list of borrower defense claims. As a result of that review, the Department developed a new methodology for determining the amount of relief to be given to successful borrower defense claimants who attended certain schools operated by Corinthian Colleges, Inc. ("Corinthian").

16. In contrast with the Department's previous approach, which had assumed that all Corinthian students received nothing of value from their education, the new methodology developed in 2017 sought to rely on empirical evidence to measure the harm that students suffered as the result of Corinthian's violations of California state

law. It did so by comparing the average earnings of borrower defense claimants who attended certain Corinthian programs with the average earnings of students who had completed similar programs at schools that received passing scores under the Department's then-operative gainful employment regulations. To the extent that Corinthian students, on average, earned less than their peers at comparable programs, the Department determined that they were harmed by the misrepresentations giving rise to their borrower defense claims and awarded proportionally tiered relief based on the earnings comparison.

17. On May 25, 2018, the U.S. District Court for the Northern District of California concluded that the process used by the Department to obtain earnings data from the Social Security Administration for use in the Department's methodology likely violated the Privacy Act and preliminarily enjoined that methodology. *Manriquez v. DeVos*, 345 F. Supp. 3d 1077 (N.D. Cal. 2018). The Court enjoined the Department from using that methodology "as it currently exist[ed], to the extent that the Secretary relies upon information provided by the Social Security Administration in violation of the Privacy Act." Amended Order at 1, *Manriquez v. DeVos*, 3:17-cv-7210 (N.D. Cal. June 19, 2018), ECF No. 70.

18. The Department appealed the District Court's decision in *Manriquez* and is still waiting for a decision from the appellate court. In the meantime, the Department has undertaken significant efforts to explore and develop an alternative approach for determining the amount of relief to be given not just to Corinthian borrowers but to all borrowers with approved borrower defense claims.

19. The Department continues to believe that the relief awarded to a borrower should be based on the financial harm suffered by the borrower and the value received from the

borrower's institution. As the court found in *Manriquez*, the 2017 methodology's "attempt to create a policy to determine whether students obtained value and if so, how much, is a legitimate exercise of the Secretary's discretion under the Higher Education Act." 345 F. Supp. 3d at 1103. The value received by the participants in a program is best determined by using measures of aggregate outcomes for all participants rather than individual measures that are more dependent upon the individual circumstances of each participant.

20. While there are various sources of data for earnings, the Department does not have that information and it has taken the Department time to identify a source of such information that would allow for an accurate comparison of earnings across academic institutions. In particular, because the Department believes that the best way to assess financial harm is to compare earnings data for borrowers who attend academic programs that are asserted to have engaged in misconduct with the same information at comparator programs not affected by such misconduct, the Department needed data identifying earnings for occupations in terms similar to those used by educational institutions. Moreover, to avoid the problem identified by the court in *Manriquez*, the Department intends to use publicly available earnings data to impute earnings to both the applicant and the comparison group.

21. In some instances, a successful borrower defense applicant may have been enrolled in a program so small that median earnings are not available for use in the formula for determining the amount of relief to provide or that there is no comparable program to use for comparison purposes. This situation presents unique challenges to the Department's ability to fairly and efficiently determine financial harm and

corresponding borrower defense relief. The Department is evaluating how best to ensure that these borrowers receive the appropriate level of debt relief.

22. The Department is working towards announcing and implementing a new partial relief methodology within the next few weeks.

23. As indicated above, the development of a new methodology has required significant time and resources for the Department. The process has involved a team of employees from the Department's Federal Student Aid office and other experts from appropriate offices as well as senior officials in the Department. The Department has had to address a number of challenges in developing a new methodology, including the identification of an accurate, reliable and accessible source of earnings data that would not raise concerns about privacy. In addition, since different institutions often assign different names to programs that are essentially the same, the Department had to determine how it would classify programs for the purpose of the earnings calculation. Finally, we have had to develop an algorithm to use to calculate the level of financial harm suffered by a successful BD applicant and therefore the level of financial relief that should be provided. It has taken months to develop the potential options, assess each option for validity, ensure that the Department would have access to the data needed to use the chosen method, and discuss the options with appropriate offices and leaders in the Department, while also avoiding the Privacy Act issues identified in *Manriquez*. Our goal throughout this process has been to develop an approach that provides an appropriate evaluation of the level of harm experienced by the borrower and a fair level of relief.

24. The Department's consideration of a borrower's application for a borrower defense discharge includes two steps: (1) a determination of whether the borrower has

submitted a borrower defense claim supported by evidence submitted by the borrower or otherwise available to the Department in accordance with the applicable standard; and if the borrower has satisfied the first step, (2) a determination of the amount of relief that the borrower should receive.

25. As explained in other declarations submitted as part of this administrative record, the Department has continued to adjudicate claims since the injunction was issued in *Manriquez*, consistent with that injunction, including making Step (1) determinations that some borrowers have established a successful borrower defense in accordance with the applicable standard. As explained above, however, the Department has not yet finished its development of a comprehensive methodology for determining the amount of relief to award successful claimants. The Department has prioritized development of this methodology and believes it is imperative to have it in place before finalizing decisions approving borrower defense claims and awarding relief. Once established, the new methodology will allow the Department to expeditiously determine the level of relief to award to successful BD applicants in a clear, consistent, and fair manner.

26. In some cases, the Department has determined that the borrower's claim for a discharge is not supported by the evidence submitted by the borrower or information otherwise available to the Department. For example, in some instances, the Department has determined that the borrower actually did not have a Federal loan to enroll at the institution that is the subject of the borrower's claim. In other instances, the borrower provided such scant information that the Department simply lacked a basis for making a determination favorable to the borrower. The Department has been working to develop documents to provide a more robust explanation for borrowers

whose claims are denied. Once these documents are developed, the Department needs to work with each of its servicers to put the process of loan relief and borrower notification in process, which requires contract updates with each of the Federal student aid loan servicers that service Direct Loans. It takes longer to develop decision letters that provide an explanation for each borrower of why their claim was denied, but we believe this investment of time is important so that borrowers understand the basis for the decision, which is vital for instilling confidence in the process. This has taken longer than we hoped but the notices are finished and we are now working with our contracting officials and loan servicers to enter these notices into servicer systems.

27. The Department plans to issue its decisions denying these borrowers' claims in the coming weeks. The Department believes that if it issued denials in advance of issuing approvals, borrowers could be confused and believe that the Department would not be approving any claims – which is not the case. Therefore, in order to prevent confusion or distress to borrowers who are eligible for relief, the Department decided that it should not issue denials until it has a methodology in place that will also allow it to issue approvals and relief. As explained above, after the Department announces its new methodology, currently anticipated in the next few weeks, it can begin expeditiously processing approvals and issuing decisions.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of November 2019 in Washington, DC.

*Diane Auer Jones*

Diane Auer Jones