**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| CAREER COLLEGES & SCHOOLS OF TEXAS,<br><br>     Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION; MIGUEL CARDONA, in his official capacity as the Secretary of Education,<br><br>     Defendants. | Case No. 1:23-cv-00433-RP |

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS
MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 2

I.   This Court Has Jurisdiction ................................................................................... 2

   A.   CCST Has Standing. ...................................................................................... 2

      (i).   Associational Standing ......................................................................... 2

      (ii).   Organizational Standing ...................................................................... 8

   B.   CCST's Claims Are Ripe. ............................................................................... 9

II.   CCST Is Likely To Prevail On The Merits ............................................................ 10

   A.   The Department Lacks the Statutory and Constitutional Authority to Adjudicate
      Borrower Defense "Claims" or Recoupment Actions Against Schools. ................... 10

      (i). Section 455(h) Does Not Authorize the Secretary to Define
      Borrower Defense "Claims" Against the Department. ................................... 10

      (ii).   Congress Did Not Authorize The Secretary To Adjudicate
      Borrower Defense Claims. ........................................................................... 11

      (iii).   Section 455(h) Does Not Authorize The Secretary To
      Adjudicate Recoupment Actions Against Schools. ......................................... 15

   B.   The Department's Definitions of Borrower Defenses Are Unlawful. ......................... 17

   C.   The Rule's Group Claim Provisions, and Particularly the Procedure-Specific
      Presumption That a Violation Adversely Affected Attendance Decisions,
      Are Unlawful. .............................................................................................. 18

   D.   The Department's Closed School Discharge Rule Is Unlawful. ............................... 21

III.   CCST and Its Member Schools Have Suffered and Are Likely to Suffer Irreparable
      Harm, Absent Preliminary Injunctive Relief. .................................................... 22

IV.   CCST's Requested Relief Is Narrowly Tailored to the Harms Identified ........................ 25

CONCLUSION .................................................................................................................. 25

CERTIFICATE OF SERVICE ............................................................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab'ys v. Gardner*,
    387 U.S. 136 (1967)..................................................................................4, 8, 9

*Bank One Chicago, N.A. v. Midwest Bank & Trust Co.*,
    516 U.S. 264 (1996)...................................................................................11, 12

*Burgess v. FDIC.*,
    No. 7:22-CV-00100-O, 2022 WL 17173893 (N.D. Tex. Nov. 6, 2022) ................................23

*Chauffeur's Training School, Inc. v. Spellings*,
    478 F.3d 117 (2d Cir. 2007)................................................................................16

*Chemical Mfrs. Ass'n v. Dep't of Transp.*,
    105 F.3d 702 (D.C. Cir. 1997) .............................................................................19

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*,
    NO. A-18-CV-0295, 2018 WL 6252409 (W.D. Tex. Nov. 6, 2018).....................................25

*Coit Indep. Joint Venture v. Fed. Sav. and Loan Ins. Corp.*,
    489 U.S. 561 (1989)......................................................................................12

*Constr. Indus. Ass'n of Sonoma Cnty. v. City of Petaluma*,
    522 F.2d 897 (9th Cir. 1975) ...............................................................................8

*Contender Farms, L.L.P. v. U.S. Dep't of Agric.*,
    779 F.3d 258 (5th Cir. 2015) ........................................................................2, 4, 14

*Czyzewski v. Jevic Holding Corp.*,
    580 U.S. 451 (2017)......................................................................................5

*Dep't of Com. v. New York*,
    139 S. Ct. 2551 (2019)...................................................................................7

*Ecosystem Inv. Partners v. Crosby Dredging, L.L.C.*,
    729 F. App'x 287 (5th Cir. 2018) ...........................................................................5

*FCC v. Prometheus Radio Project*,
    141 S.Ct. 1150 (2021)...................................................................................18

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000).....................................................................................2

*Gardner v. Toilet Goods Ass'n*,
387 U.S. 167 (1967)..........................................................................................9, 10

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*,
804 F.2d 1390 (5th Cir. 1986) ....................................................................................22

*Louisiana v. Ctrs. For Disease Control & Prevention*,
603 F. Supp. 3d 406 (W.D. La. 2022)..........................................................................22

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)......................................................................................................2, 5

*Massachusetts v. U.S. Dep't of Educ.*,
No. 1:17-cv-2679 (TNM), 2018 WL 3820021 (D.D.C. May 31, 2018)..................14

*McLaughlin v. Am. Tobacco Co.*,
522 F.3d 215 (2d Cir. 2008)..........................................................................................20

*Mullins v. City of New York*,
626 F.3d 47 (2d Cir. 2010).............................................................................................22

*Murray's Lessee v. Hoboken Land & Improvement Co.*,
59 U.S. 272 (1855)..........................................................................................................17

*NAACP v. Alabama ex rel. Patterson*,
357 U.S. 449 (1958)..........................................................................................................8

*National Fuel Gas Supply Corp. v. FERC*,
811 F.2d 1563 (D.C. Cir. 1987).....................................................................................12

*NCAA v. Governor of New Jersey*,
730 F.3d 208 (3d Cir. 2013)............................................................................................8

*Nigmadzhanov v. Mueller*,
550 F. Supp. 2d 540 (S.D.N.Y. 2008)..........................................................................13

*OCA-Greater Houston v. Texas*,
867 F.3d 604 (5th Cir. 2017) ...........................................................................................2

*Ramos v. Uber Techs., Inc.*,
No. CIV.A. SA-14-CA-502, 2015 WL 222414 (W.D. Tex. Jan. 14, 2015) ..............4

*RLC Indus. Co. v. CIR*,
58 F.3d 413 (9th Cir. 1995) ...........................................................................................12

*Roark & Hardee LP v. City of Austin*,
522 F.3d 533 (5th Cir. 2008) ...................................................................................5, 6, 7

*Somerset House, Inc. v. Turnock*,
    900 F.2d 1012 (7th Cir. 1990) ...........................................................................23

*Tex. Democratic Party v. Benkiser*,
    459 F.3d 582 (5th Cir. 2006) ...............................................................................3

*Texas v. EEOC*,
    933 F.3d 433 (5th Cir. 2019) .......................................................................2, 3, 4

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) .......................................................................23, 24

*Texas v. United States*,
    523 U.S. 296 (1998)..............................................................................................9

*Thomas v. Union Carbide Agric. Prod. Co.*,
    473 U.S. 568 (1985)...................................................................................6, 9, 10

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014)............................................................................................21

*Vara v. DeVos*,
    No. 19-12175-LTS, 2020 WL 3489679 (D. Mass. June 25, 2020) ....................12

*W. Elec. Co, v. Stern*,
    544 F.2d 1196 (3d Cir. 1976)............................................................................20

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022)........................................................................................11

**Statutes**

5 U.S.C.
    § 705..................................................................................................................25
    § 706..................................................................................................................25

12 U.S.C. § 4010(f) ...................................................................................................11

15 U.S.C.
    § 1641(d)(1) .......................................................................................................11
    § 1666i(b)...........................................................................................................11

20 U.S.C.
    § 1078e(a)(1).....................................................................................................15
    § 1087(c)(1) ...................................................................................15, 16, 20, 21
    § 1087(d)...........................................................................................................15
    § 1087e(h).................................................................................................10, 17
    § 1094(c)...........................................................................................................16

Administrative Procedure Act ................................................................................9

**Regulations**

34 C.F.R.

 § 668.71(b) ..................................................................................................3
 § 668.71(c) .............................................................................................3, 17
 § 668.72(f) ................................................................................................18
 § 668.72(p) ...............................................................................................18
 § 668.73(c) ...............................................................................................18
 § 668.74(e) ...............................................................................................18
 § 668.75 ..................................................................................................17
 § 668.500(a) ..............................................................................................3
 § 685.206(c) (1995) ....................................................................................13
 § 685.214(a)(2)(i) ......................................................................................21
 § 685.214(a)(2)(ii) .....................................................................................20
 § 685.401(a) .................................................................................17, 19, 21
 § 685.401(e) ..............................................................................................21
 § 685.402(a) ..............................................................................................18
 § 685.402(b) ..............................................................................................18
 § 685.402(d)(1) ..........................................................................................18
 § 685.403(b) ..............................................................................................19
 § 685.405(b) ...............................................................................................6
 § 685.405(d) ..............................................................................................19
 § 685.406(g) ..............................................................................................19
 § 685.406(b)(2) ..........................................................................................19
 § 685.409(c)(1) ...........................................................................................7

81 Fed. Reg. 39,330 (June 16, 2016) .......................................................................13

81 Fed. Reg. 75, 926 (Nov. 1, 2016) ..................................................................15, 16

83 Fed. Reg. 37, 242, (July 31, 2018) .....................................................................13

84 Fed. Reg. 49,788, (Sept. 23, 2019) .....................................................................13

87 Fed. Reg. 65,904 (Nov. 1, 2022) ................................................................. *passim*

**Other Authorities**

David Owen, *The Great Electrician Shortage*, The New Yorker (Apr. 24, 2023) .........................1

Dep't of Educ., Press Release, *Education Department Takes Steps to Hold Leaders of Risky Colleges Personally Liable*, https://www.ed.gov/news/press-releases/education-department-takes-steps-hold-leaders-risky-colleges-personally-liable (Mar. 2, 2023) .........................................................................7

Dep't of Educ., *2023-24Federal School Code List of Participating Schools (November 2022)*, https://fsapartners.ed.gov/knowledge-center/library/federal-school-code-lists/2022-10-31/2023-24-federal-school-code-list-participating-schools-november-2022 ....................................................................................................5, 6

Joy Addison, *Skilled Labor Workforce Sees Severe Nationwide Shortage*, Fox Business (Feb. 4, 2022), https://www.foxbusiness.com/features/skilled-labor-workforce-severe-nationwide-shortage......................................................................................1

Project on Predatory Student Lending at the Legal Services Center of Harvard Law School, Comment Letter on Proposed Rule (Aug. 2, 2018), available at https://www.regulations.gov/comment/ED-2018-OPE-0027-0011........................................13

**INTRODUCTION**

Nowhere in its 40-page Opposition Brief ("Opp.") does the Department cite any apposite authority to support the proposition that an agency may create from whole cloth a novel claim adjudication scheme untethered to any statutorily authorized proceeding and, further, appropriate to itself the unchecked power to adjudicate those claims. Nor could it. What the Department seeks to accomplish through the Rule is extraordinary, has vast economic and political significance, and is precisely what the major questions doctrine aims to prevent.

The Department acknowledges but attempts to downplay the irreparable harm that CCST and its member schools have suffered and will suffer as a result of the Rule. As set forth in the submitted declarations, and as will be presented through live witness testimony at the May 31 hearing, schools have been forced to divert time and extensive resources to revamp compliance programs and prepare for a deluge of borrower defense claims that will be adjudicated pursuant to the Rule's strict liability standard and deficient processes. Further, they have been forced to abandon plans to build new schools, invest in existing campuses, or expand educational offerings in the State of Texas, resulting in corresponding harm to CCST, as well as students and communities that rely on these institutions as necessary pathways to skilled trade professions (further exacerbating a dire shortage in the State of Texas and across the country[1]).

By contrast, maintaining the status quo and delaying the implementation of the new regulations a few short months will not harm the Department or the public. For the reasons set

---

[1] *See* David Owen, *The Great Electrician Shortage*, The New Yorker (Apr. 24, 2023), https://www.newyorker.com/news/dept-of-energy/the-great-electrician-shortage; *see also* Joy Addison, *Skilled Labor Workforce Sees Severe Nationwide Shortage*, Fox Business (Feb. 4, 2022), https://www.foxbusiness.com/features/skilled-labor-workforce-severe-nationwide-shortage.

1

forth herein, as well as those in CCST's Opening Brief ("Pl. Br."), the Court should stay the Rule's effective date pending final judgment.

## ARGUMENT

## I.     This Court Has Jurisdiction

### A.   CCST Has Standing.

CCST has standing to bring suit on behalf of its members ("associational standing") and on its own behalf ("organizational standing"). *See OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017).

### (i). *Associational Standing*

Of CCST's more than 70 member schools, at least 54 participate in the Direct Loan Program ("Participating Schools") and will be subject to the challenged regulations. Compl. ¶ 25. As a trade association, CCST has Article III standing to sue on behalf of these member schools because (1) the schools themselves would have standing, (2) the rulemaking at issue is germane to CCST's purpose, and (3) the participation of CCST's individual members is not required. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

The Department claims only that CCST is unlikely to meet the first requirement. But Participating Schools themselves would have standing because they would (1) suffer concrete injury that is (2) traceable to the challenged regulations and (3) would be redressed by a favorable decision. *See Friends of the Earth*, 528 U.S. at 180-81.

**1. Compliance Burdens and Costs.** When a challenged regulation applies to a plaintiff directly, "there is ordinarily little question" that the plaintiff has standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992); *see also Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015) ("[W]e find no reason to depart from the ordinary rule that Contender Farms and McGartland, as objects of the Regulation, may challenge it."). Indeed, "[a]n

increased regulatory burden typically satisfies the injury in fact requirement." *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019) (quoting *Contender Farms*, 779 F.3d at 266).

There is no serious question that all of CCST's Participating Schools are objects of the challenged regulations' substantive provisions, which impose new prohibitions on unintentional misstatements and omissions and "aggressive" recruitment activities. *See* 34 C.F.R. § 668.71(b) ("Substantial misrepresentations are prohibited in all forms . . . ."); *id.* § 668.500(a) ("Aggressive and deceptive recruitment tactics or conduct are prohibited in all forms . . . ."); *see also id.* § 668.71(c) (including inadvertent and innocent errors and omissions in the new definition of "misrepresentation").[2] Indeed, one of the Department's stated reasons for promulgating the new rules is to regulate schools' conduct. *See, e.g.*, 87 Fed. Reg. at 65,908 ("By setting forth a clearer and more robust Federal standard for B[orrower] D[efense] claims and a rigorous group claim process, institutions that might otherwise engage in questionable behavior will change their practices and act more ethically and truthfully.").

Participating Schools will be required to comply with these new requirements in order to avoid liability and exclusion from the Direct Loan Program. For example, schools will face significant compliance costs in order to meet the BDR Rule's new strict-liability standard and prevent its representatives and contractors from making inadvertent misstatements or omissions. *See infra* 17. They must also ensure that their recruiters do not use methods that the Department might consider "aggressive." *See infra* 7-8, 17. These compliance burdens, and the financial costs associated with them, are quintessential concrete injuries. *See Texas v. EEOC*, 933 F.3d at 446;

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the regulations that will go into effect on July 1, 2023 under the challenged rulemaking. *See* 87 Fed. Reg. 65,904, 66,039-73 (Nov. 1, 2022).

*Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006) ("[E]conomic injury is a quintessential injury upon which to base standing.").

Whether participation in Title IV programs is truly voluntary, as the Department suggests (*see* Opp. 10), is of no moment. *See Contender Farms*, 779 F.3d at 266 (finding that imposing conditions on participation in an important but voluntary category of horse show was a concrete injury to competitors, despite participation in other horse shows being unaffected); *Ramos v. Uber Techs., Inc.*, No. CIV.A. SA-14-CA-502, 2015 WL 222414, at *3 (W.D. Tex. Jan. 14, 2015) ("The denial of an opportunity to benefit from services, whether caused by direct interaction with barriers or discriminatory actions or policies or by their resulting deterrent effect and loss of opportunity, is a sufficient injury for standing purposes.").

Nor does the possibility of non-enforcement (*see* Opp. 9-10) countermand the "ordinary rule" that a regulated entity has standing to challenge a regulation with which it must comply. *Contender Farms*, 779 F.3d at 266. The burdens and costs of complying with the regulation is injury enough. *See Texas v. EEOC*, 933 F.3d at 446; *see also Abbott Lab'ys v. Gardner*, 387 U.S. 136, 154 (1967), *abrogated in other respects by Califano v. Sanders*, 430 U.S. 99, 97 (1977) ("[T]here is no question in the present case that petitioners have sufficient standing as plaintiffs: The regulation is directed at them in particular; it requires them to make significant changes in their everyday business practices; if they fail to observe the Commissioner's rule they are quite clearly exposed to the imposition of strong sanctions.").

"Causation and redressability then flow naturally from the[se] injur[ies]," which result directly from the changes made by the challenged regulations and would be redressed by an order vacating them or enjoining their implementation. *Contender Farms*, 779 F.3d at 266.

**2. Abandoned Plans for Expansion.** Participating Schools will also be prevented from scaling back programs or consolidating campuses in order to avoid potentially significant liability under the Department's expanded definition of a "closed school." *See infra* 20-21. At least one CCST member has already abandoned plans to build new facilities because of the risks posed by this new provision, giving up the potential benefits of expanded operations. *See* Arthur Decl. ¶¶ 22-23 [App-41[3]]. "This sort of injury falls squarely within a well-established line of cases holding that loss of a non-illusory opportunity to pursue a benefit constitutes injury in fact." *Ecosystem Inv. Partners v. Crosby Dredging, L.L.C.*, 729 F. App'x 287, 292 (5th Cir. 2018) (unpublished); *see also Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) (holding that a lost chance to obtain a settlement was sufficient injury to confer standing). This is true even when the foregone benefit was not certain to materialize. *See Czyzewski*, 580 U.S. at 463-64. The evidence here shows that such an injury has already been incurred by a CCST member school, that the injury was caused by the challenged regulations, and that it would be redressed by CCST's requested relief. *See* Arthur Decl. ¶¶ 22-23 [App-41]. Nothing more is required to establish standing on these claims.

**3. Violations of Procedural Rights.** A plaintiff seeking equitable relief satisfies the concrete-injury prong by showing a "significant possibility of future harm," including from the violation of procedural rights. *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 542-43 (5th Cir. 2008). "The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7.  In just the five months following the settlement in *Sweet v. Cardona*, about 250,000 claims were filed. *See* Response to Court's Inquiry Concerning Number of Post-

---

[3] References herein to "App." are to the Appendix filed in support of CCST's Opening Brief (ECF No. 25), and the corresponding pages therein.

Class Applicants, *Sweet v. Cardona*, No. 3:19-cv-03674 (N.D. Cal Feb. 16, 2023) [App-47]. These claims pertain to attendance at about 4,000 schools, or about 65 percent of the roughly 6,200 schools that participate in Title IV programs. *See id.*; Dep't of Educ., *2023-24 Federal School Code List of Participating Schools (November 2022)*, https://fsapartners.ed.gov/knowledge-center/library/federal-school-code-lists/2022-10-31/2023-24-federal-school-code-list-participating-schools-november-2022. While the identities of these 4,000 schools are unknown, it is a statistical near-certainty that at least one of them is a CCST member.[4] Many of these claims will likely be adjudicated after the Rule goes into effect, meaning that at least one CCST school will be coerced into participating in unlawful proceedings under pain of conceding a borrower defense, 34 C.F.R. § 685.405(b), and will be subject to recoupment proceedings in which they will bear the burden of proving the incorrectness of the borrower-defense determination, *id.* 668.125(e)(2).

A litigant has "an independent right to adjudication in a constitutionally proper forum," and the Supreme Court has found that litigants "aggrieved by the threat of an unconstitutional arbitration procedure" before an administrative agency satisfy Article III's concrete-injury requirement. *Thomas v. Union Carbide Agric. Prod. Co.*, 473 U.S. 568, 579 (1985). Here, CCST has alleged that agency adjudication is unauthorized and unconstitutional.

Similarly, in *Roark & Hardee*, bar owners claimed that Austin's no-smoking ordinance violated procedural due process. 522 F.3d at 543. The Fifth Circuit found that the possibility of enforcement, and the fact that the City had not disclaimed its intent to enforce the challenged provisions, was enough to show concrete injury. *Id.* Causation and redressability are similarly easy

---

[4] The probability that at least one of CCST's 54 Participating Schools is among these 4,000 schools is about 99.9999 percent, or $(1 - (1-0.645)^{54})$.

to establish. *See id*. at 544 ("The significant threat of prosecution that Plaintiff bar owners face is directly traceable to the City's intention to enforce the ordinance against them, and a judicial invalidation of the ordinance would give Plaintiffs direct relief from being prosecuted.").

The Department argues that CCST lacks standing because recoupment actions are "conjectural or hypothetical," requiring third parties (borrowers) to request discharge and that the Department seek recoupment. Opp. 9. This argument rings hollow. First, hundreds of thousands of borrowers filed discharge claims in the short time after the *Sweet* settlement was approved, [App-47], and a similar flood of claims can be expected once the Rule goes into effect and similarly lowers to bar to discharge, *see* England Decl. ¶ 12 [App-24]; Shaw Decl. ¶ 20 [App-33—34]. When the decisions of third parties are "the predictable effect of Government action," those decisions do not bar standing. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019).

Second, the Department has made clear its intention both to discharge as many loans as possible (*see* Compl. ¶¶ 42-43) and to aggressively seek recoupment from schools: "Recoupment is a critical tool for ensuring that the institution that committed acts or omissions that lead to approved claims help offset that cost," and there are only "limited circumstances under which the Department would not recoup from institutions." 87 Fed. Reg. at 65,948; 34 C.F.R. § 685.409(c)(1).[5] Together, these facts show more than a "significant possibility" that at least some of CCST's Participating Schools will be subject to the challenged proceedings. *See Roark & Hardee*, 522 F.3d at 542-43. This possibility constitutes a concrete injury. *See id.*

---

[5] *Cf.* U.S. Dep't of Educ., Press Release, *Education Department Takes Steps to Hold Leaders of Risky Colleges Personally Liable*, https://www.ed.gov/news/press-releases/education-department-takes-steps-hold-leaders-risky-colleges-personally-liable (Mar. 2, 2023) (quoting Federal Student Aid Chief Operating Office Richard Cordray) ("When financially risky schools jeopardize the safety of the government's Title IV funds and take advantage of students, we intend to hold those individuals accountable.").

(ii). *Organizational Standing*

CCST also has Article III standing in its own right. Its injuries are twofold.

*First*, additional costs and liability exposure experienced by CCST's members threaten CCST's operations, which are funded by dues and fees from members. Schools have already abandoned plans to open new campuses in Texas because of the challenged regulations, resulting in a reduction (or elimination) of membership dues that CCST would collect and on which CCST relies to remain operational. *See* England Decl. ¶¶ 28, 34-35 [App-27-28]; Arthur Decl. ¶ 22 [App-41]. *Cf.* Shaw Decl. ¶¶ 17-18 [App-33]. This actual and threatened loss of dues is a concrete injury. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 459–60 (1958) (relying on the "reasonable likelihood that the Association itself through diminished financial support and membership may be adversely affected "); *Constr. Indus. Ass'n of Sonoma Cnty. v. City of Petaluma*, 522 F.2d 897, 903 (9th Cir. 1975) (economic injury in fact to association from loss of dues). These injuries would be redressed by vacating the challenged Rule.

*Second*, as the primary trade association for career colleges in Texas, CCST's reputation will be injured by the new regulations, which will subject the industry that CCST represents to sweeping new liability and a potentially significant increase in borrower claims and recoupment proceedings, creating the impression that the members of its industry routinely make fraudulent statements or omissions and use unfairly aggressive tactics in recruitment, even when there is no evidence to support such assertions. *See NCAA v. Governor of New Jersey,* 730 F.3d 208, 220 (3d Cir. 2013), *abrogated in other respects by Murphy v. NCAA*, 138 S. Ct. 1461 (2018) (finding standing based on reputational injury caused by a state law permitting gambling). These injuries, caused by the challenged Rule and redressable by vacatur, give CCST standing in its own right.

B.  CCST's Claims Are Ripe.

In deciding whether a claim is ripe for adjudication, federal courts consider (1) their fitness for judicial determination and (2) the hardship to the plaintiff if such a determination is withheld. *Abbott Lab'ys*, 387 U.S. at 149.

*First*, CCST's claims are fit for judicial determination because they are purely legal and do not involve factual or technical questions that would benefit from further pre-judicial development. *See Abbot Lab'ys*, 387 U.S. at 149. The Department points to no such factual or technical questions, suggesting only that "it is uncertain how the relevant standards and procedures might be applied as to any CCST member." Opp. 14. But the questions at the core of CCST's claims— whether the Department has constitutional and statutory authority to adjudicate schools' liability, and whether their procedures meet the requirements of due process and the Seventh Amendment— would not be informed by the outcomes of particular enforcement proceedings. *See Union Carbide*, 473 U.S. at 581 (finding ripe an Article III claim challenging the legality of forced arbitration because it was "purely legal, and will not be clarified by further factual development").

Nor does the possibility of non-enforcement in certain cases mean that CCST's claims are unfit for determination. *See* Opp. 14. What matters is that a Participating School could face severe and possibly existential liability by failing to conform to the regulations' new prohibitions. The Supreme Court in *Abbot Laboratories* held that, "where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts under the Administrative Procedure Act . . . must be permitted." 387 U.S. at 153. By contrast, *Texas v. United States*, 523 U.S. 296, 298-99 (1998), on which the Department relies, did not involve the regulation of conduct. Rather, it involved the legality of two hypothetical sanctions that a state official could levy against underperforming

school districts. *Id.* Here, by contrast, the challenged rules require Participating Schools to conform to new prohibitions under the threat of serious liability.

*Second*, as to hardship, the challenged regulations force Participating Schools to choose between costly compliance and risking serious consequences, including significant liability, disqualification from Title IV programs, and reputational harm. This kind of forced choice constitutes a hardship. *See Abbott Lab'ys*, 387 U.S. at 152-53; *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 172 (1967) (noting that hardship includes the harm to "public good will" that would be suffered by refusing to comply with the challenged regulations). Requiring the industry to proceed when the constitutionality of the Department's adjudicatory scheme is in question is "'palpable and considerable hardship.'" *Union Carbide*, 473 U.S. at 581 (citation omitted). The Department points to a school's ability to seek judicial review after an enforcement proceeding. *See* Opp. 14-15. But this was also true of the plaintiffs in *Abbott Laboratories* and *Toilet Goods*. As in those cases, Participating Schools should not be asked to risk violating the new regulations—and accept the enormous risks that come with noncompliance—while waiting to prevail on judicial review. Dismissing this case as unripe would force schools to take that untenable gamble.

## II.   CCST Is Likely To Prevail On The Merits

### A.   The Department Lacks the Statutory and Constitutional Authority to Adjudicate Borrower Defense "Claims" or Recoupment Actions Against Schools.

#### (i).   Section 455(h) Does Not Authorize the Secretary to Define Borrower Defense "Claims" Against the Department.

The Department disregards the text of Section 455(h). This narrow statutory grant of rulemaking power provides that "the Secretary shall specify in regulations *which acts or omissions* of an institution of higher education a borrower *may assert as a defense* to repayment of a loan …." 20 U.S.C. § 1087e(h) (emphasis added). By its plain terms, the statute authorizes the Secretary to define the acts or omissions that constitute contractual defenses; it delegates

lawmaking power in that limited respect.  The statute says nothing about claims (which are the polar opposite of defenses), much less the power to adjudicate claims.

The Department argues that a defense to repayment exists whether the borrower is actively repaying her loan or in default, Opp. 16, but that is irrelevant.  The borrower may do what any contracting party with a partial or complete contractual defense may do: stop performance to the extent of the defense, and litigate the defense in the appropriate tribunal.  This is hardly "illogical," as the Department asserts, *id.*; it is how the Department implemented Section 455(h) in its initial rulemaking.  Pl. Br. 9-10.  Congress commonly distinguishes between the assertion of claims and defenses.[6]  If the Department believes a borrower should have the right to bring administrative claims for financial relief, the remedy is with Congress.

### (ii).   Congress Did Not Authorize The Secretary To Adjudicate Borrower Defense Claims.

Even if the term "defense" could be construed to encompass a "claim," that would not aid the Department because the statute does not grant the Secretary the power to adjudicate those claims.   On this front, the Department's response is notable for what it fails to address.

First, the Department does not address the basic principle that "[a]gencies have only those powers given to them by Congress." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022).  Because Congress alone decides whether public rights are committed to agency adjudication, Pl. Br. 11, courts must find an express conferral of adjudicatory power.  Thus, in *Bank One Chicago, N.A. v. Midwest Bank & Trust Co.*, 516 U.S. 264 (1996), Congress "authorize[d] the Federal Reserve Board to 'impose on or allocate among depository institutions the risks of loss and liability in

---

[6] *See, e.g.,* 15 U.S.C. § 1666i(b) ("The amount of claims or defenses asserted by the cardholder may not exceed the amount of credit outstanding …); *Id.* § 1641(d)(1) (mortgage assignee "shall be subject to all claims and defenses with respect to that mortgage that the consumer could assert against the creditor of the mortgage").

connection with any aspect of the [check] payment system,'" *id.* at 272 (quoting 12 U.S.C. § 4010(f)), yet the Supreme Court held that Congress did not grant adjudicatory authority. "Congress no doubt intended rules regarding interbank losses and liability to be developed administratively. But nothing in § 4010(f)'s text suggests that Congress meant the Federal Reserve Board to function as both regulator and adjudicator in interbank controversies." *Id.* at 273. The Court found it significant that the statute "does not explicitly confer adjudicatory authority on the Board, nor 'set forth the relevant procedures' for resolution of private disputes." *Id.* at 275. Here, too, Section 455(h) grants only the rulemaking power to specify what acts or omissions may be asserted as defenses, without any conferral of adjudicatory authority or identification of procedures. *See also Coit Indep. Joint Venture v. Fed. Sav. and Loan Ins. Corp.*, 489 U.S. 561, 572-74 (1989). These cases answer the Department's extraordinary claim (Opp. 19) that an agency has adjudicatory power unless the statute expressly forecloses it. And there is no statutory ambiguity to which deference is owed. *See id*. 21.[7]

Second, the Department ignores precedent that a grant of *rulemaking* authority—which is all that Section 455(h) is—does not grant authority to *adjudicate* rule violations. The Ninth Circuit held that the statutory grant of the power to the Commissioner of Internal Revenue to promulgate regulations on depletion allowances "does not subsume within it the authority to decide individual cases," and instead "merely gives the Commissioner the authority to prescribe regulations setting forth standards by which courts will determine the reasonableness of depletion allowances." *RLC*

---

[7] The Department affirmatively mischaracterizes *National Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563 (D.C. Cir. 1987), as recognizing that Congress may implicitly grant adjudicatory authority. Opp. 19. *National Fuel Gas* says the opposite; it declares, that in "contrast" to an implicit delegation to an agency to resolve ambiguities in statutes it administers, "the delegation of adjudicative authority to an agency that is empowered to hear disputes, receive settlement proposals, and enter binding orders is *explicit*." 811 F.2d at 1569 (emphasis added).

*Indus. Co. v. CIR*, 58 F.3d 413, 417-18 (9th Cir. 1995). Section 455(h)'s grant of rulemaking power likewise does not authorize adjudication of borrower defenses to repayment.

Rather than confront those precedents, the Department relies on an unpublished district court decision that "the HEA and the 1995 borrower defense regulation require the Secretary to adjudicate borrower defense claims." *Vara v. DeVos*, No. 19-12175-LTS, 2020 WL 3489679, at *2 (D. Mass. June 25, 2020). *See* Opp. 17-18. *Vara* is unpersuasive. It draws an inapposite analogy to cases holding that immigration officials have a duty to adjudicate immigration applications; in those cases, Congress made an "explicit delegation of the power (and responsibility) to process form I–485 applications" to the agency, and the courts rejected the proposition that adjudication was not required simply because the granting of relief was discretionary. *Nigmadzhanov v. Mueller*, 550 F. Supp. 2d 540, 546 (S.D.N.Y. 2008) (cited in *Vara*, 2020 WL 3489679, at *3).

The Department also claims that CCST's reliance on the 1994 rule is misleading, Opp. 17, but it is the Department's arguments that deserve that appellation. The 1994 rule makes clear that a borrower may assert a defense to repayment "[i]n any proceeding to collect on a Direct Loan," and then sets forth four non-exhaustive examples of such collection proceedings; discharge relief followed a successful defense. 34 C.F.R. § 685.206(c) (1995). The Department acknowledged in 2016 that "[t]he current regulations for borrower defense do not provide a process for claims." 81 Fed. Reg. 39,330, 39,346 (June 16, 2016). In 2018, the Department declared that [f]rom 1994 to 2015, the Department's regulation … provided defense to repayment loan discharge opportunities only to borrowers who were in a collections proceedings." 83 Fed. Reg. 37, 242, 37,253 (July 31, 2018). The Department then amended that statement to acknowledge that there were "limited circumstances" in which "the Department has approved a small number of affirmative borrower

13

defense to repayment requests."  84 Fed. Reg. 49,788, 49,796 (Sept. 23, 2019). Those few circumstances either settled litigation against the Department, or involved unpaid refunds or stipulations of fact by the institution in judgments that established the defense.[8]  These were not claims adjudications, and the current Rule does not reflect a consistent interpretation of 30 years. *See* Mem. of Defs., *Massachusetts v. U.S. Dep't of Educ.*, No. 1:17-cv-2679 (TNM), 2018 WL 3820021 (D.D.C. May 31, 2018) (*ad hoc* claims adjudication began with closure of Corinthian schools in 2015).  Regardless, the Department's views cannot cure an absence of statutory authority.

The Department relies on the Department's general rulemaking powers, Opp. at 18-19, but such grants are limited to carrying out expressly delegated powers and are not an independent source of authority.  *See* Pl. Br. 12; *Contender Farms*, 779 F.3d at 273.  Agencies have the power to promulgate procedures when vested with adjudicatory powers, but Congress has vested the Department with no such power.  And the Department cannot rely on general rulemaking powers to "carry out" the limited rulemaking power of Section 455(h), which does not extend to adjudication.

Not only must a grant of adjudicatory powers be express, but a waiver of sovereign immunity must be unequivocal.  Pl. Br. 11-12.  The Department protests that sovereign immunity is not implicated, Opp. 19-20, but cannot escape its own characterization that a borrower-defense claim "is invoked against the Department, not schools."  87 Fed. Reg. at 65,909-11 (state law claims under the Rule are asserted "against … a Federal agency"); 65,923 ("the Department is the party against which borrowers assert a defense to repayment").  The Department has characterized

---

[8] *See* Project on Predatory Student Lending at the Legal Services Center of Harvard Law School, Comment Letter on Proposed Rule (Aug. 2, 2018), available at https://www.regulations.gov/comment/ED-2018-OPE-0027-0011 (attachments).

borrower-defense relief as equivalent to "remedies like rescission, avoidance, restitution, and certain forms of out-of-pocket or reliance costs." *Id.* at 65,914.  The Department could not be sued for such remedies in court absent an unequivocal waiver of sovereign immunity, and the same is true for claims before an agency tribunal.  Before the Department grants financial relief in the many billions of dollars, *id.* at 66,017, Congress must waive sovereign immunity.  *See also* Pl. Br. 14-15 (applying major-questions doctrine).

(iii).  <u>*Section 455(h) Does Not Authorize The Secretary To*</u>
<u>*Adjudicate Recoupment Actions Against Schools.*</u>

 The Department cites to no statutory provision that authorizes recoupment from institutions, much less grants the Secretary the right to adjudicate recoupment actions *for its own recovery* (which violates due process).  It is undisputed that program participants accept financial liability for their failure to perform agreement obligations, 20 U.S.C. § 1087(d), but that begs the question of what constitutes a failure to perform agreement obligations, and what tribunal determines the fact and amount of liability.

Here, Section 455 of the Higher Education Act ("HEA") does not provide the Department with the authority to recover the amount of loans discharged by way of borrower defense.  That stands in stark contrast to other parts of the HEA, which do provide certain recoupment authority. *See* 20 U.S.C. § 1087(c)(1) (Federal Family Education Loan program ("FFEL")).

Unable to point to any statutory authority, the Department relies on what it claims is 30 years of Departmental practice in recovering loan discharges from institutions.  *See* Opp. 20.  But the Department ignores what the Department has said about recoupment, none of which can justify administrative adjudication of claims for recoupment of borrower-defense discharges.

First, the Department has said that section 487(c)(1), applicable to FFEL loans, authorizes the Secretary "to pursue any claim of the borrower against the school, its principals, or other

15

source, and the borrower is deemed to have assigned his or her claim against the school to the Secretary."   81 Fed. Reg. 75, 926, 75,930 (Nov. 1, 2016) (citing 20 U.S.C. § 1087(c)(1)).   The Department claims that this same provision applies to Direct Loans by virtue of 20 U.S.C. § 1078e(a)(1), which provides that Direct Loans have the same terms and conditions as FFEL loans.  81 Fed. Reg. at 75,930.  The Secretary's recoupment right against institutions under section 487(c)(1) is not a term or condition of a student loan; in any event, the statute applies only to three types of discharges (inability to complete a program because of school closure; false certification of loan eligibility; and failure to refund), and would not support the Department's recoupment regulation.  *See* 20 U.S.C. § 1087(c)(1).  Regardless, the Department has always insisted that this provision provided no greater rights in recoupment than the borrower had against the institution, and created no new liabilities for the school.  81 Fed. Reg. at 75,930-31.  That rationale would not justify the current Rule, which creates new liabilities and does not limit recovery to vindication of borrower rights against the school that have an independent source in law.

Not only has Congress not granted recoupment rights to the Secretary for all borrower-defense discharges, but it also did not take the further step of authorizing the Department to adjudicate any recoupment claim.  The Department did not analyze this point in the current Rule, but the Department now points to *Chauffeur's Training School, Inc. v. Spellings*, 478 F.3d 117, 125–30 (2d Cir. 2007).  *See* Opp. 21.  But that case is not authority that the Department can conduct recoupment adjudications without statutory authorization.

There, the Second Circuit noted that the statute authorized hearings for terminations, suspensions, and fines, *see* 20 U.S.C. § 1094(c), and held that "it would be unreasonable to view the specification of remedies set forth in § 1094(c)" as excluding relief to recover guarantee payments.  478 F.3d at 127-29.  The analysis is wrong but, significantly, the Department is doing

16

more than grafting additional remedies unto an authorized statutory proceeding; indeed, for recoupment, the Department denies institutions hearings under Subpart G of Part 668, which implements § 1094(c).  *See* 87 Fed. Reg. at 65,949. *Chauffeur's* does not support the Department's wholesale creation of a novel adjudication scheme untethered to any authorized statutory hearing.

The alternative ground for recoupment that the Department has asserted is the common-law right to recover damages for breach of fiduciary authority.  81 Fed. Reg. at 75,931-32.  That theory cannot support broad recoupment rights (schools are not agents or fiduciaries of the Department in recruiting students or in most communications), but regardless, Congress never authorized the Department to adjudicate common-law causes of action, and, indeed, could not do so.  Even Congress cannot "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law …." *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1855).

B.  The Department's Definitions of Borrower Defenses Are Unlawful.

The Department objects that it need specify every act or omission that can constitute a borrower defense, Opp. 26, but that is exactly what Section 455(h) commands: "the Secretary shall specify in regulations *which acts or omissions* of an institution of higher education" can be asserted as a defense. 20 U.S.C. § 1087e(h) (emphasis added). The omissions, aggressive recruitment, contract, judgment, adverse-action, and catch-all state law defenses fail this test.  Pl. Br. 15-16.

The Department complains that it is a "caricature" to say that the Rule permits sanctioning a school for innocent and unintentional misstatements or omissions of fact.  Opp. 27.  But that is indisputably what the Rule does: *any* substantial "erroneous" statement, 34 C.F.R. § 668.71(c), or "absence of material information" that a reasonable borrower would have considered, *id.* § 668.75, provides a defense, even if the school is not culpable.  The Department says that the need to redress

17

the borrower's injury justifies the breadth of the defense, but for group claims—anticipated to be

75% of the claim volume for proprietary schools, 87 Fed. Reg. at 65,993—reliance and injury are

presumed, not proven, with no means of rebutting that presumption. And, even though Section

455(h) does not authorize rules for determining the amount of discharge, the Department has

unlawfully declared that borrowers will receive a full discharge of their entire debt, without any

proof that the institutional act or omission caused or even *preceded* the borrowing in question. 34

C.F.R. § 685.401(a); Pl. Br. 18. Many of the specific offenses are potentially picayune—*e.g.*,

incorrect information about books or supplies, 34 C.F.R. § 668.72(f), the customary nature of "a

particular charge," *id.* § 668.73(c), contracts with specific externship sites, *id.* § 668.72(p), or

Government job market statistics, *id.* §668.74(e)—and so would rarely justify the cancellation of

a student's entire debt. The combination of these provisions creating a strict liability regime for

schools for the entirety of borrower debts—without any proof of reliance, injury, or causation—is

arbitrary and capricious because it is not both "reasonable and reasonably explained." *FCC v.

Prometheus Radio Project*, 141 S.Ct. 1150, 1158 (2021).  Moreover, contract and other state law

rights are not federal public rights that can be committed to agency adjudication, and (contrary to

the Department's claim, Opp. 30) do not lose their character as private rights simply because the

Department designates them as defenses.  Pl. Br. 16.

C. <u>The Rule's Group Claim Provisions, and Particularly the Procedure-Specific Presumption That a Violation Adversely Affected Attendance Decisions, Are Unlawful.</u>

The Department's group claim provisions are fundamentally unfair and not designed to

determine the truth.  There are no prerequisites to the Department's decision to invoke a group

procedure akin to the numerosity, commonality, typicality, and adequacy requirements of Federal

Rule of Civil Procedure 23(a).  The Department has simply identified a non-exhaustive list of

factors it may consider, one of which—"the promotion of compliance by an institution or other

title IV, HEA program participant"—is irrelevant to the truth-finding process and betrays its results-oriented approach. 34 C.F.R. § 685.402(a). The Secretary may initiate a group, or may accept third-party requests that primarily address the evidence of the alleged institutional conduct. *Id.* § 685.402(b). Once a group is formed, a Department official "present[s] the side of the group." *Id*. § 685.402(d)(1), even though nominally "the Department is the party against which borrowers assert a defense to repayment," 87 Fed. Reg. at 65,923. An institution must present a response or else is deemed not to contest the claim—but has no right of subpoena, discovery, or witness examination to develop necessary evidence from third parties. 34 C.F.R. § 685.405(d). Even though an individual borrower claimant must present a sworn declaration describing reliance and injury, *id.* § 685.403(b), no similar requirement is required of identified group members. The group process must be completed in 1 year from group formation (versus 3 years for individuals), or else the loan is unenforceable. *Id.* § 685.406(g).

Because Congress clearly did not intend that a borrower be relieved of loan obligations if they were not injured by an institutional act or omission, the crux of any borrower defense is that the act caused the borrower detriment. 34 C.F.R. § 685.401(a). But the Rule presumes that if a group claim is proven, "there is a rebuttable presumption that the act or omission giving rise to the borrower defense affected each member of the group *in deciding to attend, or continue attending*, the institution, and that such reliance was reasonable." *Id.* § 685.406(b)(2) (emphasis added).

The Department cannot defend the presumption. It has no answer to the contention that evidentiary presumptions are outside the scope of Section 455(h), or that a procedural rule should not affect substantive rights. Pl. Br. 18-19. Moreover, a presumption is arbitrary and capricious if there is no rational nexus between proven and presumed facts. *See, e.g.*, *Chemical Mfrs. Ass'n v. Dep't of Transp.*, 105 F.3d 702, 703-05 (D.C. Cir. 1997). The Department avers that "often, an

19

institution's act or omission . . . will have affected many borrowers." Opp. 28.  That is not true of all the enumerated prohibitions, but regardless that is not the test; rather proof of a violation has to render so probable that every individual suffered the presumed injury that individual proof is unnecessary.  *Chemical Mfrs.*, 105 F.3d at 705.  Here, the Department overlooks that the presumption is that the individual would not have attended, or continued attending the institution, absent reliance on the violation, *and* that the reliance was reasonable.  The reasons that a borrower decides to attend, or continue attending, a school are highly individualistic and variegated, and reasonable reliance depends on the totality of the facts and circumstances.

It cannot be presumed that for *every* violation *every* borrower in a group reasonably relied on that alleged representation or omission in making the decision to enroll.  For example, assume an error in an employment statistic on the website; a student in their final year may never have seen the statistic, much less relied on it, and if they have a job lined up it may not have been reasonable under the circumstances to rely on that statistic to terminate their attendance.  The Department cavalierly states that it cannot be bothered with individualized adjudication, Opp. 28, but due process does not allow collective determination of matters of individualized proof.  S*ee, e.g., W. Elec. Co, v. Stern*, 544 F.2d 1196, 1199 (3d Cir. 1976); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 232 (2d Cir. 2008), *abrogated in other respects by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).

Furthermore, the Department does not contest that the presumption—because reliance and attendance decisions are information solely in the possession of the buyer, and there is no mechanism in either the group or recoupment proceedings to develop that evidence by subpoena, discovery, or witness examination—is effectively irrebuttable.  The group procedures do not comport with due process.  Pl. Br. 19-20.

D.  <u>The Department's Closed School Discharge Rule Is Unlawful.</u>

The HEA authorizes discharge when a student "is unable to complete the program in which

such student is enrolled due to the closure of the *institution*," 20 USC § 1087(c)(1) (emphasis

added).  The Department cannot reasonably interpret "school" to mean any location or branch of

a school even if not a Title IV eligible institution, *see* 34 C.F.R. § 685.214(a)(2)(ii), and then

provide that the school is closed on "the date, determined by the Secretary, that the school ceased

to provide educational instruction in programs in which *most* students at the school were enrolled,"

*id.* § 685.214(a)(2)(i) (emphasis added).  A school that remains open but eliminates certain

locations or programs is not closed.  "An agency has no power to 'tailor' legislation to bureaucratic

policy goals by rewriting unambiguous statutory terms."  *Util. Air Regul. Grp. v. EPA*, 573 U.S.

302, 325–26 (2014).

Furthermore, even for students who do not fall within section 1087(c)(1), the Department

presumes that any borrower at a school that is subsequently closed who proves a defense is entitled

to have their total debt erased.  34 C.F.R. § 685.401(e).  As an initial matter, the Department

provides no response to CCST's showing that the full-discharge rule is *ultra vires* and arbitrary

and capricious.  Pl. Br. 18.  Be that as it may, the Department does not have the power to define

evidentiary presumptions, and there is no nexus such that proof of any detriment dispenses with

proof that the detriment warrants the relief of total discharge, just because the school is closed.[9]

The Department's invocation of experience with closed schools, Opp. 29, is a makeweight, since

it has no experience with the new borrower-defense standards and the detriment violations of those

standards cause.  Nor is the availability of evidence from closed schools relevant, *id.*; not only is

---

[9] The Department's contention that the presumption does not expand a school's liability, Opp. 28,
is puzzling.  Absent the presumption, if the borrower does not prove that the injury warrants relief,
the defense fails and there is no discharge.  *See* 34 C.F.R. § 685.401(a).

the information about borrower detriment not in the school's possession, but it is the nexus to proven facts (not availability of evidence) that must justify a presumption.   Like any borrower, a borrower at a school that has closed should have to prove that their injury warrants full debt relief.

### III.   CCST and Its Member Schools Have Suffered and Are Likely to Suffer Irreparable Harm, Absent Preliminary Injunctive Relief

CCST has demonstrated a substantial threat of irreparable injury to not only CCST's member schools, but schools across the country, absent an order of preliminary injunctive relief. To establish the likelihood of irreparable harm, CCST "need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986); *see also Louisiana v. Ctrs. For Disease Control & Prevention*, 603 F. Supp. 3d 406, 439-40 (W.D. La. 2022).   CCST has done so here.

Come July 1, there is a substantial threat of immediate and irreparable harm to CCST Schools. The Rule's borrower-friendly and liability-presumptive standard and adjudication process are almost certain to result in schools in Texas and across the country being suddenly inundated by tens of thousands of borrower defense claims that will be subject to a slanted process that presumes liability without means of rebuttal, and incentivizes borrowers with the prospect of large dollar loan discharges without risk or downside to submitting a claim.

The Department's argument that the pending and forthcoming borrower defense applications have not yet been adjudicated against the schools pursuant to the new Rule is unpersuasive. The Rule will take effect on July 1, and it is not yet July 1. However, a plaintiff need only show "a *threat* of irreparable harm, not that irreparable harm already ha[s] occurred." *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010) (emphasis in original).   The Department attempts to downplay but cannot deny the fact that, on July 1, schools will be inundated by a torrent

of borrower defense applications, as evidenced by the *Sweet v. Cardona* preliminary settlement, which resulted in the immediate submission of "250,000 [borrower defense] applications from approximately 206,000 borrowers who attended approximately 4,000 schools" in a matter of weeks. Response to Court's Inquiry Concerning Number of Post-Class Applicants, No. 3:19-cv-03674 (N.D. Cal Feb. 16, 2023) [App-47]. The corresponding threat of immediate and irreparable harm to schools forced to defend against a deluge of borrower defense claims—while being subject to an unauthorized and unconstitutional adjudicatory process that imposes a strict-liability standard, and deprives schools of due process protections and appeal rights—is thus more than sufficient for purposes of preliminary injunctive relief. *See Burgess v. FDIC*, No. 7:22-CV-00100-O, 2022 WL 17173893, at *11 (N.D. Tex. Nov. 6, 2022) ("[T]hat a violation of a constitutional right in and of itself constitutes irreparable injury has been universally recognized and is not open to debate.").[10]

Further, CCST and its member schools have already suffered harm in advance of the July 1 effective date by having to expend time and significant efforts, incur costs or loss of benefits, and invest resources toward complying with the impending Rule. *See* England Decl. ¶¶ 21, 30 [App-25-27]; Shaw Decl. ¶ 20 [App-33-34]; Arthur Decl. ¶¶ 16-20 [App-39—41]. Courts in this and other circuits have repeatedly held that "complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21

---

[10] The Department cites *Somerset House, Inc. v. Turnock*, 900 F.2d 1012 (7th Cir. 1990), but to no avail.  There, the Seventh Circuit held that there was no deprivation of rights *where there was a pre-deprivation* hearing that afforded the subjected party ample notice and opportunity to respond, including the opportunity to collect and present evidence as well as to present legal or factual arguments.  *Id.* The Rule's deprivation of due process rights for CCST and its member schools is an irreparable harm for which there is no meaningful remedy.

(1994) (Scalia, J., concurring in part and in the judgment)). In preparation for the impending effective date for the Rule, and its new processes and standard, CCST Schools have and continue to necessarily expended substantial time and financial resources into undertaking efforts to conform their conduct, recordkeeping activity, and compliance efforts, all in an effort to mitigate the risk of reputational injury, substantial financial liability, and exclusion from participation in the federal student loan programs, based on the new standard and processes set forth under the Rule. *See, e.g.,* Jones Decl. ¶ 8 [App-4]; Arthur Decl. ¶¶ 16-20 [App-39—41]. These are not harms that can be remedied upon prevailing on the merits of the case. *See Texas v. EPA*, 829 F.3d at 433.

CCST schools have been forced to abandon or cancel longstanding business plans to build new and upgrade or consolidate existing schools on account of the Rule's amorphous criteria for what constitutes a "closed school", and the threat of resulting and overwhelming financial liability. *See* Arthur Decl. ¶¶ 22-26 [App-41—43]; Pl. Br. 6, 20; *see also* Jones Decl. ¶¶ 30-34 [App-9—10]. The effect of these forced business actions is lost business opportunity in addition to loss of time and investment made. *See id.* These are not harms that can be remedied by CCST's prevailing on the merits of its case.

Finally, CCST itself has suffered injury in at least three ways. First, as a result of institutions abandoning plans to build new schools or campuses in Texas on account of the closed school provision, CCST has suffered (or will suffer) financial harm in the way of lost membership dues, on which CCST relies to support its business viability and growth plans. *See* England Decl. ¶¶ 28, 34 [App-27—28]. Second, the resulting stunted growth (and, inevitable, reduction) in career education institutions and offering of skilled trade training programs in Texas further harms and directly undermines CCST's central mission and organizational purpose. *See id.* ¶¶ 34-37 [App-28]. Third, CCST has been forced to divert substantial time and resources away from existing

advocacy and educational programs and toward assisting CCST Schools with necessary compliance initiatives, including but not limited to extensive data preservation and recordkeeping and organization efforts, given the effect of the Rule's newly imposed requirements. *See id.* ¶¶ 27-32 [App-27—28]. Accordingly, CCST has satisfied the irreparable injury prong of the preliminary injunction analysis.

## IV.    CCST's Requested Relief Is Narrowly Tailored to the Harms Identified

In its preliminary injunction motion, CCST requests the standard temporary relief under the APA: to maintain the status quo by staying the effective date of the agency action (here, the Rule) until this Court renders final judgment. *See* 5 U.S.C. § 705. For a nationally applicable regulation, such relief is not limited to the parties.  Moreover, the irreparable injuries that CCST members suffer are no different from that suffered by other schools across the country.  Nor ultimately is the permanent relief that this Court would order if CCST prevails in this APA challenge party-specific; if CCST proves an APA violation, "[t]he reviewing court *shall* . . . hold unlawful and set aside agency action, findings, and conclusions," without any requirement for a party to demonstrate irreparable injury or the requisites of a permanent injunction.  *Id.* § 706 & (2) (emphasis added).  There is no reason to require schools or associations across the country to file duplicative actions to secure a stay of the effective date for each individually. This is consistent with what courts across the country, including this Court, have done in the cases involving similar APA challenges. *See, e.g., Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, NO. A-18-CV-0295, 2018 WL 6252409, at *1 (W.D. Tex. Nov. 6, 2018) ("[T]he court concludes that to prevent irreparable injury a stay of the Rule's current compliance date of August 19, 2019, is appropriate." (citing 5 U.S.C. §705.))

## CONCLUSION

For the foregoing reasons, the Court should grant CCST's motion.

Dated:  May 22, 2023

/s Philip Vickers      /s Allyson B. Baker    
Philip Vickers       Allyson B. Baker (*pro hac vice*)
 Texas Bar No. 24051699   Stephen Kinnaird (*pro hac vice*)
Katherine Hancock     Michael Murray (*pro hac vice*)
 Texas Bar No. 24106048   Sameer P. Sheikh (*pro hac vice*)
CANTEY HANGER LLP    Tor Tarantola (*pro hac vice*)
600 West 6th Street, Suite 300  PAUL HASTINGS LLP
Fort Worth, TX 76102    2050 M Street NW
pvickers@canteyhanger.com  Washington, DC 20037
(817) 877-2800      allysonbaker@paulhastings.com
           (202)-551-1830

## CERTIFICATE OF SERVICE

  I hereby certify that on May 22, 2023, a true and correct copy of the foregoing document was served upon all counsel of record in this action via the Court's CM/ECF system.

         /s Allyson B. Baker    
         Allyson B. Baker

         *Attorney for Plaintiff CCST*

26