IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CAREER COLLEGES & SCHOOLS OF TEXAS, | § § § | |
| Plaintiff, | § § | |
| v. | § § | 1:23-cv-433-RP |
| UNITED STATES DEPARTMENT OF EDUCATION, and MIGUEL CARDONA, in his official capacity as the Secretary of Education, | § § § § § | |
| Defendants. | § § | |

## ORDER

Before the Court is Plaintiff Career Colleges & Schools of Texas's ("CCST" or "Plaintiff") motion for preliminary injunction, (the "Motion"). (Dkt. 23). Defendants United States Department of Education ("DOE") and Secretary Miguel Cardona (collectively "Defendants") filed a response, (Dkt. 56), Plaintiff filed a reply, (Dkt. 64), and the Court held an evidentiary hearing on the motion on May 31, 2023. Having considered the briefing, the arguments made at the hearing, the evidence, and the relevant law, the Court will deny the motion.

## I. BACKGROUND

### A. Parties

CCST is a trade association a trade association dedicated to the interests of for-profit colleges and similar post-secondary institutions in Texas. (*See* England Decl., Dkt. 25, at 25). Its membership is comprised of more than 70 schools located throughout Texas. (*Id.*) Like many other public and nonprofit schools, the majority of CCST's members participate in Title IV programs under the Higher Education Act of 1965 ("HEA"), which allows their enrolled students to pay for tuition using federal student loans. (*Id.* at 27). The U.S. Department of Education ("DOE") is an

executive agency of the United States government, 5 U.S.C. §§ 101, 105, subject to the

Administrative Procedure Act ("APA"), *id.* § 551(1). Defendant Miguel Cardona is the current

Secretary of Education and is responsible for DOE's promulgation and administration of the

challenged regulations. He is sued in his official capacity only.

### B.  Statutory & Regulatory Background

DOE distributes federal student loans via Title IV of the HEA. Most funding is disbursed

through the William D. Ford Federal "Direct Loan Program," in which DOE issues federal loans

directly to eligible students who attend institutions of higher education that participate in Title IV.

20 U.S.C. § 1087a. In 1993, Congress amended the HEA by adding a provision that enables students

who have been the victims of certain types of institutional misconduct to have their federal student

loans forgiven. Specifically, Section 455(h) of the HEA provides:

> Notwithstanding any other provision of State or Federal law, the
> Secretary shall specify in regulations which acts or omissions of an
> institution of higher education a borrower may assert as a defense to
> repayment of a loan made under this part, except that in no event may
> a borrower recover from the Secretary, in any action arising from or
> relating to a loan made under this part, an amount in excess of the
> amount such borrower has repaid on such loan.

20 U.S.C. § 1087e(h). In a separate provision, the HEA also requires the Department to "discharge

[a] borrower's liability on [a] loan" where that borrower "is unable to complete the program in

which such student is enrolled due to the closure of the institution." *Id.* § 1087(c) (the "Closed-

School Discharge").

Over the next 30 years, DOE published four different iterations of regulations governing

borrower defense to repayment ("BDR"). The first BDR rule was published in 1994. *See* 59 Fed.

Reg. at 61,664 (Dec. 1, 1994). The 1994 rule allowed borrowers to "assert as a defense against

repayment . . . any act or omission of the school attended by the student that would give rise to a

cause of action against the school under applicable State law," but did not specify a process by which a student could assert a borrower defense claim. The rule also provided a non-exhaustive list of proceedings in which the borrower could assert a defense, *id.*, and created a "system for adjudicating claims by borrowers that have a defense against repayment of a loan based on the acts or omissions of the school," *id.* at 61,671. The 1994 rule left to the Secretary's discretion the relief to be afforded to successful borrower defense applicants. *See id.* at 61,696.

For the next 20 years, DOE received few requests for discharges under the BDR. *See* 81 Fed. Reg. at 75,926 (Nov. 1, 2016). However, in 2015 the number of BDR applications increased significantly following the collapse of a large network of proprietary schools owned by Corinthian Colleges, Inc. *See id.* In response to this influx of claims, DOE commenced a negotiated rulemaking process to update its BDR regulations and published a final rulemaking on November 1, 2016. *See id.* Among other changes, the 2016 rule adopted a federal standard for actionable misstatements, permitting borrowers to obtain debt relief upon showing that their school made a "substantial misrepresentation," defined as (1) intentional falsehoods and (2) statements that have "the likelihood or tendency to mislead under the circumstances," including statements that omit information in a "false, erroneous, or misleading" way. 34 C.F.R. §§ 668.71(c), 668.222(d) (2016). The 2016 rule also allowed DOE to begin adjudicating factually similar BDR claims together on a groupwide basis. *Id.* §§ 685.206(c)(2), 685.222(e) (2016).

Following a change in presidential administrations, DOE again amended its BDR regulations, publishing a new final rulemaking on September 23, 2019. *See* 84 Fed. Reg. at 49,788 (Sept. 23, 2019). Among other changes, the 2019 rule narrowed the 2016 rule's definition of actionable "misrepresentations" to require evidence of an institution's intent to mislead or its reckless regard of the truth. It also restricted actionable misrepresentations to those made in writing,

3

and it required borrowers to prove financial harm other than their student loan debt. *See* 34 C.F.R.

§ 685.206(e)(3), (e)(4) (2019). The 2019 rule also abolished the group claim process and required that

DOE consider each borrower claim independently. *See* 84 Fed. Reg. at 49,799.

### C.  The 2022 Final Rule

DOE initiated the latest BDR rulemaking in 2021. *See* 86 Fed. Reg. 28,299 (May 26,

2021). After engaging in a negotiated rulemaking process, the Department published a notice

of proposed rulemaking (NPRM) in July 2022 proposing "several significant improvements to

existing programs authorized under the [HEA] that grant discharges to borrowers who meet specific

eligibility conditions." 87 Fed. Reg. at 41,879. After a public comment period, DOE issued its final

rule, updating regulations governing borrower defense and closed school discharges, along with a

number of other provisions affecting a broad swath of statutory programs. *See* 87 Fed. Reg. 65,904

(Nov. 1, 2022) (the "Rule").

According to CCST, the new Rule "upends critical regulations governing borrower

defenses" and "greatly broadens the substantive grounds for relief to borrowers (and liability for

schools)" by imposing borrower-friendly standards, new adjudicatory schemes, and prejudicial

evidentiary presumptions. (Complaint, Dkt. 1, at 2). CCST claims the Rule is designed "to

accomplish massive loan forgiveness for borrowers and to reallocate the correspondingly massive

financial liability to institutions of higher education." (*Id.*). The Complaint discusses various aspects

of the Rule, but the specific provisions challenged in CCST's motion can be grouped into the

following categories.

### 1.  Borrower Defenses to Repayment

The Rule amends the substantive grounds for borrower relief by recognizing five types of

"acts" or "omissions" by an institution that can give rise to a BDR claim: (1) a substantial

misrepresentation; (2) a substantial omission of fact; (3) breach of contract; (4) "aggressive or deceptive" recruitment tactics; or (5) a state or federal judgment or final Department action against an institution that could give rise to a borrower defense claim. *See* 34 C.F.R. § 685.401(b)(1)–(5) (2022). A misrepresentation is deemed "substantial" if a borrower reasonably relied upon it or "could reasonably be expected to rely" upon it to his or her detriment. 34 C.F.R. § 668.71. Because a misrepresentation need not be intentional, knowing, or negligent, 87 Fed. Reg. at 65,921, and any "absence of material information" is actionable, CCST contends the Rule effectively imposes "strict liability" on schools for even erroneous or non-material representations or omissions. (Compl, Dkt. 1, at 24-25).

### 2. Borrower Claim Adjudication

The Rule establishes new adjudicative procedures by which DOE receives and adjudicates borrowers' BDR claims. While institutions do not participate in the BDR claim adjudication process, DOE must give institutions notice of any claims against them, and the Rule provides a 90-day window for the school to respond by submitting relevant materials relating to the claim. 34 C.F.R. § 685.405. Moreover, during the initial BDR claim adjudication, the institution cannot engage in discovery or otherwise test evidence submitted by the borrower. 34 C.F.R. §§ 685.405, 685.406(b), (c). The Rule also reinstates a procedure for the groupwide adjudication of BDR claims. *Id.* §§ 685.402, 685.403. For group claims, the Rule creates a "rebuttable presumption that the act or omission giving rise to [the claim] affected each member of the group in deciding to attend, or continue attending, the institution, and that such reliance was reasonable." *Id.* § 685.406(b)(2). Similarly, for "Closed-School" claims, the Rule creates a presumption "that the detriment suffered warrants relief." *Id.* § 685.401(e). The Rule does not prescribe a limitation period for BDR claims;

they may be filed "at any time," so long as the borrower has a balance due on a direct loan or any

loan that may be consolidated into a direct loan. *Id.* § 685.401(b).

### 3. Full Discharge

The Rule removes the previous requirement for borrowers to prove financial harm. It also

requires DOE to award a full discharge of the borrower's total paid and unpaid debt upon a

successful BDR claim, with no requirement for the borrower to prove the entire debt was caused by

the act or omission. *See* 34 C.F.R. § 685.401(b)

### 4. Recoupment Adjudication

If the Department approves a BDR claim, the Rule provides DOE discretion to initiate a

separate administrative proceeding to recoup the value of discharged loan directly from schools. *See*

34 C.F.R. § 668.125. If DOE opts to initiate a recoupment proceeding, it must give written notice to

the school of the borrower-defense determination, the basis of liability, and the amount of the

discharge. 34 C.F.R. § 668.125(a). The institution can request review by a designated DOE official.

Id. § 668.125(b). If it does request review, an administrative hearing will be held. *Id.* § 668.125(c)-(d).

To prevail in a recoupment action, DOE has "the burden of production to demonstrate that loans

made to students to attend the institution were discharged on the basis of a borrower defense to

repayment claim." *Id.* § 668.125(e)(1). By contrast, "[t]he institution has the burden of proof to

demonstrate that the decision to discharge the loans was incorrect or inconsistent with law and that

the institution is not liable for the loan amounts discharged or reimbursed." *Id.* § 668.125(e)(2).

According to CCST, the evidence allowed in recoupment proceedings is "extremely restricted" and

consists only of: (1) materials submitted to DOE in the BDR process by the borrowers, the

institution, or third parties; (2) any materials that the Department relied on that it chooses to provide

to the institution; and (3) any "documentary evidence" that the institution submits that relates to the

bases of the borrower defense or recoupment claim. *Id.* § 668.125(e)(3). There is no mechanism for the school to seek discovery from the borrower or examine witnesses.

5. <u>Closed School Discharge</u>

Finally, the Rule amends DOE's "closed-school discharge" regulations to "expand borrower eligibility for automatic discharges," 87 Fed. Reg. at 65,904, by changing the criteria for determining the "closure date for a school that has ceased overall operations," *id.* at 65,966. The Rule provides that a school closure date is, as determined by the Secretary, the earlier of the date "that the school ceased to provide educational instruction in programs in which most students at the school were enrolled" or the date "that reflects when the school ceased to provide educational instruction for all of its students." *Id.* at 66,060.

**D.  This Action**

On February 28, 2023, CCST filed this action, alleging that the Rule exceeds DOE's statutory authority under the HEA; is arbitrary and capricious under the APA; and violates Article III, the Seventh and Tenth Amendments, and principles of separation of powers and federalism. (Compl., Dkt. 1, at 78-84). On these grounds, CCST seeks declaratory relief and an order vacating the Rule and enjoining Defendants from enforcing it. *Id.*

On April 5, 2023, CCST filed a motion for preliminary injunction, (Dkt. 23), seeking to enjoin Defendants from enforcing, applying, or implementing the Rule pending resolution of this suit. The Rule is scheduled to become effective on July 1, 2023.

**II.  LEGAL STANDARD**

"A preliminary injunction is an extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren,* 553 U.S. 674, 689–90 (2008) (citation omitted). To demonstrate eligibility for such relief, a plaintiff must clearly show (1) "a substantial threat of irreparable injury," (2) "a

7

substantial likelihood of success on the merits," (3) "that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted," and (4) "that the grant of an injunction will not disserve the public interest." *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016) (citation omitted). Whether to grant preliminary injunctive relief is committed to the district court's sound discretion. *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985).

### III. DISCUSSION

#### A. Standing

A preliminary injunction cannot be requested by a plaintiff who lacks standing to sue, although, at earlier stages of litigation, "the manner and degree of evidence required to show standing is less than at later stages." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329 (5th Cir. 2020). Before analyzing the merits of CCST's motion, the Court must first decide whether CCST has met its burden to demonstrate its standing to challenge the Rule.

Article III of the Constitution limits "[t]he judicial power of the United States" to "cases" or "controversies." To state a case or controversy, a plaintiff must establish standing. *Arizona Christian School Tuition Organization v. Winn*, 563 U. S. 125, 133 (2011). That, in turn, requires a plaintiff to demonstrate that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U. S. 330, 338 (2016). At the preliminary injunction stage, the movant must clearly show only that each element of standing is "likely to obtain in the case at hand." *Speech First*, 979 F.3d at 330.

A plaintiff that is an organization can demonstrate standing in two ways: it can assert standing as the representative of its members (*i.e.*, "associational standing"), or, alternatively, it can claim that it suffered an injury in its own right (*i.e.*, "organizational standing"). *Warth v. Seldin*, 422 U.

S. 490, 511 (1975). For associational standing, a plaintiff must show that: (1) its members themselves would have standing; (2) the interests it seeks to protect are germane to its organizational purpose; and (3) participation of its members is not required. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). A plaintiff establishes organizational standing by "meet[ing] the same standing test that applies to individuals." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017). Here, CCST claims standing under both theories.

Defendants argue CCST lacks associational standing because it cannot show that at least one of its members themselves would have standing.[1] (Def's Resp., Dkt. 56, at 9-10). They argue that CCST members' alleged injuries are "conjectural or hypothetical," and that there is no evidence that any CCST member faces the type of concrete injury required to support individual standing. (*Id.*) CCST contends that its members would have individual standing because, as the "objects of the challenged regulations," its members face direct injuries from the Rule in the form of new regulatory burdens, increased risk of financial liability in the future, and violations of their procedural rights. (Pl's Reply, Dkt. 64, at 2-6).

The Court agrees that CCST has sufficiently shown its members would likely have individual standing to challenge the Rule. There is no real dispute that CCST's member schools are among the objects of the regulation at issue. When a challenged regulation applies to a plaintiff directly, "there is ordinarily little question" that the plaintiff has standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992); *see also Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015) ("[W]e find no reason to depart from the ordinary rule that Contender Farms and McGartland, as objects of the Regulation, may challenge it."). Indeed, CCST submits declarations from two of its

---

[1] Defendants do not dispute that CCST has met the other two elements of associational standing.

member schools stating that they have expended time conducting "preparatory activities" to ensure compliance with the Rule and mitigate future liability. Among other things, they contend that the Rule broadens the kinds of school actions that can give rise to a borrower defense claim (and potentially recoupment), including new prohibitions on "aggressive recruitment" and in other areas that require at least some degree of preparatory analysis, staff training, and reviews of existing compliance protocols. (*See* Shaw Decl., Dkt. 25, at App-33-34; Arthur Decl., Dkt. 25, at App-39-40). This is the type of concrete injury that the Fifth Circuit has deemed adequate to provide standing in other regulatory challenges. *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019) (quoting *Contender Farms*, 779 F.3d at 266) (an "increased regulatory burden typically satisfies the injury in fact requirement"). Accordingly, the Court finds that CCST has met its burden to demonstrate associational standing.

Because the Court finds CCST has adequately shown associational standing to request a preliminary injunction on its members' behalf, the Court need not resolve the question of organizational standing at this juncture. *See United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 551 n.4 (1996).

## B.  Irreparable Harm

An injury that suffices to establish Article III standing does not necessarily equate to a likelihood of irreparable harm that justifies preliminary injunctive relief. In this case, the Court's analysis begins and ends with its finding that CCST has not met its burden to make this required showing. CCST describes three categories of irreparable harms stemming from the Rule: (1) financial and reputational harms associated with anticipated BDR claims and recoupment actions; (2) abandoned plans for expansion and consolidation, and (3) unrecoverable compliance costs. (Brief, Dkt. 24, at 23-24).  The Court will examine each category in turn.

1.   Financial & Reputational Harm

CCST first claims to face a threat of "financial and reputational harm" resulting from its member schools having to "defend against a deluge of borrower defense claims." (Brief, Dkt. 24, at 21). Pointing to the Rule's new "borrower-friendly standard," groupwide-claims process, full-discharge requirement, and evidentiary presumptions, CCST says that, starting July 1, proprietary schools "are almost certain" to be "inundated by tens of thousands of borrower defense claims that will be subject to a rubber-stamp process that presumes [schools'] liability." (*Id.*) For smaller schools within its membership, CCST contends that imposing liability for discharged loans, especially on a group-claim basis, would pose an "existential threat." (*Id.* at 22). Defendants respond by noting that CCST has not identified any actual or anticipated BDR claims affecting its members, so the threat of injury arising from future BDR claims and recoupment actions is purely speculative. (Defs' Resp., Dkt 56, at 33–34).

At the outset, the Court notes that CCST waited over five months after the Rule's passage before seeking a temporary injunction. (Def's Resp., Dkt. 56, at 32–33). While not determinative, undue delay on the movant's part "militates against the issuance of a preliminary injunction." *Massimo Motor Sports LLC v. Shandong Odes Indus. Co.*, 2021 WL 6135455, at *2 (N.D. Tex. Dec. 28, 2021) (citation omitted); *see also id.* (citing *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (plaintiff's three-month delay in seeking preliminary injunction provided "some evidence that the detrimental effects of the [agency action] have already taken their toll") (citations omitted); *H.D. Vest, Inc. v. H.D. Vest Mgmt & Servs., LLC*, No. 3:09-cv-390-L (N.D. Tex. June 23, 2009) ("Plaintiff's undue delay [of five months] is sufficient to rebut a presumption of irreparable harm.") (citations omitted).

11

Putting this delay aside, there are more substantial problems with CCST's claims of impending financial injury. In general, "economic harms cannot, as a matter of law, constitute irreparable harm." *Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*, 492 F. Supp. 3d 701, 725 (E.D. Tex. 2020). The Fifth Circuit has recognized an exception in cases "where the [monetary] loss threatens the very existence of the movant's business," *Texas v. EPA*, 829 F.3d 405, 434 n.1 (5th Cir. 2016). Still, "a preliminary injunction will not be issued simply to prevent the possibility of some remote future injury," *Johnson v. Owens*, 2013 WL 12177176, at *1 (W.D. Tex. Aug. 5, 2013). Rather, a movant must affirmatively demonstrate a substantial likelihood that, in the absence of the extraordinary remedy it seeks, it will suffer injury that is "both certain and great," "actual and not theoretical." *Rozelle v. Lowe*, No. 5:15-CV-108-RP, 2015 WL 13236273, at *1 (W.D. Tex. June 1, 2015) (citation omitted).

With these principles in mind, the Court finds that CCST's asserted financial and reputational injuries are too conjectural to support preliminary injunctive relief. Regarding financial harm, CCST generally states that the Rule could one day "subject [its members] to potential liability for discharged loans, to revocation or denial of eligibility to participate in the federal student loan programs, and to restrictions upon participation," and leave them facing "enormous financial liability." (England Decl., Dkt. 25, at 28). But these outcomes are hypothetical at best. Before any CCST member would come close to facing these prospects, several events would have to occur first. For one, a student at a CCST member school would have to assert a BDR claim after July 1, 2023. CCST has not identified any pending or anticipated BDR claims against its members, much less any reason to believe such claims will be "meritless" or "rubber-stamped" by DOE. Even assuming that a "deluge" of such claims is imminent, DOE would have to adjudicate the claims in the borrowers' favor. Even then, CCST members would face no risk of financial liability because "the grant of a

12

borrower-defense application has no binding effect on the school." *Sweet v. Cardona*, No. C19-03674

WHA, 2022 WL 16966513, at *9 (N.D. Cal. Nov. 16, 2022) (emphasis removed). Instead, DOE

would have to initiate a separate recoupment action against the school, then eventually prevail in

that administrative proceeding. At that point, a school would still have the opportunity to seek

judicial review before it would be compelled to pay recoupment. "[S]peculation built upon further

speculation does not amount to a 'reasonably certain threat of imminent harm'" and does not

warrant injunctive relief. *Friends of Lydia Ann Channel v. United States Army Corps of Engineers*, 701 F.

App'x 352, 357 (5th Cir. 2017) (quoting *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir.

1991)).

　　Notwithstanding the remoteness of any recoupment liability, CCST argues that its smaller

schools face an immediate burden on July 1 because the costs of merely *responding* to a potential

group based BDR claim could overwhelm their administrative resources. In its motion and during

the hearing, CCST proffered the expert testimony of Diane Auer Jones to opine on the irreparable

harms that the Rule would impose on "small proprietary schools" (*i.e.*, "schools that have 150, or

200, or 300 students as opposed to schools that have 8,000 students or 10,000 students, or 12,000

students.") (Tr. at 39:12-40:15.) Ms. Jones opines that responding to a group claim notice would be

"disproportionately burdensome" on smaller schools because they have smaller staffs and fewer

resources (Tr. 58:20-22). Ms. Jones also opines that, under the Rule's group claim procedure, DOE

could theoretically seek recoupment to a degree that would push smaller schools into bankruptcy.

(Tr. 44:17-51:24). While Ms. Jones undoubtedly has experience in the sector, the Court finds her

testimony in support of the instant motion to be less than compelling because her opinions are

based entirely on her prior work experience at a non-CCST school. Indeed, Ms. Jones acknowledged

during the hearing that she did not speak with *any* CCST member schools in preparation for her

testimony (Tr. 57:11-58:13), nor did she review any records of any CCST member schools. *Id.* As far as the Court can discern on the current record, there is no concrete evidence that any CCST member school faces an imminent borrower claim—much less a threat of recoupment for any discharged loans. As such, the Court cannot conclude that the Rule poses any immediate existential threat to CCST or its members.

CCST's claims of reputational harm are equally thin because they are premised on the same speculative injuries and lack evidentiary support. *See Cal. Ass'n of Private Postsecondary Schs. v. DeVos* ("*CAPPS*"), 344 F. Supp. 3d 158, 182-83 (D.D.C. 2018) (rejecting similar theory of reputational injury); *Sweet v. Cardona*, 2023 WL 2213610 (N.D. Cal. Feb. 24, 2023) (rejecting claims of irreparable reputational harm from borrower defense applications); *Pruvit Ventures, Inc. v. Forevergreen Int'l LLC*, No. 4:15-CV-571, 2015 WL 9876952, at *5 (E.D. Tex. Dec. 23, 2015) (to constitute irreparable injury, "showing of reputational harm must be concrete and corroborated, not merely speculative" (citation omitted)).

At bottom, the testimony of CCST's witnesses and declarants reflects a "concern that the potential liability that schools face has increased significantly under the Final Rule." (Arthur Decl., Dkt. 25, at 39). While this concern may be genuine and credible, CCST must show that irreparable financial or reputational harm is "likely." It has not done so. *See CAPPS*, 344 F. Supp. 3d at 182–83 (finding that association of for-profit schools failed to demonstrate irreparable harm from 2016 borrower defense provisions for similar reasons).

### 2. Abandoned Plans for Expansion and Consolidation

CCST next asserts that member schools have "abandon[ed] plans to build, expand, or consolidate campuses or facilities" because doing so might trigger liability under the Rule's new "Closed-School Discharge" provisions. (Brief, Dkt. 24, at 23 (citing Arthur Decl., Dkt. 25, at 43

14

("ECPI University has been forced to abandon plans to build new or upgrade existing schools"); Shaw Decl., Dkt. 25, at 35 (stating that Lincoln Tech schools "will be forced to reconsider the opening of new campuses and upgrading of existing ones")).

But CCST's declarations do not identify any specific plans that have been or may be delayed or abandoned, nor explain why the Rule's closed school discharge provisions would necessitate any such changes in the first place. During the hearing, CCST's witness John Dreyfus testified that EPCI University, since 2019 "had been in the process of selecting a site [to build a new campus] in Dallas and when this rule was promulgated, we basically put a halt to it." (Tr. at 9:24-10:1). However, Mr. Dreyfus confirmed that ECPI's abandonment of this plan was motivated by its desire to "conserve our funds" in preparation for potential future recoupment actions—not because of the Rule's changes to the closed school discharge provisions. (*See* Tr. at 27:1-4 (acknowledging that opening Dallas campus would not provide San Antonio students a basis for a closed-school discharge)). Mere "uncertainty" about what the Rule actually requires "falls short of the type of actual and imminent threat needed to show" CCST's entitlement to relief. *CAPPS*, 344 F. Supp. 3d at 172. This is particularly so when, as here, DOE has stated its intention to provide further guidance on the "closed school" definition. *See* 87 Fed. Reg. at 41,924.

As with the borrower-defense provisions, any concrete harm that CCST's members might suffer from the closed school discharge provisions remains several steps away. To start, CCST does not allege that any member school has closed or plans to close. And the imposition of closed school liability against apparently open schools based on hypothetical future plans to "build, expand, or consolidate campuses," (Br., Dkt. 24, at 3), could occur only after DOE prevails in an administrative proceeding, after having granted relief to eligible borrowers. (*Cf.* Arthur Decl., Dkt. 25 at 46 (contending that "a 'closed school discharge' *could* be triggered by consolidating facilities,"

for which a school "would be *presumptively* held liable" if DOE "determin[es] that the criteria is met")
(emphases added)). Such claims are too remote to constitute irreparable harm.

### 3. Unrecoverable Compliance Costs

Finally, CCST claims its members will suffer irreparable harm in the form of "substantial
time and financial resources" that must now be diverted toward complying with the impending Rule.
(Brief, Dkt. 24, at 23). In response, Defendants argue that CCST member schools are under no
obligation to participate in the Title IV program; as such, they can simply decline such funds and
obviate the need to comply with the Rule's funding conditions. Furthermore, Defendants argue that
ordinary compliance costs are typically insufficient to constitute irreparable harm. (Def's Resp., Dkt.
56, at 35). While this category of harm presents a closer question, the Court finds that the specific
compliance costs shown by CCST and its members do not constitute irreparable harm sufficient to
justify preliminary injunctive relief.

The Fifth Circuit has held that "complying with a regulation later held invalid almost always
produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d 405,
433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J.,
concurring in part and in the judgment)). Thus, "[w]here costs are nonrecoverable because the
government–defendant enjoys sovereign immunity from monetary damages . . . irreparable harm is
generally satisfied." *VanDerStok v. Garland*, No. 4:22-CV-00691-O, 2022 WL 4809376, at *3 (N.D.
Tex. Oct. 1, 2022) (citing W*ages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir.
2021)). Nonetheless, such harm "must be more than speculative; there must be more than an
unfounded fear on the part of the applicant." *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022)
(internal quotations omitted). And, while "it is not so much the magnitude but the irreparability that
counts," the scale of the projected harm must be "more than de minimis." *Id.* at 1035 (quotations

omitted). Finally, showing irreparable harm requires more than vague or conclusory statements. *See, e.g.*, *Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir. 1991) (conclusory allegations do not establish irreparable harm); *Coleman v. Bank of New York Mellon*, 2013 WL 1187158 at *8 (N.D. Tex. Mar. 4, 2013) ("[U]nsupported, conclusory statements are insufficient to demonstrate entitlement to the extraordinary relief of a . . . . preliminary injunction."); *Mitchell v. Sizemore*, No. 6:09cv348, 2010 WL 457145, at *3 (E.D. Tex. Feb. 5, 2010) ("[V]ague and conclusory allegation that [the plaintiff] is undergoing 'a number of problems' is insufficient to show entitlement to injunctive relief.").

For several reasons, the compliance costs shown by CCST do not meet these standards. First, the record indicates that most of the costs described by CCST and its members have already been incurred. *Aransas Project v. Shaw*, 775 F.3d 641, 664 (5th Cir. 2014) (injunctions are forward-looking remedies that may issue "only if future injury is certainly impending.") (internal quotes omitted). CCST's declarants and witnesses confirm that their preparatory compliance efforts have been underway for months, and at least since the final Rule was published in November 2022. For example, CCST's Chairperson Nikki England attests that CCST "has *already* expended approximately three hundred staff hours working on issues integral to the Final Rule," and that its members "have *already* expended and continue to expend significant resources in anticipation of the Final Rule's effective date." (England Decl., Dkt. 25, at 30-31) (emphases added). Declarant Jeff Arthur (Vice President of CCST member ECPI University) states that his school "has *already* undertaken and continues to undertake significant efforts to comply" in anticipation of the Rule's effective date. (Arthur Decl., Dkt. 25, at 41-43) (emphasis added). Compliance costs that have already been incurred in anticipation of the Rule cannot form the basis for injunctive relief.

To the extent CCST references costs that will arise starting on July 1, it provides only nebulous and conclusory descriptions. For example, declarant Scott Shaw (CEO of CCST member

Lincoln Educational Services Corp.) avers that CCST schools "are being forced to expend time and resources" on compliance activities, including: (1) training staff on the Rule's requirements; (2) reviewing marketing, advertising, and recruitment materials; (3) "allocating staff and resources to handle the anticipated flood of meritless borrower defense claims;" and (4) developing and upgrading recordkeeping systems to maintain student records "for perpetuity," given the alleged lack of any limitation period for future BDR claims. (Shaw Decl., Dkt 25, at 35-37). Similarly, declarant Jeff Arthur states ECPI University has "expended significant time and effort preparing and training staff to comply," including by: (1) educating staff on the Rule's requirements; (2) reviewing recruiting materials and communications; (3) expanding the school's record-keeping policies; and (4) "expanding systems that monitor representations made by hundreds of staff." (Arthur Decl., Dkt. 25, at 42).

Even if the Court assumes these compliance burdens are entirely forward-looking, these statements provide no meaningful information about the specific nature or extent of these costs, nor any concrete indication that they impose more than a de minimis burden in comparison to the schools' pre-existing compliance expenses. *See CAPPS*, 344 F. Supp. 3d at 171 (finding that similar declarations from schools about the compliance-related costs of the 2016 borrower defense rule failed to present the requite "specific details regarding the extent to which [their] business will suffer" (citation omitted)). Notably, there is clear evidence that CCST's member schools have historically devoted resources to compliance with Title IV programming requirements, including previous iterations of the BDR rules. For example, ECPI University already employs significant staff whose job duties include ensuring compliance with Title IV and other state and federal regulations. (*See* Arthur Decl., Dkt. 25, at 41-43). During the hearing, CCST's witness John Dreyfus confirmed that EPCI University has operated for years with adequate staff, policies, and procedures to guard

18

against misrepresentations and ensure compliance with BDR regulations. (*See* Tr. at 18:7-23:1; *see also* Tr. at 84:5-16 (CCST counsel acknowledging, "Nobody is suggesting that there aren't current compliance costs . . . [associated with] the existing regime."). Given these pre-existing compliance costs, CCST must provide more concrete evidence to show that its member schools face more than a de minimis injury that is traceable to the new Rule.

CCST relies heavily on *Texas v. EPA* for the principle that "complying with [an agency order] later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." 829 F.3d 405, 433 (5th Cir. 2016). Defendants have not argued that CCST's members would ever be able to recover such costs, even if they ultimately prevail on the merits. "That's probably because federal agencies generally enjoy sovereign immunity for any monetary damages." *Wages & White Lion Invs., L.L.C. v. U.S. Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021). But a cursory review of the compliance costs examined in *Texas v. EPA* shows that they are not comparable to those shown in this case. For starters, the economic impact in *Texas v. EPA* was vastly larger, as petitioners proved the rule "would impose $2 billion in costs on power companies, businesses, and consumers." *Texas v. EPA*, 829 F.3d at 433. Moreover, the EPA rule at issue required the regulated companies to immediately begin constructing extensive emission-controls measures—a process that would take years to complete, raise energy costs for millions of consumers, and severely impair ERCOT's reliability. *Id.* By contrast, CCST offers only nebulous descriptions of "increased regulatory burdens and compliance costs," (England Decl., Dkt. 25, at 29), without attempting to quantify them or tie them to specific requirements within the Rule.

Moreover, the Fifth Circuit has been "less generous with private-sector plaintiffs' efforts to show irreparable harm" based on the costs of complying with agency regulations. *Texas v. EPA*, No. 3:23-cv-17, 2023 WL 2574591, at *10 (S.D. Tex. Mar. 19, 2023) (emphasizing that private plaintiffs

must show "more specificity" and "ascribe more urgency to the consequences of a challenged action" than a state plaintiff). That is not to say movants must always "convert each allegation of [financial] harm into a specific dollar amount," which would "reflect[] an exactitude our law does not require." *Restaurant Law Ctr. v. U.S. Dep't of Labor*, 66 F.4th 593, 600 (5th Cir. 2023) (finding sufficient evidence of compliance costs where "witnesses offered specific estimates of the additional time that managers would incur to comply with the rule" and described plans to "hire additional managers to perform ongoing monitoring of tasks, audits, and correct back pay when servers, bartenders, and bussers do not clock in and out correctly."). Here, CCST has not attempted to quantify its anticipated compliance costs, nor has it described them with a level of specificity courts in this circuit have historically required. *See Div. 80, LLC v. Garland*, No. 3:22-cv-148, 2022 WL 3648454, at *2–5 (S.D. Tex. Aug. 23, 2022) (distinguishing *Texas v. EPA* and declining to find irreparable harm based on alleged cost of complying with agency regulation). Based on the current record, CCST has not clearly shown that its projected compliance costs are "more than an unfounded fear" or "more than de minimis," which precludes a finding of irreparable harm. *Louisiana v. Biden*, 55 F.4th 1017, 1034-35. (5th Cir. 2022) (internal quotations omitted).

## IV. CONCLUSION

The Court finds that CCST has failed to meet its burden of clearly establishing that it or its members face irreparable harm in the absence of a preliminary injunction. Because CCST has not satisfied this essential requirement, "the court need not address the remaining three factors" of likelihood on the merits, balance of equities, and public interest. *Lee v. Verizon Commc'ns Inc.*, No. 3:12-CV-4834-D, 2012 WL 6089041, at *6 (N.D. Tex. Dec. 7, 2012) (citing *DFW Metro Line Servs. v. Sw. Bell Tel. Co.*, 901 F.2d 1267, 1269 (5th Cir. 1990)).

For these reasons, **IT IS ORDERED** that CCST's motion for preliminary injunction (Dkt.

23) is **DENIED**.

**SIGNED** on June 30, 2023.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

21