**FILED**

March 06, 2026

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _Christian Rodriguez_
DEPUTY

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

|  |  |
|---|---|
| CAREER COLLEGES & SCHOOLS OF TEXAS and CAREER EDUCATION COLLEGES AND UNIVERSITIES, | |
| Plaintiffs, | |
| v. | CASE NO. 1:23-CV-433 |
| UNITED STATES DEPARTMENT OF EDUCATION and LINDA E. McMAHON, in her official capacity as the Secretary of Education, | |
| Defendants. | |

## FIRST AMENDED COMPLAINT

Plaintiffs CAREER COLLEGES & SCHOOLS OF TEXAS ("CCST") and CAREER EDUCATION COLLEGES AND UNIVERSITIES ("CECU") in this first amended complaint against Defendants the U.S. DEPARTMENT OF EDUCATION (the "Department") and the Honorable LINDA E. McMAHON, in her official capacity as the Secretary of the Department of Education (the "Secretary"), allege, by and through their undersigned attorneys, as follows:

### INTRODUCTION & NATURE OF THE ACTION

1.      This action challenges the Department's borrower defense to repayment ("BDR") and closed-school-discharge ("CSD") regulations promulgated in 2022 (the "2022 Rule") and certain portions of the regulations involving the same subject matter promulgated in 2019 (the "2019 Rule") on the grounds that they exceed the Department's statutory authority, violate the Constitution, and fail to adhere to the requirements of the Administrative Procedure Act ("APA").

2.      The 2019 and 2022 Rules represent a significant departure from thirty years of regulatory practice, shifting the fundamental nature of borrower defense from a narrow statutory protection into an expansive administrative regime for affirmative wholesale debt cancellation. *See Career Colleges & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 244 (5th Cir. 2024) ("*Career Colleges*").

3.      Neither the 2019 Rule nor the 2022 Rule has any statutory basis under the Higher Education Act ("HEA").  Section 455(h) of the HEA authorizes the Secretary to specify "acts or omissions" that a borrower may assert as a *defense* to repayment within a judicial proceeding. 20 U.S.C. § 1087e(h).  However, both the 2019 Rule and the 2022 Rule purport to authorize *affirmative claims* for discharge outside the context of any judicial proceeding.  By doing so, the Department has created an offensive "damages remedy" that Congress did not authorize.  *Career Colleges*, 98 F.4th at 243.

4.      The 2022 Rule's implementations of "group-claim" procedures and "rebuttable presumptions" are also arbitrary and capricious.  By establishing a framework in which the Department presumes that every member of a group relied upon a school's allegedly misleading statement—regardless of individual circumstances—the Rule "shortcut[s] conventional civil litigation" and abandons the requirement for a causal connection between a school's act and a borrower's injury.  *Id.* at 247.

5.      Furthermore, the 2022 Rule creates an administrative adjudication and recoupment process "out of whole cloth" that lacks statutory footing.  *Id.* at 248.  Under the 2022 Rule, schools are subjected to financial liability through proceedings that deny basic procedural safeguards, such as the right to discovery or the cross-examination of witnesses.  *Id.* at 228.  But Congress did not

authorize the Department to reallocate to schools massive "financial liability" of such vast economic and political significance.  *Id.* at 237, 241.

6.      The 2022 Rule also improperly expands the Secretary's authority under the CSD provisions to grant complete loan discharges to borrowers, regardless of whether they asserted an applicable defense or submitted a BDR application at all.  In addition, the 2022 Rule redefines school "closure" in a way that contradicts the plain meaning of the term.  *Id.* at 252.  Without statutory authorization, the Department appropriated to itself expanded loan discharge powers and implemented extra-judicial procedures to decide, based on the Secretary's own discretion, the application of those rules, while eliminating due-process protections for schools subject to the new Rule.  *Id.* at 252–53.

7.      In addition, the Department exceeded its authority when it promulgated the 2022 Rule's prohibition on pre-dispute arbitration agreements and class-action waivers.  The Department cannot use its general authority to set terms and conditions to override the Federal Arbitration Act's strong policy favoring arbitration, particularly when Congress has not provided a clear statement authorizing the Department to strip institutions of their contractual rights to use such dispute-resolution mechanisms.  *Id.* at 254–55.

8.      Review of both the 2019 Rule and the 2022 Rule is appropriate here because of events that occurred after CCST filed the original complaint in this suit.

9.      That original complaint challenged only the 2022 Rule's BDR and CSD provisions. Reviewing CCST's challenges on appeal from the denial of a preliminary injunction, the Fifth Circuit held that the Department had exceeded its authority in promulgating the BDR and CSD provisions and that CCST had shown it was likely to succeed in demonstrating that the challenged provisions violated the HEA, the APA, and the Constitution.  *Id.* at 239–54.  The Fifth Circuit

remanded with instructions to enter a preliminary injunction and postpone the effective date of the challenged provisions pending final judgment. *Id.* at 256.

10.    After the Fifth Circuit's order, the U.S. House of Representatives passed legislation that would have repealed the 2022 Rule outright. That legislation was then taken up in the Senate as part of the reconciliation process that eventually resulted in passage of the One Big Beautiful Bill Act ("OBBBA"), Pub. L. No. 119-21, 139 Stat. 72 (2025). *See* Congress.gov, *Public Law No: 119-21* (July 4, 2025), https://www.congress.gov/bill/119th-congress/house-bill/1/summary/49 (explaining that the OBBBA was a "reconciliation bill . . . considered by Congress using expedited legislative procedures that prevent a filibuster and restrict amendments in the Senate"). Some members of the Senate, however, objected that implementing a permanent substantive alteration of the BDR and CSD provisions as part of a reconciliation bill would violate the so-called "Byrd Rule" and require a 60-vote minimum for passage. *See Republicans' "One Big, Beautiful Bill" Includes Additional Provisions That Violate the Byrd Rule*, U.S. Senate Comm. on the Budget, Ranking Member's Newsroom (June 26, 2025), https://www.budget.senate.gov/ranking-member/newsroom/press/republicans-one-big-beautiful-bill-includes-additional-provisions-that-violate-the-byrd-rule. The Senate therefore adopted a modified version of the House-passed legislation under which, rather than permanently repeal the 2022 Rule, it instead merely suspended operation of the 2022 Rule for 10 years. In the interim, the 2019 Rule would be "restored and revived" as it was in effect before the promulgation of the 2022 Rule.

11.    On July 4, 2025, President Trump signed the OBBBA into law. As a result, Plaintiffs and their member schools must not only prepare to implement the 2022 Rule when it becomes effective, but also adhere to provisions of the 2019 Rule that, as the Fifth Circuit's ruling makes clear, violate the APA and the Constitution.

12.     To address the unlawful provisions in each of the 2019 Rule and 2022 Rule and prevent the harm that will result to CCST, CECU, their member schools, and the tens of thousands of students they educate, Plaintiffs ask this Court to declare the 2022 Rule unlawful, declare certain portions of the 2019 Rule unlawful, set aside those provisions, and enjoin Defendants from enforcing them or adjudicating any pre-default borrower-defense claims.

## PARTIES

13.     CCST is a 501(c)(6) board of trade for the proprietary sector of higher education. CCST represents more than 70 postsecondary schools, institutes, colleges, and universities, which reside not only in this District but across the State of Texas.  CCST's express mission is to serve and protect the interests of its members, career education schools of Texas, and their students.  By supporting and protecting quality career education schools in Texas, CCST further aims to enable more students to reach their career goals, to provide employers with a large and necessary pool of competitive skilled workers, and to further attract and expand business in Texas.

14.     CECU is the national association representing the proprietary sector of higher education.  CECU counts among its membership nearly 900 schools across the United States.  CECU's mission is to open doors of opportunity and equip graduates with the skills that power the economy through its member career and trade schools all over the country, including in Texas.  By empowering students with skills in health, mechanics, skilled trades, and cosmetology, CECU provides employers addressing labor shortages in these industries a large and necessary pool of competitive skilled workers, attracting and expanding business in Texas and throughout the country.

15.     Defendant U.S. Department of Education is an executive agency of the United States government, 5 U.S.C. §§ 101, 105, subject to the APA, 5 U.S.C. § 551(1).  The Department,

in its current form, was created by the Department of Education Organization Act of 1979, 20 U.S.C. § 3401 *et seq.*, Pub. L. No. 96-88, 93 Stat. 668.

16.     Defendant Linda E. McMahon is the U.S. Secretary of Education.  The Secretary is named as a party to this matter in her official capacity as the head of the Department of Education.  The Secretary is responsible for the Department's promulgation of the challenged regulations and for related acts and omissions alleged herein.

## JURISDICTION & VENUE

17.     This Court has subject-matter jurisdiction because this civil case arises under the Constitution and the laws of the United States, including the APA.  *See* 28 U.S.C. § 1331; 5 U.S.C. §§ 701–706.

18.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief, including setting aside the relevant regulations, pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 706.

19.     This Court is the proper venue for this case because a substantial part of the events or omissions giving rise to the claims occurred in the Western District of Texas.

20.     Texas is home to 2.9 million student loan borrowers, the second largest number of borrowers of any state; these borrowers held $85.4 billion of student loan debt in 2019, the second largest amount of debt of borrowers in any State.  *See* Zack Friedman, *Student Loan Debt Statistics in 2022: A Record $1.7 Trillion*, Forbes.com (May 16, 2022), https://www.forbes.com/sites/zackfriedman/2022/05/16/student-loan-debt-statistics-in-2022-a-record-17-trillion/.  A significant number of the borrowers subject to the challenged rules reside in this District.

21.     Texas is also home to more than 350 institutions of higher learning that participate in the Direct Loan Program and are subject to the challenged rules.  *See* U.S. Dep't of Educ., *2026-*

*27 Federal School Code List of Participating Schools* (February 2026), https://fsapartners.ed.gov/knowledge-center/library/federal-school-code-lists/2026-02-04/2026-27-federal-school-code-list-participating-schools-february-2026.

22.     A significant number of those institutions are present in this District, including major institutions like Concordia University Texas, Huston-Tillotson University, Southwestern University, St. Edward's University, Texas State University, and the University of Texas-Austin.

23.     CCST's and CECU's member schools that reside in the Austin Division of this District and are Direct Loan program participants (the "Austin Schools") will suffer concrete injury from both the 2019 Rule and the 2022 Rule.

24.     Many students and graduates of CCST and CECU member schools who hold federal student debt and can file borrower-defense-to-repayment claims reside in the Austin Division of this District.  For example, the Austin Schools currently provide employment to hundreds of residents as instructional staff members and are responsible for providing education and workforce training to more than 2,500 students.  The 2019 Rule and 2022 Rule will harm not only the Austin Schools themselves, but by extension the local communities they serve.  By constraining educational resources and causing school closures, the Rules will eliminate essential employment opportunities and deprive students of access to critical career education opportunities.

## STANDING

25.     This Court and the Fifth Circuit have each found that CCST has standing to sue. *See* ECF No. 74, at 9–10 (June 30, 2023); *Career Colleges*, 98 F.4th at 233–34.  CECU's standing follows from this Court's and the Fifth Circuit's determinations about CCST.

26.     Both CCST and CECU have organizational standing because they are harmed and their missions are frustrated and endangered by the 2019 Rule and the 2022 Rule.  The Rules not

only increase regulatory burdens and compliance costs but also threaten irreparable and even existential liability for proprietary schools, ultimately reducing access to career education and hindering workforce development.  To the extent such liability will result in the closure of CCST's or CECU's member schools, the 2019 Rule and 2022 Rule each would greatly hinder CCST's and CECU's operations and effectiveness.  Further, there is resulting irreparable reputational harm to CCST and CECU, as both are prominent representatives of the interests of Texas career education schools, which the 2019 Rule and 2022 Rule each disfavor.

27.    CCST and CECU have diverted significant organizational resources to identify and counteract the harms of the 2019 Rule and the 2022 Rule.  In response to the Department's July 13, 2022, Notice of Proposed Rulemaking ("2022 NPRM"), CCST and CECU joined with over a dozen organizations also representing career and private schools around the country.  The group submitted 137 pages of comments, urging the Department to withdraw the then-proposed rule due to its numerous legal and regulatory deficiencies.  Before and after the publication of the 2022 Rule, CCST and CECU have been working with their members and affiliate organizations to prepare for the future regulatory landscape.  And after the enactment of the OBBBA, CCST and CECU have been working with their members and affiliate organizations to implement the relevant provisions of the 2019 Rule.

28.    CCST and CECU also each have associational standing to bring this suit on behalf of its members.

29.    CCST's membership includes more than 70 postsecondary schools, institutes, colleges, and/or universities, of which there are at least 54 that are accredited by a U.S. Department of Education recognized agency, participate in the Ford Direct Loan Program, will suffer concrete

injury from each of the 2019 Rule and the 2022 Rule—and thus have individual standing to sue in their own right.

30.    CECU's membership includes nearly 900 schools across the United States, including more than 50 schools in Texas, many of which reside in this District.  All member schools are accredited by a U.S. Department of Education recognized agency.  Member schools participate in the Ford Direct Loan Program and will suffer concrete injury from each of the 2019 Rule and the 2022 Rule—and thus have individual standing to sue in their own right.

31.    Both CCST's and CECU's member schools have trained, and are responsible for training, thousands of students to serve in highly demanded skilled professions, including nurses and medical assistants, welders, HVAC repair technicians, and trucking maintenance and automotive technology specialists.  These are professions that are essential to the communities in not only this District but the State of Texas as a whole.

32.    Both associations' members participating in the Direct Loan Program suffer concrete injury from the 2019 Rule and the 2022 Rule and have standing to sue in their own right.

33.    Each participating member school is required to conform, by 2035, to the substantive provisions of the 2022 Rule specifying acts or omissions that give rise to borrower defenses.  Violations of those provisions subject the school to potential liability for discharged loans, to revocation or denial of eligibility to participate in the federal student loan programs, and to restrictions upon participation.  *See, e.g.*, 34 C.F.R. §§ 668.71(a), 668.500(b).[1]

34.    At the same time, until 2035, each participating member school must also conform to the substantive provisions of the 2019 Rule that also specify acts or omissions that give rise to

---

[1] Citations herein to the C.F.R. shall refer to provisions upon codification of the 2022 Rule unless otherwise stated.  *See* 87 Fed. Reg. 65,904, 66,039–66,073 (Nov. 1, 2022) ("2022 Rule") (setting forth 2022 Rule amendments to the C.F.R.).

borrower defenses.  Violations of the 2019 Rule also subject the school to potential liability for discharged loans or fines, to revocation or denial of eligibility to participate in the federal student loan programs, and to restrictions on the institution's participation in the program.  34 C.F.R. §§ 668.71(a), 668.93, 668.94 (2020).  Each participant is subject to these unlawful Departmental procedures that threaten unwarranted reputational injury and enormous financial liability.

35.    The 2022 Rule requires participating member schools to prepare for and take action to avoid reputational harms, liability, and exclusion from (or restrictions upon) participation in the federal student loan program under the 2022 Rule.  And, in the interim, participating member schools must comply with the 2019 Rule.

36.    The member interests at stake are germane to each organization's purpose, which includes protecting members from unjust laws and regulations, promoting student access to career education, and serving as an advocate for member interests before governmental bodies.

37.    Neither the claims asserted nor the relief requested requires the participation of individual members in this pre-enforcement challenge.  Each CCST and CECU member school that participates in the Direct Loan Program is equally subject to the substantive and procedural provisions of the 2019 Rule and the 2022 Rule, and no facts or legal issues specific to individual CCST and CECU members require adjudication to resolve the legal claims presented.

38.    The 2019 Rule and 2022 Rule each constitute final agency action.  Following passage of the OBBBA, the 2019 Rule went back into effect on July 4, 2025, and the 2022 Rule will resume effect on July 1, 2035.  All claims are strictly legal and based on a complete administrative record.  Schools must conform their conduct, recordkeeping activity, and compliance efforts to avoid reputational injury, potentially substantial financial liability, and exclusion from (or restriction upon) participation in the federal student loan programs.

## BACKGROUND

### I.     The Higher Education Act & the History of the Department's BDR Rules

39.     The HEA establishes several student loan programs.  The three most relevant to this lawsuit are the Direct Loan, Perkins, and FFEL programs.  *See* 87 Fed. Reg. at 65,904 (citing 20 U.S.C. §§ 1071 *et seq.*, 1087a *et seq.*).

40.     In 1993, Congress amended the HEA by adding Section 455(h), which is now codified at 20 U.S.C. § 1087e(h).  Pub. L. No. 103-66, § 4021, 107 Stat. 312, 351 (1993); *see Career Colleges*, 98 F.4th at 229 n.4.

41.     Section 455(h) provides, in pertinent part, that:

> [T]he Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part, except that in no event may a borrower recover from the Secretary, in any action arising from or relating to a loan made under this part, an amount in excess of the amount such borrower has repaid on such loan.

20 U.S.C. § 1087e(h).  The "part" referred to in Section 455(h) is Part D of Title 20, Chapter 28, Subchapter IV: the Direct Loan program.  Thus, Section 455(h) grants the Secretary authority to promulgate regulations related to Direct Loans.

42.     In its first two decades of existence, Section 455(h) was rarely invoked.  87 Fed. Reg. at 65,979 ("[T]he [borrower defense] process . . . was rarely used prior to 2015"); 81 Fed. Reg. 75,926, 75,926 (Nov. 1, 2016) ("2016 Rule") ("[The] Section . . . governing defenses to repayment[] has been in place since 1995 but, until recently, has rarely been used.").

43.     Pursuant to the HEA, the Department promulgated borrower-defense regulations in 1994, including one stating that where a borrower's defense against repayment is successful, a borrower may be "relieved of the obligation to repay all or part of the loan and associated costs and fees."  34 C.F.R. § 685.206(e)(12)(i); *see Career Colleges*, 98 F.4th at 230.  The Department also announced the standards for permitting a borrower to "assert as a defense against repayment,

any act or omission of the school attended by the [borrower] that would give rise to a cause of action against the school under applicable State law." 59 Fed. Reg. 61,664, 61,696 (Dec. 1, 1994). The Department later clarified that the 1994 Rule did not "provide a private right of action for a borrower and [was] not intended to create new Federal rights in this area." 60 Fed. Reg. 37,768, 37,769 (July 21, 1995); *Career Colleges*, 98 F.4th at 230.

44.    In connection with that first 1994 regulatory implementation of Section 455(h), the Department explained that Section 455(h) has a limited role: If the Secretary or other authorized person brings "an action" for repayment, the borrower "may assert as a defense" an institutional act or omission specified in Department regulations. 59 Fed. Reg. at 61,696. The Department's 1994 Rule explicitly contemplated that a "defense" would be asserted only in existing formal collection proceedings. Indeed, it provided that "[i]*n any proceeding to collect on a Direct Loan,* the borrower may assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law." 34 C.F.R. § 685.206(c) (1995) (emphasis added). The Department commented that "the regulations identify *formal proceedings* in which borrowers may raise the acts or omissions of the school as a defense against collection of the loan," 59 Fed. Reg. at 61,671 (emphasis added), which would include "(i) Tax refund offset proceedings under 34 CFR 30.33"; "(ii) Wage garnishment proceedings under Section 488A of the Act"; "(iii) Salary offset proceedings for Federal employees under 34 CFR Part 31"; and "(iv) Credit bureau reporting proceedings under 31 U.S.C. 3711(f)," 59 Fed. Reg. at 61,696.

45.    In 1995, the Department first recognized a defense to an action for repayment that allowed the Department to recoup the funds from a school if a court had already found that school liable for some violation of law. At the time, the Department required such institutions to

"purchase" from the Department that part of a Direct Loan that is unenforceable whenever the unenforceability "resulted in whole or in part" from the school's violation of a federal statute or regulation or the school's negligent or willful false certification. 34 C.F.R. § 685.308(a) (1995). But the Department did not develop a separate procedure for these limited cases; instead, it specified that the Secretary would follow the audit appeals procedures in 34 C.F.R. pt. 668 when determining whether to require a school to repay funds. *See* 34 C.F.R. § 685.308(b) (1995).

46.     The Department retained that understanding of Section 455(h) of the HEA for about 20 years. In that time, "[t]he regulations governing borrower defense claims were 'rarely used.'" *Career Colleges*, 98 F.4th at 230 (citation omitted). Indeed, "the Department . . . recognized borrower claims covering fewer than 100 persons between 1998 and 2009." *Id.* at 241.

## II.    The 2016 Rule

47.     In 2016, in response to increased borrower-defense claims asserted by attendees of the Corinthian Colleges, the Department adopted new regulations ostensibly to "streamline the borrower defense process" that would apply to Direct Loans made on or after July 1, 2017. 81 Fed. Reg. 39,330, 39,331 (June 16, 2016); *see Career Colleges*, 98 F.4th at 230.

48.     Under the 2016 Rule, schools bore new burdens in connection with borrower-defense claims. Departing from the previous regulatory framework, the 2016 Rule authorized, for the first time, the affirmative assertion of "borrower defense" claims across a much broader range of circumstances outside the context of collection proceedings. *See Career Colleges*, 98 F.4th at 241 ("Before 2016, the Department authorized borrowers to assert affirmative claims only in very limited circumstances"). In addition, the 2016 Rule established a new "group" claim process, whereby the Department could, in its own discretion, initiate the grouping of individual borrower-defense claims whenever the Department determined that there were sufficient factual commonalities among the claims. 81 Fed. Reg. at 75,927. Under the group-claim process, schools

had the onus to rebut the presumption that each member of the group reasonably relied on the alleged misrepresentation or omission.  81 Fed. Reg. at 75,970.  Meanwhile, the 2016 Rule did not allow schools to challenge the class of borrowers chosen by the Department.  81 Fed. Reg. at 75,968.

49.    Further, the 2016 Rule introduced a prohibition on the use or enforcement of pre-dispute agreements to arbitrate borrower-defense claims and of class-action waivers, even if such provisions were agreed upon in binding contracts prior to the 2016 Rule's effective date.  81 Fed. Reg. at 75,927.

50.    The 2016 Rule also permitted application of its newly created borrower-defense causes of action to all loans, not just Direct Loans.  81 Fed. Reg. at 75,930–75,931.

51.    Thus, more than 50 years after enactment of the HEA, the Department adopted for the first time an interpretation of the statute that empowered it to expand the class of Direct Loans that were eligible for forgiveness and institute new adjudicatory processes to decide borrower-defense claims.

52.    The 2016 Rule's effective date was delayed until October 2018, due to litigation and the Department's decision to initiate a new negotiated rulemaking process.

## III.    The 2019 Rule

53.    In 2019, following consideration of public comments on a 2018 Notice of Proposed Rulemaking, the Department published new borrower-defense regulations that applied to loans "first disbursed on or after July 1, 2020."  84 Fed. Reg. 49,788, 49,788 (Sept. 23, 2019) ("2019 Rule").

54.    The 2019 Rule reversed some of the aspects of the 2016 Rule.  For example, the 2019 Rule reverted to limiting the application of borrower-defense causes of action to Direct Loans.  84 Fed. Reg. at 49,814–49,815.

55.     The 2019 Rule also acknowledged that certain other aspects of the 2016 Rule were improper, including the 2016 Rule's limitations on a school's ability to challenge group adjudication of claims, 84 Fed. Reg. at 49,831, and the 2016 Rule's assignment of liability to schools for even inadvertent or innocent misstatements, 84 Fed. Reg. at 49,804.  To address these unlawful aspects of the 2016 Rule, the 2019 Rule gave schools a more robust opportunity to provide evidence to support their positions, 81 Fed. Reg. at 49,831, and limited a school's liability to only those misstatements that were false, misleading, or deceptive in nature, 84 Fed. Reg. at 49,804.  The 2019 Rule also featured a requirement to disclose the use of mandatory pre-dispute arbitration agreements and class-action waivers, which replaced the 2016 Rule's blanket prohibition of such provisions.  84 Fed. Reg. at 49,888; *see Career Colleges*, 98 F.4th at 232.

56.     But the 2019 Rule retained or augmented many other unlawful aspects of the 2016 Rule.  For example, the 2019 Rule retained the 2016 Rule's novel interpretation that the Department is empowered to create "a process for adjudicating" borrower defenses to repayment as separate affirmative "claims."  84 Fed. Reg. at 49,788.  It also allowed the Secretary to "collect from schools the amount of financial loss due to" conduct that the Department found to have been unlawful.  *Id.*; *see* 34 C.F.R. § 685.206(e)(16) (2020).  The Department continued to claim "broad statutory authority," including the authority to "not only identify borrower causes of action that may be recognized as defenses to repayment, but also to establish the procedures for receipt and adjudication of borrower claims—including the type of proceeding through which the Department may consider such a claim."  84 Fed. Reg. at 49,796.

57.     The 2019 Rule also embraced inconsistent definitions for acts it deemed unlawful.  For example, the Department narrowed the scope of acts or omissions that constituted misrepresentations for purposes of BDR claims brought by borrowers.  But at the same time, it

expanded the scope of acts or omissions that constituted misrepresentations for purposes of allowing the Department to recoup the value of the discharged loans from the schools. 84 Fed. Reg. at 49,825 (citing 34 C.F.R. §§ 685.206(e)(3), 668.71(c)). These disparate definitions led to situations where the Department could deny a student relief for the same action by a school that would have allowed the Department to recover against the school. The Department's explicit motivation for implementing these different definitions was to ensure that the Department was able to recoup funds from schools to the maximum extent possible. *Id.*

58.    Additionally, while the 2019 Rule's adjudicatory process allowed schools more opportunity to review evidence adduced against them by borrowers, the process still allowed the Department to "weigh information and evidence from all sides" for itself and not through a judicial or quasi-judicial process. 84 Fed. Reg. at 49,795, 49,830–49,831; 34 C.F.R. § 685.206(e)(10) (2020). The Department also denied the school an opportunity to appeal its determination, asserting that it was not "necessary [to] add an appeals process to the adjudication process, nor does due process require an appeal." 84 Fed. Reg. at 49,830. Rather, the losing party was to "challenge the Department's decision through a judicial proceeding." *Id.*

59.    The 2019 Rule originally became effective on July 1, 2020.

## IV.    The 2022 Rule

### A.    The 2022 Notice of Proposed Rulemaking and Adoption of the 2022 Rule

60.    On July 13, 2022, the Department published a Notice of Proposed Rulemaking ("2022 NPRM") in the Federal Register under the caption "Student Assistance General Provisions." 87 Fed. Reg. 41,878 (July 13, 2022).

61.    Publication of the 2022 NPRM followed three public hearings and three negotiated rulemaking sessions.

62.     The 2022 NPRM proposed to significantly modify and expand the process for adjudicating borrower-defense claims, adding new claims and new procedures for the benefit of borrowers while eliminating many procedural and evidentiary safeguards for institutions.

63.     For example, the 2022 NPRM proposed to (i) prohibit schools from entering into mandatory agreements to arbitrate and forgo class actions; and (ii) expand the reasons a loan could be discharged to include total and permanent disability, a school's closure, and false certification.

64.     The 2022 NPRM set a deadline of August 12, 2022, for comment submissions, which the Department refused to extend. 87 Fed. Reg. at 41,878.

65.     Many, including CECU, CCST, and Members of Congress on the U.S. Senate Committee on Health, Education, Labor and Pensions and the U.S. House Committee on Education and Labor (now the Committee on Education and the Workforce), took issue with the Department's refusal to extend the 30-day period, especially given the 2022 NPRM's numerous and complex regulatory proposals, which spanned several hundred pages. *See*, *e.g.*, Letter from Sen. Richard Burr and Rep. Virginia Foxx to Secretary Cardona (Aug. 12, 2022), https://edworkforce.house.gov/uploadedfiles/8.12.22_foxx_and_burr_to_cardona.pdf.    Despite the Department's refusal to extend the deadline, the 2022 NPRM elicited more than 5,300 public comment submissions, including comments from CECU and CCST.

66.     Little more than a month following the comment deadline, the Department distributed the proposed final rule (the 2022 Rule) for interagency review.

67.     The 2022 Rule substantially adopted each of the proposals in the 2022 NPRM and promulgated the final 2022 Rule on November 1, 2022.

**B.      Expansion of "Borrower-Defense" Causes of Action**

68.     The 2022 Rule greatly broadened the substantive grounds on which borrowers may assert affirmative borrower-defense claims to include five new areas: "substantial"

misrepresentation under a new uniform federal standard; "substantial" omission of fact; breach of contract; aggressive or deceptive recruitment; and a state or federal judgment or final Department action against an institution that could give rise to a borrower-defense claim. *See* 34 C.F.R. § 685.401(b)(1)–(5).

69.    In connection with misrepresentation claims, the 2022 Rule removed the scienter requirement that had been added in 2019 and defined a new substantive standard. Under that new standard, a misrepresentation was deemed *substantial* if a borrower reasonably relied upon it or "*could* reasonably be expected to rely" upon it to his or her detriment. 34 C.F.R. § 668.71(c) (emphasis added).

70.    The 2022 Rule also provided that a borrower could assert claims based on substantial omissions of fact. Under the 2022 Rule, "the concealment, suppression, or absence of material information" relating to "[t]he nature of the institution's educational programs, the institution's financial charges, or the employability of the institution's graduates" could qualify as a substantial omission, 34 C.F.R. § 668.75(e), but the 2022 Rule did not limit a "substantial omission of fact" to those circumstances and declined to provide a comprehensive definition of that phrase.

71.    The 2022 Rule also expanded the types of "evidence" that borrowers or the Department could use to prove a borrower defense, while limiting the types of evidence that institutions could put forward in defense. Further, the 2022 Rule purported to "incorporate[] the conventional elements of injury and causation" by requiring the Department to "conclude that the institution's act or omission is an actionable ground for [defense to repayment] that caused detriment to the borrower that warrants relief." 87 Fed. Reg. at 65,908. But the 2022 Rule provided that "[i]n considering whether an institution's acts or omissions caused detriment that

warrants this form of relief, the Department would consider the totality of the circumstances, including the nature and degree of the act or omission and of the harm or injury along with other relevant factors"—elements that are not encompassed in traditional interpretations of injury and causation. *Id.*

72.     Although Section 455(h) of the HEA applies only to the Direct Loan Program, the 2022 Rule extended the reach of borrower defenses to borrowers with Perkins Loans and Federal Family Education Loans ("FFEL") as well. *See* 34 C.F.R. § 685.219(c)(3).

73.     The 2022 Rule also established new adjudicatory procedures for BDR claims. In addition to authorizing individuals to file BDR claims, the 2022 Rule permitted "group" consideration of borrower-defense claims, an about-face from the Department's 2019 rejection of group processes in favor of a "more fact-specific inquiry." 84 Fed. Reg. at 49,798. Instead, reverting to the approach pioneered in the 2016 Rule, the 2022 Rule established a process for grouping and adjudicating such claims based on the existence of "common facts and circumstances." 87 Fed. Reg. at 65,998. The Secretary could initiate those group processes upon the Department's own determination, creating a group based on federal or state law enforcement activity, individual claims, and/or lawsuits filed against institutions. 34 C.F.R. § 685.402(a), (b).

74.     The 2022 Rule also permitted state government entities and legal assistance organizations to initiate the group-claim process. 87 Fed. Reg. at 65,938; 34 C.F.R. § 685.401. The Department acknowledged that its "inclusion of third-party requestors from the legal assistance community mean[t] the possible number of requests for considering a group claim could be substantially higher than anticipated." 87 Fed. Reg. at 65,938.

75.     For group processes, the 2022 Rule established "a rebuttable presumption that the act or omission giving rise to the borrower defense affected each member of the group in deciding

to attend, or continue attending, the institution, and that such reliance was reasonable."  34 C.F.R. § 685.406(b)(2).

76.    The 2022 Rule's expansion of "evidence" that could prove a BDR claim also included any information submitted with a claim or group application, or possessed by the Department, regardless of whether it was sworn, authenticated, or hearsay.  As a result, the Department acknowledged that "there [we]re situations where the evidence supporting the approval of a borrower's claim could come solely from the application submitted by the borrower." 87 Fed. Reg. at 65,939.  Although the 2022 Rule provided for an institutional response to an allegation of wrongdoing, the regulations provided no opportunity for the institution to discover or test evidence from the borrower(s) or cross-examine any borrower.  34 C.F.R. §§ 685.405, 685.406(b), (c).

77.    In contrast to prior regulations, the 2022 Rule eliminated any possibility of a partial loan discharge; rather, the Department could only "award *a full discharge* for approved claims." 87 Fed. Reg. at 65,946 (emphasis added); 34 C.F.R. § 685.408.  The Department concluded that full discharge was the only practical form of relief because, in its view, "articulating a clear and consistent standard for applying a partial discharge is not feasible."  87 Fed. Reg. at 65,946.  As a result, a consolidated loan would have to be discharged in full—and the school would have to return the entire amount of the loan—even if the consolidated loan included loans that were disbursed before the alleged misrepresentation and therefore not otherwise subject to relief.  *See Career Colleges*, 98 F.4th at 231.

78.    Under the 2022 Rule, borrowers could raise a defense to repayment "at any time," so long as the borrower had a balance due on a Direct Loan or another loan that could be consolidated into a Federal Direct Consolidation Loan.  34 C.F.R. § 685.401(b).

20

79.    The 2022 Rule continued to provide a system of appeals for borrowers but not for schools.  And though a borrower could seek reconsideration of decisions denying a borrower-defense claim, the Department continued to deny schools any corresponding opportunity to seek reconsideration of or to appeal an adverse decision of the Department on a borrower-defense claim. 87 Fed. Reg. at 65,945.  Further, the 2022 Rule permitted a borrower to seek reconsideration of a claim under a state-law standard if her initial claim was denied.  87 Fed. Reg. at 65,933 (citing 34 C.F.R. § 685.401(c)).

80.    Under the 2022 Rule, following Department approval of a borrower-defense claim, the Department could undertake a separate process for seeking recoupment against schools. Specifically, the Secretary would seek recoupment through the process previously established for program reviews under Part 668, subpart H, which sharply circumscribes a school's ability to submit evidence.  87 Fed. Reg. at 65,913.

81.    Asserting that the Department did not "consider recoupment . . . to be a sanction or punishment," 87 Fed. Reg. at 65,908, the 2022 Rule imposed the burden on the school to disprove the propriety of the discharge and the school's liability for the discharged amount, 87 Fed. Reg. at 65,950.  The 2022 Rule denied the school any right to discovery or to witness examination to aid it in satisfying that burden.  *Id.*

C.    **Prohibition on Arbitration Agreements and Class-Action Waivers**

82.    The 2022 Rule also prohibited schools from agreeing with students to arbitrate or to resolve claims on an individual basis, rather than through class actions.  87 Fed. Reg. at 65,953; 34 C.F.R. §§ 668.41, 685.300, 685.304.

83.    The Department prohibited those agreements even though, according to the Department's 2019 estimate, approximately one-half of participating proprietary institutions had agreed with students, upon enrollment, to arbitrate potential future disputes and/or resolve them

21

on an individual, case-by-case basis rather than through class-action processes.  *See* 84 Fed. Reg. at 49,904 ("Of the 1,888 proprietary institutions participating in the title IV, HEA programs, we estimate that 50 percent or 944 will use a pre-dispute arbitration agreement and/or class action waiver and will provide the required information electronically.").

> **D.  "Closed School" Loan Discharges**

84.    The 2022 Rule also provided that students who were attending a school at the time it "closed," or shortly before it "closed," would be eligible to have their loans discharged.  87 Fed. Reg. at 65,966–65,967.  Where students received such discharges, the Department would seek to recover corresponding funds from the "closed" school.  87 Fed. Reg. at 65,968.

85.    The 2022 Rule defined school closures broadly in a manner that would cover even schools that continued to provide classes to substantial numbers of students.  Specifically, the 2022 Rule gave the Secretary wide discretion to determine that a school's closure date was the earlier of the date that the school "ceased to provide educational instruction in programs in which *most* students at the school were enrolled," as "determined by the Secretary," or "a date determined by the Secretary that *reflects* when the school ceased to provide educational instruction for all of its students."   34 C.F.R.  §§ 674.33(g)(1)(ii)(A),  682.402(d)(1)(ii)(A),  685.214(a)(2)(i)  (emphases added).

86.    In addition, the 2022 Rule empowered the Secretary or a guaranty agency to discharge an FFEL loan "without an application from the borrower" if the Secretary or guaranty agency had information that the borrower did not complete an institutional teach-out plan or teach-out agreement at another approved school.  34 C.F.R. §§ 674.33(g)(3)(i)(B), 682.402(d)(8)(i)(B), 685.214(c)(1).

87.    The 2022 Rule also disposed of the 2019 Rule's limitation on closed-school discharges.  Under the 2019 Rule, a borrower could only receive a closed-school discharge without

an application only if the school closed between November 1, 2013, and July 1, 2020, and the borrower did not enroll in another Title IV school within three years of the prior school's closure date. 34 C.F.R. § 685.214(c)(3) (2020). But the 2022 Rule allowed for automatic discharge for any school closure unless the borrower completed the program at another branch or location of the closed school or through an approved teach-out program within a year of the school's closure. 34 C.F.R. §§ 674.33(g)(3)(ii), 682.402(d)(8)(ii), 685.214(c)(1).

## V.    The Fifth Circuit Stays the Enforcement of the 2022 Rule Because of the Rule's "Pantheon of Legal Problems."

88.    CCST filed this lawsuit challenging the 2022 Rule on February 28, 2023. To prevent harm to its members during the course of the suit, CCST moved for a preliminary injunction. ECF No. 23 (Apr. 5, 2023). This Court denied the motion. *See* ECF No. 74 (June 30, 2023).

89.    The Fifth Circuit granted a stay pending appeal on June 30, 2023, to prevent irreparable harm while it considered the merits of CCST's interlocutory appeal. *See* ECF No. 77 (June 30, 2023).

90.    The Fifth Circuit subsequently determined that the 2022 Rule should be preliminarily enjoined because there was "a strong likelihood that the plaintiffs will succeed on the merits in demonstrating the Rule's numerous statutory and regulatory shortcomings." *Career Colleges*, 98 F.4th at 226.

91.    The Fifth Circuit held that the Department likely lacks statutory authority to define affirmative borrower-defense claims against the United States or to adjudicate actions between borrowers and schools. *Id.* at 254. The court held that the Department's shift to make defenses proactive as opposed to purely "reactive measure[s]" effectively "establishes new federal causes of action without clear congressional authorization." *Id.* at 240–41, 243.

92.    The Fifth Circuit also held that the Department's authority likely extends only to "promulgat[ing] *regulations*," not "*adjudicat*[*ing*] cases based on its regulations." *Id.* at 247. "Nothing in the text of" the HEA, the court observed, "specifically mentions the Department's authority to adjudicate claims, much less the authority to adjudicate borrower-defense or recoupment claims." *Id.* at 248.

93.    Further, the Fifth Circuit determined that the 2022 Rule's definitions of defenses that qualify for discharge were too "vague and broad" and "full of non-exclusive examples and undefined terms," in ways that are contrary to the specificity requirement of Section 455(h). *Id.* at 240, 245.

94.    Additionally, the Fifth Circuit observed that the program transformed borrower-defense adjudications from administrative actions between the Department and borrowers into *de facto* adjudications of private rights of action between borrowers and schools. *Id.* at 248. Although declining to resolve definitively the constitutionality of such a transformation, the Fifth Circuit noted that it raised serious constitutional concerns by entrusting the resolution of private rights to non-Article III adjudicator and depriving schools of their right to a jury trial under the Seventh Amendment. *Id.* at 248–49.

95.    The Fifth Circuit also emphasized several more specific aspects of the 2022 Rule's borrower-defense provisions that likely violated the Department's authority under the HEA, the APA, and the Constitution. For example:

a.    The 2022 Rule's removal of a knowledge or negligence requirement on the part of schools for misrepresentation claims resulted in strict liability, but the Department failed to provide an adequate explanation for that change. *Id.* at 246.

b.     The 2022 Rule's authorization of a full discharge of consolidated loans combined with the absence of a causation requirement resulted in a punitive-damages remedy that the Department was not authorized to create. *Id.* at 243.

c.     The 2022 Rule's rebuttable presumption—that each borrower included as a member of a group claim "*knew* about the particular claimed borrower defense; that each member *relied on* the representation, omission, or other act; and that each member's reliance was *reasonable*"—lacked due-process protections, seized "immense non-reviewable discretion" for the Department, and was "not designed to further the truth-seeking process." *Id.* at 249–51.  Making these statutory and constitutional violations worse, the 2022 Rule offered only limited opportunities for a school to present evidence to rebut the presumption. *Id.* at 249.

96.     The Fifth Circuit also determined that the closed-school discharge provisions likely exceeded the Department's statutory authority. *Id.* at 251–52.  It observed that under the HEA, the Secretary may discharge a borrower's liability on a loan when the borrower cannot complete the program "due to the closure of the institution." 20 U.S.C. § 1087(c)(1); *see Career Colleges*, 98 F.4th at 252.  But the Fifth Circuit explained that, contrary to the plain meaning of that statute, the 2022 Rule allowed the Secretary to deem a school "closed," even if it was not, so long as "the school ceased to provide educational instruction in programs in which most students at the school were enrolled." 34 C.F.R. § 685.214(a)(2)(i); *Career Colleges*, 98 F.4th at 253.  Further, the Fifth Circuit held that the factors involved in making the decision about when a school is deemed closed were impermissibly "vague, subject to arbitrary and unequal enforcement, and potentially sweeping." *Career Colleges*, 98 F.4th at 252.

97.     The Fifth Circuit also pointed out that the closed-school provisions of the 2022 Rule "arbitrarily authorize[] automatic, full discharges of debt *without proof of causation*," even for borrowers who withdrew before the determined closure date or had an option to accept instruction at another campus or teach-out agreement at another comparable school.  *Id.* at 251.  The Fifth Circuit held that the HEA does not authorize the Department to enforce such a presumption of dischargeability, instead explicitly requiring "proof that the student's inability to complete a program was 'due to' the closure."  *Id.* at 253 (quoting 20 U.S.C. § 1087(c)(1)).

98.     For all those reasons, the Fifth Circuit ordered this Court to issue a preliminary injunction that "postpone[d] the effective date of the borrower-defense and closed-school discharge provisions of the [2022] Rule pending final judgment."  *Id.* at 256.  The Fifth Circuit specified that its stay pending appeal would "remain[] in effect until the district court enters the preliminary injunction."  *Id.*

99.     The Supreme Court granted a writ of certiorari to review a limited question regarding the reach of the HEA on January 10, 2025.  *Dep't of Educ. v. Career Colleges & Schs. of Tex.*, 145 S. Ct. 1039 (2025).  But on August 8, 2025, following a stay of briefing, the parties filed a joint stipulation requesting that the Supreme Court dismiss the case in light of intervening legislative developments discussed below.  The Court dismissed the case on August 11, 2025.  *See* ECF No. 107 (Aug. 12, 2025).

100.     On January 28, 2026, in accordance with the Fifth Circuit's direction, this Court entered a preliminary injunction.  ECF No. 116 (Jan. 28, 2026).

**VI.    The One Big Beautiful Bill Act Delays, but Does Not Repeal, the 2022 Rule and Revives the 2019 Rule in the Interim**

101.    Following the Fifth Circuit's decision, Congress enacted the One Big Beautiful Bill Act ("OBBBA"), Pub. L. No. 119-21, 139 Stat. 72 (2025), which suspended—but did not repeal—the 2022 Rule.

102.    On May 22, 2025, as part of passing a budget-reconciliation bill, the U.S. House of Representatives provided that provisions of the 2022 Rule concerning borrower defense to repayment and closed-school loan discharges would be "repealed and shall have no legal effect." One Big Beautiful Bill Act, H.R. 1, 119th Cong. § 30051(c) (2025).  The House bill provided that in their place, the regulations concerning those topics would be "restored and revived" as they existed before the 2022 Rule was promulgated.  H.R. 1, 119th Cong. § 30051(d).

103.    The House bill also prohibited the Department from implementing regulations substantially similar to the 2022 Rule "unless authority for such implementation is explicitly provided in an Act of Congress."  H.R. 1, 119th Cong. § 30051(e).

104.    When the U.S. Senate considered the bill, however, the provisions concerning borrower defense to repayment and closed-school loan discharges in the House bill faced scrutiny by the Senate Parliamentarian under the Senate's rules of reconciliation.  Those rules require at least 60 votes for any major legislation proposed in budget reconciliation bills.  2 U.S.C. §§ 644, 645.  As of June 26, 2025, the Senate Parliamentarian was still reviewing whether the BDR and CSD provisions in the House bill would be subject to a 60-vote threshold.  *Republicans' "One Big, Beautiful Bill" Includes Additional Provisions That Violate the Byrd Rule*, U.S. Senate Comm. on the Budget, Ranking Member's Newsroom (June 26, 2025), https://www.budget.senate.gov/ranking-member/newsroom/press/republicans-one-big-beautiful-bill-includes-additional-provisions-that-violate-the-byrd-rule; 2 U.S.C. § 645(e)(2)(A).

105.    In an effort to avoid further delay in passing the budget reconciliation bill, the Senate revised the bill to remove the House version's full repeal of the relevant portions of the 2022 Rule and instead merely modify the effective dates of the disfavored provisions.  One Big Beautiful Bill Act, H.R. 1 (Engrossed Amendment Senate ("EAS")), 119th Cong. §§ 85001–85002 (2025); *see* David Morgan, *Trump Pushes Congress to Pass His "Big Beautiful Bill" as Debate Clouds Path Forward*, Reuters (June 24, 2025), http://reuters.com/legal/transactional/trump-pressures-congress-his-big-beautiful-bill-debate-clouds-path-forward-2025-06-24/.

106.    With respect to the borrower-defense regulations, the Senate bill stated that "for loans that first originate before July 1, 2035, the provisions of subpart D of part 685 of title 34, Code of Federal Regulations (relating to borrower defense to repayment), as added or amended by the final regulations published by the Department of Education on November 1, 2022, . . . shall not be in effect."  H.R. 1 (EAS), 119th Cong. § 85001(a).  The Senate bill provided that, in the interim, for loans that originate before July 1, 2035, "any regulations relating to borrower defense to repayment that took effect on July 1, 2020, are restored and revived as such regulations were in effect on such date."  H.R. 1 (EAS), 119th Cong. § 85001(b).

107.    Similarly, the Senate bill stated that "for loans that first originate before July 1, 2035, the provisions of sections 674.33(g), 682.402(d), and 685.214 . . . [relating to closed school discharges], as added or amended by the final regulations published by the Department of Education on November 1, 2022, . . . shall not be in effect."  H.R. 1 (EAS), 119th Cong. § 85002(a).  As to such loans, the designated sections of the Code of Federal Regulations "shall be in effect as if the amendments made by [the 2022 Rule] had not been made."  H.R. 1 (EAS), 119th Cong. § 85002(b).

108.    As a result, under the Senate version of the bill, certain provisions of the 2022 Rule "shall not be in effect" until July 1, 2035, and the corresponding provisions of the 2019 Rule are "restored and revived" to operate in the interim.

109.    The Senate also struck the provision in the House bill that would have prohibited the Department from enacting further regulations that are similar to the 2022 Rule. Neither it nor an analogue to it appears in the final statute.

110.    The House of Representatives passed the Senate version of the bill without modification, and the President signed the OBBBA into law on July 4, 2025. Pub. L. No. 119-21.

## DISCUSSION

### I.    The 2022 Rule Exceeds the Department's Authority, Violates the APA, and Is Unconstitutional.

111.    As in CCST's original complaint, Plaintiffs continue to maintain that the borrower-defense, closed-school discharge, and arbitration/class-action waiver provisions of the 2022 Rule exceed the Department's authority under the HEA, violate the APA, and are unconstitutional. This Court and the Fifth Circuit already determined that the challenge to the 2022 Rule was proper under Article III, and while the OBBBA delayed the effective date of many relevant provisions of the 2022 Rule, it did not render that challenge moot because it did not establish that enforcement of the challenged provisions "'could not reasonably be expected'" to recur. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 92 (2013) (citation omitted). On the contrary, under the OBBBA, enforcement of the challenged provisions of the 2022 Rule is certain to resume in the future absent regulatory or legislative amendments (or judicial action).

**A.    The Department Lacks Authority to Create Federal Causes of Action.**

112.    As described above, the 2022 Rule substantially broadens the affirmative borrower-defense claims that may be presented to the Department for adjudication.  *See* 34 C.F.R. § 685.401(b)(1)–(5).  In doing so, the 2022 Rule exceeds the Department's statutory authority.

113.    Section 455(h) of the HEA provides that "the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan."  20 U.S.C. § 1087e(h).  That provision enables the Department to specify defenses to repayment, not to create private or public rights of action.  *Career Colleges*, 98 F.4th at 241; *see* Black's Law Dictionary (6th ed. 1990) (defining "defense" as "that which is offered and alleged by the party . . . in an action or suit, as a reason in law or fact why the plaintiff should not recover or establish what he seeks").

114.    Moreover, the statute requires that borrower defenses be raised "*in any action* arising from or relating to a loan made under this part."  20 U.S.C. § 1087e(h) (emphasis added).  An "action" is a "a lawsuit brought in a court."  Black's Law Dictionary (6th ed. 1990)  Read as a whole, therefore, the HEA authorizes the Department to establish a reactive measure that can be asserted in the context of judicial proceedings, not to create brand-new causes of action that may be raised outside of pre-existing judicial proceedings.

115.    Earlier Departmental interpretations confirm that understanding.  The 1994 Rule allowed a borrower to introduce "any act or omission of the school . . . that would give rise to a cause of action against the school under applicable State law" only as a defense within one of four specified judicial "proceedings": "(i) Tax refund offset proceedings under 34 CFR 30.33"; "(ii) Wage garnishment proceedings under Section 488A of the Act"; "(iii) Salary offset proceedings for Federal employees under 34 CFR Part 31"; and "(iv) Credit bureau reporting proceedings under 31 U.S.C. 3711(f)."  59 Fed. Reg. at 61,671, 61,696.  And the Department explicitly clarified that

its 1994 Rule did not "provide a private right of action for a borrower and [was] not intended to create new Federal rights in this area."  60 Fed. Reg. at 37,769.

> ### B.    The Department's Adjudication of Borrower-Defense Claims Violates the Statute, the APA, and the Constitution.

116.    The 2022 Rule also "create[s] out of whole cloth" an adjudicatory process that lacks "any statutory basis" and that improperly denies schools any colorable opportunity to develop a defense. *Career Colleges*, 98 F.4th at 248.

117.    Section 455(h) "speaks only to the Secretary's power to promulgate *regulations*— not the power to *adjudicate* cases based on its regulations." *Id.* at 247.  The power to make rules does not subsume the power to adjudicate violation of those rules. *RLC Indus. Co. v. Comm'r*, 58 F.3d 413, 417–18 (9th Cir. 1995).  In fact, when Congress confers adjudicatory authority, it does so "explicitly and set[s] forth the relevant procedures in considerable detail." *Bank One Chi., N.A. v. Midwest Bank & Tr. Co.*, 516 U.S. 264, 274 (1996) (citation omitted); *see, e.g.*, 26 U.S.C. §§ 7441–7443 (Tax Court); 8 U.S.C. § 1324a (adjudication for unlawful employment of aliens before an administrative law judge); 35 U.S.C. § 6 (Patent Trial and Appeal Board).  No such authority has been granted here.

118.    The 2022 Rule's authorization to adjudicate claims in an administrative tribunal also "essentially contradicts" Section 455(h), as the HEA only allows borrower defenses to "be asserted 'in any *action* arising from or relating to a loan made under this part.'  20 U.S.C. § 1087e(h) (emphasis added).  The contemporaneous legal definition of 'action' is 'a lawsuit brought in a court,' which is distinct from an adjudication brought in an administrative tribunal. *Action*, Black's Law Dictionary (6th ed. 1990)." *Career Colleges*, 98 F.4th at 247.

119.    The Department's historical understanding of Section 455(h) further undermines the claims to adjudicatory authority reflected in the 2022 Rule.  The Supreme Court has repeatedly

held that when an agency claims the power to take actions of great "economic and political significance," that claim must be evaluated in light of the "history and the breadth of the authority . . . asserted." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (citation omitted). Here, the Department recognized shortly after enactment of Section 455(h) that the authority granted therein was sharply limited and empowered it only to promulgate a circumscribed defense that could be asserted in pre-existing proceedings. 59 Fed. Reg. at 61,671. The Department cannot now refashion Section 455(h) into a broad delegation to create and adjudicate new causes of action that could effectively sanction billions of dollars of loan forgiveness. *See Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (per curiam). As the Department recognized as recently as 2021, when it disavowed the power to cancel loan debt e*n masse*, "Congress does not impliedly delegate a policy decision of massive economic and political magnitude—as blanket or mass cancellation, compromise, discharge, or forgiveness of student loan principal balances, or the material modification of the repayment terms or amounts thereof, surely would be—to an administrative agency." U.S. Department of Education, Office of the General Counsel, Memorandum to the Secretary Re: Student Loan Principal Balance Cancellation, Compromise, Discharge, and Forgiveness Authority, at 2 (Jan. 12, 2021); *see* 87 Fed. Reg. at 65,906 ("[T]he statute does not authorize the Secretary to . . . forgiv[e] all student loans [or] set[] interest rates to 0 percent").

120.   The Department also claimed the authority to adjudicate because Congress has granted it rulemaking authority to "carry out functions otherwise vested in the Secretary," 20 U.S.C. § 1221e-3, and to "manage the functions of the Secretary or the Department," 20 U.S.C. § 3474. But those procedures refer to audit and liability functions which are "simply not the same

as the adjudications authorized by the [2022] Rule for individual or group claims alleging violations of the newly created borrower defenses." *Career Colleges*, 98 F.4th at 247.

### C.    The Recoupment Procedures in the 2022 Rule Violate the Statute, the APA, and the Constitution.

121.    Section 455(h)'s grant of rulemaking power also does not authorize the Department to adjudicate an institution's liability to the Government for discharged loans.

122.    The 2022 Rule, however, provides that the Department may collect the liability for any borrower defense discharge from the school in a recoupment proceeding.    34 C.F.R. § 685.409; *see* 87 Fed. Reg. at 65,912.

123.    In proceedings under that section, the Department will provide written notice to the school of the borrower-defense determination, the basis of liability, and the amount of the discharge.    34 C.F.R. § 668.125(a).    The institution may then request review by a designated Department official.    34 C.F.R. § 668.125(b).    If the institution requests review, the official will hold a hearing.    34 C.F.R. § 668.125(c)-(d).    At the hearing, the Department has only "the burden of production to demonstrate that loans made to students to attend the institution were discharged on the basis of a borrower defense to repayment claim."    34 C.F.R. § 668.125(e)(1).    By contrast, the institution has "the burden of proof to demonstrate that the decision to discharge the loans was incorrect or inconsistent with law and that the institution is not liable for the loan amounts discharged or reimbursed."    34 C.F.R. § 668.125(e)(2).

124.    The evidence allowed under the recoupment procedure is restricted to (1) any materials submitted to the Department in the BDR process by the borrowers, the institution, or third parties; (2) any materials that the Department relied on that it chooses to provide to the institution; and (3) any "documentary evidence" that the institution submits that relates to the bases of the borrower defense or recoupment claim.    34 C.F.R. § 668.125(e)(3).

125.    The Department's establishment of that process for adjudicating recoupment claims far exceeds its statutory authority.  Agencies may exercise only those authorities that Congress provides by statute.  "[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (citation omitted).  In particular, where "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Aishat v. U.S. Dep't of Homeland Sec.*, 288 F. Supp. 3d 261, 267 (D.D.C. 2018) (citation omitted).

126.    Congress did not grant the Department authority in Section 455 of the HEA to recover loans discharged through borrower-defense adjudications at all, let alone to establish internal procedures that make it a judge in its own cause.  That stands in stark contrast to other parts of the HEA, which grant the Department authority to pursue recoupment following loan discharges granted on certain specified bases.  *See, e.g.*, 20 U.S.C. § 1087(c)(1) (in cases of closed schools, false certification, and lender refunds, "the Secretary shall discharge the borrower's liability on the loan (including interest and collection fees) by repaying the amount owed on the loan and shall subsequently pursue any claim available to such borrower against the institution and its affiliates and principals or settle the loan obligation pursuant to the financial responsibility authority under subpart 3 of part H").  Indeed, the Department appears to have admitted as much. *See* 81 Fed. Reg. at 75,929 (noting the distinction between 20 U.S.C. § 1087(c)(1) and § 1087e(h)).

127.    The Department points to Section 454(a)(3) of the HEA, 20 U.S.C. § 1087d(a)(3), as authority for its recoupment procedures.  *See* 87 Fed. Reg. at 41,911, 65,948.  But that provision is about an entirely separate arrangement called a Program Participation Agreement, which is supposed to "provide that the institution accepts responsibility and financial liability stemming

from its failure to perform its functions pursuant to the agreement." 20 U.S.C. § 1087d(a)(3).  The provision notably does not by itself connect the Program Participation Agreement or an institution's "responsibility and financial liability" to the Department's discharge of loans pursuant to a borrower defense, nor does it authorize the Department to prescribe recoupment procedures.

128.    No other contextual evidence suggests that Congress intended to authorize the Department to create recoupment procedures.  Agencies only enjoy those powers provided them by Congress and, when major questions are involved, a "clear congressional authorization" is required.  *West Virginia*, 597 U.S. at 732 (citation omitted).  As Congress did not clearly authorize the Department to effectuate recoupment procedures, the Department cannot assume such authority.

129.    The recoupment procedures established in the 2022 Rule also violate the Constitution, which requires due process in administrative adjudications that may deprive any person of a property interest.  *See, e.g.*, *Mathews v. Eldridge*, 424 U.S. 319 (1976).  The recoupment procedures fail to provide for adjudication by a neutral decisionmaker, thereby violating that constitutional guarantee:  It is a fundamental requirement of due process (and also consequently the APA) that the adjudicator of a claim be unbiased and exercise some independence.  *See*, *e.g.*, *Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 155 (1991) (observing that, in the context of administrative adjudication, "adjudication by independent panel" "mores closely . . . accord[s] with traditional notions of due process" (citation omitted)).  Here, the Department stands to gain financially by recouping discharged loan amounts from schools because doing so will shift the risk of nonpayment to institutions, and yet the 2022 Rule takes no steps to protect the independence of the Department officials who may be designated to adjudicate recoupment claims.  Indeed, commenters suggested that due process prohibited

ordinary Department officials from adjudicating these claims and called for the Department to require a "third-party, such as an ALJ," to oversee these procedures. 87 Fed. Reg. at 65,917. The Department, however, saw "no need for such limitations on which employees could serve as a Department official" presiding over these adjudications and rejected the commenters' calls for a neutral decisionmaker. *Id.*

130.    Due process protections are especially important here given that the recoupment procedure implicates such significant property interests. A successful BDR will result in a complete discharge of a borrower's loan obligations, so recoupment of any individual discharged loan could involve hundreds of thousands of dollars. A group claim could involve millions of dollars. All told, the Department stands to gain billions of dollars from recoupment decisions. In such circumstances, the Department cannot grant itself the adjudicatory authority to make those recoupment decisions, particularly without any clear congressional authorization and without protections for the independence of the Department personnel charged with conducting the adjudications.

131.    The Department's seizure of the authority to adjudicate borrower forgiveness and recoupment also violates procedural guarantees under Article III and the Seventh Amendment. Under both Article III and the Seventh Amendment's jury-trial protections, Congress may assign an action to administrative adjudication when it involves "public rights." *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 450 (1977); *Tull v. United States*, 481 U.S. 412, 417 (1987). But "Congress may not withdraw" an action "from judicial cognizance" when it "involves a matter of private rather than public right." *SEC v. Jarkesy*, 603 U.S. 109, 134 (2024) (citation modified).

132.    The 2022 Rule's recoupment procedures are not administrative adjudications of public rights; rather, as the Department conceded in 2016, they resolve "common law claim[s]." 81 Fed. Reg. at 75,929.  That is underscored by the fact that the BDR claim giving rise to the recoupment process may turn on a violation of state law or breach of contract, classic common-law causes of action.  *See Career Colleges*, 98 F.4th at 248–49.

133.    The 2022 Rule does not cure that problem through the ostensible bifurcation of (i) the BDR claim adjudication between the borrower and the Department, on one hand; and (ii) the recoupment proceeding between the school and the Department, on the other.  As the Fifth Circuit recognized, the bifurcated mechanism simply allowed the Department to provide loan forgiveness to the borrower and then put itself in the shoes of the borrower to recoup the value of the loan from the school.  *Id.* at 248–49.  That does not sufficiently "disaggregate the integrated process[es]" to turn the recoupment procedures into an adjudication of public rights.  *Id.* at 249.

134.    The Department made no meaningful attempt to justify the recoupment procedure as a more efficient mechanism for arriving at a correct and just conclusion.  Nor did the Department suggest that jury trials would be incompatible with the HEA's statutory scheme.  Indeed, such a suggestion would not have been credible as the HEA survived for decades without recoupment procedures like the ones adopted in the 2022 Rule.

135.    The 2022 Rule also lacks other basic procedural safeguards.  It provides no mechanisms by which the school may secure critical evidence from either third parties or the borrower, nor does it give the school any opportunity to test the borrower's credibility.  That procedural omission is critical even in circumstances where the school may have some evidence of its own relating to a borrower-defense claim.  For example, while a school may dispute allegations that aggressive or deceptive recruitment occurred based on its own recruiting records,

it has no mechanism to discover the borrower's evidence, to test borrower's testimony in a prior proceeding, or to compel the testimony of the borrower or necessary third parties.  Without any means to discover or adduce such critical evidence, it will often be impossible, as a practical matter, for schools to carry the burden of proof that the 2022 Rule assigns to them.  *See* 34 C.F.R. § 668.125(e)(2).

136.    Finally, the 2022 Rule's recoupment procedure also violates the APA because it lacks a sufficiently reasoned explanation.  The Department claims that institutions will prefer the 2022 Rule's procedure because it follows the program-review process in Part H of the HEA and is therefore more "familiar."  87 Fed. Reg. at 41,912.  But even if schools would sacrifice procedural fairness for "familiarity," the recoupment procedures of the 2019 Rule that the 2022 Rule will replace are themselves based on Part G of the HEA.  The difference between Part G, which the 2019 recoupment process relies on, and Part H, which the Department adopted in the 2022 Rule, is that Part H provides fewer procedural protections.  Since schools are equally familiar with both longstanding parts of their governing regulations, the Department's reasoning for the changes does not pass muster.

137.    Further, the Department failed to credit concerns that bifurcated proceedings will subject schools to substantial reputational harms before (and notwithstanding) the final adjudication of borrower-defense claims.  To the extent that a school has any meaningful procedural rights under the 2022 Rule, it will not be able to exercise them until a recoupment proceeding, which will necessarily occur only after a BDR claim has been granted.  In the meantime, the institution will lose community support; its reputation will be tarnished in the eyes of accreditors, state authorization agencies, and employers; its alumni will lose opportunities; and its prospective students will be discouraged from applying and enrolling.

D.      **The 2022 Rule's Definitions of Substantive Borrower Defenses Violate the Statute, the Administrative Procedure Act, and the Constitution.**

138.    Even if Section 455(h) authorized the Department to convert a borrower defense into a borrower claim, and even if the Department were empowered to adjudicate such claims itself, the substantive standards for borrower defenses adopted in the 2022 Rule are invalid for the additional reasons that they violate the HEA, the Constitution, and the APA.

1.      **The Department's Failure to Specify What Acts or Omissions Are Actionable Violates the HEA and Is Arbitrary and Capricious.**

139.    Section 455(h) requires the Department to "specify in regulations which acts or omissions of an institution of higher education" can be "assert[ed] as a defense to repayment." 20 U.S.C. § 1087e(h).  As the Fifth Circuit recognized, "[t]he verb 'specify' connotes specificity, which means a precise definition of the prohibited acts or omissions." *Career Colleges*, 98 F.4th at 243–44.  The 2022 Rule's vague definitions of actionable acts and omissions fail to satisfy that statutory standard.  *See id.* at 244.

140.    Actionable conduct under the 2022 Rule includes any misrepresentations or omissions by any employee, representative, or contractor of a school that in any way relates to the borrower's decision to attend, continue to attend, or take out a covered loan.  34 C.F.R. §§ 668.71(c), 668.75, 685.401(b)(1), (2).

141.    The 2022 Rule purports to define the scope of actionable conduct by enumerating examples of the kinds of misrepresentations or omissions that justify relief.  For example, the 2022 Rule identifies misrepresentations or omissions concerning educational programming, financial charges and assistance, or the employability of graduates.  34 C.F.R. §§ 668.72–668.74.  But this list is just representative; in reality, "[p]otential liability runs the gamut of a student's interactions with the school." *Career Colleges*, 98 F.4th at 244.  Similarly, the prohibitions on aggressive and deceptive recruiting tactics list six categories of potentially actionable conduct.  34 C.F.R.

§ 668.501.  But the 2022 Rule explicitly states that potential liability is "not limited to" those

categories, and as a result, leaves "the key terms . . . undefined."  *Career Colleges*, 98 F.4th at 244.

The Department's failure to provide appropriate limitations to the definitions of actionable acts or

omissions is contrary to law.  *See id.*

> **2.**    **The Department's Failure to Require Intent for an Actionable Misrepresentation Claim Violates the HEA and Is Arbitrary and Capricious.**

142.    In subpart F of the 2022 Rule, the Department defines misrepresentation as a

borrower defense, and broadly "establishes the types of activities that constitute substantial

misrepresentation by an eligible institution."  34 C.F.R. § 668.71(b); *see* 87 Fed. Reg. at 65,920.

143.    As the Department noted in the 2022 NPRM, "[s]ubstantial misrepresentations

constitute most of the claims that the Department has approved to date and have consistently served

as a basis for borrower defense discharges across the several sets of regulations."  87 Fed. Reg. at

41,889.

144.    The 2022 Rule eliminates most of the elements that have historically comprised a

misrepresentation claim, including that the alleged misrepresentation be made with intent.  Instead,

the 2022 Rule defines a misrepresentation broadly as:

> Any false, erroneous or misleading statement an eligible institution, one of its
> representatives, or any ineligible institution, organization, or person with whom the
> eligible institution has an agreement to provide educational programs, or to provide
> marketing, advertising, recruiting or admissions services makes directly or
> indirectly to a student, prospective student or any member of the public, or to an
> accrediting agency, to a State agency, or to the Secretary. A misleading statement
> includes any statement that has the likelihood or tendency to mislead under the
> circumstances.

34 C.F.R. § 668.71(c).

145.    The Department should have restricted the defense to only *intentional*

misrepresentations.  Instead, the 2022 Rule imposes liability for any erroneous representation,

however inadvertent.   The imposition of such a strict-liability rule of misrepresentation, particularly given the Department's "inadequate explanation of its decision to eliminate an intent requirement," is arbitrary and capricious.  *Career Colleges*, 98 F.4th at 246.

146.    The Department claims that "[r]equiring intent would place too great a burden on an individual borrower."  87 Fed. Reg. at 69,521.  However, the Department overlooks several practical realities: intent is a common element of proof throughout the law; intent is often proven through circumstantial evidence; an institution's response to a claim could provide relevant evidence; and a finder of fact can make inferences from the totality of evidence presented. Eliminating the intent element to facilitate relief to a borrower was not justified.  The Department provides no reasoned explanation why that context here is so different from others where individual plaintiffs must prove institutional intent.  Nor does the Department give a reasoned explanation why a school should have liability for discharged loans without any proof of culpability (not even, for example, negligence).  *Career Colleges*, 98 F.4th at 246.

147.    Many schools may be unable to survive such liabilities and could be forced out of business (especially if subject to group claims discussed below), to the detriment of their students and communities over the long run.

148.    The Department also attempts to justify removal of the intent requirement by noting that "if the action resulted in detriment to the borrower that warrants relief, the Department does not believe whether it was taken with knowledge or intent should be relevant."  87 Fed. Reg. at 65,921.  But the manner in which the Department determines detriment itself lacks meaningful safeguards.  For example, the Department already presumes the existence of detriment without individualized proof when adjudicating group claims and closed-school discharges (as discussed below).  And even in non-group adjudications, the Department allows borrowers to prevail on a

borrower-defense claim based merely on an "inference of causation that does not meet the strictures of a conventional common law fraud claim." 87 Fed. Reg. at 65,922.

149.    Moreover, the Department uses its new misrepresentation standard not only to grant relief to borrowers, but to fine schools and revoke, restrict, or deny their participation in the federal student loan program, even without proof of borrower detriment. 34 C.F.R. § 668.71(a). It is arbitrary and capricious to authorize the sanctioning of a school for innocent and unintentional misstatements of fact.

### 3.    The Department's Freestanding "Omission of Fact" Defense Violates the HEA and Is Arbitrary and Capricious.

150.    Under the 2022 Rule, an omission of fact is treated as a misrepresentation "if a reasonable person would have considered the omitted information in making a decision to enroll or continue attendance." 34 C.F.R. § 668.75. In order to establish such an actionable omission, a borrower need not point to any affirmative representation that was rendered misleading as a result of the omitted information (though claims based on such affirmative misrepresentations are separately actionable under 34 C.F.R. § 668.71(c)).

151.    The 2022 Rule thus creates a novel, open-ended borrower defense based on inadvertent or unanticipated nondisclosures, even where there was no prior duty of disclosure and no breach of good faith. The Department's newly fashioned duty to disclose arises merely upon retrospective proof that a borrower would have "considered" the fact in a borrowing or enrollment decision. The absence of such information is actionable even if its absence did not render any actual misrepresentation misleading, even if the fact was objectively unimportant, and even if the omission was wholly accidental. The new standard based on what a prospective student "would have considered" is vague and unworkable, fails to create a concrete standard of conduct for schools, and is arbitrary and capricious.

152.    The Department's freestanding omissions rule is not within the scope of Section 455(h).

153.     In authorizing the Secretary to specify borrower defenses to contractual repayment obligations based on omissions by the school, Congress drew upon a long tradition of contractual defenses based on omission—all of which require the party to have been misled.  Absent a relationship of trust and confidence, an omission provides a contractual defense only when a party knows that the other party will be misled: *i.e.*, knowledge that (1) nondisclosure will make a prior representation fraudulent or material; (2)  nondisclosure will not correct another's mistake of fact, if nondisclosure is contrary to principles of good faith and fair dealing; and (3)  the other person is mistaken as to some fact as to the content or effect of the instrument.  *Restatement (Second) of Contracts* § 161 (1981).

154.    The Department elsewhere acknowledges that an omission must be misleading to be a misrepresentation.  *See* 87 Fed. Reg. at 65,925 (noting that Section 668.75 "incorporate[s] the definition of misleading conduct from part 668, subpart F, which requires that the omission make the school's interaction with a borrower misleading under the circumstances").  But the 2022 Rule's definition of omission does not require the borrower to have been misled, and thereby departs from the common-law backdrop on which Congress drew in Section 455(h).

155.    The Department's omissions rule is also arbitrary and capricious.  It imposes unreasonable duties upon institutions on pain of potentially existential liability.  An inadvertent failure to disclose potentially triggers liability to the entire "affected" cohort and for the full amount of their loans.  Liability could be in the millions of dollars (even hundreds of millions for larger institutions) for an inconsequential and inadvertent omission.  Omissions of fact are also

grounds for fining schools or revoking, restricting, or denying their participation in the federal student loan program. *See* 34 C.F.R. § 668.71(a), (c).

156. The Department provided no rational explanation justifying its arbitrary and capricious rule, which imposes amorphous duties that no school could meet.

157. The Department defends the open-ended disclosure duty on the ground that it is paired with a requirement of borrower injury, 87 Fed. Reg. at 65,925, but (as discussed below) for group and closed-school claims, that fact is presumed and need not be proven. Thus, the injury requirement cannot justify the open-ended "omissions" defense to repayment, which broadly applies to individual, group, and closed-school claims.

### 4. The Department's "Breach of Contract" Defense Does Not Define "Acts and Omissions" as the Statute Requires and Is Constitutionally Infirm.

158. The 2022 Rule creates a defense to repayment where "[t]he institution failed to perform its obligations under the terms of a contract with the student and such obligation was undertaken as consideration or in exchange for the borrower's decision to attend, or to continue attending, the institution, for the borrower's decision to take out a covered loan, or for funds disbursed in connection with a covered loan." 34 C.F.R. § 685.401(b)(3).

159. It is common practice for students to sign enrollment agreements, *i.e.*, binding contracts between student and school.

160. The power to resolve contract disputes must be expressly authorized by Congress and is not authorized in these circumstances. *See Am. Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995).

161. Similarly, because breach-of-contract claims are not public rights and litigants have a right to a jury trial of such claims in federal court, the Department's rule also violates Article III and the Seventh Amendment. *See, e.g., Jarkesy*, 603 U.S. at 127–28.

162.    By establishing its own peculiar BDR right of action for contract breach, the Department also impermissibly abrogates States' authority to establish the law of recovery for contract breaches.  The BDR action for breach of contract effectively allows the Department to preempt state contract laws by awarding a form of consequential discharge to borrowers who have not shown any cognizable damages that are causally connected to a breach, or established their efforts to mitigate or avoid such damages.

163.    The Department also has abrogated States' rights to set their own statutes of limitations for these kinds of breach-of-contract claims.  Under the 2022 Rule, borrowers face no limitations period for bringing BDR claims for breach of contract—meaning that a borrower could assert such a claim even decades after the borrower ceased enrollment.  The 2022 Rule thus permits borrowers to bring BDR claims for contract breaches long after their state-law causes of action for the same breach are extinguished.

164.    The Department's bifurcated proceedings for BDR claims and recoupment based on contract disputes are also unlawful.  Contracts may generally be enforced only by parties or, in carefully delineated circumstances, third-party beneficiaries, and are typically enforced before judges and juries in adversarial judicial proceedings between plaintiffs and defendants in which all claims, defenses, and remedies are resolved after discovery of relevant facts.  Here, however, the HEA does not allow the Department to stand in the shoes of borrowers and to so broadly recoup the borrowers' loans as a third-party beneficiary—especially when the adjudicatory structure set up by the Department denies the institutions the right to discovery, relies on a series of presumptions that are not grounded in state law, and imposes procedures designed to prejudice the rights of institutions.

165.    The 2022 Rule is also arbitrary and capricious because it provides for adjudication of contract rights by any designated Department official, not just an administrative law judge.

166.    To the extent the Department's decisions seek to follow state law, the 2022 Rule will require the agency to interpret and apply the state laws of every jurisdiction in the United States—a task it has no evident expertise to perform.  *See* 81 Fed. Reg. at 75,957 (acknowledging the "significant burden" that reliance upon state law places on Department officials).  And to the extent the Department will *not* adhere to state law, the 2022 Rule violates principles of federalism and the Tenth Amendment.

### 5.    The Department's "Aggressive Recruitment" Defense Violates the Statute and Is Arbitrary and Capricious.

167.    The 2022 Rule includes a new standalone basis for borrower defense: aggressive and deceptive recruitment conduct or tactics.  The 2022 Rule defines aggressive recruitment only by example, such as where a school "pressure[s] the student . . . to make . . . decisions immediately" or "engage[s] in unsolicited contact . . . after the student . . . has requested not to be contacted."  34 C.F.R. § 668.501(a)(1), (6).  Under the 2022 Rule, any form of aggressive and deceptive recruitment practice can support a defense to repayment.  The borrower need not even prove that the alleged aggressive recruitment practice was antecedent to the relevant lending or attendance decision, or involved misrepresentation.  *See, e.g.*, 87 Fed. Reg. at 65,928 (defending "aggressive recruitment" as a "pathway to relief" precisely when there are no misrepresentations).

168.    The Department's use of a non-exhaustive list of examples in Section 668.501 without an overarching definition constitutes another example of the Department's failure to specify which acts or omissions gave rise to a borrower defense.  The result renders institutions vulnerable to liability based on amorphous and highly subjective standards.  For example, the 2022 Rule does not explain how the Department intends to assess what might constitute improper

46

"pressure" or how to assess the reasonableness or credibility of a student's subjective assertion that she felt pressured.

169.    The vagaries of the aggressive recruitment provision are multiplied by the group-claim process and the Department's presumption that everyone in the group was affected by aggressive recruiting.  Given that the grounds for asserting an aggressive recruitment claim are numerous, highly subjective, and dependent on individualized facts (*e.g.*, what the prospective student knew about postsecondary education processes and what the recruiter knew about the prospective student's knowledge), the Department cannot simply bypass fact-finding in favor of a presumption that all members of a group are entitled to a discharge.  Rather, the Department must determine an aggressive recruitment claim based on individual proof and on an individual basis.

### 6.    The Department's Defense Based on a Prior Judgment Against an Institution Under Any State or Federal Law Expands the Borrower-Defense Framework Beyond the Statute.

170.    The 2022 Rule recognizes the following as an additional basis for a borrower-defense claim:

> The borrower, whether as an individual or as a member of a class, or a governmental agency has obtained against the institution a favorable judgment based on State or Federal law in a court or administrative tribunal of competent jurisdiction based on the institution's act or omission relating to the making of covered loan, or the provision of educational services for which the loan was provided.

34 C.F.R. § 685.401(b)(5)(i).  Critically, the standard would apply regardless of whether the judgment was obtained by the borrower as an individual or member of a class, or was obtained by a State's Attorney General or other governmental agency.  According to the Department, the defense could apply even to a nondefault, contested "judgment[] obtained against an institution based on any State or Federal law . . . whether obtained in a court or an administrative tribunal of competent jurisdiction."  87 Fed. Reg. at 65,932.

171.    That provision of the 2022 Rule violates the statute.  Section 455(h) provides that "the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense."  20 U.S.C. § 1087e(h).  A judgment against an institution is not an "act or omission" of that institution.  Furthermore, judgments can be based on an indeterminate number of acts or omissions of institutions that happen to violate federal law, state statutory or regulatory law, state common law, municipal law, or even foreign law.  The Department has thus abdicated its duty to identify particular acts or omissions of schools that justify relief.

172.    To permit any judgment based on any federal or state law to serve as the basis for a borrower-defense claim would defeat the purpose of the borrower-defense provisions, which require the Secretary to evaluate and specify which acts or omissions of the institution justify loan discharge.  And, for the same reasons discussed with regard to breach-of-contract claims, the Department does not have authority to supplant state law or other federal laws it does not administer by creating additional liability or relief and overriding legal restrictions on relief.  Nor may the Department effectively extend any applicable statute of limitations.

173.    The 2022 Rule also offends longstanding principles of claim preclusion.  A prior judgment "'prevents litigation of *all grounds for . . . recovery* that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding.'"  *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 590 U.S. 405, 412 (2020) (emphasis added) (quoting *Brown v. Felsen*, 442 U.S. 127, 131 (1979)).

174.    The Department attempts to avoid claim preclusion by bifurcating the proceedings so that the BDR claim is brought only against the Secretary, with the Secretary then recouping liability from the school.  But in substance, the BDR operates prospectively to impose additional

liability on the institution for any discharge granted to the borrower based on a prior judgment. It is, at minimum, arbitrary and capricious to trample on the institution's rights of repose in a judgment. And there is no reason for the Department to grant additional relief to other parties when the court that issued the judgment presumably granted the plaintiff in question the full relief to which she was entitled after evaluating the facts and the nature of the legal violation.

175.    If the borrower had already received a judgment for a particular violation of law, that should be *res judicata* and the end of the matter, regardless of whether the borrower might reap more benefits for the same act or omission. A judgment may also preclude re-litigation of issues, but issue preclusion should be applied neutrally whether it benefits the borrower or the institution.

> **7.    The Department's Defense Based on Departmental Adverse Actions Exceeds Its Statutory Authority and Violates the Constitution and the APA.**

176.    The 2022 Rule allows a borrower defense any time "[t]he Secretary sanctioned or otherwise took adverse action against the institution" in certain program review proceedings "based on the institution's acts or omissions that could give rise to a borrower defense claim" under the new federal standard. 34 C.F.R. § 685.401(b)(5)(ii).

177.    The Secretary's sanction or adverse action cannot qualify as a borrower defense under Section 455(h) because it does not "specify in regulations *which* acts or omissions of an institution of higher education a borrower may assert as a defense." 20 U.S.C. § 1087e(h) (emphasis added).

178.    Additionally, the 2022 Rule does not require that the Department's action satisfy the standards for a borrower-defense claim—only that the adverse Department decision was "based on . . . acts or omissions that *could* give rise" to a borrower-defense claim under one of the other provisions. 34 C.F.R. § 685.401(b)(5)(ii) (emphasis added). This aspect of the 2022 Rule

thus serves to deprive institutions of a full and fair opportunity to litigate the borrower defense aspect of the "adverse action."

179.    The 2022 Rule's expansion of the bases for BDR to include adverse actions is particularly arbitrary and capricious because it allows the Secretary to rely on non-adjudicative adverse actions as the basis for automatic loan discharge.  For example, the 2022 Rule lists denial of an application for recertification and revocation of a provisional program participation agreement as eligible adverse actions.  *See id.* (citing 34 C.F.R. § 668.13).  But the recertification process is primarily non-adjudicative and predominately considers administrative capability and financial responsibility.  *See* 34 C.F.R. § 668.13(a)(1)(i).

180.    Because the 2022 Rule does not even guarantee notice to the school that the adverse action may subsequently be used to determine a borrower-defense claim, the 2022 Rule effectively makes a non-adjudicatory adverse finding that "could give rise" to a BDR claim conclusive in a subsequent adjudication.

181.    The 2022 Rule thereby creates a novel form of issue preclusion based on non-adjudicative agency action, contrary to longstanding precedent recognizing that collateral-estoppel effect attaches to agency action only "[w]hen an administrative agency is acting in a judicial capacity and resolve[s] disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate."  *United States v. Utah Constr. & Mining Co*., 384 U.S. 394, 422 (1966).  Nothing in Section 455(h) or any other source of law authorizes the Department to violate that fundamental principle of collateral estoppel, which is grounded in due process.  *See Blonder-Tongue Lab'ys, Inc. v. Univ. of Ill. Found*., 402 U.S. 313, 329 (1971).

**8.    The Department's Newly Established Defense Based on Any State Law Violation Exceeds Its Statutory Authority and Violates the Constitution and the APA.**

182.    For loans disbursed before July 1, 2017, the 2022 Rule also permits a borrower to seek reconsideration under state law if the school "committed any act or omission that relates to the making of the loan for enrollment at the school or the provision of educational services for which the loan was provided that would give rise to a cause of action against the school under applicable State law without regard to any State statute of limitations." 34 C.F.R. § 685.401(c).

183.    That defense violates Section 455(h) because it does not specify which acts or omissions give rise to a borrower defense to repayment. The Secretary must determine what acts or omissions justify rescission of contractual repayment obligations and cannot depend upon the various states' laws, which creates an inconsistent and fluctuating federal standard.

184.    Furthermore, the Department lacks statutory and constitutional authority to adjudicate state causes of action, which are not federal public rights. The Department's adjudication of state-law causes of action therefore violates Article III and, for actions for which there is a right to jury trial, the Seventh Amendment.

185.    Similarly, the Department's implicit abrogation of state statutes of limitations discussed above also is without statutory authority, is arbitrary and capricious, and violates due process, principles of federalism, and the Tenth Amendment.

**9.    The Department's Creation of Substantive Presumptions Exceeds Its Statutory Authority and Violates the APA and the Due Process Clause.**

186.    The core, irreducible meaning of institutional "acts or omissions" giving rise to a borrower's "defense to repayment" under Section 455(h) is that the act or omission must make it inequitable for the borrower to be held to perform his or her contractual repayment obligations.

187.    The Department has recognized that principle in defining a "[b]orrower defense to repayment" as an act or omission of a school relating to enrollment or borrowing "that caused the borrower detriment."  34 C.F.R. § 685.401(a).  Furthermore, because the Department has resolved that any borrower defense entitles the borrower to a total discharge of the loan, the detriment must "warrant[] relief" of total forgiveness of outstanding borrower debt and reimbursement of amounts previously paid on the loan.  *Id.*

188.    That injury requirement is the crux of any Section 455(h) defense, particularly given that the Secretary has defined acts or omissions broadly and categorically to cover any act or omission that might conceivably negatively affect a given borrower.  For example, actionable misrepresentations include erroneous statements about "*any . . . fact* related to the degree, diploma, certificate of completion, or any similar document that the student is to be, or is, awarded upon completion of the course of study" or "the existence of contracts with specific externship sites." 34 C.F.R. § 668.72(k), (p) (emphasis added).  It would be absurd to award a borrower full discharge of loans and reimbursement of all past loan repayments if the act in question did not cause the borrower detriment warranting such relief.  Nonetheless, the Department does not require proof of detriment warranting relief in two common circumstances in which borrower defenses will be adjudicated: group claims and closed-school claims.

189.    For any group claim "for which the Department official determines that there may be a borrower defense under § 685.401(b), there is a rebuttable presumption that the act or omission giving rise to the borrower defense affected each member of the group in deciding to attend, or continue attending, the institution, and that such reliance was reasonable."  34 C.F.R. § 685.406(b)(2).

190.    And "for borrowers who attended a closed school shown to have committed actionable acts or omissions that caused the borrower detriment, there will be a rebuttable presumption that the detriment suffered warrants relief under this section."    34 C.F.R. § 685.401(e).

191.    The Department has no statutory authority to create such presumptions.    The Department's limited rulemaking authority under Section 455(h) extends only to specifying institutional acts or omissions that can serve as borrower defenses to loan repayment, not defining rules as to how defenses may be proven.

192.    Furthermore, even if such authority exists, it is arbitrary and capricious for an agency to create rebuttable presumptions where there is no rational nexus between proven and presumed facts (*i.e.*, where proof of one fact does not render so probable the existence of a second fact that it is unnecessary to prove it).  *See, e.g.*, *Chem. Mfrs. Ass'n v. Dep't of Transp.*, 105 F.3d 702, 703–05 (D.C. Cir. 1997).

193.    Proof of an act or omission does not logically mean that any borrower was detrimentally affected by it, much less that all borrowers were.  *See Career Colleges*, 98 F.4th at 250.  Indeed, the inquiry into whether any borrower was detrimentally affected by an act or omission is "highly fact-specific."  *Id.*  Nor is it logical to infer, upon proof of any detriment, that the detriment warranted total forgiveness of debt and reimbursement of past payments.

194.    Furthermore, it is arbitrary and capricious, and contrary to due process, for the application of a certain procedure to affect substantial rights.  The fact that a particular borrower's claim is adjudicated in a group rather than an individual proceeding should not affect the outcome or reduce the proof required.

195.    It is also arbitrary and capricious to apply a special presumption when the borrower attended a school that is now closed (which can happen for innumerable reasons).  The mere fact

that a school has closed provides no logical basis to presume that a given student suffered detriment warranting full forgiveness of the loan and reimbursement of past loan repayments.  Whether the borrower suffers detriment, and whether that detriment warrants full relief, is information in possession of the borrower and should be proven; there is no need or justification for a presumption simply because the school has closed.

196.    The very notion of a borrower "defense" implies that the borrower should bear the burden of proof, but by creating a presumption, the Department has effectively removed any requirement of proof of the full defense.

197.    Although the presumption is nominally rebuttable, the Department's processes provide no opportunity for rebuttal.  The borrower-defense phase of the adjudication does not permit the institution to discover facts from the borrower and present them to the adjudicator.  *See Career Colleges*, 98 F.4th at 250.  Plus, the Department is not adversarial to the borrower, and nothing in the 2022 Rule calls for the Department to discover or investigate evidence relevant to rebutting the presumption.

198.    The recoupment phase affords schools no mechanisms for obtaining the evidence necessary to rebut the presumption, either.  The 2022 Rule does not permit a school in a recoupment proceeding to take discovery, at trial or otherwise, even though the borrower ostensibly possesses evidence regarding the causation and extent of injury.

199.    Accordingly, while the presumptions are rebuttable in name, they are not rebuttable in practice; far from *bona fide* evidentiary presumptions, they are instead simply indirect means of maximizing loan forgiveness for borrowers.

### 10. The Elimination of a Limitations Period Is Unlawful, Arbitrary and Capricious, and Violative of Due Process

200.    The Department compounded its unlawful conversion of borrower defenses into affirmative claims by providing that no BDR claim shall be subject to a limitations period.  87 Fed. Reg. at 65,935.  Thus, into perpetuity, a borrower is free to bring a claim dating back to 1994, the date of the first BDR rule.

201.    Limitations periods "are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared."  *Order of R.R. Telegraphers v. Ry. Express Agency*, 321 U.S. 342, 348–49 (1944).  The types of claims that comprise the 2022 Rule's causes of action—*e.g.*, claims sounding in fraud, tort, and contract—are routinely subject to statutes of limitations in other contexts, as they should be here.  But the 2022 Rule allowing any borrower with an active loan dating from 1994 onward to file a BDR claim—including for amounts paid years before—violates that well-established principle.  It is thus arbitrary, capricious, and fundamentally unfair, in violation of due process.

202.    The Department has no authority to determine whether limitations periods should apply to borrower-defense claims; Section 455(h) authorizes only that the Department may specify institutional acts or omissions that give rise to a BDR.

203.    Eliminating a limitations period is incompatible with the Department's BDR claim adjudication process and likely would render the process unworkable.  The Department states elsewhere that its framework "will ensure institutions have ample opportunity to respond" and "to present their evidence and arguments before an independent hearing official in an administrative proceeding."  87 Fed. Reg. at 65,912.  Yet the Department fails to acknowledge that schools, faced with responding to cases that may be decades old, will be substantially hampered in their ability

to proffer evidence and present a defense.  The lack of a limitations period will prevent schools from participating in the BDR response process and contributing to the "complete record" the Department purportedly desires, 87 Fed. Reg. at 41,901, as documentary and testimonial evidence frequently will be unavailable.  Where evidence is unavailable due to the passage of time, it may be impossible for schools to disprove borrower claims that they were misled, that a school breached an education contract, or that a school engaged in "aggressive recruitment," along with other theories included in the Department's expansive rule.

204.    The elimination of a limitations period also is inconsistent with the Department's rationale for affirming a three-year record-retention requirement.  In discussing schools' record-retention obligations, and whether the three-year period is compatible with the 2022 Rule's lack of a limitations period, the Department surmised that the financial-aid records that must be retained under the 2022 Rule are "unlikely . . . [to] be the most relevant records in question to adjudicate the BD claim."  87 Fed. Reg. at 65,941.  Rather, according to the Department, more relevant evidence would be "related to recruitment and admission practices, advertising campaigns, brochures, and handbooks."  *Id.*  But while observing that schools subject to BDR claims "have kept poor records," 87 Fed. Reg. at 65,935, the Department provides no explanation as to why it is reasonable to expect that those same schools would have maintained those manuals or brochures indefinitely (particularly when the records were not within the scope of Title IV records retention requirements), or why it is reasonable to expect them to do so in the future.

205.    Further, despite the Department's speculation that "the financial aid records of individual borrowers" are unlikely to be germane to defending a BDR claim, 87 Fed. Reg. at 41,902, schools facing the possibility of BDR claims well into the future will confront two problematic options: (a) retaining such records long-term out of an abundance of caution in the

event that they are relevant to a BDR defense, or (b) disposing of such records as a matter of the Department's student privacy and data security best practices.

206.    The Department excuses its open-ended claim adjudication process by asserting that "the passage of time would also affect the evidence that could be available in favor of the claim." 87 Fed. Reg. at 65,935.  But the Department does not consider how the passage of time would burden schools more than borrowers.  For example, the borrower need not retain documents or records because, as the Department contemplated elsewhere, claims tend to center on the borrower's "story"—which may not depend on documents or records at all.  87 Fed. Reg. at 41,890.  Additionally, the fact that the borrower has the burden to show evidence that meets the borrower-defense standard, 87 Fed. Reg. at 65,935, is not persuasive in light of the other inequitable provisions and presumptions adopted by the 2022 Rule.  And, in any event, the existence of a standard for approving claims does not distinguish this claims process from any other; there is no reason that borrowers should have an indefinite timeline to bring a claim.

207.    The Department attempted to mitigate the harm arising from lifting the limitations period for BDR claims altogether by noting that the six-year limitations period for recoupment proceedings "would protect institutions" on the backend from not being able to defend themselves in BDR proceedings. 87 Fed. Reg. at 41,902.  Contrary to the Department's assumption, however, the six-year limitations period on recoupment does not "provide[] adequate protection for institutions." 87 Fed. Reg. at 41,913; *see* 87 Fed. Reg. at 65,935.  The six-year limitations period is undermined by numerous exceptions and tolling provisions, and even where it might eventually prevent recoupment, it does nothing to mitigate the reputational harms to an institution that is forced to participate in the initial liability phase of the adjudication process without necessary evidence.  Those costs will increase sharply when claims are adjudicated *en masse* through the

group process.  Further, taxpayers will bear the massive burden of funding BDR claims that have

no hope of recoupment because they fall outside the limitations period.

208.    Next, the Department reasons that the schools' concerns about record retention are

overblown because the Department's notification to schools of the claims against them through

the institutional response process will be "sufficient notice to retain pertinent records."  87 Fed.

Reg. at 41,902.  That ignores the likelihood that schools will already have lost or retired records

for stale allegations well before a claim is filed and the Department provides notice.

209.    Finally, the Department reasons that "operational challenges of administering a

limitations period," particularly in the context of allowing group claims, counsel in favor of

dispensing with a statute of limitations entirely.  87 Fed. Reg. at 65,935.  That concern, however,

is not supported by experience.  Indeed, class-action claims (a form of group claim) are routinely

subject to statutes of limitations in other contexts.  *See, e.g.*, *Lewis v. Becerra*, No. 18-cv-2929,

2022 WL 1262122, at *8, *12 (D.D.C. Apr. 28, 2022) (concluding that "the number of putative

class members in this case should be reduced to account for those individuals who . . . did not file

their claims within the applicable statute of limitations window").  There is nothing unique about

BDR group-claim adjudication that would make a limitations period particularly unworkable.

210.    The Department worries about "a situation in which a borrower is still obligated to

repay a loan . . . solely because the individual did not fill out an application in time."  87 Fed. Reg.

at 65,935.  That a limitations period may interfere with the Department's policy goals, which could

be said of any limitations period, is not a basis to ignore this fundamental procedural protection.

**E.    The Group Process Regulation Violates the Statute and the Due Process
        Rights of Schools and Is Arbitrary and Capricious**

211.    The 2022 Rule resurrects and then expands the flawed group adjudication process

from the 2016 regulations.  *See* 34 C.F.R. § 685.402; 87 Fed. Reg. at 65,936–65,939.  That

component of the 2022 Rule exceeds the Department's statutory authority, violates the due process rights of schools, and is arbitrary and capricious in violation of the APA.

212.    The group process provisions conflict with the HEA.  Not only does the Department lack any adjudicatory authority, but *a fortiori* Congress did not grant the Department the authority to promulgate or administer group or class-action procedures.  *See West Virginia*, 597 U.S. at 723 ("Agencies have only those powers given to them by Congress").

213.    Quite the contrary, Congress authorized the Department merely to specify which "acts or omissions" "a borrower may assert as a defense."  20 U.S.C. § 1087e(h).

214.    Nothing on the face of the statute authorizes the Department to consider borrower-defense claims on a group basis.  Indeed, the same statute defines a "borrower" as "an *individual* who is a new borrower on the date such individual applies for a loan under this part."  20 U.S.C. § 1087e(f)(5) (emphasis added).

215.    Moreover, courts must presume that "Congress intends to make major policy decisions itself, not leave those decisions to agencies."  *West Virginia*, 597 U.S. at 723 (citation omitted).  Resolving claims through group or class-action procedures is a significant policy decision in multiple ways.  First, as the Department recognized in the course of rescinding group procedures in the 2019 regulations, "a group discharge process could place an extraordinary burden on both the Department and the taxpayer."  83 Fed. Reg. 37,242, 37,244 (July 31, 2018).  Second, the Department itself admits that the group procedure will disproportionately burden the public fisc, acknowledging that most of the cost of the new regulations will arise from the granting of group claims.  *See* 87 Fed. Reg. at 65,994–65,996.  Congress cannot be presumed to delegate by silence such a major decision to the Department.

216.    Even if the Department had the statutory authority to establish a process for group adjudications, the 2022 Rule's procedure to adjudicate group claims is inconsistent with Section 455(h) because it provides no mechanism for determining whether and to what extent an individual borrower was injured for purposes of the amount of discharge.

217.    The group process regulation is also arbitrary and capricious.  As an initial matter, there is no reasoned basis for a group process.  There is no evidence that a group or class-action procedure "will ensure a more efficient process."  87 Fed. Reg. at 65,993.  Rather, if a common issue is resolved after full and fair litigation in an individual proceeding, re-litigation of that issue could be precluded in subsequent proceedings against the school through ordinary principles of collateral estoppel, thereby minimizing litigation costs.

218.    The Department has implied that it would grant a higher rate of borrower-defense claims through a group process.  *See* 87 Fed. Reg. at 66,010–66,012.  That is not an appropriate rationale for adopting a group procedure: procedural changes are not supposed to alter substantive outcomes.  *See, e.g.*, 28 U.S.C. § 2072(b) (federal Rules Enabling Act providing that procedural rules, including class-action rules, "shall not abridge, enlarge or modify any substantive right").  That divergence in predicted approval rate also indicates that the adoption of the group procedure is in fact an alteration of the substantive standard for the approval of a borrower-defense claim.  Indeed, the presumption of reliance is in fact different for group claims, as discussed above.

219.    The group process also guarantees that if a group claim is not resolved within one year, "the loans, or portion of the loans in the case of a Direct Consolidation Loan, will not be enforceable by the Department against the borrower."  34 C.F.R. § 685.406(g)(5).  Thus, the Department will discharge student loan debt even without any proof of a borrower defense to repayment, in direct contravention of Section 455(h).

220.    The 2022 Rule also fails to specify adequate criteria for when a group process is appropriate.    The 2022 Rule permits the Department to institute a group process "[u]pon consideration of factors including, but not limited to, the existence of common facts and claims by borrowers, the likelihood of actionable acts or omissions that were pervasive or widely disseminated, and the promotion of compliance by an institution or other title IV, HEA program participant."    34 C.F.R. § 685.402(a).    Typically, a group procedure is justified only where common issues predominate and the procedure provides a fair and efficient means of resolving common issues while respecting matters that require individualized proof.    In contrast, the Department's open-ended criteria are arbitrary and capricious.

221.    In addition, the 2022 Rule unlawfully ignores that numerous issues critical to a borrower-defense claim—including reliance, injury, and damages—involve individualized issues of proof.

222.    The 2022 Rule's group-process regulation accordingly is arbitrary and capricious and contravenes due process, which requires that a party be able to present a defense to allegations of wrongdoing.  *See Degen v. United States*, 517 U.S. 820, 828 (1996); *Hovey v. Elliott*, 167 U.S. 409, 433 (1897).  That includes presenting individualized evidence on matters of individualized proof.  *See, e.g.*, *W. Elec. Co. v. Stern*, 544 F.2d 1196, 1199 (3d Cir. 1976).

223.    The Department's own discussion of the timeline for adjudication of a group claim acknowledges that the group process is not designed to accommodate the analysis of individualized issues.    The 2022 NPRM proposed asymmetrical timelines in which group claims would be adjudicated in two years while individual claims were adjudicated in three.    The Department reasoned that "[i]ndividual claims would be subject to a longer adjudication timeframe because they may include case-specific research on the merits."  87 Fed. Reg. at 41,904.  Then, in the 2022

Rule, the Department actually "shorten[ed] the time to render a final decision on the group claim to 1 year." 87 Fed. Reg. at 65,938. The obvious implication is that the Department intends to rush through group adjudication to grant bulk loan forgiveness without conducting meaningful "research on the merits." The Department's own estimates—that only 12% of individual claims will be approved while 75% of group claims will be approved, 87 Fed. Reg. at 41,959 (Table 5)—corroborate these concerns.

224.    Indeed, on the issues of reliance and the fact and extent of injury, the 2022 Rule simply relieves the borrowers of any need to produce proof. Instead, it erects the "rebuttable presumption" that "the act or omission . . . affected each member of the group in deciding to attend, or continue attending, the institution, and that such reliance was reasonable." 34 C.F.R. § 685.406(b)(2). As noted above, there is no lawful basis for that presumption, and there is no mechanism by which the presumption can be rebutted in a proceeding.

225.    The Department's slanted and results-driven proceedings cannot satisfy due process. *See Eldridge*, 424 U.S. 319. Because borrower-defense liabilities are potentially massive, the private interests at stake are substantial. The risk of error in determining borrower defenses is high, and the value of standard safeguards—such as reserving matters of individualized proof for individualized proceedings—is substantial. Any additional administrative cost to the Government is more than justified by the avoidance of waste of substantial government funds from granting unjustified loan discharges.

226.    The Department states that an institution would "have a separate opportunity to respond to a claim during any recoupment proceeding," but the procedures the Department adopts for recoupment do not provide an effective opportunity to contest reliance, effect on borrowers, or amount of discharge. 87 Fed. Reg. at 41,901. Schools are injured by any mistakes in the group-

claim process because they bear the burden in the recoupment proceeding of proving that the initial borrower-defense determination was wrong, *see* 34 C.F.R. § 668.125(e), but have no meaningful ability to defend against the discharges decided in the group process.

227.    The Department also jettisons any of the protections common to class-action procedures, such as those embodied in Rule 23 of the Federal Rules of Civil Procedure.  While "Rule 23 protects the integrity of civil class actions for money damages by requiring, at a minimum, that the class representative's claim is 'typical' of that of the class and that common questions of law and fact 'predominate' in the case," the group claim process in the 2022 Rule contains no such requirements and "thus lacks due process protections available under the class action process." *Career Colleges*, 98 F.4th at 250.  The Department's group process impermissibly fails to limit class-like procedures to common issues and ensure separate determination of matters that require individualized proof.

228.    In addition to ignoring aspects of a borrower-defense claim adjudication that requires individualized proof, the group-process regulation also arbitrarily restricts the opportunity for institutions whose rights would be affected to object to group formation.  Under the 2022 Rule, schools can object to the group process only where a third party proposed a group process. 34 C.F.R. § 685.402(c)(4).  In cases where the Secretary *sua sponte* forms a group, institutions are completely denied the opportunity to be heard at the equivalent of the class-certification stage.

### F.    The Department's Approach to Discharge Amounts Violates the Statute and Is Arbitrary and Capricious.

229.    Nothing in Section 455(h) grants the Department the power to prescribe rules for assessing discharge amounts.  Nevertheless, to the extent the Department is deemed to have both broad rulemaking authority over discharge amounts *and* adjudicatory authority over borrower defenses, the Department must make individualized determinations of the amount of discharge

based on the harm or injury to the borrower caused by the conduct that prompted the loan obligation. *See* 20 U.S.C. § 1087e(h). The 2022 Rule does not satisfy that statutory requirement.

230.    The clear text of the statute indicates that the amount of the discharge must be based on the harm or injury to the individual borrower. A "defense to repayment" is predicated on a circumstance that excuses the repayment of a loan because of an antecedent "act or omission" of the institution that gives rise to the defense. In other words, a borrower has a "defense to repayment" when the borrower cannot equitably be held responsible for repayment of all or part of the loan obligation. *See, e.g., Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002) (equitable restitution generally involves money or property "identified as belonging in good conscience to the plaintiff" that "could clearly be traced to particular funds or property" in the defendant's possession). That, of course, depends on the borrower's actual, individualized harm or injury, that is, a determination that the borrower, as result of the institution's act or omission, would not have incurred the loan, suffered harm from attending the institution or enrolling in a particular program, or did not receive the value of the promised education that the loan funded. By disconnecting the amount of discharge from the amount of harm or injury, however, the 2022 Rule transforms the HEA into a massive windfall for borrowers.

231.    The Department's determination that the only permissible remedy is full rescission of all loan obligations and full restitution of past repayments is also arbitrary and capricious. Contrary to Section 455(h)'s causation requirement, the Department's discharge rule is untethered to the borrower's actual loss. Under the Department's approach, if a borrower defense is found, the Department will discharge "*all* amounts owed to the Secretary on a Direct Loan" and reimburse "*all* payments previously made to the Secretary on the Direct Loan." 87 Fed. Reg. at 66,068 (emphases added). As a result, the Department can completely discharge a borrower's loan

obligations even if the borrower incurred the debt before the actionable act or omission occurred. If, for example, a misrepresentation concerning the provision of educational services to a student occurs in her senior year, the 2022 Rule discharges that student's entire four-year debt obligations, even though the student incurred three years of debt before the unlawful act. Thus, the 2022 Rule eliminates any intelligible principle for determining the amount of discharge.

232.    The Department failed to provide reasoned explanation for why the amount of discharge could never depend on the loss suffered by the borrower (*e.g.*, a loss determined by the comparison between the value of the education received and the loan obligation), as the agency had previously required. *See, e.g.*, 81 Fed. Reg. at 75,974–75,975 (emphasizing in connection with 2016 Rule that the amount of relief turns on the "value of the education" that the borrower received notwithstanding a school's misconduct); 84 Fed. Reg. at 49,834 (similar in connection with 2019 Rule).

233.    With little explanation, the 2022 Rule deviated from the Department's long-held position that the amount of discharge should be tied to educational value. The Department arbitrarily presumed a full, automatic discharge was appropriate absent rebuttal and removed the requirement that the borrower must prove individualized harm, notwithstanding the Department's recognition in the 2022 NPRM "that there may be circumstances in which the financial harm experienced by a borrower is less than the amount of a full loan discharge." 87 Fed. Reg. at 41,908–41,909.

234.    The Department's proffered reasons do not justify its change in position. First, the Department stated in its 2022 NPRM that the individualized-harm requirement "could have the unintended consequence of providing lesser amounts of relief for a borrower who succeeded despite their program." 87 Fed. Reg. at 41,908. But that argument rests on the mistaken and

unsupported premise that the Department could not assess harm to an individual borrower.  While the Department expressed concerns that assessing harm is a "subjective" or difficult enterprise, 87 Fed. Reg. at 41,909; *see* 87 Fed. Reg. at 65,946, tribunals across the country routinely assess individualized harm in tort cases, and the Department identified no sound basis for determining that such determinations are not feasible in the borrower-defense context as well.  On the contrary, the Department has historically required such showings of individualized harm.

235.    Second, in adopting the 2022 Rule, the Department stated that an individualized-harm requirement is "an inappropriate barrier to relief for the borrower" because it "require[s] the borrower to have knowledge about regional and national employment opportunities."  87 Fed. Reg. at 65,910.  The Department states that it "believe[s] that a borrower is unlikely to know how to locate regional or national unemployment rates and connect those data to their own experience." *Id.*  But analysis of unemployment rates is only one way that a borrower could establish harm; the Department never explains why borrowers would be unable to establish individualized harm in other ways.  Nor does the Department explain why its concern that harm is difficult to prove would justify simply presuming the existence of harm.

236.    Because, according to the Department, how much to award a borrower meriting only partial discharge would be "difficult to reliably estimate," 87 Fed. Reg. at 65,946, the 2022 Rule is tantamount to an improper presumption of full discharge.  The proof of a borrower-defense claim on the merits, on whatever basis, does not render a full discharge so probable that individual fact-finding can be bypassed.  *Chem. Mfrs. Ass'n*, 105 F.3d at 705.  That renders the Department's 2022 Rule unlawful.

### G. The Extension of BDR Regulations to FFEL and Perkins Loans Violates the Statute.

237.     Section 455(h) authorizes borrower defenses to repayment only to a loan "made under this part," *i.e.*, Part D (the William D. Ford Federal Direct Loan Program).  20 U.S.C. § 1087e(h).  The Department acknowledges this limitation but applies the 2022 Rule to both FFEL and Perkins loans that have been *or could be* consolidated with Direct Loans.  Indeed, the Department states that the BDR application will itself serve as the application for consolidation, and that consolidation can occur *after* a borrower defense is granted.  87 Fed. Reg. at 65,915–65,916.  That approach cannot be squared with Section 455(h).

238.     Congress chose to authorize a BDR only for Direct Loans because the government is the lender, and thus, the Department could specify appropriate BDR to the government's own lending contracts.  FFEL and Perkins loans—which have not been issued since 2010 and 2017, respectively, 87 Fed. Reg. at 65,905 n.3—stand on different footing.  FFEL loans are agreements that the borrower executes with *private lenders*, for which the United States guaranteed repayment. Federal Student Aid, Department of Education, *Federal Family Education Loan (FFEL) Program*, https://studentaid.gov/help-center/answers/article/ffel-program.  Perkins loans involve a lending contract with the school, which the United States subsidizes.  Financial Aid Programs, https://www.benefits.gov/benefit/418;  Federal  Student  Aid,  Department  of  Education, *Participating  in  the  Perkins  Loan  Program*,  https://fsapartners.ed.gov/knowledge-center/fsa-handbook/2021-2022/vol6/ch3-participating-perkins-loan-program.     Congress  granted  the Department no authority to specify BDR of loans to private or institutional lenders under the FFEL or Perkins programs.

239.     A Federal Direct Consolidation Loan ("FDCL") is a loan under Part D (the William D. Ford Federal Direct Loan Program), and thus the Department may specify as borrower defenses

to repayment under Section 455(h) acts or omissions taken against a borrower who at the time of those acts or omissions holds or is applying for a FDCL. *See* 20 U.S.C. § 1087e(a)(2)(C). The Department holds no statutory authority, however, to recognize a borrower defense based on acts or omissions against a student who at the time funded her education with FFEL or Perkins loans, not Direct Loans.

240.    The Department's position with respect to FDCLs leads to unfair and arbitrary treatment of similarly situated individuals. Under the Department's position, students who took out FFEL loans at the same time and were subject to the same acts or omissions can obtain relief so long as they take the step of consolidating their FFEL loans after the 2022 Rule's effective date, but will receive no relief if they do not. There is no rationale for treating similarly situated borrowers so radically differently. That arbitrariness would have been minimized had the Department properly interpreted Section 455(h) to apply the defense only to borrowers who funded their education with Direct Loans.

241.    The Department justifies its consolidation rule because Congress has provided that Direct Loans should be made under the same "terms, conditions, and benefits" as FFEL Program loans. 87 Fed. Reg. at 65,916 & n.47 (citing 20 U.S.C. §§ 1087a(b)(2), 1087e(a)(1)). But BDR is not a term, condition, or benefit of an FFEL Program loan; it is a statutory provision specific to Direct Loans, and it cannot be extended to FFEL and Perkins loans through consolidation.

242.    Furthermore, the statute contemplates only "a defense to *repayment* of a loan *made* under this part." 20 U.S.C. § 1087e(h) (emphases added). One cannot assert a defense unless the Direct Loan has already been "made"; further, there is no such thing as "repayment" of a Direct Loan that has not yet been made. But under the 2022 Rule, the Department first adjudicates a borrower defense even when no Direct Loan has been made, and then consolidates other loans into

a Direct Loan "only . . . if the claim is approved," "streamlin[ing] the claims process."  87 Fed. Reg. at 65,916.  That exceeds any authority granted in Section 455(h) of the HEA, which does not permit the granting of borrower defenses to putative "repayment" of future Direct Loans that have not yet been "made."

243.    Finally, the 2022 Rule's consolidation rule is at odds with its own regulatory definition of a "borrower defense."  The definition provides that "[b]*orrower defense to repayment* means an act or omission of the school attended by the student that relates to *the making of a Direct Loan* for enrollment at the school or the provision of educational services for which *the loan* [*i.e.*, the Direct Loan] was provided."  34 C.F.R. § 685.401(a) (emphases added).  That would exclude acts or omissions that relate to the making of FFEL or Perkins loans, which are not Direct Loans.

244.    The Department attempts to elide this issue by declaring that BDR includes "repayment of all amounts owed to the Secretary on a Direct Loan including a Direct Consolidation Loan that was used to repay" FFEL and Direct Loans.  *Id.*  But that interpretation runs contrary to the plain text of the statute, which requires a borrower defense to relate directly to the making of a Direct Loan.

## H.    The Department's Establishment of a Reconsideration Process for Borrowers But Not For Schools Is Arbitrary and Capricious and Violates the Constitution.

245.    The 2022 Rule enshrines a one-sided process by which only borrowers and state requestors may seek reconsideration of a BDR decision, even in situations in which state law matters may be adjudicated.  34 C.F.R. § 685.407.

246.    The one-sided nature of the Department's reconsideration regulation is discriminatory and arbitrary.  Administrative agencies "must accredit themselves by acting in accordance with the cherished judicial tradition embodying the basic concepts of fair play."

*Morgan v. United States*, 304 U.S. 1, 22 (1938). Accordingly, due process instructs administrative agencies to provide both sides of a dispute with an opportunity to be heard.

247.    Here, only one side of a dispute—the borrower or the state requestor—has the opportunity to be heard by requesting reconsideration. The Department asserts that borrowers or state requestors may want to seek reconsideration due to administrative or technical errors and new evidence. But the Department provides no basis to conclude that schools will not want to seek reconsideration on the same grounds. And the Department provides no reason to distinguish between schools and borrowers or state requestors in this regard, nor does it explain why duplicating judicial review for borrowers but not institutions is appropriate. Drawing such a distinction without a rationale is discriminatory, and thus arbitrary. It also is particularly harmful because schools are provided limited procedural rights in both discharge and recoupment proceedings.

I.    **The Department's Prohibition on Pre-Dispute Arbitration Agreements and Class Action Waivers Contravenes the Federal Arbitration Act, the Spending Clause, the Due Process Clause, and the APA.**

248.    Relying solely on HEA § 454's vague authorization to condition funding on "such other provisions as the Secretary determines are necessary," 20 U.S.C. § 1087d(a)(7), the 2022 Rule imposes a wholesale ban on advance agreements between schools and students to arbitrate, 34 C.F.R. § 685.300(e).

249.    By forbidding reliance on arbitration agreements, the 2022 Rule renders them invalid and unenforceable in clear contravention of the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*.

250.    The Department insists that its arbitration ban will neither "displace or diminish the effect of the FAA" nor "invalidate any arbitration agreement," 87 Fed. Reg. at 65,956, but instead "simply condition the institution's future participation in the Direct Loan Program on the

institution not enforcing of certain [arbitration or class-action] provisions in those contracts going forward," 87 Fed. Reg. at 41,917.  In the Department's view, the 2022 Rule does not render any arbitration agreement unenforceable, but rather prohibits institutions from enforcing arbitration agreements at pain of losing funding that is critical to their continued existence.

251.    Even accepting the Department's framing—that the 2022 Rule is a "simple condition" and not a ban—the FAA preempts *any* discrimination against arbitration not authorized by Congress.  *See Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 581 U.S. 246, 251 (2017).  Under prevailing Supreme Court precedent, there is no difference between an outright prohibition on arbitrating a certain type of claim and a "rule that covertly accomplishes the same objective."  *Id.*  However described, the 2022 Rule is unlawful because it "fail[ed] to put arbitration agreements on an equal plane with other contracts."  *Id.* at 252.

252.    In addition, the Department's reliance on its vague power to place conditions on federal funding as authority for that regulation violates the Spending Clause.  In the absence of unambiguous congressional intent, the Department may not coerce schools to agree to a condition unrelated to the purpose of federal funding.  *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581–82 (2012).  The Department never addressed that constitutional issue in its 2022 Rule.

253.    The Department asserts that the prohibition on arbitration agreements serves the purposes of the Direct Loan Program because arbitration agreements "discourage borrowers from pursuing complaints," prevent borrowers from "hav[ing] their day in court," and "insulate[] institutions from the potential financial risk of their wrongdoing."  87 Fed. Reg. at 65,980.  But those vague and generic arguments reflect just "the kind of 'hostility to arbitration' that led Congress to enact the FAA" in the first place.  *Kindred Nursing Ctrs*, 581 U.S. at 254 (citation

omitted).  They provide no specific, non-arbitrary rationale for banning arbitration of disputes related to the provision of education services in the particular context here.

254.    The 2022 Rule is also arbitrary and capricious in that it fails to weigh the benefits of arbitration in any meaningful way.  In 2019, the Department's "extensive review" suggested that arbitration of BDR-related claims made sense for borrowers in light of "the burdens attending litigation."  84 Fed. Reg. at 49,843.  In comparison to the courts, the Department said, "arbitration adjudicates claims relatively quickly, cheaply, and, concurrently, gives the 'customers' what they want."  *Id.*  More specifically, the Department observed that arbitration is "more accessible to borrowers since it does not require legal counsel and can be carried out more quickly than a legal process that may drag on for years."  83 Fed. Reg. at 37,265.  And the Department recognized that quicker adjudication of borrower-defense claims would benefit not only individual claimants but also future students, because it: (a) would enable "an institution to more quickly identify and stop bad practices to ensure that other students are not harmed"; and (b) "may reduce the expense of litigation that a university would otherwise pass on to students in the form of higher tuition and fees."  *Id.*

255.    The 2022 Rule fails to consider these benefits, which are directly relevant to the Department's stated concern that arbitration agreements "undermin[e] borrowers' rights to avail themselves of certain loan discharges, depriving borrowers of the protections in the HEA."  87 Fed. Reg. at 65,980.

256.    The Department never engages in a real comparison between arbitration and litigation on these points, acknowledging in passing that "arbitration lowers the costs" but ignoring the myriad other benefits.  *Id.*  That "fail[ure] to consider an important aspect of the problem" before it is arbitrary and capricious.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*

*Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955, 962 (D.C. Cir. 2003).

257.    The most concrete evidence marshaled against arbitration agreements was the 2022 NPRM's citation to "the Department's experience with Corinthian Colleges." 87 Fed. Reg. at 41,915. Even if this sort of tunnel vision were a permissible mode of agency decisionmaking, the agency's reasoning ultimately relied on a counterfactual—*not its experience*—that Corinthian would have possibly faced "significant deterrent threat" if not for its arbitration provisions. *Id.* The agency cannot (of course) prove its counterfactual history, which also glosses over a host of reasons for the failure of Corinthian Colleges that had nothing to do with pre-dispute arbitration clauses.

**J.      The 2022 Rule's Closed School Discharge Provisions Violate the HEA and Due Process.**

258.    Like the BDR provisions of the 2022 Rule, the closed-school discharge ("CSD") provisions of the 2022 Rule also exceed the Department's regulatory authority and violate constitutional requirements of due process.

**1.      The Department's Definition of "Closed" Contravenes the HEA.**

259.    The Department's expansion of the definition of a "closed school" is contrary to the statute. In the preamble, the Department refers to closed-school discharge as something borrowers are "legally entitled [to in] the HEA," 87 Fed. Reg. at 65,906, and declares that the changes in the 2022 Rule "streamline and strengthen the closed school discharge process" for students whose schools closed while the students were attending or shortly after the students left, 87 Fed. Reg. at 65,969. But the 2022 Rule goes well beyond the HEA, particularly in its unjustified definition of what constitutes a "closed school."

260.    The 2022 Rule affords the Secretary discretion to determine that a school's closure date was the earlier of the date that the school ceased to provide instruction in "programs in which most students at the school were enrolled" or "a date chosen by the Secretary that reflects when the school had ceased to provide educational instruction for most of its students."  87 Fed. Reg. at 65,966.[2]

261.    The HEA, however, does not suggest that a school closure is—or should be—defined as a scenario where "most" programs have ceased or "most" students have ceased to receive educational instruction.  Rather, the HEA describes the discharge as applying where:

> [A] borrower who received, on or after January 1, 1986, a loan made, insured, or guaranteed under this part and the student borrower, or the student on whose behalf a parent borrowed, is unable to complete the program in which such student is enrolled *due to the closure of the institution.*

20 U.S.C. § 1087(c)(1) (emphasis added).

262.    "Closed" is an unambiguous term that means "not open."  *See, e.g.*, *Closed*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/closed (last visited Jan. 29, 2026); *Closed*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/closed (last visited Jan. 29, 2026).  The Department's attempt to rewrite the term "closed," and to give the Secretary additional discretion to interpret the Department's rewritten definition, contradicts the U.S. Supreme Court's instruction that "[a]n agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms."  *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 325 (2014).

---

[2] The Department has stated that it would provide additional guidance as to what constitutes a closed school in Volume 2 of the Federal Student Aid Handbook, *see* 87 Fed. Reg. at 41,923–41,924.  To the extent forthcoming guidance includes triggering events that are inconsistent with the statute, that guidance would be objectionable and unlawful.

263.    The Department's definition also affects the practical operation of schools in an ever-changing economic environment.  Institutions evaluate the labor market and make decisions to add or discontinue program offerings or school facilities in response to market demand and student needs.  The Department's vague definition of what constitutes a "closure" risks penalizing schools that adjust their programming to reflect market shifts, and could be particularly damaging to small institutions that wish to make changes to their portfolio of programs.[3]  Instead of starting new programs and discontinuing old programs, some colleges may keep old programs afloat simply to avoid school loan liability.

264.    Similarly, it is common for institutions to cease certain operations at some facilities while continuing to operate at others in order to meet program demands as they ebb and flow.  But while responsible resource-allocation decisions of that sort are important to the health of institutions and enable them to better serve their students and faculty, the 2022 Rule treats them no differently than an institution that ends all operations.  Indeed, working in tandem with the Department's highly discretionary and arbitrary process for determining when a school has "closed," the definition threatens to impose extreme costs—which may pose an existential threat to an institution—for responsible operational decisions that best serve a school's current and future students.  The Department arbitrarily failed to consider these effects of its definition of "closed" on the students of institutions that remain "open" under any ordinary understanding of that term.

---

[3] Although the Department contended in the 2022 NPRM that "[t]his provision would not automatically apply if, for example, a small institution remains open but ends a program or two but would capture a circumstance where an institution continues only one small program while otherwise ceasing all other enrollment," 87 Fed. Reg. at 41,923, given the Secretary's discretion to interpret what constitutes the termination of "most" programming, the risk to small institutions remains substantial.

### 2.    The Department's Elimination of a Causality Requirement Contravenes the Statute.

265.    The Department has also unlawfully expanded the categories of borrowers who may be entitled to closed-school discharge and relieved many borrowers of the requirement to apply for relief.  The 2022 Rule allows borrowers who withdrew from the school not more than 180 days before closure to receive a full discharge.  That contravenes the HEA, which states that closed-school discharges are available only to those students who are "*unable* to complete the program in which such student is enrolled."  20 U.S.C. § 1087(c)(1) (emphasis added).

266.    Further, the 2022 Rule makes no provision for borrowers who may have left their schools due to circumstances unrelated to educational programming, such as illness, locational preference, change in family situation, or job change.  Thus, the 2022 Rule arbitrarily requires "no proof" that the closure "actually caused the students not to complete the program" and allows discharges even where there is no causal connection between a student's decision to withdraw from school and a school's closure.  *Career Colleges*, 98 F.4th at 254.

### 3.    The Department Exceeds Its Authority in Seeking to Recover Funds from Closed Schools and Their Affiliates or Principals.

267.    The Department stated in its 2022 NPRM that it would seek to recover funds "especially" for "closed school discharges."  87 Fed. Reg. at 41,881.  Yet the 2022 Rule fails to provide procedural protections for institutions (or their affiliates or principals) that would allow them to present evidence to defend against an application or recoupment.  That omission is unfair and violates the due-process rights of institutions treated as "closed" by the 2022 Rule, as well as their affiliates and principals.

268.    The Department also lacks statutory authority to impose closed-school borrower-defense liability against affiliated persons.  The 2022 Rule, "in the case of a closed school," allows the Department to pursue BDR recovery from "a person affiliated with the school."  34 C.F.R.

§ 685.409(a). But while Congress has authorized recourse against principals and affiliates of closed schools in certain limited circumstances described elsewhere in the HEA, nothing in the statute authorizes the Department to pursue such recourse on borrower-defense grounds in connection with loans issued under Part D, the William D. Ford Federal Direct Loan Program.

269.    Under Section 437 of Part B, governing *FFEL* loans, if a borrower's loan is discharged, the borrower "shall be deemed to have assigned to the United States the right to a loan refund up to the amount discharged against the institution and its affiliates and principals." 20 U.S.C. § 1087(c)(2).

270.    No comparable authority exists under Part D, the William D. Ford Federal Direct Loan Program. Nonetheless, the Department claims the authority to recover approved BDR discharges from, "in the case of a closed school, a person affiliated with the school as described in § 668.174(b) of this chapter." 34 C.F.R. § 685.409(a)(1). Moreover, Section 668.174(b) then expands the definition of affiliated persons beyond the definitions provided in the HEA, *see* 20 U.S.C. §§ 1087(c)(1), 1099c(c), (e), to include those who individually or with family members exercise substantial control or ownership of the institution, or have liability for violation of a Title IV, HEA requirement, including directors, executive officers, and general partners, 34 C.F.R. § 668.174(b).

271.    The Department cannot create BDR liability for controlling or affiliated persons without statutory authority—and it cannot derive such authority, directly or indirectly, from Section 437 of Part B. That provision is limited by its terms and does not permit attribution of BDR liability for Direct Loans to controlling persons. It applies only to FFEL loans made under Part B, not Direct Loans under Part D, and authorizes discharges (and recovery against an institution and its affiliates and principals) only in one of three circumstances: (1) inability to

complete the program; (2) false certification by the eligible institution; or (3) false certification because of identity theft.  20 U.S.C. § 1087(c)(1).

272.    Moreover, Section 437 of Part B allows the Secretary to recover discharge amounts only through one of two mechanisms, neither of which would apply in the context of BDR liability related to Direct Loans as established under the 2022 Rule.

273.    First, the Secretary may "pursue any claim available to such borrower against the institution and its affiliates and principals," which means that the *borrower* must have a claim of legal liability that can be asserted against those persons.  *Id.*  A borrower, however, cannot bring a BDR claim directly against an institution or its affiliates and principals—the BDR mechanisms only allow a borrower to raise a BDR claim with the Department.  20 U.S.C. § 1087(c)(2).

274.    Second, the Secretary may "settle the loan obligation pursuant to the financial responsibility authority under subpart 3 of part H."  20 U.S.C. § 1087(c)(1).  Under subpart 3, the Secretary may require specific institutions to have sufficient cash reserves, have third-party guarantees, have financial guarantees from controlling persons, or to direct their controlling persons to assume personal liability.  *See* 20 U.S.C. § 1099c(c), (e).  But the 2022 Rule's framework for allowing the Department to recoup funds from affiliates and controlling persons does not contain any such financial guarantees.

275.    The Department rationalizes its expansion of liability to individuals on the ground that it will "protect taxpayers as much as possible," 87 Fed. Reg. at 65,948, but that does not provide a statutory basis.  Moreover, to the extent the Department's reading of the statute imputes the acts or liabilities of certain individuals to the institutions, or vice versa, those matters should be covered by traditional principles of agency and derivative liability.

276.     The Department's only discussion of its extension of closed-school discharge provisions to Direct Loans is the summary statement in its 2022 NPRM that "[t]he closed school discharge provisions also apply to Direct Loans, under the parallel terms, conditions, and benefits provision in Section 455(a) of the HEA."  87 Fed. Reg. at 41,920; *see* 20 U.S.C. § 1087e(a)(1) ("Unless otherwise specified in this part, loans made to borrowers under this part shall have the same terms, conditions, and benefits, and be available in the same amounts, as loans made to borrowers, and first disbursed on June 30, 2010, under Sections 1078, 1078–2, 1078–3, and 1078–8 of this title.").  But the Secretary's rights to recover BDR losses against institutions and affiliated persons are not the "terms, conditions, and benefits" of FFEL "loans made to borrowers."  *Id.*

## II.     The 2019 Rule Likewise Exceeds the Department's Statutory Authority and Violates the Constitution.

277.     On July 4, 2025, President Trump signed the OBBBA into law.  The OBBBA postpones the effective date of the 2022 Rule until July 1, 2035, and, in the meantime, "restore[s] and revive[s]" the 2019 Rule "as [it was] in effect" before the 2022 Rule came into effect.  Pub. L. No. 119-21.  The OBBBA made no substantive changes to either Rule.

278.     As a result, as of July 4, 2025, borrowers, schools, and other regulated entities must comply with the BDR and CSD provisions of the 2019 Rule.  At the same time, schools must actively prepare to implement the BDR and CSD provisions of the 2022 Rule when it becomes effective in 2035.

279.     Three provisions of the 2019 Rule are contrary to the HEA and violate the Constitution.

280.     First, the 2019 Rule unlawfully seized authority Congress never granted to the Department.  As in the 2022 Rule, the Department claims in the 2019 Rule "broad statutory authority" to "identify borrower causes of action that may be recognized as defenses to repayment"

that could be raised "in any action" involving Direct Loans. 84 Fed. Reg. at 49,796, 49,791; 34 C.F.R. 685.206(e) (2020). But, as the Fifth Circuit observed in connection with the 2022 Rule, Section 455(h) of the HEA only enables the Secretary to specify acts or omissions a borrower may assert "as a defense to repayment of a loan." *Career Colleges*, 98 F.4th at 241; 20 U.S.C. § 1087e(h). Just as the Department's authorization of affirmative claims in the 2022 Rule exceeds the authority granted to it by the HEA, so too does the Department's authorization of affirmative borrower-defense claims in the 2019 Rule.

281.    The 2019 Rule also allows borrowers to raise these new affirmative claims within the context of administrative proceedings before the Department, again exceeding the Department's statutory authority under the HEA. *See* 84 Fed. Reg. at 49,788. The HEA requires that borrower defenses be raised "in any action arising from or relating to a loan made under this part." 20 U.S.C. § 1087e(h). In this context, an "action" is a formal judicial proceeding, not an administrative adjudication. *See supra* Section I.A. Thus, the HEA only authorizes the Department to establish defenses to be raised in the context of formal judicial proceedings, not new causes of action to be raised before administrative bodies.

282.    Second, like the 2022 Rule, the 2019 Rule's definition of "defenses" also fails to define the term with sufficient particularity. For example, the 2019 Rule defines what constitutes an actionable misrepresentation differently depending on whether it is addressed in the context of a borrower's BDR claim or a recoupment proceeding against a school. *Compare* 34 C.F.R. § 685.206(e) (misrepresentation in BDR proceeding), *with* 34 C.F.R. § 668.71(c) (misrepresentation in recoupment proceeding). Specifically, the Department explicitly applies a broader standard for misrepresentation in recoupment proceedings than in BDR proceedings. 84 Fed. Reg. at 49,825. That divergence could lead to the absurd result that the same act or

omission that makes an institution liable to the Department in a recoupment proceeding does not meet the threshold for a borrower to prevail on her BDR claim—a circumstance that is not contemplated by the HEA's grant of authority to the Department to define "defense" with particularity.

283.    The Department justifies its decision to treat the same act as a misrepresentation in one part of the adjudication and not in another part of the same set of proceedings by asserting that the "different definitions of misrepresentation allow the Department to act in a financially responsible manner to protect taxpayers." 84 Fed. Reg. at 49,825. By using different standards, the Department puts a thumb on the scales during the recoupment process such that if a borrower prevails on her BDR claim, it is virtually certain that the Department will be able to recoup the value of that loan from the institution. *Id.* But simply wanting to ensure collections from schools for conduct that may be found not to satisfy the definition of "misrepresentation" used in BDR proceedings does not provide a reasonable basis for applying a different definition in recoupment proceedings. Moreover, the Department's justification highlights the due-process violations that occur when the adjudicator has a stake in the outcome of the adjudication (as discussed below).

284.    Third, just as it did in the 2022 Rule, the Department in the 2019 Rule improperly asserts the power to create "a process for adjudicating" BDR claims as separate affirmative claims. 84 Fed. Reg. at 49,788; 34 C.F.R. 685.206(e) (2020). That assertion of power finds no support in the HEA and in any event runs afoul of the Constitution.

285.    The 2019 Rule claims "broad statutory authority" to "establish the procedures for receipt and adjudication of borrower claims—including the type of proceeding through which the Department may consider such a claim." 84 Fed. Reg. at 49,796. The 2019 Rule further allows the Department to "weigh information and evidence from all sides" for itself and not through a

judicial or quasi-judicial process, even when it is adjudicating an action against a school that will determine whether the Department is awarded recoupment.  84 Fed. Reg. at 49,795, 49,830–49,831; *see* 34 C.F.R. § 685.206(e)(10) (2020).

286.    The Fifth Circuit's determination that the 2022 Rule's adjudicatory process lacks "any statutory basis" applies with equal force here.  *Career Colleges*, 98 F.4th at 248.

287.    Just as in the promulgation of the 2022 Rule, the Department here also wrongly assumes adjudicatory and loss-recovery authority based solely on a limited rulemaking grant to define defenses.  *Id.* at 247.  But the HEA does not grant the Department authority to adjudicate borrower-defense claims, and absent explicit congressional conferral of such authority, the Department cannot assume that its grant to make rules also gives it the power to adjudicate a violation of those rules.  *RLC Indus. Co.*, 58 F.3d at 418.

288.    Nor is there other contextual evidence to suggest that Congress intended to authorize the Department to create adjudicatory and recoupment procedures, both of which involve major questions.  *West Virginia*, 597 U.S. at 732.

289.    Separately, the 2019 Rule's adjudicatory and loss-recovery provisions also violate due process.  Like the recoupment procedures at issue in the 2022 Rule, the procedures in the 2019 Rule also do not ensure adjudication by a neutral decisionmaker.  Rather, the Department has designated itself the decider in proceedings against institutions to determine whether the Department should recoup the amount of the discharged loan.  Absent clear congressional authorization, the Department cannot be a neutral arbiter in proceedings which, all told, could allow it to recoup billions of dollars.

290.    As with similar provisions in the 2022 Rule, the 2019 Rule's claim of broad authority to establish the adjudication procedures for BDR claims and recoupment proceedings,

including authority to determine what kinds of proceedings would be made available to regulated entities, also violates procedural guarantees under Article III and the Seventh Amendment. Like the 2022 Rule, the 2019 Rule sets up a bifurcated path of adjudication of a BDR claim between the borrower and the Department and recoupment proceedings between the school and the Department. 84 Fed. Reg. at 49,788. And like the 2022 Rule, that bifurcated process transforms the borrower-relief process into an adjudication of private rights between the borrower and the school, not an adjudication of public rights between the Department and the regulated entity— thereby violating the principle that an agency may not adjudicate private rights. *See Jarkesy*, 603 U.S. at 134. That violation is particularly obvious because the 2019 Rule's recoupment procedure, like the 2022 Rule's recoupment procedure, disposes of claims of fraud and misrepresentation that closely parallel traditional common-law claims of the sort that can only be resolved in a judicial forum, not before an agency. *Id.* at 134–35.

## COUNT ONE
### (2022 BDR Regulations: No Statutory Authority)

291.    Plaintiffs repeat and incorporate the preceding paragraphs as though fully set forth herein.

292.    The 2022 Rule's provisions regarding borrower defenses to repayment are not authorized under the HEA, 20 U.S.C. § 1001 *et seq.*

293.    Those provisions exceed the Department's statutory jurisdiction and authority and do not comport with the terms of the HEA, the General Education Provisions Act, the Department of Education Organization Act, or any other identifiable statutory source of authority Congress has conferred upon the Department. The regulations impermissibly turn a statutory defense into a novel cause of action, fail to define defenses with requisite specificity, and provide a novel adjudicatory process in contravention of the plain meaning of the HEA.

294.    Specific BDR regulations set forth in the 2022 Rule—34 C.F.R. §§ 668.75, 668.125, 668.500–.501, 685.300(13), and 685.401–.409—violate or are unauthorized by statute.

295.    Consequently, the 2022 Rule's provisions concerning borrower defenses to repayment are in excess of statutory authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

### COUNT TWO
### (2022 BDR Regulations: Arbitrary & Capricious)

296.    Plaintiffs repeat and incorporate the preceding paragraphs as though fully set forth herein.

297.    The Department failed to consider the thousands of public comments submitted in response to the July NPRM prior to hastily promulgating the 2022 Rule.

298.    The 2022 Rule's provisions regarding borrower defenses to repayment, and specific regulations therein—34 C.F.R. §§ 668.71–.75, 668.125, 668.500–.501, 685.300(13), and 685.401–.409—lack sufficient reasonable basis, reasoned explanation, and consideration of appropriate factors, and do not serve the purposes of the Act.

299.    Consequently, the 2022 Rule's provisions concerning borrower defenses to repayment are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

### COUNT THREE
### (2022 BDR Regulations: Constitutional Violations)

300.    Plaintiffs repeat and incorporate the preceding paragraphs as though fully set forth herein.

301.    The 2022 Rule's provisions regarding borrower defenses to repayment, and specifically the regulations described in 34 C.F.R. §§ 668.125, 668.300(13), and 685.401–.409, violate the Due Process Clause of the U.S. Constitution.

302.    By providing for administrative adjudication of private rights, or of public rights without congressional authorization, the 2022 Rule and its component regulations violate Article III of the U.S. Constitution and constitutional principles of the separation of powers.

303.    By providing for administrative adjudication of federal and state rights to which a right of jury trial exists, including misrepresentation, contract, and recoupment claims, the 2022 Rule and its component regulations violate the Seventh Amendment to the U.S. Constitution.

304.    By providing for administrative adjudication of any state law claim, and abrogating requirements or limitations under state law, the 2022 Rule and its component regulations violate the Tenth Amendment and constitutional principles of federalism.

305.    Consequently, the 2022 Rule is contrary to constitutional right, power, privilege, or immunity, in violation of 5 U.S.C. § 706(2)(B), and is not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT FOUR
### (2022 Arbitration and Class Action Provisions: No Statutory Authority)

306.    Plaintiffs repeat and incorporate the preceding paragraphs as though fully set forth herein.

307.    The 2022 Rule's provisions concerning arbitration and class-action contracts between schools and students are not authorized under the HEA, 20 U.S.C. § 1001 *et seq*.

308.    These provisions exceed the Department's statutory jurisdiction and authority and do not comport with the terms of the HEA.  Among other things, the regulations are not tied to any specific grant of authority conferred by the HEA, conflict with the Federal Arbitration Act, and were not otherwise authorized by Congress.

309.     Consequently, the 2022 Rule's provisions concerning arbitration and class-action agreements are in excess of statutory authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT FIVE
### (2022 Arbitration and Class Action Provisions: Arbitrary & Capricious)

310.     Plaintiffs repeat and incorporate the preceding paragraphs as though fully set forth herein.

311.     The 2022 Rule's provisions concerning arbitration and class-action contracts between schools and students are arbitrary and capricious.  Among other things, the regulations fail to confront or acknowledge the benefits of individual arbitration to schools and students and fail to consider industry reliance on the terms of private contracts.

312.      Consequently, the 2022 Rule's provisions concerning arbitration and class-action agreements are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT SIX
### (2022 Arbitration and Class Action Provisions: Constitutional Violation)

313.     Plaintiffs repeat and incorporate the preceding paragraphs as though fully set forth herein.

314.     The 2022 Rule's provisions concerning arbitration and class-action contracts between schools and students violate the Spending Clause of the U.S. Constitution.  Among other things, the regulations wrongly coerce recipients of Title IV funding to agree to a condition not related to the purpose of such funding and not intended by Congress.  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581–82 (2012).

315.    The 2022 Rule's provisions concerning arbitration and class-action contracts between schools and students violate the Due Process Clause of the U.S. Constitution by retroactively voiding private contracts.

316.    Consequently, the 2022 Rule is contrary to constitutional right, power, privilege, or immunity, in violation of 5 U.S.C. § 706(2)(B), and is not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT SEVEN
### (2022 CSD Provisions: No Statutory Authority)

317.    Plaintiffs repeat and incorporate the preceding paragraphs as though fully set forth herein.

318.    The 2022 Rule's provisions concerning closed-school loan discharges are not authorized under the HEA, 20 U.S.C. § 1001 *et seq*.

319.    Those provisions exceed the Department's statutory jurisdiction and authority and do not comport with the terms of the HEA, which do not grant the Secretary discretion to determine when a school has closed or to impose liability upon affiliated persons.  The regulations are not tied to any specific grant of authority conferred by the HEA and were not otherwise authorized by Congress.

320.    Consequently, the 2022 Rule's provisions concerning closed-school loan discharges are in excess of statutory authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT EIGHT
### (2022 CSD Provisions: Arbitrary & Capricious)

321.    Plaintiffs repeat and incorporate the preceding paragraphs as though fully set forth herein.

322.    The 2022 Rule's provisions concerning closed-school loan discharges are arbitrary and capricious because, among other reasons, there is no necessary causal connection between a school's closure and harm to an individual borrower.

323.    Consequently, the 2022 Rule's provisions concerning closed-school loan discharges are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT NINE
### (2022 CSD Provisions: Constitutional Violation)

324.    Plaintiffs repeat and incorporate the preceding paragraphs as though fully set forth herein.

325.    The 2022 Rule's provisions concerning closed-school loan discharges violate the Due Process Clause of the U.S. Constitution because they grant schools inadequate procedural protections for defending against application or recoupment actions, particularly where the Secretary decides what constitutes a school closure.

326.    Consequently, the 2022 Rule is contrary to constitutional right, power, privilege, or immunity, in violation of 5 U.S.C. § 706(2)(B), and is not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT TEN
### (2019 BDR Regulations: No Statutory Authority)

327.    Plaintiffs repeat and incorporate the preceding paragraphs as though fully set forth herein.

328.    The 2019 Rule's provisions regarding borrower defenses to repayment—34 C.F.R. §§ 685.206(e), 685.308(a)(3), and 685.300(b) (2020)—are not authorized under the HEA, 20 U.S.C. § 1001 *et seq.*

329.    Those provisions exceed the Department's statutory jurisdiction and authority and do not comport with the terms of the HEA, the General Education Provisions Act, the Department of Education Organization Act, or any other identifiable statutory source of authority Congress has conferred upon the Department.  The regulations impermissibly turn a statutory defense into a novel cause of action, fail to define defenses with requisite specificity, and provide a novel adjudicatory process in contravention of the plain meaning of the HEA.

330.    Consequently, the 2019 Rule's provisions concerning borrower defenses to repayment—34 C.F.R.  §§ 685.206(e),  685.308(a)(3),  685.300(b)  (2020)—are  in  excess  of statutory authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

### COUNT ELEVEN
### (2019 BDR Regulations: Constitutional Violations)

331.    Plaintiffs repeat and incorporate the preceding paragraphs as though fully set forth herein.

332.    The 2019 Rule's provisions regarding borrower defenses to repayment—34 C.F.R. §§ 685.206(e), 685.308(a)(3), and 685.300(b) (2020)—violate the Due Process Clause of the U.S. Constitution.

333.    By providing for administrative adjudication of private rights, or of public rights without congressional authorization, those provisions of the 2019 Rule and their components violate Article III of the U.S. Constitution and constitutional principles of the separation of powers.

334.    By providing for administrative adjudication of federal rights to which a right of jury trial exists, certain portions of the 2019 Rule and its component regulations violate the Seventh Amendment to the U.S. Constitution.

335.    Consequently, 34 C.F.R. §§ 685.206(e), 685.308(a)(3), and 685.300(b) (2020) are contrary to constitutional right, power, privilege, or immunity, in violation of 5 U.S.C. § 706(2)(B), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

1.    Declare the 2022 Rule unlawful.

2.    Vacate and set aside the 2022 Rule.

3.    Declare that any action taken by Defendants pursuant to the 2022 Rule is null and void.

4.    Enjoin Defendants and their officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the 2022 Rule.

5.    Exercise equitable discretion to declare provisions of the 2022 Rule inseverable in whole or in part to prevent unfair or prejudicial administration of its provisions.

6.    Declare that the 2019 Rule is unlawful to the extent that it grants the Department the authority to define causes of action, the authority to establish an adjudicatory procedure, or the authority to define applicable defenses without specificity.

7.    Enjoin Defendants and their officers, employees, and agents from implementing or applying any provisions, or taking any action whatsoever that would allow the Department to assume the authority to define causes of action, establish an adjudicatory procedure, or define applicable defenses without specificity.

8.    Award Plaintiffs their costs and reasonable attorneys' fees as appropriate.

9.    Grant such further and other relief as this Court deems just and proper.

Dated: February 20, 2022                Respectfully submitted,

                                        */s/ Allyson B. Baker*
                                        Allyson B. Baker (*pro hac vice*)
                                        Meredith Leigh Boylan (*pro hac vice*)
                                        Michael Murray (*pro hac vice*)
                                        Benjamin W. Snyder (*pro hac vice*)
                                        Sameer P. Sheikh (*pro hac vice*)
                                        Paul Hastings LLP
                                        2050 M Street NW
                                        Washington, DC 20037
                                        allysonbaker@paulhastings.com
                                        (202) 551-1830

                                        Philip Vickers
                                         Texas Bar No. 24051699
                                        Katherine Hancock
                                         Texas Bar No. 24106048
                                        Cantey Hanger LLP
                                        600 West 6th Street, Suite 300
                                        Fort Worth, TX 76102
                                        pvickers@canteyhanger.com
                                        (817) 877-2800

                                        *Counsel for Plaintiffs*